## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| S&P GLOBAL INC. and STANDARD & POOR'S FINANCIAL SERVICES LLC, | ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 20-701-RGA |
| v. | ) ) | |
| S&P DATA LLC, S&P DATA OHIO LLC, S&P DATA MICHIGAN LLC and S&P DATA NEW MEXICO LLC, | ) ) ) ) | |
| Defendants. | ) ) | |

## [PROPOSED] PRETRIAL ORDER

Neal C. Belgam (No. 2721)
Jason Z. Miller (No. 6310)
SMITH, KATZENSTEIN & JENKINS LLP
1000 West Street, Suite 1501
Wilmington, DE  19801
(302) 652-8400
*nbelgam@skjlaw.com*
*jmiller@skjlaw.com*

*Attorneys for Plaintiffs*

*Of Counsel:*
Richard S. Mandel (Pro Hac Vice)
Joelle A. Milov (Pro Hac Vice)
COWAN, LIEBOWITZ & LATMAN, P.C.
114 West 47th Street
New York, NY 10036
*rsm@cll.com*
*jam@cll.com*

Frederick L. Cottrell (No. 2555)
Jason J. Rawnsley (No. 5379)
Valerie A. Caras (No. 6608)
RICHARDS, LAYTON & FINGER, P.A.
920 North King Street
Wilmington, DE  19801
(302) 651-7700
*cottrell@rlf.com*
*rawnsley@rlf.com*
*caras@rlf.com*

*Attorneys for Defendants*

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION, PLEADINGS AND
        COUNTERCLAIMS ................................................................................1

II.     BASIS FOR FEDERAL JURISDICTION ...............................................3

III.    STATEMENT OF FACTS THAT ARE ADMITTED AND
        REQUIRE NO PROOF .........................................................................3

IV.     STATEMENT OF ISSUES OF FACT THAT REMAIN TO BE
        LITIGATED .........................................................................................22

        A.  S&P'S STATEMENT OF ISSUES OF FACT THAT REMAIN
            TO BE LITIGATED ......................................................................22

        B.  S&P DATA'S STATEMENT OF ISSUES OF FACT THAT
            REMAIN TO BE LITIGATED. ......................................................26

V.      STATEMENT OF ISSUES OF LAW THAT REMAIN TO BE
        LITIGATED .........................................................................................30

        A.   S&P'S STATEMENT OF ISSUES OF LAW THAT REMAIN
            TO BE LITIGATED. .....................................................................30

        B.  S&P DATA'S STATEMENT OF ISSUES OF LAW THAT
            REMAIN TO BE LITIGATED. ......................................................50

VI.     EXHIBIT LISTS ...................................................................................59

VII.    WITNESSES AND DEPOSITION DESIGNATIONS .........................62

VIII.   PLAINTIFFS' INTENDED PROOF OF AFFIRMATIVE CLAIMS
        AND RELIEF SOUGHT .......................................................................66

IX.     DEFENDANTS' INTENDED PROOF OF DEFENSES .......................67

X.      AMENDMENTS ...................................................................................68

XI.     SETTLEMENT CERTIFICATION .......................................................68

XII.    ADDITIONAL MATTERS -- CONFIDENTIALITY AT TRIAL ...........68

XIII.   ANY OTHER MATTERS WHICH THE PARTIES DEEM
        APPROPRIATE ...................................................................................69

        A.   Motions *In Limine* ....................................................................69

        B.   Type of Trial ............................................................................69

        C.   Order of Proof ...........................................................................69

XIV.    ORDER TO CONTROL COURSE OF ACTION ...................................70

## PROPOSED PRETRIAL ORDER

Plaintiffs S&P Global Inc. and Standard & Poor's Financial Services LLC ("S&P" or

"Plaintiffs") and Defendants S&P Data LLC, S&P Data Ohio LLC, S&P Data Michigan LLC,

and S&P Data New Mexico, d/b/a S&P Data Digital (collectively, "S&P Data," or "Defendants")

jointly submit this Proposed Pretrial Order Pursuant to Local Rule 16.3.  The pretrial conference

is scheduled for February 18, 2022.  A three-day bench trial is scheduled to begin on March 14,

2022.

The parties' respective portions of this Pretrial Order are based upon the current status of

the case.  The parties reserve the right to modify, supplement, or change this statement in light of

further rulings by the Court or as otherwise appropriate.

The following matters as to the conduct of the trial are hereby ordered by the Court.

## I.    NATURE OF THE ACTION, PLEADINGS AND COUNTERCLAIMS

1.    On May 26, 2020, S&P filed its Complaint (D.I. 1) alleging that S&P Data

infringed and diluted S&P's famous family of S&P Marks under federal and state law; and

violated the Delaware Deceptive Trade Practices Act and the common law of unfair competition

under Delaware law.

2.    On August 3, 2020, S&P Data filed its Answer, Defenses, and Counterclaim (D.I.

11), denying liability for Plaintiffs' claims and asserting affirmative defenses of failure to state a

claim upon which relief may be granted; no infringement; equitable defenses of laches, waiver,

and acquiescence; statute of limitations; prior rights; and no damages, and seeking a declaratory

judgment that S&P Data could not infringe U.S. Reg. No. 4380744, under Section 32(1) of the

Lanham Act, 15 U.S.C. § 1114(1), because the Trademark Office cancelled that registration.

3.      On August 11, 2020, S&P filed its First Amended Complaint (D.I. 14), removing all allegations as to the S&P INDICES mark, U.S. Reg. No. 4380744, but otherwise asserting the same causes of action.  The First Amended Complaint is the operative complaint in this action.

4.      On August 25, 2020, S&P Data filed its Answer and Defenses (D.I. 19) to the First Amended Complaint, denying liability for Plaintiffs' claims and asserting affirmative defenses of failure to state a claim upon which relief may be granted; no infringement; equitable defenses of laches, waiver, and acquiescence; statute of limitations; prior rights; and no damages.

5.      On October 19, 2021, the parties filed the following motions:

A.      S&P's motion to exclude portions of the expert report and testimony of Dr. Larry Chiagouris, S&P Data's rebuttal witness to S&P's expert, Hal Poret (D.I. 89).

B.      S&P Data's motion for partial summary judgment on the basis that (1) S&P's claims for common law unfair competition and violations of Delaware's Deceptive Trade Practice Act and Trademark Dilution and Injury to Business Reputation statute were barred by the statute of limitations; and (2) the cancellation of S&P's S&P INDICES mark (U.S. Reg. No. 3889706) entitled S&P Data to a declaration of non-infringement of that mark (D.I. 94).

6.      On February 3, 2022, by Oral Order, the Court denied S&P's motion to exclude portions of the expert report and testimony of Dr. Larry Chiagouris, (D.I. 89) without prejudice to S&P raising specific objections to the report and testimony at or before trial.

7.      On February 3, 2022, by Oral Order, the Court denied S&P Data's motion for partial summary judgment seeking dismissal of S&P's state-law claims as barred by the statute of limitations.  The Court indicated that it did not need to rule on S&P Data's motion for partial summary judgment concerning non-infringement of S&P's S&P INDICES mark (U.S. Reg. No.

3889706) given the parties' agreement that relief was no longer being sought based on such mark in view of its cancellation.

## II.   BASIS FOR FEDERAL JURISDICTION

8.      S&P states that the Court has jurisdiction over its claims for violation of 15 U.S.C. §§ 1114(1), 1125(a), and 1125(c) under the Lanham Act, 15, U.S.C. §1051, et seq., pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338.  S&P further asserts that the Court has jurisdiction over the parties' state law claims pursuant to 28 U.S.C. §1367.

## III.   STATEMENT OF FACTS THAT ARE ADMITTED AND REQUIRE NO PROOF

### PARTIES

#### Plaintiffs

9.      Plaintiff S&P Global Inc. is a New York corporation with its principal place of business at 55 Water Street, New York, New York 10041.

10.     Plaintiff Standard & Poor's Financial Services LLC is a Delaware limited liability company with its principal place of business at 55 Water Street, New York, New York 10041, and is a wholly owned subsidiary of S&P Global Inc.

#### Defendants

11.     Defendant S&P Data LLC is a Delaware limited liability company with its principal place of business at 1500 West 3rd Street, Cleveland, Ohio 44113.

12.     Defendant S&P Data Ohio LLC is a Delaware limited liability company with its principal place of business at 1500 West 3rd Street, Cleveland, Ohio 44113, and is a wholly owned subsidiary of S&P Data LLC.

3

13.     Defendant S&P Data Michigan LLC is a Delaware limited liability company with its principal place of business at 1500 West 3rd Street, Cleveland, Ohio 44113, and is a wholly owned subsidiary of S&P Data LLC.

14.     Defendant S&P Data New Mexico LLC is a Delaware limited liability company with its principal place of business at 1500 West 3rd Street, Cleveland, Ohio 44113, and is a wholly owned subsidiary of S&P Data LLC.

**PLAINTIFFS' BUSINESS AND THE S&P MARKS**

15.     In 1957, S&P introduced the S&P 500 stock index, which comprises 500 large companies listed on stock exchanges in the United States.

16.     S&P owns the following U.S. federal registrations:

| **Mark** | **Reg. No.** | **Goods & Services** |
|---|---|---|
| S&P | 3569703 | Cl. 35 Providing financial indices in the nature of quantitative measurements to evaluate investments, market trends and financial instruments |
| S&P 100 | 1517924 | Cl. 36 Providing financial and investment services |
| S&P 1000 | 2746375 | Cl. 36 Providing financial and investment information services; namely, trading analysis and financial information based on a stock index |
| S&P 500 | 1521758 | Cl. 16 Newsletters on finance and investing<br><br>Cl. 36 Providing financial and investment services |
| S&P 500 CATHOLIC VALUES INDEX | 5064982 | Cl. 35 Providing financial indices based on selected groups of securities; providing and updating a financial index |

4

| Mark | Reg. No. | Goods & Services |
|---|---|---|
| S&P 500 DYNAMIC VEQTOR INDEX | 5173899 | Cl. 36 Providing financial indices based on selected groups of securities |
| S&P 500 LOW VOLATILITY INDEX | 4219317 | Cl. 36 Providing and updating a financial index |
| S&P 500 VEQTOR | 5125031 | Cl. 35 Providing and updating financial indices |
| S&P AGGREGATE | 4956810 | Cl. 35 Providing and updating a fixed income financial index |
| S&P CAPITAL IQ | 4667902 | Cl. 9 Computer software for accessing and manipulating data in a financial database, creating customized financial models, charts, analyses and reports based on a financial database; computer software that performs risk portfolio analytics; computer software that performs quantitative risk analysis<br><br>Cl. 35 Providing on-line retail store services featuring software applications in the field of financial-related data and company data over a global computer network; business consulting in the nature of providing merger and acquisition support services in the field of business; acquisition and merger consultation<br><br>Cl. 36 Financial services provided over a global computer network, namely, commercial and investment banking; private equity and venture capital funding; investment services, namely, financial investment and investment consultation in the fields of funds, mutual funds, real estate, commodity, capital, securities, bonds, annuities; financial consulting in the nature of providing merger and acquisition |

5

| **Mark** | **Reg. No.** | **Goods & Services** |
|---|---|---|
| | | support services in the field of finance; providing an on-line electronic database over a global network in the field of financial information; securities valuation services; providing real-time financial market data; commodities and data pricing<br><br>Cl. 41 Providing on-line publications in the nature of electronic books, magazines, and newsletters in the field of finance<br><br>Cl. 42 Providing temporary use of online non-downloadable software for providing access to streaming quotes, news, charts and market views for use by the financial industry |
| S&P CHINA 500 | 5358107 | Cl. 35 Providing a financial index based on selected groups of securities; providing and updating a financial index; providing a financial index consisting of stocks that reflect the performance of the market that the index measures |
| S&P COMPOSITE 1500 | 3334728 | Cl. 35 Providing a financial index consisting of stocks that reflect the performance of markets the index measures |
| S&P GIVI | 4203753 | Cl. 36 Financial and investment information services, namely, trading analysis and financial information |
| S&P GLOBAL | 5800653 | Cl 9: Downloadable computer software and mobile application software for accessing general news, business and financial information, financial indices, financial and credit ratings, market research, data analytics, stock prices, equity research, investment funds, risk |

6

| **Mark** | **Reg. No.** | **Goods & Services** |
| --- | --- | --- |
| | | solutions, investment data, and information concerning energy, commodities, metal pricing and metal market data, shipping, contracting, product and services ratings, and the financial, electronics, healthcare, homes, insurance, telecommunications, travel, and consumer products industries; Computer software for accessing and manipulating data in a financial database, and creating customized financial models, charts, analyses, and reports based on a financial database; Computer software that performs risk portfolio analytics and quantitative risk analyses;<br><br>Cl 16: Trade magazines, pamphlets, brochures, and newsletters concerning general news, business and financial information, financial indices, financial and credit ratings, market research, data analytics, stock prices, equity research, investment funds, risk solutions, investment data, and information concerning energy, commodities, metal pricing and metal market data, shipping, contracting, product and services ratings, and the financial, electronics, healthcare, homes, insurance, telecommunications, travel, and consumer products industries;<br><br>Cl 35: Business information, advisory, and consultation services; Arranging and conducting business conferences, workshops, and exhibitions concerning general news, business and financial information, financial indices, financial and credit ratings, market research, data analytics, stock prices, equity research, investment funds, risk solutions, investment data, and information concerning energy, commodities, |

7

| **Mark** | **Reg. No.** | **Goods & Services** |
|---|---|---|
| | | shipping, contracting, product and services ratings, and the financial, electronics, healthcare, homes, insurance, telecommunications, travel, and consumer products industries; Providing business information online concerning general news, business and financial information, financial indices, financial and credit ratings, market research, data analytics, stock prices, equity research, investment funds, risk solutions, and investment data, and information concerning energy, commodities, metal pricing and metal market data, shipping, contracting, product and services ratings, and the financial, electronics, healthcare, homes, insurance, telecommunications, travel, and consumer products industries; Market research relating to general news, business and financial information, financial indices, financial and credit ratings, data analytics, stock prices, equity research, investment funds, risk solutions, investment data, and information concerning energy, commodities, metal pricing and metal market data, shipping, contracting, and the financial, electronics, healthcare, homes, insurance, telecommunications, travel, and consumer products industries; Conducting business and market research surveys; Providing on-line retail store services featuring software applications in the field of financial-related data and company data over a global computer network; Providing information, news and commentary in the field of business on the subjects of commodities, energy, metals, and energy generation and production industries; Providing online information, |

8

| **Mark** | **Reg. No.** | **Goods & Services** |
|---|---|---|
|  |  | news and commentary in the field of business on the subjects of commodities, energy, metals, and energy generation and production industries; Providing information and news in the field of business, namely, providing real-time information concerning the financial markets, financial indices, and financial ratings; Price comparing services in the field of commodities; <br><br> Cl 36: Providing financial information, namely, information in the field of stock indices, securities indices, commodities indices, and other financial indices; Providing financial analyses and ratings of securities, investment funds, bonds, institutions, governments, and other financial instruments regarding performance, creditworthiness, risk assessments, and other characteristics; Providing information, studies, quality ratings, and opinions concerning investment funds; Providing information, studies, quality ratings, and opinions concerning the creditworthiness, performance, and other characteristics of debt instruments and commercial paper, namely, bonds, debentures, shares, warrants, options, investment certificates, and notes of corporations, governments, municipalities, public utilities, financial institutions, and other issuers; Providing financial and investment information via on-line computer databases; Financial and investment information services, research services, data and data analytic services, and financial analyses; Providing real-time information relating to the financial markets; Providing financial information, research, analytics, and analyses regarding |

| **Mark** | **Reg. No.** | **Goods & Services** |
|---|---|---|
| | | companies, industries, and countries; Providing financial information and data in support of merger and acquisition activities; Financial risk management services; Pricing of commodities, namely, commodity quotations; Securities valuation services; Financial and investment consultation and advisory services; Investment services, namely, investment consultation in the fields of funds, mutual funds, real estate, commodities, capital, securities, bonds, and annuities; Providing financial information, namely, news in the field of financial information on commodities, energy, metals, and energy generation and production industries; Providing online financial information, namely, news in the field of financial information on commodities, energy, metals, and energy generation and production industries; News reporting services in the field of financial news, namely, providing real-time information concerning the financial markets, financial indices, and financial ratings;<br><br>Cl 40: Providing information on the production of energy, the treatment of metals, and custom manufacturing of commodities;<br>Cl 41: Providing a website containing non-downloadable articles and reports concerning general news, business and financial information, financial indices, financial and credit ratings, market research, data analytics, stock prices, equity research, investment funds, risk solutions, investment data, and information concerning energy, commodities, metal pricing and metal market data, shipping, contracting, product and services |

| **Mark** | **Reg. No.** | **Goods & Services** |
|---|---|---|
| | | ratings, and the financial, electronics, healthcare, homes, insurance, telecommunications, travel, and consumer products industries; Providing on-line publications in the nature of electronic books, magazines, and newsletters concerning the financial markets, financial indices, and financial ratings<br><br>Cl 42: Providing online non-downloadable software in connection with ratings of securities, investment funds, bonds, institutions, governments, and other financial instruments; Providing online non-downloadable software for tracking the performance of stock indices, securities indices, commodities indices, other financial indices, financial investments, securities, companies, and institutions; Providing temporary use of online nondownloadable software for providing access to streaming quotes, news, charts, and market views for use by the financial industry; Providing online non-downloadable software to measure, monitor, and manage credit risk, processes, and infrastructure by providing centralized data management, spreading, forecasting, and risk rating assessments |
| S&P GLOBAL MARKET INTELLIGENCE | 5649623 | Cl 9: Downloadable computer software and mobile applications for accessing general news, business and financial information, financial indices, financial and credit ratings, interest rates, market research, demographic and unemployment data, data analytics, stock prices, capital structure, corporate structure, officer data and executive compensation, equity research, |

11

| **Mark** | **Reg. No.** | **Goods & Services** |
|---|---|---|
| | | investment funds, portfolio and risk solutions, country risk data, investment data, thrift data, mergers and acquisitions, and data, news, research, and analysis concerning energy, commodities, REITs, media, utilities, entertainment communications, and the banking and financial services, real estate, insurance, media and communications, metals and mining, and energy industries; Computer software and mobile application software for accessing and manipulating data in a financial database, and creating customized financial models, charts, analyses, and reports based on a financial database; Computer software that performs risk portfolio analytics and quantitative risk analyses; Downloadable computer software for use in the quantitative modeling of single stock and equity portfolios including historical back testing, excess returns forecasting, and portfolio simulation and optimization; Downloadable computer software for analyzing default, transition, ratings, and recovery data for professionals in the financial services industry in connection with risk management; Downloadable computer software for use in the fields of market data integration and management, proprietary workflow creation, proprietary statistical/computational algorithms, risk model development, forecast model development, strategy script development, optimization practices, and quantitative research and risk management solutions; Downloadable articles and reports concerning general news, business and financial information, financial indices, financial and credit ratings, interest rates, market |

12

| **Mark** | **Reg. No.** | **Goods & Services** |
|---|---|---|
| | | research, demographic and unemployment data, data analytics, stock prices, capital structure, corporate structure, officer data and executive compensation, equity research, investment funds, portfolio and risk solutions, country risk data, investment data, thrift data, mergers and acquisitions, and data, news, research, and analysis concerning energy, commodities, REITs, media, utilities, entertainment communications, and the banking and financial services, real estate, insurance, media and communications, metals and mining, and energy industries; Downloadable electronic publications in the nature of reports featuring credit adjusted financial statement data and commentaries<br><br>Cl. 16: Trade magazines, pamphlets, brochures, and newsletters concerning general news, business and financial information, financial indices, financial and credit ratings, interest rates, market research, demographic and unemployment data, data analytics, stock prices, capital structure, corporate structure, officer data and executive compensation, equity research, investment funds, portfolio and risk solutions, country risk data, investment data, thrift data, mergers and acquisitions, and data, news, research, and analysis concerning energy, commodities, REITs, media, utilities, entertainment communications, and the banking and financial services, real estate, insurance, media and communications, metals and mining, and energy industries; Newsletters covering ratings of debt securities |

| **Mark** | **Reg. No.** | **Goods & Services** |
|---|---|---|
| | | Cl 35: Business information, advisory, and consultation services; Arranging and conducting business conferences, workshops, and exhibitions concerning general news, business and financial information, financial indices, financial and credit ratings, market research, data analytics, stock prices, equity research, investment funds, risk solutions, investment data, and information concerning energy, commodities, shipping, contracting, product and services ratings, and the financial, automotive, boating, electronics, healthcare, homes, insurance, telecommunications, travel, and consumer products industries; Providing business information online concerning general news, business and financial information, financial indices, financial and credit ratings, market research, data analytics, stock prices, equity research, investment funds, risk solutions, and investment data, and information concerning energy, commodities, metal pricing and metal market data, shipping, contracting, product and services ratings, and the financial, automotive, boating, electronics, healthcare, homes, insurance, telecommunications, travel, and consumer products industries; Market research relating to general news, business and financial information, financial indices, financial and credit ratings, data analytics, stock prices, equity research, investment funds, risk solutions, investment data, and information concerning energy, commodities, metal pricing and metal market data, shipping, contracting, and the financial, automotive, boating, electronics, healthcare, homes, insurance, telecommunications, travel, |

14

| **Mark** | **Reg. No.** | **Goods & Services** |
|---|---|---|
| | | and consumer products industries; Conducting business and market research surveys; Providing on-line retail store services featuring software applications in the field of financial-related data and company data over a global computer network; Providing information, news and commentary in the field of business on the subjects of commodities, energy, metals, and energy generation and production industries; Providing online information, news and commentary in the field of business on the subjects of commodities, energy, metals, and energy generation and production industries; Providing information and news in the field of business, namely, providing real-time information concerning the financial markets, financial indices, and financial ratings<br><br>Cl 36: Providing financial information, namely, information in the field of stock indices, securities indices, commodities indices, and other financial indices; Providing financial analyses and ratings of securities, investment funds, bonds, institutions, governments, and other financial instruments regarding performance, creditworthiness, risk assessments, and other characteristics; Providing information, studies, quality ratings, and opinions concerning investment funds; Providing nformation, studies, quality ratings, and opinions concerning the creditworthiness, performance, and other characteristics of debt instruments and commercial paper, namely, bonds, debentures, shares, warrants, options, investment certificates, and notes of corporations, governments, municipalities, public utilities, financial institutions, and other |

15

| **Mark** | **Reg. No.** | **Goods & Services** |
|---|---|---|
| | | issuers; Providing financial and investment information via on-line computer databases; Financial and investment information services, research services, data and data analytic services, and financial analyses; Providing real-time information relating to the financial markets; Providing financial information, research, analytics, and analyses regarding companies, industries, and countries; Providing financial information and data in support of merger and acquisition activities; Financial risk management services; Financial and investment consultation and advisory services; Investment services, namely, investment consultation in the fields of funds, mutual funds, real estate, commodities, capital, securities, bonds, and annuities; Providing financial information regarding rating changes that affect financial portfolios via e-mail notification alerts; Providing credit ratings and financial news and information via an internet website; Financial services, namely, providing investment research and information online regarding equity capital markets, structured finance transactions, and collateralized debt transactions; Financial services, namely, providing financial analyses, financial analytics, recovery-trend platforms, financial industry data, financial ratings, debt analyses, performance analyses, risk assessment scenario and trend analyses, and information on credit and loan losses and loss-given default; Online financial data services, namely, providing comprehensive reference data matching services to market participants linking industry standard identifiers for domestic and global |

16

| **Mark** | **Reg. No.** | **Goods & Services** |
|---|---|---|
| | | securities, issuers, counter-party corporate hierarchies, business entities, and reference data sets; Financial services in the nature of assessing the risk profile of a specific security on a peer group comparison basis and providing qualitative research opinions that interpret the risk profile of a specific security on a peer group comparison basis; Providing financial information, namely, news in the field of financial information on commodities, energy, metals, and energy generation and production industries; Providing online financial information, namely, news in the field of financial information on commodities, energy, metals, and energy generation and production industries; News reporting services in the field of financial news, namely, providing real-time information concerning the financial markets, financial indices, and financial ratings<br><br>Cl 38: Communications via computer terminals or via fiber-optic networks; Providing user access to a global computer network; Providing telecommunications connections to a global computer network; Providing access to an online platform and database featuring management tools and solutions for investor relations, financial news, information, commentary, and analyses, including market data, investor activities and investment trends, news, quotes, global indices, alerts, broker research reports, independent research reports, analyst information, financial transaction reports, reports of corporate, state, and SEC filings, institutional holdings data, portfolio holdings data, corporate |

17

| **Mark** | **Reg. No.** | **Goods & Services** |
|---|---|---|
| | | ownership profiles, calendars of company corporate events, global financial market statistics and forecasts, corporate finance and capital markets activity, mergers and acquisitions, financial investment activities, and financial restructuring data; Telecommunication services, namely, providing e-mail notification alerts via the internet of rating changes that affect financial portfolios<br><br>Cl 40: Providing information on the production of energy, the treatment of metals, and custom manufacturing of commodities<br><br>Cl 41: Providing on-line publications in the nature of electronic books, magazines, and newsletters concerning the financial markets, financial indices, and financial ratings; Educational services, namely, providing training on quantitative research platforms; Providing an online electronic newsletter containing articles of importance concerning credit markets; Providing on-line publications in the nature of reports featuring credit adjusted financial statement data and commentaries; Arranging and conducting educational conferences and workshops relating to banking, insurance, real estate, energy, media, communications, metals, and mining; providing recognition and incentives by the way of awards to demonstrate excellence in the field of customer product satisfaction rankings<br><br>Cl 42: Providing online non-downloadable software in connection with ratings of securities, investment funds, bonds, institutions, governments, |

| __Mark__ | __Reg. No.__ | __Goods & Services__ |
|---|---|---|
| | | and other financial instruments; Providing online non-downloadable software for tracking the performance of stock indices, securities indices, commodities indices, other financial indices, financial investments, securities, companies, and institutions; Providing temporary use of online nondownloadable software for providing access to streaming quotes, news, charts, and market views for use by the financial industry, and structured-finance transaction data; Providing online non-downloadable software to measure, monitor, and manage credit risk, processes, and infrastructure by providing centralized data management, spreading, forecasting, and risk rating assessments; Design, development, installation, maintenance, updating, and rental of software; Providing on-line, non-downloadable software for searching a database of financial ratings and creating customized financial portfolios and reports; Computer services, namely, computer programming for others, software development and computer consulting services in the fields of market data integration and management, proprietary workflow creation, proprietary statistical/computational algorithms, risk model development, forecast model development, strategy script development, optimization practices and quantitative research and risk management solutions; Providing an on-line web-based application for analyzing default, transition, ratings, and recovery data for professionals in the financial services industry in connection with risk management; Design and development of computer hardware and software; Technical project studies, namely, |

19

| **Mark** | **Reg. No.** | **Goods & Services** |
|---|---|---|
| | | conducting feasibility studies and technical studies in the fields of software and computer hardware design and implementation; Providing non-downloadable computer software via a website that assesses the risk profile of a specific security on a peer group comparison basis; Providing a website featuring on-line non-downloadable software that enables users to access general news, business and financial information, financial indices, financial and credit ratings, interest rates, market research, demographic and unemployment data, data analytics, stock prices, capital structure, corporate structure, officer data and executive compensation, equity research, investment funds, portfolio and risk solutions, country risk data, investment data, thrift data, mergers and acquisitions, and data, news, research, and analysis concerning energy, commodities, REITs, media, utilities, entertainment communications, and the banking and financial services, real estate, insurance, media and communications, metals and mining, and energy industries |
| S&P HIGH YIELD DIVIDEND ARISTOCRATS | 3290686 | Cl. 35 Providing a financial index consisting of stocks that reflect the performance of markets the index measures |
| S&P LTVC GLOBAL INDEX | 5299430 | Cl. 35 Providing a financial index based on selected groups of securities; providing and updating a financial index; providing a financial index consisting of stocks that reflect the |

20

| **Mark** | **Reg. No.** | **Goods & Services** |
|---|---|---|
| | | performance of markets the index measures |
| S&P MIDCAP 400 | 3727781 | Cl. 36 Providing a financial index |
| S&P PRISM | 5711193 | Cl. 35 Providing and updating a financial index; providing and updating a multi-asset financial and commodities index |
| S&P SMALLCAP 600 | 3727779 | Cl. 36 Providing a financial index |
| S&P STRIDE | 5004731 | Cl. 36 Financial and investment information services, namely, trading analysis and financial information; financial analysis and research services; calculating and providing financial indices |
| S&P STRIDE TIPS-LOCKBOX | 5192112 | Cl. 36 Financial and investment information services, namely, trading analysis and financial information; financial analysis and research services; Cl. 35 Calculating and providing financial indices based on selected groups of securities |
| S&P U.S. RETIREE SPENDING INDEX | 5358311 | Cl. 35 Providing a financial index based on selected groups of securities; providing and updating a financial index; providing a financial index consisting of stocks and fixed-income investments that reflect the performance of the market that the index measures |
| S&P VEQTOR | 5125032 | Cl. 35 Providing and updating financial indices |
| S&P WCI | 3975798 | Cl. 35 Providing a commodities index based on a select group of commodity futures contracts |

21

**DEFENDANTS' BUSINESS AND THEIR ADOPTION OF THE S&P DATA MARK**

17.     S&P Data is engaged in the business of providing outsourced contact center services.  The contact centers S&P Data operates provide various services to clients, which have outsourced certain business functions to S&P Data.

18.     S&P Data, LLC is owned by three individuals: Dan Plashkes, David Borts and Ken Crema.

## IV.     STATEMENT OF ISSUES OF FACT THAT REMAIN TO BE LITIGATED

19.     The parties identify the following issues of fact that remain to be litigated.  If any issue identified in this statement of the issues of fact is more properly considered an issue of law, it should be so considered.  Likewise, should the Court determine that any issues identified in the parties' statement of the issues of law are more appropriately considered issues of fact, those issues are incorporated herein by reference.  By including an issue of fact herein, the parties do not assume the burden of proof or production with regard to that issue of fact.   The parties' identification of issues of fact that remain to be litigated is based on their understanding of the arguments, pleadings, and discovery in the action to date.  The parties reserve the right to revise this statement in light of the statements of fact or law that remain to be litigated or any revisions thereto.  The parties also reserve the right to address additional issues not set forth herein to the extent they are raised at trial.

### A.     S&P'S STATEMENT OF ISSUES OF FACT THAT REMAIN TO BE LITIGATED

20.     Whether Plaintiffs' use of the S&P Marks predates the adoption and use of Defendants' S&P DATA mark.

21.     Whether Defendants' use of S&P DATA is similar in terms of sight, sound, and meaning with Plaintiffs' use of the S&P Marks.

22

22.     Whether Plaintiffs' S&P Marks are inherently strong and have acquired distinctiveness.

23.     Whether Plaintiffs have made substantially exclusive use of the S&P Marks.

24.     Whether the S&P Marks are commercially strong, given Plaintiffs' substantially exclusive use in the relevant markets.

25.     Whether Plaintiffs have spent considerable sums of money in advertising and marketing the goods and services sold in connection with the S&P Marks.

26.     Whether the S&P Marks have for decades been routinely advertised and publicized in national advertising outlets throughout the United States.

27.     Whether Plaintiffs' sale of goods and services in connection with the S&P Marks has yielded significant revenues for Plaintiffs.

28.     Whether Plaintiffs' S&P Marks have extensive actual recognition among members of the general public in the United States.

29.     Whether Plaintiffs' S&P Marks are distinctive and famous and were so prior to the date Defendants adopted the S&P DATA mark.

30.     Whether both professionals and members of the general public are relevant consumers of Plaintiffs' and Defendants' goods and services.

31.     Whether the relevant consumers of Plaintiffs' and Defendants' goods and services are sophisticated and the extent to which any sophistication or care affects potential confusion.

32.     Whether Plaintiffs' and Defendants' goods and services are marketed through the same or similar channels of trade.

33.     Whether Plaintiffs' and Defendants' goods and services are advertised through the same media.

34.     Whether Plaintiffs and Defendants target the same consumers in connection with their respective marks.

35.     Whether there have been examples of actual confusion between Plaintiffs and Defendants on account of Defendants' use of S&P DATA.

36.     Whether the examples of actual confusion between Plaintiffs and Defendants on account of Defendants' use of the S&P DATA mark is evidence of a likelihood of confusion.

37.     Whether Defendants intended to create an association between Defendants or their S&P DATA mark and Plaintiffs or their S&P Marks.

38.     Whether Defendants adopted the S&P DATA mark in bad faith given that Mr. Plashkes and Mr. Borts were aware that S&P's predecessor company, McGraw-Hill, had previously objected to registration of S&P DATA-formative marks by Mr. Plashkes' and Mr. Borts' former company.

39.     Whether Defendants' awareness of McGraw-Hill's prior objections caused them initially to use the name SP Data, which was the sole name that appeared on the company website for many years after the formation of the current defendant by Mr. Plashkes.

40.     Whether consumers are likely to perceive a relationship between the goods sold and services rendered under the S&P Marks and the services rendered under the S&P DATA mark.

41.     Whether the use of the word "DATA," in connection with the mark S&P, is likely to draw a connection or association with S&P in the minds of consumers.

42.     Whether Defendants' use of S&P DATA is likely to cause confusion as to the source, sponsorship, or affiliation with Plaintiffs or their S&P Marks.

43.     Whether Defendants' use of the name and mark S&P DATA causes a likelihood of dilution of the distinctive quality of S&P's famous S&P Marks.

44.     Whether any delay by Plaintiffs in initiating suit was so outrageous as to bar injunctive relief against Defendants' infringing use of the S&P DATA mark.

45.     Whether the doctrine of progressive encroachment excuses any delay by Plaintiffs when Defendants initially operated as SP DATA and only later used the name S&P DATA, changed their logo over time to emphasize the "S&P" portion of the mark, expanded the locations from where they were operating, and further developed their online presence from the time when Plaintiffs learned of Defendants.

46.     Whether Defendants prejudicially relied on Plaintiffs' delay in bringing suit when Defendants have stated that "SP DATA" had greater brand equity in Canada, a third-party consultant concluded "S&P DATA" had low awareness in the U.S and recommended that the company be renamed, Defendants' CEO has stated that the "DATA" portion of the mark historically was more important than "S&P" and that the memorable portion of the name is "DATA," and SP Data, rather than S&P Data, is a name that Defendants went by for years.

47.     Whether Plaintiffs rebutted any presumption of laches.

48.     Whether bad faith adoption and use of S&P Data with knowledge of prior objections by Plaintiffs' predecessor serves to render Defendants' laches defense inapplicable.

49.     Whether Defendants' use of the S&P DATA name and mark will lead to inevitable or actual confusion such as to render Defendants' laches defense inapplicable.

50.     Whether S&P is entitled to a permanent injunction against S&P Data's use, advertisement, or exploitation of the name and mark S&P DATA or any other mark confusingly similar to Plaintiffs' S&P Marks.

**B.     S&P DATA'S STATEMENT OF ISSUES OF FACT THAT REMAIN TO BE LITIGATED.**

51.      Whether the S&P, S&P 100, S&P 1000, S&P 500, S&P 500 CATHOLIC VALUES INDEX, S&P 500 DYNAMIC VEQTOR INDEX, S&P 500 LOW VOLATILITY INDEX, S&P 500 VEQTOR, S&P AGGREGATE, S&P CAPITAL IQ, S&P CHINA 500, S&P COMPOSITE 1500, S&P GIVI, S&P GLOBAL, S&P GLOBAL MARKET INTELLIGENCE, S&P HIGH YIELD DIVIDEND ARISTOCRATS, S&P LTVC GLOBAL INDEX, S&P MIDCAP 400, S&P PRISM, S&P SMALLCAP 600, S&P STRIDE, S&P STRIDE TIPS-LOCKBOX, S&P U.S. RETIREE SPENDING INDEX, S&P VEQTOR, and S&P WCI marks comprise a single family of marks.

52.     Whether Plaintiffs' use of the S&P 500 CATHOLIC VALUES INDEX mark has priority over Defendants' use of the S&P DATA mark.

53.     Whether Plaintiffs' use of the S&P 500 DYNAMIC VEQTOR INDEX mark has priority over Defendants' use of the S&P DATA mark.

54.     Whether Plaintiffs' use of the S&P 500 LOW VOLATILITY INDEX mark has priority over Defendants' use of the S&P DATA mark.

55.     Whether Plaintiffs' use of the S&P 500 VEQTOR mark has priority over Defendants' use of the S&P DATA mark.

56.     Whether Plaintiffs' use of the S&P AGGREGATE mark has priority over Defendants' use of the S&P DATA mark.

57.     Whether Plaintiffs' use of the S&P CAPITAL IQ mark has priority over Defendants' use of the S&P DATA mark.

58.     Whether Plaintiffs' use of the S&P CHINA 500 mark has priority over Defendants' use of the S&P DATA mark.

59.     Whether Plaintiffs' use of the S&P COMPOSITE 1500 mark has priority over Defendants' use of the S&P DATA mark.

60.     Whether Plaintiffs' use of the S&P GIVI mark has priority over Defendants' use of the S&P DATA mark.

61.     Whether Plaintiffs' use of the S&P GLOBAL mark has priority over Defendants' use of the S&P DATA mark.

62.     Whether Plaintiffs' use of the S&P GLOBAL MARKET INTELLIGENCE mark has priority over Defendants' use of the S&P DATA mark.

63.     Whether Plaintiffs' use of the S&P HIGH YIELD DIVIDEND ARISTOCRATS mark has priority over Defendants' use of the S&P DATA mark.

64.     Whether Plaintiffs' use of the S&P LTVC GLOBAL INDEX mark has priority over Defendants' use of the S&P DATA mark.

65.     Whether Plaintiffs' use of the S&P PRISM mark has priority over Defendants' use of the S&P DATA mark.

66.     Whether Plaintiffs' use of the S&P STRIDE mark has priority over Defendants' use of the S&P DATA mark.

67.     Whether Plaintiffs' use of the S&P STRIDE TIPS-LOCKBOX mark has priority over Defendants' use of the S&P DATA mark.

68.     Whether Plaintiffs' use of the S&P U.S. RETIREE SPENDING INDEX mark has priority over Defendants' use of the S&P DATA mark.

69.     Whether Plaintiffs' use of the S&P VEQTOR mark has priority over Defendants' use of the S&P DATA mark.

70.     Whether Plaintiffs' use of the S&P WCI mark has priority over Defendants' use of the S&P DATA mark.

71.     Whether there is a likelihood of confusion between each asserted mark and the S&P DATA mark.

72.     The degree of similarity between each asserted mark and the S&P Data mark.

73.     The strength of each asserted mark.

74.     The price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase.

75.     The length of time Defendants have used the mark without evidence of actual confusion.

76.     The intent of Defendants in adopting the S&P DATA mark.

77.     The evidence of actual confusion between each asserted mark and S&P DATA mark and services provided in connection with it.

78.     Whether the parties' services, though not competing, are marketed through the same channels of trade and advertised through the same media.

79.     The extent to which the targets of the parties' sales efforts are the same.

80.     The relationship of the services in the minds of consumers because of the similarity of functions.

28

81.     Whether other facts suggest that the consuming public might expect Plaintiffs to offer services in Defendants' market or that Plaintiffs are likely to expand into that market.

82.     Whether Defendants' use of the S&P DATA mark dilutes each of the asserted marks.

83.     Whether each asserted mark is famous.

84.     The duration, extent, and geographic reach of advertising and publicity of each asserted mark.

85.     The amount, volume, and geographic extent of sales of goods or services offered under each asserted mark.

86.     The extent of actual recognition of each asserted mark.

87.     Whether Defendants use the S&P DATA mark in interstate commerce.

88.     Whether Defendants' use of the S&P DATA mark began after each asserted mark became famous.

89.     Whether Defendants' use of the S&P DATA mark dilutes each asserted mark by lessening the capacity of each asserted mark to identify and distinguish goods or services.

90.     The degree of similarity between the S&P DATA mark and each asserted mark.

91.     The degree of inherent or acquired distinctiveness of each asserted mark.

92.     The extent to which Plaintiffs are engaging in substantially exclusive use of each asserted mark.

93.     The degree of recognition of each asserted mark.

94.     Whether Defendants intended to create an association with each asserted famous mark.

95.     Any actual association between the S&P DATA mark and each asserted mark.

96.     Whether there is unfair competition.

97.     Whether Plaintiffs' claims accrued before the limitations period.

98.     Whether Plaintiffs inexcusably delayed bringing suit.

99.     Whether Defendants suffered economic prejudice as a result of the delay.

100.    Whether Defendants have suffered evidentiary prejudice as a result of the delay.

101.    Whether Defendants enjoy a presumption of inexcusable delay and prejudice resulting from the delay.

102.    Whether Plaintiffs can overcome the presumption of inexcusable delay and prejudice resulting from the delay.

103.    Whether each of the asserted marks is a mark valid at common law under the law of the State of Delaware.

## V.     STATEMENT OF ISSUES OF LAW THAT REMAIN TO BE LITIGATED

104.    The parties identify the following issues of law that remain to be litigated, along with citations to authorities relied upon by each party.

### A.     S&P'S STATEMENT OF ISSUES OF LAW THAT REMAIN TO BE LITIGATED.

105.    S&P submits the following issues of law that remain to be litigated. S&P reserves the right to modify or amend this Statement to the extent necessary to reflect any future rulings by the Court and to supplement or amend this Statement to respond to any new issues that may arise. This Statement of Issues of Law that Remain to be Litigated is based on issues that S&P Data identified in its Statement of Issues of Law that Remain to be Litigated. To the extent S&P Data advances issues of law not set forth in its Statement of Issues of Law That Remain to Be Litigated, S&P reserves the right to object to the introduction of such issues at trial and/or to respond with additional issues of law.

106.    By inclusion herein, S&P does not assume the burden of proof or production with regard to any statement of law.

**S&P's Trademark Infringement, False Designation of Origin, Deceptive Trade Practices and Unfair Competition Claims:**

107.    S&P's claims for infringement of a registered mark and false designation of origin in violation of 15 U.S.C. §§1114(1) and 1125(a)(1)(A), deceptive trade practices under 6 Del. C. § 2532(a)(2)-(3), and common law unfair competition under Delaware law are all governed by the same standards.  See Sanofi-Aventis v. Advancis Pharm. Corp., 453 F. Supp. 2d 834, 847 n.2 (D. Del. 2006); Chase Manhattan Bank, USA, N.A. v. Freedom Card, Inc., 333 F. Supp. 2d 239, 244 n.13 (D. Del. 2004); Rockland Mortg. Corp. v. S'holders Funding, Inc., 835 F. Supp. 182, 196-97 (D. Del. 1993).  To prove these claims, S&P must show that it owns a valid mark and that S&P Data's use of the S&P DATA mark is likely to create confusion concerning the origin of its services.  Sanofi-Aventis, 453 F. Supp. 2d at 847 (citing, inter alia, Checkpoint Sys. v. Check Point Software Tech., 269 F.3d 270, 279 (3d Cir. 2001)).

108.    S&P's incontestable registrations, including Reg. No. 3,569,703 for the mark S&P alone, "create[] a conclusive presumption that [the] mark is valid and owned by the registrant, and that the registrant has the exclusive right to use the mark."  Am. Cruise Lines, Inc. v. HMS Am. Queen Steamboat Co. LLC, 223 F. Supp. 3d 207, 212 (D. Del. 2016) (citing 15 U.S.C. § 1115(b)).  Stated otherwise, because S&P's registrations are incontestable, "validity, legal protectability, and ownership are proved."  Ford Motor Co. v. Summit Motor Prods., 930 F.2d 277, 291 (3d Cir. 1991).

109.    Accordingly, the S&P mark and the other marks protected by incontestable registrations cannot be challenged on grounds that they lack distinctiveness or secondary meaning.  J.T. McCarthy, McCarthy on Trademarks and Unfair Competition ("McCarthy's")

31

§ 32:145 (5th ed. 2021) (citing <u>Park 'N Fly, Inc. v. Dollar Park & Fly, Inc</u>., 469 U.S. 189, 205

(1985)).  Because the registrations are incontestable, the conclusive evidence of validity,

ownership and exclusive rights of these marks can only be challenged on the grounds reserved in

15 U.S.C. §1065, none of which have been asserted by S&P Data here.

110.    The Third Circuit assesses the likelihood of confusion using the following factors:

> the degree of similarity between the owner's mark and the alleged infringing
> mark; (2) the strength of the owner's mark; (3) the price of the goods and other
> factors indicative of the care and attention expected of consumers when making a
> purchase; (4) the length of time the defendant has used the mark without evidence
> of actual confusion arising; (5) the intent of the defendant in adopting the mark;
> (6) the evidence of actual confusion; (7) whether the goods, competing or not
> competing, are marketed through the same channels of trade and advertised
> through the same media; (8) the extent to which the targets of the parties' sales
> efforts are the same; (9) the relationship of the goods in the minds of the
> consumers, whether because of the near-identity of the products, the similarity of
> function, or other factors; and (10) other facts suggesting that the consuming
> public might expect the prior owner to manufacture a product in the defendant's
> market, or expect a prior owner is likely to expand into the defendant's market.

<u>Sanofi-Aventis</u>, 453 F. Supp. 2d at 847-48 (citing, <u>inter alia</u>, <u>Interpace Corp. v. Lapp, Inc</u>., 721

F.2d 460, 463 (3d Cir.1983)).

111.    No single likelihood of confusion factor is determinative in the analysis, and each

may be provided different weight depending upon the facts in question.  <u>Kos Pharms., Inc. v.</u>

<u>Andrx Corp.</u>, 369 F.3d 700, 709 (3d Cir. 2004).  Moreover, the "confusion" to be tested is not

merely confusion as to product or as to source, but rather any confusion about whether there is

any association between the parties, their products or services.  <u>Id</u>. at 711.  Such confusion may

manifest itself at different levels and among different constituencies, including the parties' direct

customers and end user consumers who encounter the parties' marks.  <u>See id</u>. at 715 n.12

(relevant classes of consumers of pharmaceuticals include doctors, nurses, pharmacists and

patients); <u>Country Floors, Inc. v. Gepner</u>, 930 F.2d 1056, 1066 (3d Cir. 1991) ("[T]he trademark

law protects the entire gamut of purchasers, including retail consumers and members of the trade"); Acxiom Corp. v. Axiom, Inc., 27 F. Supp. 2d 478, 501 (D. Del. 1998) (Lanham Act protects both purchasers and non-purchasers, including investors, against confusion).

112.    In addition, "initial interest confusion – *i.e.*, confusion that creates initial customer interest without any sale completion – is actionable under the Lanham Act."  Gavrieli Brands LLC v. Soto Massini (USA) Corp., No. 18-cv-462, 2020 WL 1443215, at *5 (D. Del. Mar. 24, 2020); see also McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC, 511 F.3d 350, 358 (3d Cir. 2007).  Such pre-sale confusion may result in confusion even among sophisticated purchasers by creating a "marketing advantage in the form of a foot in the door."  Acxiom, 27 F. Supp.2d at 497 (noting how certain marketing activities, such as cold calls from sales representatives, can create initial interest confusion).

113.    In assessing likelihood of confusion, the "degree of similarity of the marks may be the most important of the ten factors in *Lapp*."  Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 476 (3d Cir. 1994); see also Kos, 369 F.2d at 712-13 (citation and internal quotation marks omitted) ("The single most important factor in determining likelihood of confusion is mark similarity.").

114.    Here, the dominant portion of each party's mark is identical—S&P—which itself is indicative of the fact that "confusion is likely."  See Country Floors, Inc., 930 F.2d at 1065 (internal citation omitted) ("When comparing two marks each must be viewed in its entirety, although 'one feature of a mark may be more significant than other features, and it is proper to give greater force and effect to that dominant feature.'  When the dominant portions of the two marks are the same, confusion is likely.").  Indeed, the only difference between the marks S&P and S&P DATA is Defendants' addition of the generic or descriptive word "Data," which is

insufficient to distinguish between the parties' marks.  See Fisons, 30 F.3d at 477 (quoting

McCarthy's § 23:15[8] at 23-102 (3d ed. 1992)) ("'[A] subsequent user may not avoid likely

confusion by appropriating another's entire mark and adding descriptive or non-descriptive

matter to it.").  Instead, the addition of "Data" to S&P in fact heightens confusion because

providing "data" is a significant part of Plaintiffs' business.  Cf. In re Mr. Recipe, LLC, 118 U.S.

P.Q.2d 1084, 1090 (T.T.A.B. 2016) ("[W]hile there is no explicit rule that we find marks to be

similar where Applicant's mark contains in part the whole of the mark in the cited registration,

the fact that the cited registered mark is incorporated in full in Applicant's mark increases the

similarity between the two because, in this case, the addition of the phrase 'Devour Your

Hunger' calls to mind the shark from the JAWS movies.").

   115. Moreover, the fact that Plaintiffs use and promote a family of S&P Marks makes

it likely members of the public may be more inclined to view services rendered in connection

with the mark S&P DATA to be related to Plaintiffs.  See Oriental Fin. Grp., Inc. v. Cooperativa

De Ahorro Crédito Oriental, 832 F.3d 15, 29-30 (1st Cir. 2012) ("[C]onsumers are likely to

recognize the pattern and conclude that COOP ORIENTAL and COOPERATIVA ORIENTAL -

- two-word marks consisting of ORIENTAL and a descriptive term for financial services -- are

members of the same family."); J & J Snack Foods Corp. v. McDonald's Corp., 932 F.2d 1460,

1462-62 (Fed. Cir. 1991) (noting that "[t]he [Trademark Trial & Appeal] Board found that by

extensive promotion and use McDonald's has created public recognition of a family of marks

wherein 'Mc' is combined with the generic name of a food product, and that the public has come

to associate such marks with McDonald's" and affirming refusal to register); Mine O'Mine, Inc.

v. Calmese, 2:10-cv-43, 2011 WL 2728390, at *6 (D. Nev. July 12, 2011) (on summary

judgment finding that "the Shaqtus mark falls within the scope of MOM's family of Shaq

marks"), aff'd, 489 Fed. Appx. 175 (9th Cir. 2012); Chips 'n Twigs, Inc. v. Chip-Chip, Ltd., 414

F. Supp. 1003, 1016 (E.D. Pa. 1976) ("Moreover, the 'CHIPS' family of trademarks is

completely arbitrary and fanciful as applied to wearing apparel; it has been used over a long

period of time and has been extensively advertised. These considerations lead inescapably to the

conclusion that the 'CHIPS' family of trademarks are strong marks and as such are entitled to

protection from use of confusingly similar marks even on non-competing goods, especially

where the goods are related in character."); see also McCarthy's § 23:61 (5th ed. 2021) (citation

and internal quotation marks omitted) ("In comparing [the senior user's] family of marks with

[the junior user's] mark, the question is not whether [the junior user's] mark is similar to [the

senior user's] individual marks, but whether [the junior user's] mark would be likely to be

viewed as a member of [the senior user's] family of marks.").

116.    "The strength of the owner's mark is a measure of the mark's distinctiveness,

which is the mark's tendency to identify the products or services sold 'under the mark as

emanating from a particular, although possibly anonymous source."  Acxiom, 27 F. Supp.2d at

495-96 (citation and internal quotation marks omitted).  A court makes an assessment of a

trademark's strength "by weighing both the conceptual and commercial aspects of its strength."

Id. at 496.  As arbitrary marks supported by substantial marketplace recognition, the S&P Marks

belong to the strongest category of marks.  Id.; see New Balance Ath., Inc. v. USA New Bunren

Int'l Co. Ltd. LLC, 424 F. Supp.3d 334, 348 (D. Del. 2019) (finding that "'N' marks are

conceptually strong, because they are arbitrary" and "also commercially strong because New

Balance[] has funded extensive advertising campaigns featuring the 'N' marks that has led to

substantial sales."); Rockland, 835 F. Supp. at 193 ("[P]laintiff's mark is strong, not only

because it is arbitrary and thus inherently distinctive, but also because its

consumer recognition value is high. The strength element, then, also tips the scales in favor of a finding of likelihood of confusion.").

117.    Defendants cannot rebut the potent evidence showing the commercial strength of the S&P Marks based on supposed third-party use.  "'[T]he significance of third-party trademarks depends wholly upon their usage' such that the alleged infringer must present 'evidence that these trademarks were actually used by third parties, that they were well promoted or that they were recognized by consumers.'"  Elizabeth Taylor Cosmetics Co. v. Annick Goutal, S.A.R.L., 673 F. Supp. 1238, 1244 (S.D.N.Y. 1987) (quoting Scarves by Vera, Inc. v. Todo Imports Ltd., 544 F.2d 1167, 1173 (2d Cir. 1976)); see also Accu Pers., Inc. v. Accustaff, Inc., 823 F. Supp. 1161, 1167 (D. Del. 1993); Polymer Dynamics Inc. v. Cabot Corp., 13 U.S.P.Q.2d 1220, 1223 (D. Del. 1989).  Any such evidence is lacking in this case.

118.    In cases such as the instant one, "[w]here both professionals and the general public are relevant consumers, 'the standard of care to be exercised . . . will be equal to that of the least sophisticated consumer in the class.'"  Kos, 369 F.3d at 716 (citation omitted); see also Ford Motor Co., 930 F.2d at 293 (citation omitted) (where buyer class includes both "'professional buyers and consumers," confusion "'within the lowest stratum of "reasonably prudent buyers" may give rise to liability even if professional buyers in the market are not confused'").

119.    Moreover, otherwise scrupulous professionals may nonetheless be vulnerable to confusion, because professional expertise does not necessarily translate into skill at discriminating among brands.  See Kos, 369 F.3d at 717.  Stated otherwise, "'the care with which consumers select a product does not impact the association they may make regarding sponsorship of another product or service; therefore even a high degree of care would have little

effect on confusion of sponsorship."  Id. (quoting 3A L. Altman, Callman on Unfair

Competition, Trademarks & Monopolies § 21:10 & n. 139 (4th ed. 2003)).  Thus, even where the

parties sell "relatively expensive products and services to sophisticated and knowledgeable

purchasers that typically involve relatively long sales cycles," the methods of marketing can

"contribute to a realistic situation where a sophisticated purchaser will mistakenly associate" the

parties based on the similarity of their names.  Acxiom, 27 F. Supp.2d at 497.

120.    Indeed, the fact that there have already been several instances of actual confusion

among even more sophisticated clients and/or potential clients of the parties is compelling proof

supporting a likelihood of confusion in this case.  Because "[e]vidence of actual confusion is

frequently difficult to find . . . .[,] actual confusion is not necessary to demonstrate a likelihood

of confusion."  Sabinsa Corp. v. Creative Compounds, LLC, 609 F.3d 175, 187 (3d Cir. 2010);

see also Fisons, 30 F.3d at 472 (citation and internal quotation marks omitted) ("Proof of actual

confusion is not necessary; likelihood of confusion is all that need be shown.").  However, "[t]he

rarity of such evidence makes even a few incidents highly probative of the likelihood of

confusion."  Kos, 369 F.3d at 720 (citation and internal quotation marks omitted).

121.    Assessing the accused infringer's intent "extends beyond asking whether a

defendant purposely chose its mark to promote confusion," and so "adequacy and care with

which the defendant investigates and evaluates its proposed mark are highly relevant."  Sanofi-

Aventis, 453 F. Supp. 2d at 852 (quoting, in part, Kos, 369 F.3d at 721).  S&P's registrations for

the S&P Marks provided constructive notice of its rights in that mark.  See 15 U.S.C. §1072

("Registration of a mark on the principal register provided by this Act . . . shall be constructive

notice of the registrant's claim of ownership thereof."); B & B Hardware, Inc. v. Hargis Indus.,

575 U.S. 138, 142 (2015) (quoting 15 U.S.C. § 1072) ("Registration is significant. . . .

37

Registration, for instance, serves as 'constructive notice of the registrant's claim of ownership' of the mark.").

122.     Moreover, Mr. Plashkes and Mr. Borts, the principals of S&P Data, were also on notice of S&P's potential objections by virtue of prior complaints raised by McGraw-Hill, S&P's predecessor, to the use of S&P DATA in Canada by Plashkes' and Borts' earlier company. Indeed, the evidence suggests that Defendants' awareness of that prior objection influenced their decision to use the name SP Data when they formed their current company.  For many years, SP Data was the only name referenced on the company website before Defendants eventually evolved such usage to S&P Data over time.  See Flat Rate Movers, Ltd. v. FlatRate Moving & Storage, Inc., 104 F. Supp. 371, 378, 381 (S.D.N.Y. 2015) (finding bad faith when, in an earlier litigation between the parties, one of the individual defendants testified that the company did not use FLAT RATE on its trucks for its moving services in upstate New York to avoid confusion between the parties, but defendants nonetheless used FLAT RATE in New York and other locations after the conclusion of that earlier suit).

123.     The parties' services are offered to the same type of customers, including in some of the same industries, and those services also both result in regular exposure of the parties' marks to end user members of the consumer public interacting with the parties' products or services.  This overlap in the parties' respective audiences enhances the likelihood of confusion. See Acxiom, 27 F. Supp. 2d at 501 (citing Lapp, 721 F.2d at 463-64) ("likelihood of confusion increases if the targets of the parties' sales efforts are the same or are likely to be the same in the future").

124.     "Once a trademark owner demonstrates likelihood of confusion, it is entitled to injunctive relief."  Lapp, 721 F.2d at 462; see Trademark Modernization Act, 15 U.S.C.

§ 1116(a) (Dec. 27, 2020) (amending 15 U.S.C. § 1116(a) to add the following: "A plaintiff

seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm

upon a finding of a violation identified in this subsection in the case of a motion for a permanent

injunction . . . .").

**S&P's Trademark Dilution Claims Under Federal and Delaware State Law:**

125.    S&P also brings claims for dilution under the federal Lanham Act, 15 U.S.C.

§ 1125(c), and the Delaware Trademark Act, 6 <u>Del. C.</u> § 3313.  "The federal cause of action for

trademark dilution grants extra protection to strong, well-recognized marks even in the absence

of a likelihood of consumer confusion . . . if the defendant's use diminishes or dilutes the strong

identification value associated with plaintiff's famous mark." <u>Times Mirror Magazines Inc. v.</u>

<u>Las Vegas Sports News, L.L.C.</u>, 212 F.3d 157, 163 (3d Cir. 2000), superseded by statute on

other grounds.

126.    The federal dilution statute provides:

> Subject to the principles of equity, the owner of a famous mark that is distinctive,
> inherently or through acquired distinctiveness, shall be entitled to an injunction
> against another person who, at any time after the owner's mark has become
> famous, commences use of a mark or trade name in commerce that is likely to
> cause dilution by blurring or dilution by tarnishment of the famous mark,
> regardless of the presence or absence of actual or likely confusion, of competition,
> or of actual economic injury.

15 U.S.C. § 1125(c)(1).  The Trademark Dilution Revision Act of 2006 (the "TDRA") made

clear that to obtain relief under the statute, a plaintiff need only prove a likelihood of, as opposed

to actual, dilution.  <u>See</u>, <u>e.g.</u>, <u>Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.</u>, 633 F.3d

1158, 1165 (9th Cir. 2010); <u>Starbucks Corp. v. Wolfe's Borough Coffee, Inc.</u>, 477 F.3d 765, 766

(2d Cir. 2007).

127.     Similarly, to prevail on a claim for dilution under the Delaware Trademark Act, the plaintiff must establish a likelihood of dilution.  Treasury Mgmt. Servs. v. Wall St. Sys. Del., 123 U.S.P.Q. 2d 1357, 1362 (D. Del. 2017).  "Likelihood of dilution requires some mental association between the marks and can be defined as a blurring of a mark's product identification or the tarnishment of the affirmative association a mark has come to convey."  Sanofi-Aventis, 453 F. Supp.2d at 855 (citation and internal quotation marks omitted).  However, unlike the federal dilution statute, the Delaware statute does not require the plaintiff's mark to be famous, but simply requires proof of distinctiveness, which "typically is the same proof used to show inherent or acquired distinctiveness for infringement purposes under the Lanham-Act."  Id. (citation and internal quotation marks omitted).

128.     A mark will be deemed famous for purposes of the Lanham Act's dilution provision "if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."  15 U.S.C. § 1125(c)(2)(A). Among the factors a court can consider in determining whether a mark possess the requisite degree of recognition are the following:

(i)      The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

(ii)     The amount, volume, and geographic extent of sales of goods or services offered under the mark.

(iii)    The extent of actual recognition of the mark.

(iv)    Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

Id.; see also New Balance, 424 F. Supp.3d at 350.

129.     The evidence here demonstrates that the S&P Marks have been long used and advertised throughout the country, have generated substantial sales for services offered under

40

such marks, are widely recognized as shown by the survey conducted by Hal Poret and are registered on the principal register and supports a finding of fame for purposes of the Lanham Act.  See, e.g., New Balance, 424 F. Supp.3d at 350.  Moreover, the inherent distinctiveness of the S&P Marks for purposes of S&P's infringement claim, as shown by their numerous incontestable federal trademark registrations, amply establishes the requisite degree of distinctiveness to support a claim for dilution under the Delaware Trademark Act.  See Sanofi-Aventis, 453 F. Supp.3d at 855.

130.    Dilution by blurring under the Lanham Act "is association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of a famous mark." 15 U.S.C. § 1125(c)(2)(B).   Even where there is no confusion between marks, a mark may dilute another mark by eroding its ability to serve as a powerful source identifier, causing "the identifying features of the plaintiff's famous mark to become vague and less distinctive" and endangering the "capacity of [plaintiff's] mark to continue to be strong and famous." See Times Mirror, 212 F.3d at 168.

131.    In assessing whether a dilution by blurring has occurred, courts may consider all relevant factors, including:

(i)     The degree of similarity between the mark or trade name and the famous mark.

(ii)    The degree of inherent or acquired distinctiveness of the famous mark.

(iii)   The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.

(iv)    The degree of recognition of the famous mark.

(v)     Whether the user of the mark or trade name intended to create an association with the famous mark.

(vi)    Any actual association between the mark or trade name and the famous mark.

41

15 U.S.C. § 1125(c)(2)(B).

132.    Much of the same evidence regarding the similarity of the parties' marks and the distinctiveness and recognition of the S&P Marks considered for purposes of infringement also supports S&P's claim for dilution.  See New Balance, 424 F. Supp.3d at 351 (citation and internal quotation marks omitted) (noting the "substantial overlap between the factors for trademark dilution and trademark infringement").  Moreover, "[s]ubstantially exclusive use can be evidenced by federal registration of the trademark and significant enforcement efforts against unauthorized use."  Id.; see id. at 352 (noting plaintiff had "actively policed unauthorized use by sending cease and desist letters, filing lawsuits, and filing oppositions and cancellation petitions in the Trademark Trial and Appeal Board").  These factors here establish blurring under the Lanham Act, id., as well as the requisite "mental association" giving rise to dilution under the Delaware Trademark Act.  Sanofi-Aventis, 453 F. Supp.2d at 855 (citation and internal quotation marks omitted).

133.    Injunctive relief is available as a remedy for dilution.  New Balance, 424 F. Supp.3d at 344 (quoting 15 U.S.C. § 1125(c)(1)) (emphasis removed) ("Under § 1125(c), an owner of a famous mark may obtain an injunction to stop 'use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark.'").

### S&P Data's Affirmative Defenses

134.    S&P Data asserts laches as an affirmative defense.  The defense of laches requires that defendant prove "(1) inexcusable delay in instituting suit, and (2) prejudice resulting to

defendant from such delay."  See Univ. of Pittsburgh v. Champion Prods. Inc., 686 F.2d 1040, 1044 (3d Cir. 1982).

135.    "[T]he correct disposition of the equitable defense of laches can only be made by a close scrutiny of the particular facts and a balancing of the respective interests and equities of the parties, as well as of the general public."  Country Floors, 930 F.2d at 1066 (citation and internal quotation marks omitted).

136.    Only where the delay is so "outrageous, unreasonable and inexcusable as to constitute a virtual abandonment of its right" will laches bar prospective injunctive relief.  See Univ. of Pittsburgh, 686 F.2d at 1044; see also Sanofi-Aventis, 453 F. Supp.2d at 856.  Such circumstances are generally limited to a "narrow class of cases" involving extended periods of delay, such as 100 years.  Univ. of Pittsburgh, 686 F.2d at 1044.  Otherwise, in the more typical case, laches may bar claims for damages but not for prospective injunctive relief.  Id.; see also Sanofi-Aventis, 453 F. Supp.2d at 856; Medtronic AVE, Inc. v. Cordis Corp., 55 U.S.P.Q.2d 1354, 1360 (D. Del. 2000); Mobilificio San Giacomo S.p.A. v. Stoffi, No. 96-cv-415, 1997 WL 699299, at *7 (D. Del. Sept. 24, 1997).  Because S&P has limited the relief sought here to prospective injunctive relief, the laches defense should not apply.

137.    Because the Lanham Act does not have a statute of limitations, in assessing laches, a federal court "must look to state law to find the statute of limitations period most analogous to trademark infringement."  Sanofi-Aventis, 453 F. Supp. 2d at 855-56.  In Delaware, the statute of limitations for an analogous state claim is three years.  Id. at 856.  If plaintiff's claim is filed outside the statute of limitations, "the burden of proof shifts to the plaintiff to prove the absence of such prejudice to the defendant as would bar all relief."  Univ. of Pittsburgh, 686 F.2d at 1045.  In other words, even if the claim is filed outside the statute of limitations period,

43

laches may still be rebutted.  See Gloster v. Relios, Inc., No. 02-cv-7140, 2006 WL 1737800, at

*2 (E.D. Pa. June 26, 2006) (denying motion for reconsideration of denial of summary judgment

order on laches, finding that on trademark dilution claim "a reasonable fact-finder could

conclude that Gloster rebutted any presumption of laches").

138.    In assessing delay, a court may take into consideration "reasonable time

consumed in objecting to the use and awaiting the defendant's response" to a claim of

infringement.  See Restatement (Third) of Unfair Competition § 31, cmt c (1995).  "Time spent

in attempting to resolve a dispute is not counted towards laches because 'Settlement of legal

disputes is a highly favored course of conduct for which a party should be rewarded, not

penalized.'"  McCarthy's § 31:15 (quoting Varitronics Sys. v. Merlin Equip., 682 F. Supp. 1203

(S.D. Fla. 1988)).

139.    The progressive encroachment doctrine renders S&P Data's laches defense

inapplicable here.  Under that doctrine, laches will not apply in the trademark context where

defendant's conduct has changed quantitatively or qualitatively over time, resulting in a

progressive encroachment upon plaintiff's rights.  See Univ. of Pittsburgh, 686 F.2d at 1046; see

also Oriental Fin. Grp., Inc. v. Cooperativa De Ahorro Crédito Oriental, 698 F.3d 9, 21-24 (1st

Cir. 2012) ("Oriental Fin. Grp. I"); Kellogg Co. v. Exxon Corp., 209 F.3d 562, 570-74 (6th Cir.

2000); Kason Indus. v. Component Hardware Grp., Inc., 120 F.3d 1199, 1205-06 (11th Cir.

1997); Amy's Ice Creams, Inc. v. Amy's Kitchen, Inc., 60 F. Supp. 3d 738, 743-44 (W.D. Tex.

2014); Internet Specialties, W., Inc. v. ISPwest, No. 05-cv-3296, 2006 WL 4568073, at *3-4

(C.D. Cal. Nov. 15, 2006); Thomasville Furniture v. Thomasville Cabinet Works, No. 92-cv-

00383, 1992 U.S. Dist. Lexis 22599, at *17-19 (M.D.N.C. Oct. 1, 1992);  see also McCarthy's

§31:20; Restatement (Third) of Unfair Competition §31, cmt c.

140.    Court have found the doctrine of progressive encroachment to apply when defendants have made changes to their mark over a period of time to more closely approximate plaintiff's mark.  See Urban Outfitters, Inc. v. BCBG Max Azria Grp., Inc., 511 F. Supp. 2d 482, 509 (E.D. Pa. 2007) (finding that plaintiffs did not unreasonably delay in bringing suit when, since plaintiff's first knowledge of defendants' mark, defendants materially altered mark, actively promoted it for the first time, and produced goods in different segment under separate company name); Am. Eagle Outfitters, Inc. v. Am. Eagle Furniture, Inc., No. 11-cv-02242, 2013 WL 6839815, at *10-11 (N.D. Ill. Dec. 27, 2013) (granting summary judgment motion dismissing laches defense because defendant progressively encroached on plaintiff's mark; defendants initially sold furniture at wholesale under the name TITANIC FURNITURE and only some furniture was branded AE FURNITURE, but at a later period defendant sold furniture in retail stores with AMERICAN EAGLE FURNITURE signage); Sci Sys. v. Solidstate Controls, Inc., 748 F. Supp. 1257, 1262-63 (S.D. Ohio 1990) (stating "[c]hanges in a mark over the years and recent entry into the same marketing area can defeat a defense of laches" and denying motion for summary judgment on laches defense due to defendant's progressive encroachment when defendant changed the presentation of its mark over the years, by removing a distinctive design from its mark and changing its colors, and entering a new market); Union Carbide Corp. v. Ever-Ready, Inc., 531 F.2d 366, 388-89 (7th Cir. 1976) (finding laches did not apply, despite 19 year delay, when defendant did not market goods at issue under own name for majority of time period); The Hoover Co. v. W. Vacuum Bag Mfg., Inc., No. 63-cv-3566, 1964 WL 8146, at *10 (S.D.N.Y. May 11, 1964) (finding defendants progressively encroached on plaintiff's mark when they "increased their emphasis on those and other indicia of 'HOOVER' origin, and progressively subordinated or concealed their own identity"); A.E. Staley Mfg. Co. v. Staley

45

Milling Co., 253 F.2d 269, 272-73, 275, 279 (7th Cir. 1958) (finding that defendant progressively encroached on plaintiff's mark when defendant changed the wording and style of its mark over a period of decades and holding that plaintiff's claim for an injunction was not prohibited by laches or estoppel due to progressive encroachment); Indep. Nail & Packaging Co. v. Stronghold Screw Prods., 205 F.2d 921, 927 (7th Cir. 1953) (finding defendant progressively encroached on plaintiff's mark when it changed how the mark was presented to the public by changing its corporate name over time and holding that plaintiff's claim for injunctive relief was not barred by laches); see also 3M v. Shurtape Techs., Inc., No. 98-cv-2134, 2001 WL 530551, at *6-7 (D. Minn. May 17, 2001) (9-year delay in bringing suit did not amount to inexcusable delay when defendant progressively encroached on defendant's mark by changing the color and functionality of its product to more closely approximate that of plaintiff's color trademark).

141.    Where Defendants initially operated primarily under the name SP Data and gradually evolved over time to S&P Data, while also updating their logo to emphasize the "S&P" portion of the mark, expanding the locations out of which they operated and further developing their online presence under the S&P Data mark, the changed circumstances excuse S&P's delay in seeking relief.  See, e.g., Oriental Fin. Grp. I, 698 F.3d at 21-24; Urban Outfitters, 511 F. Supp. 2d at 509; Am. Eagle Outfitters, 2013 WL 6839815, at *10-11; Hoover, 1964 WL 8146, at *10.

142.    Prejudicial reliance exists where "the defendant has done something it otherwise would not have done absent the plaintiff's conduct."  See Conan Props., Inc. v. Conans Pizza, Inc., 752 F.2d 145, 153 (5th Cir. 1985).  Delay standing alone does not bar relief.  See McCarthy §31.12 & n.1) (citing numerous cases); Am. Home Prods. Corp. v. Chelsea Labs., Inc., 572 F. Supp. 278, 283 (D. N.J. 1982) ("In the absence of prejudice, delay is not laches.").  Prejudice can

46

be established by showing "economic prejudice or evidentiary prejudice." Bayer Ag v. Sony Elecs., 229 F. Supp. 2d 332, 366 (D. Del. 2002) (discussion of laches in context of patent infringement suit), aff'd, 83 Fed. Appx. 334. "Economic prejudice arises where a defendant suffers the loss of monetary investments or incurs damages which would have been prevented if the plaintiff had failed suit earlier." Id. "Evidentiary prejudice may arise where the delay has curtailed the defendant's ability to present a full and fair defense on the merits due to the loss of evidence, the death of a witness, or the unreliability of memories." Id. However, a defendant alleging evidentiary prejudice must "specifically point out the prejudice that they suffered from the alleged absence of witnesses or evidence. 'Conclusory statements that there are missing witnesses, that witnesses' memories have lessened, and that there is missing documentary evidence, are not sufficient." Id. at 367-68 (citation omitted).

143.    A mere expansion of its activities over time cannot alone establish prejudicial reliance. See Tisch Hotels, Inc. v. Americana Inn, Inc., 350 F.2d 609, 615 (7th Cir. 1965) ("If . . . prejudice could consist merely of expenditures in promoting the infringed name, then relief would have to be denied in practically every case of delay."); Weight Watchers Int'l, Inc. v. Stouffer Corp., 744 F. Supp. 1259, 1287 (S.D.N.Y. 1990) (continued advertising does not establish prejudicial reliance). Moreover, prejudicial delay cannot be found when it would cost defendant little to remedy infringement. See Tri-Star Pictures, Inc. v. Unger, 14 F. Supp. 2d 339, 361 (S.D.N.Y. 1998) ("[A]n infringing party does not suffer prejudice where it would cost little to remedy the infringement").

144.    Here, Defendants have no claim to economic prejudice. In 2007, S&P Data stated that "SP DATA" had greater brand equity in Canada, its marketing was negligible, and that it did not make much use out of its trade name. In 2015, a third-party marketing consultant engaged

by S&P Data to assist in redesigning its website concluded that S&P Data had low awareness in the U.S. and even recommended that the brand be renamed in the United States. And still to this day the CEO of S&P Data has called the company's marketing "pretty negligible." Defendants' CEO has additionally testified that the "DATA" portion of the mark was more important than the "S&P" portion historically and that the memorable portion of the S&P DATA name is "Data." Accordingly, it would not be difficult to remedy the infringement by changing Defendants' name to SP DATA, as that is the name and mark it went by for many years. See id.

145.     Further, Defendants have not specifically claimed what evidentiary prejudice they have suffered from witnesses or documents that are allegedly missing. See, e.g., Bayer, 229 F. Supp. 2d at 368 (finding claim of prejudice due to the fact that one of the inventors was too sick to be deposed and attorney who prosecuted patent was deceased insufficient because defendant did not "identif[y] any testimony that only these witnesses could have provided and have not established to the Court's satisfaction that the absence of these witnesses prejudiced their defense"; finding claim of prejudice due to the fact that documents were allegedly missing insufficient because defendant did not state why documents would contain information important to litigation and, "in the Court's view, the extensive discovery in this case undermines any allegation that the Sony Defendant's [sic] were prejudiced in their ability to mount a defense as a result of Bayer's alleged delay in filing suit."). Nor is it likely that any missing witness or document prevented Defendants from fully litigating this case. See id. Accordingly, Defendants' claims of evidentiary prejudice are insufficient. See id. at 367-68.

146.     The doctrine of laches also does not apply when defendants have deliberately infringed plaintiffs' mark, acted in bad faith, or were otherwise aware of plaintiff's objection to defendant's use of the mark. See, e.g., Champagne Louis Roederer v. J. Garcia Carrion, S.A.,

48

569 F.3d 855, 859 (8th Cir. 2009) ("[C]ourts tend to reject a defendant's assertion of the laches

defense when the defendant knew that the plaintiff objected to the use of the mark."); Hermes

Int'l v. Lederer de Paris Fifth Ave., Inc., 219 F.3d 104, 107 (2d Cir. 2000); Coty Inc. v. Excell

Brands, LLC, 277 F. Supp. 3d 425, 439 (S.D.N.Y. 2017); see also Lewis & Clark Outdoors, Inc.

v. L.C. Indus., No. 07-cv-5164, 2009 WL 10673015, at *4 (W.D. Ark. July 22, 2009)

("[F]orewarning of a plaintiff's objections generally prevents a defendant from making a laches

defense").

      147.    Finally, a court may find that, despite plaintiff's delay, a defendant's use of its

mark will lead to inevitable or actual confusion and thus find that it is in the public's interest to

grant injunctive relief.  See Angel Flight of Ga., Inc. v. Angel Flight Am., Inc., 522 F.3d 1200,

1208 (11th Cir. 2008); Profitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical

Therapy P.C., 314 F.3d 62, 68 (2d Cir. 2002); Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp.,

148 F.3d 417, 423 (4th Cir. 1997); Kason Indus., 120 F.3d at 1207; Sara Lee Corp. v. Kayser-

Roth Corp., 81 F.3d 455, 461 (4th Cir. 1996); see also McCarthy's § 31:10 (citation omitted) ("If

it is inevitable that a significant amount of confusion will probably be created by the junior

user's actions, a number of courts will find that the right of the public not to be confused and

deceived outweighs the inequity to the junior user of the trademark owner's delay in suing.  For

example, courts have held that where the likelihood of confusion is not 'reasonably in doubt,'

laches, estoppel and acquiescence may not be considered as factors.").

      148.    Finally, S&P Data also asserts a statute of limitations defense.  However, "[t]he

Lanham Act does not contain a statute of limitations and instead subjects all claims to 'the

principles of equity,' such as laches."  Kars 4 Kids Inc. v. Am. Can!, 8 F.4th 209, 220 (3d Cir.

2021) (citation omitted).  In any event, the statute of limitations does not provide a defense

against a prospective claim for injunctive relief under either federal or state law because there is a continuing tort as long as S&P Data's infringing conduct persists.  See, e.g., Lyons P'ship, L.P. v. Morris Costumes, Inc., 243 F.3d 789, 797 (4th Cir. 2001); vonRosenberg v. Lawrence, No. 13-cv-587, 2018 WL 4039324, at *3 (D. S.C. Aug. 23, 2018); Springboards to Educ., Inc. v. Scholastic Book Fairs, Inc., No. 17-cv-0054, 2018 WL 1806500, at *8 (N.D. Tex. Apr. 17, 2018); Gucci Am., Inc. v. Guess?, Inc., 868 F. Supp. 2d 207, 246, 257 (S.D.N.Y. 2012); Levi Strauss & Co. v. Papikian Enters., No. 10-cv-05051, 2011 WL 3739550, at *4 (N.D. Cal. Aug. 24, 2011).

### B.   S&P DATA'S STATEMENT OF ISSUES OF LAW THAT REMAIN TO BE LITIGATED.

149.   S&P Data submits the following issues of law that remain to be litigated.  S&P Data reserves the right to modify or amend this Statement to the extent necessary to reflect any future rulings by the Court and to supplement or amend this Statement to respond to any new issues that may arise.  This Statement of Issues of Law that Remain to be Litigated is based on issues that S&P identified in its Statement of Issues of Law that Remain to be Litigated.  To the extent S&P advances issues of law not set forth in its Statement of Issues of Law That Remain to Be Litigated, S&P Data reserves the right to object to the introduction of such issues at trial and/or to respond with additional issues of law.

150.   By inclusion herein, S&P Data does not assume the burden of proof or production with regard to any statement of law.

### Federal Trademark Infringement, False Designation of Origin, Deceptive Trade Practices and Unfair Competition

151.   S&P asserts claims for federal trademark infringement, false designation or origin, deceptive trade practices and unfair competition.  "Federal trademark infringement, 15 U.S.C. §

50

1114(1)(a), and a false designation of origin claim, known more broadly as federal unfair competition, 15 U.S.C. § 1125(a)(1)(A), are measured by identical standards." Louis Vuitton Malletier & Oakley, Inc. v. Veit, 211 F. Supp. 2d 567, 580 (E.D. Pa. 2002).  Under these standards, a plaintiff must prove that: (1) it owns the mark; (2) the mark is valid and legally protectable; and (3) defendant's use of the mark to identify goods or services is likely to create confusion.  A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir. 2000); New Balance Athletics, Inc. v. USA New Bunren Int'l Co., 424 F.Supp.3d 334, 346 (D. Del. 2019).  Federal registration is prima facie evidence of the ownership and validity of a mark.  Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc., 186 F.3d 311, 315 (3d Cir. 1999).  Federal registration also evidences the right to use the mark in commerce.  Id.

152.    The burden to prove likelihood of confusion lies with the plaintiff.  Keurig, Inc. v. Strum Foods, Inc., 769 F. Supp. 2d 699, 707 (D. Del. 2011).  The Third Circuit applies the *Lapp* test, which is "a qualitative inquiry."  A & H Sportswear, Inc., 237 F.3 d at 215.  "[D]ifferent factors may properly be accorded different weights," including no weight at all, "depending on the particular factual setting."  Id.  The Lapp factors must be applied in the present case.

153.    To determine whether  there is a likelihood of confusion, the court must examine:

(1)    the degree of similarity between the owner's mark and the alleged infringing mark.  Checkpoint Sys., Inc., 269 F.3d at 279.  "[M]ark similarity is not necessarily determinative of likely confusion, particularly when the products do not directly compete."  Id. at 282;

(2)    the strength of the owner's mark, which entails examining the "(1) the mark's distinctiveness or conceptual strength (the inherent

51

features of the mark) and (2) its commercial strength (factual evidence of marketplace recognition)." Freedom Card Inc., 432 F.3d at 472. "[C]ourts must look at the strength of the mark in the industry in which infringement is alleged." Checkpoint Sys., Inc., 269 F.3d at 284;

(3)     the price of the goods and other factors indicative of the care and attention one would expect when making a purchase. A & H Sportswear, Inc., 237 F.3d at 215;

(4)     the length of time the defendant has used the mark without evidence of actual confusion. Id. (citing inter alia, Lapp, Inc., 721 F.2d at 463;

(5)     the intent of the defendant in adopting the mark. Id.;

(6)     the evidence of actual confusion. Id.;

(7)     whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media. Id.;

(8)     the extent to which the targets of the parties' sales efforts are the same. Id.;

(9)     the relationship of the goods in the minds of consumers because of the similarity of functions. Id.; and

(10)    other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market or that he is likely to expand into that market. Id.

52

154.    The Third Circuit recognizes initial interest confusion within the context of the Lapp factors.  Checkpoint Sys., Inc., 269 F.3d at 292.  "Product relatedness and level of care exercised by consumers are relevant factors in determining initial interest confusion."  Id. at 296. Some initial confusion likely does not constitute free riding on the goodwill of another mark or harm the party alleging infringement.  Id. at 296–97.  "Where confusion has little or no meaningful effect in the marketplace, it is of little or no consequence in our analysis."  Id. at 297.  Such a determination requires an analysis of the totality of the circumstances.  Id.

## The Delaware Deceptive Trade Practices Act

155.    The Delaware Uniform Deceptive Trade Practices Act ("DDTPA"), 6 Del. C. § 2531, prohibits causing a likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or" association with or certification of goods or services in violation of 6 Del. C. § 2532(a)(2); causing a likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another in violation of 6 Del. C. § 2532(a)(3). 6 Del. C.  §§ 2531 et seq; Enzo Life Scis., Inc. v. Digene Corp., 295 F. Supp. 2d 424, 426 (D. Del. 2003).  "Courts reviewing DDTPA violations apply the same standards as they apply to trademark infringement claims (i.e., valid and protectable mark, plaintiff owns mark, and likelihood of confusion)."  Treasury Mgmt. Servs., Inc. v. Wall St. Sys. Delaware, Inc., No. CV 16-283-SLR, 2017 WL 1821114, at *5 (D. Del. May 5, 2017) (citing Keurig, Inc., 2012 WL 4049799, at *9). "[P]roof of a Lanham Act claim would necessarily meet the requirements for a claim under the DTPA."  Schering–Plough Healthcare Prod., Inc. v. Neutrogena Corp., 702 F. Supp. 2d 266, 272 (D. Del. 2010); Treasury Mgmt. Servs., Inc., 2017 WL 1821114, at *5 (Robinson, J.).

## Federal and Delaware State Dilution Laws

156.     S&P asserts federal and Delaware State dilution claims against S&P Data.  To establish federal trademark dilution under U.S.C. § 1125(c), "the plaintiff must prove that: (1) it owns a mark that qualifies as "famous"; (2) the defendant is using the mark in interstate commerce; (3) defendant's use began after plaintiff's mark became famous; and (4) defendant's use causes dilution by lessening the capacity of the plaintiff's mark to identify and distinguish goods or services."  New Balance Athletics, Inc., 424 F. Supp. 3d at 350.

157.     Courts consider four factors when determining whether a mark is famous: (1) '[t]he duration, extent, and geographic reach of advertising and publicity of the mark'; (2) '[t]he amount, volumes, and geographic extent of sales of goods or services offered under the mark'; (3) '[t]he extent of actual recognition of the mark'; and (4) '[w]hether the mark was registered.'"  Id. at 350 (quoting 15 U.S.C. §§1125(c)(2)(A)).

158.     Once a court determines these factors of fame, it must look to these six factors to determine whether dilution occurred:  (1) '[t]he degree of similarity between the mark or trade name and the famous mark'; (2) '[t]he degree of inherent or acquired distinctiveness of the famous mark'; (3) '[t]he extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark'; (4) '[t]he degree of recognition of the famous mark'; (5) '[w]hether the user of the mark or trade name intended to create an association with the famous mark'; and (6) '[a]ny actual association between the mark or trade name and the famous mark.'"  New Balance Athletics, Inc., 424 F. Supp. 3d at 351 (quoting 15 U.S.C. § 1125(c)(2)(B)(i)-(vi)).

159.     The burden lies with the plaintiff to show "evidence and proof of the timing of two events: when the plaintiff's mark achieved that elevated status called 'fame' and when the defendant made its first use of the mark."  Chatam Int'l, Inc. v. Bodum, Inc., 157 F. Supp. 2d 549, 560 (E.D. Pa. 2001), aff'd, 40 F. App'x 685 (3d Cir. 2002) (quoting 3 MCCARTHY ON TRADEMARK

AND UNFAIR COMPETITION §24:96 (4th ed. 2000)); <u>Times Mirror Mags., Inc. v. Las Vegas Sports News, L.L.C.</u>, 212 F.3d 157, 162-63 (3d Cir. 2000) (stating that the mark in question must become famous before the defendants begins to use the mark for plaintiff to be entitled to an injunction against defendant's use).  The reference to "such use" in §1125(c) refers to the "any" use by the defendant in commerce, not to the particular use being challenged in the litigation or whatever use the plaintiff finds objectionable.  <u>Nissan Motor Co. v. Nissan Computer Corp.</u>, 378 F.3d 1002, 1012–13 (9th Cir. 2004).  "This rule reflects the fair and equitable principle that one should not be liable for dilution by the use of a mark which was legal when first used. " 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24:103 (5th ed.).

160.    The Delaware Trademark Act grants injunctive relief only where there is a "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this chapter, or a mark valid at common law or a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties, or the absence of confusion as to the source of goods or services."  6 <u>Del. C.</u> § 3313.

161.    Though a plaintiff must only demonstrate that there is a likelihood of dilution, not actual dilution, to prevail on a DTA claim, a showing of "likelihood of dilution requires 'some mental association between the marks' and can be defined as a 'blurring of a mark's product identification or the tarnishment of the affirmative associations a mark has come to convey.'" <u>Sanofi–Aventis</u>, 453 F. Supp. 2d at 855 (quoting <u>Barnes Grp. Inc. v. Connell Ltd. P'ship</u>, 793 F. Supp. 1277, 1304 (D. Del. 1992)); <u>Treasury Mgmt. Servs., Inc.</u>, 2017 WL 1821114, at *4–5.  The plaintiff must demonstrate such mental association, blurring, or tarnishment of its marks through the testimony of its witnesses to prevail on its DTA claim.  <u>See</u> <u>Sanofi–Aventis</u>, 453 F. Supp. 2d at 855.  Where the record demonstrates that the defendant's use of its marks is visually distinct

from the plaintiff's marks, thus reinforcing the distinction between the provided goods and services, the plaintiff cannot succeed. Barnes Grp. Inc., 793 F. Supp. at 1304.

**S&P's Claims Are Barred By The Doctrines Of Laches and the Statute of Limitations**

162.    Even if valid, S&P's claims are barred by the doctrine of laches. "Laches is one of several defenses" available to a defendant when a court finds infringement and dilution. Sanofi– Aventis, 453 F. Supp. 2d at 855. The federal Lanham Act (15 U.S.C. § 1051 et seq.) expressly provides the equitable doctrine of laches as an affirmative defense to the incontestability of a registered mark. See 15 U.S.C. § 1115(b)(9) ("[C]onclusive evidence of the right to use the registered mark shall be subject to proof of infringement . . . and shall be subject to . . . equitable principles, including laches, estoppel, and acquiescence[.]"). It is well-settled that the doctrine of laches consists of two elements: (1) inexcusable delay in bringing suit and (2) prejudice to the defendant as a result of the delay. See Emerson Elec. Co., 2019 WL 1397244, at *3 (citing Santana Prod., Inc., 401 F.3d at 138). Plaintiffs did not serve an interrogatory seeking Defendants' contentions as to laches.

163.    To successfully raise the affirmative defense of laches, the defendant must prove two elements: (1) the plaintiff inexcusably and unreasonably delayed in filing suit after the plaintiff knew or reasonably should have known its claim arose against the defendant; and (2) the defendant suffered material prejudice or injury due to the plaintiff's delay. McKesson Info. Sols. LLC v. Trizetto Grp., Inc., 426 F. Supp. 2d 203, 208 (D. Del. 2006).

164.    With regard to the first element, inexcusable delay, courts look to "the most analogous state statute of limitation" to determine the reasonableness of delay. Liqwd, Inc. v. L'Oreal USA, Inc., No. CV 17-14-JFB-SRF, 2019 WL 10252725, at *8 (D. Del. Apr. 30, 2019) (internal quotations omitted).

56

165.     As the Lanham Act contains no express statute of limitations for suits, courts must look to analogous state law to determine the appropriate statute of limitations period, as well as on the closely related questions of tolling and application of the statute of limitations.  See Beauty Time, Inc., 118 F.3d at 144.  The right to maintain a suit under the Lanham Act "occurs when the plaintiff receives some information that would cause a reasonable person to inquire into the situation further."  Newborn Bros. Co., Inc. v. Albion Eng'g Co., No. 12-2999, 2021 WL 1248490, at *2 (D.N.J. Apr. 5, 2021) (citing Symbol Techs., Inc. v. Proxim Inc., No. 01-801, 2004 WL 1770290, at *3 (D. Del. July 28, 2004)).  Therefore, the court must determine when a party knew or should have known of its claim under the Lanham Act to determine when the statute of limitations begins to run. See id. at *3 (finding that the statute of limitations started to run when the party was contacted regarding alleged infringing products and conducted an investigation in response); Kars 4 Kids Inc. v. Am. Can!, 8 F.4th 209, 221 (3d Cir. 2021) (finding the statute of limitations barred claims under the Lanham Act where wrongful conduct was discovered in 2003 and claim was not brought until 2015).

166.     Under Delaware law, the statute of limitations is three years.  See Sanofi-Aventis, 453 F. Supp. 2d at 855 (citing 6 Del. C. § 8106); Liqwd, Inc., 2019 WL 10252725, at *8 ("The most analogous statute of limitations to Lanham Act claims under Delaware law is the three-year statute of limitations for contract and related claims not involving personal injury under 10 Del. C. § 8106.").  Therefore, where a plaintiff has brought a claim under the Lanham Act more than three years after it arose, there is a "presumption of inexcusable delay and prejudice" in favor of the defendant.  Emerson Elec. Co. v. Emerson Quiet Kool Co., No. CV 17-1846-LPS, 2019 WL 1397244, at *3 (D. Del. Mar. 28, 2019) (quoting Santana Prod., Inc. v. Bobrick Washroom Equipment, Inc., 401 F.3d 123, 138 (3d Cir. 2005).

167.    The statute of limitations begins to run when the cause of action accrues, not when the injury is discovered.  See Weiss v. Swanson, 948 A.2d 433, 451 (Del. Ch. 2008).  In other words, the statute of limitations begins to run at the time of the alleged wrongful act, absent fraud, regardless if the plaintiff is ignorant of the cause of action.  See Beauty Time, Inc. v. VU Skin Sys., 118 F.3d 140, 143-44 (3d Cir. 1997) (finding that the statute of limitations begins to run when "the right to institute and maintain the suit arises."); In re Dean Witter P'ship Litig., 1998 WL 442456, at *4 (Del. Ch. July 17, 1998) (same); EP Henry Corp. v. Cambridge Pavers, Inc., No. CV 17-1538 (JHR/KMW), 2019 WL 6712341, at *5 (D.N.J. Dec. 10, 2019) (holding that under the Lanham Act. The statute of limitations begins to run when the right to institute and maintain the suit, through the exercise of due diligence, arises).

168.    Turning to the second element of a laches defense, a defendant can establish either evidentiary prejudice or economic prejudice.  McKesson Info. Sols. LLC , 426 F. Supp. 2d at 208. Evidentiary prejudice is shown where the plaintiff's inexcusable delay "curtailed the defendant's ability to present a full and fair defense" due to circumstances such as loss of evidence or the unreliability of memories.  Id.  Evidentiary prejudice includes deceased witnesses.  Id.; Joint Stock Soc'y v. UDV N. Am., Inc., 53 F. Supp. 2d 692, 717 (D. Del 1999), aff'd, 266 F.3d 164 (3d Cir. 2001); Kepner-Tregoe, Inc. v. Exec. Dev., Inc., 79 F. Supp. 2d 474, 491 (D.N.J. 1999), aff'd, 276 F.3d 577 (3d Cir. 2001).  Severe evidentiary prejudice occurs where the death of a witness who might clarify the issue at hand makes the relevant determination impossible.  Joint Stock Soc'y, 53 F. Supp. 2d at 721 n.31; Tenneco Auto. Operating Co. v. Visteon Corp., 375 F. Supp. 2d 375, 381 (D. Del. 2005).

169.    "Economic prejudice arises where a defendant suffers the loss of monetary investments or incurs damages which could have been prevented" if the action was filed without

delay.  McKesson Info. Sols. LLC, 426 F. Supp. 2d at 208-209. Economic prejudice is determined

by change in the economic position of the alleged infringer during the period of delay.  Magnetar

Techs. Corp. v. Six Flags Theme Parks Inc., 2014 WL 533425, at *6 (D. Del. Feb. 7, 2014).  The

Third Circuit has noted that "in the face of an unreasonable and inexcusable delay in filing suit,

laches will operate to bar relief when the defendant has suffered *either* economic or evidentiary

prejudice."  Joint Stock Soc'y, 53 F. Supp. 2d at 717 (citing Wanlass v. General Elec. Co., 148

F.3d 1334, 1337 (Fed.Cir.1998)) (emphasis in original).

170.    Once the statute of limitations expires, and the presumption of inexcusable delay

and prejudice applies, the plaintiff has the burden to prove both that any delay was excusable *and*

that the defendant would not face prejudice.  Sanofi-Aventis, 453 F. Supp. 2d at 855 (emphasis

added); see also Santana Prod., Inc., 401 F.3d at 140 ("In all of our cases addressing this issue, we

have held that the plaintiff's burden to rebut the presumption of laches is conjunctive. Not once

have we used the word 'or.'").  Thus, a plaintiff's claim is barred where it cannot prove both.

171.    Progressive encroachment does not apply to ordinary business growth.

"Progressive encroachment denotes some change in direction, such as expansion into different

territories or into a different type of business. It must be something more than a normal expansion

in quantity within its original line of business that most business will experience over time."  6

McCarthy on Trademarks § 31:20.

**VI.    EXHIBIT LISTS**

172.    S&P's list of pre-marked exhibits S&P may offer (other than those to be used for

impeachment) and S&P Data's evidentiary objections thereto is attached as **Exhibit A**.  S&P

Data's list of pre-marked exhibits it may offer (other than those to be used for impeachment) and S&P's evidentiary objections thereto is attached as **Exhibit B**.

173.    The parties reserve the right to update their respective exhibit lists for good cause shown, by agreement of the parties, or as permitted by the Court; to use any exhibit from the other parties' exhibit lists, any exhibit used at trial, and, for the purpose of impeachment, any exhibit, including items not listed; and to not introduce any exhibits from their respective exhibit lists.

174.    In addition to the objections identified in the parties' respective exhibit lists, the parties object to any document or exhibit identified on each other's exhibit list that is affected by the ruling on Plaintiffs' motion *in limine*.  The parties reserve the right to make additional objections at trial as appropriate in light of the trial evidence and testimony, to make objections to exhibits not identified as part of pretrial disclosures, and to make appropriate use of any document listed by other parties, notwithstanding the objections lodged thereto.

175.    S&P's trial exhibits will be identified with PTX numbers, starting with PTX 1. S&P's demonstrative exhibits will be identified with PDX numbers, starting with PDX 1.  S&P's physical trial exhibits will be identified with PPX numbers, starting with PPX 1.  S&P Data's trial exhibits will be identified with DTX numbers, starting with DTX 1.  S&P Data's demonstrative exhibits will be identified with DDX numbers, starting with DDX 1.  S&P Data's physical trial exhibits will be identified with DPX numbers, starting at DPX 1.

176.    Each party may use an exhibit that is listed on the other party's exhibit list, to the same effect as though it were listed on its own exhibit list, subject to evidentiary objections.  Any exhibit, once admitted, may be used equally by any party.  The inclusion of an exhibit on a party's exhibit list does not indicate that the party agrees that the exhibit is authentic or admissible for any

or all purposes and does not waive any evidentiary or other objections to that exhibit should the opposing party attempt to offer it into evidence.

177.    The parties will meet and confer in a further effort to resolve objections without the Court's intervention.

178.    The parties agree that any date listed on the exhibit list is not evidence of nor an admission of the date of the document, and that failing to list a date is neither evidence of nor an admission of whether the document is dated.  The parties agree that any description of a document on an exhibit list is provided for convenience only and shall not be used as an admission or otherwise as evidence regarding that document.

179.    Legible photocopies of documents may be offered and received in evidence in lieu of originals thereof, subject to all foundational requirements and other objections that might be made to the admissibility of originals and subject to the right of the party against which it is offered to inspect an original upon reasonable request in advance of any proposed use of the photocopy.

180.    Documents that were exchanged in native format in discovery may be imaged for use with witnesses so long as the contents of the native document are preserved without substantive change (non-format changes).  The parties will make available imaged copies of native trial exhibits for use with witnesses during the witness exhibit exchange described below.

181.    The parties agree that the demonstrative exhibits the parties intend to use at trial do not need to be included on their respective lists of trial exhibits attached as Exhibits A and B. The parties further agree that they will identify and exchange demonstrative exhibits to be used in opening statements by 2:00 p.m. Eastern Time on Sunday, March 13, 2022, shall exchange any objections to these demonstrative exhibits by 6:00 p.m. Eastern Time on Sunday, March 13, 2022, and shall meet and confer on any objections prior to the beginning of opening statements on

61

Monday, March 14, 2022.  If the parties cannot resolve their objections during any of the above meet and confers, they will submit the issue to the Court before trial starts each day.

182.    These exhibit lists include exhibits that may not be introduced into evidence.  A party's failure to introduce any exhibit appearing on its list shall not be commented on during trial.

183.    The parties request that, to the extent evidence is not admitted at the time of its use, counsel shall be permitted to move such evidence into evidence at other opportunities during the pendency of trial.

## VII.    WITNESSES AND DEPOSITION DESIGNATIONS

184.    Plaintiffs may call the following witnesses to testify, either in person or by deposition, at the trial in its case-in-chief:

        A.    Alice Cherry

        B.    Anna Linne

        C.    Kimberly Boyle

        D.    Dan Plashkes

        E.    David Borts

        F.    Laura Albert

        G.    Katherine Roome

        H.    Duncan Hall (representative of Internet Archive) by declaration pursuant to Fed. R. Evid. 901

        I.    Dean Harris

        J.    Hal Poret

185.    S&P Data may call the following witnesses to testify, either in person or by deposition, at the trial in its case-in-chief:

A. Dan Plashkes

B. David Borts

C. Kimberly Boyle

D. Alice Cherry

E. Melissa Kinsley

F. Anna Linne

G. Katherine Roome

H. Dean Harris

I. Laura Albert

J. Larry Chiagouris

186. Any witness not listed above is precluded from testifying during the parties' case-in-chief, absent good cause shown, except that each party reserves the right to call rebuttal witnesses as may be necessary, on reasonable notice to the opposing party. No party shall be required to present testimony from any witnesses on its list of witnesses.

187. The parties agree that Plaintiffs' case-in-chief shall not be deemed closed until they have had an opportunity to cross-examine Defendants' witnesses, Dan Plashkes and David Borts, whom Defendants intend to call as live witnesses. Plaintiffs reserve the right to introduce excerpts from the depositions of Mr. Plashkes and/or Mr. Borts as part of their case-in-chief in the event that Defendants fail to call one of those witnesses to testify.

188. With respect to each side's fact witnesses that they may call in person at trial who are also on the parties' list of trial witnesses, the parties agree, for the convenience of the witnesses, that the parties may cross such live witnesses beyond the scope of their direct examination.

189.    All witnesses other than one corporate representative for each side and expert witnesses will be sequestered.

190.    S&P's deposition designations, S&P Data's objections thereto, S&P Data's counter-designations, S&P's objections to those counter-designations, and S&P's reply designations are attached as **Exhibit C**.  S&P Data reserves its rights to object to counter-counter designations made by S&P.

191.    S&P Data's deposition designations, S&P's objections thereto, S&P's counter-designations, and S&P Data's objections to those counter-designations are attached as **Exhibit D**.  S&P reserves its rights to object to counter-counter designations made by S&P Data.

192.    The parties agree to supplement the pre-trial order by submitting before trial each side's deposition designations, objections, and counter-designations from the forthcoming deposition of Laura Albert.

193.    All irrelevant and redundant material such as objections and colloquy between counsel will be eliminated when the deposition is read or viewed at trial to the extent feasible.

194.    The parties may offer at trial some, all or none of the deposition testimony each has designated.  A party's decision not to introduce some or all of the testimony of a witness designated herein shall not be commented upon at trial.

195.    Any deposition testimony may be used at trial for the purpose of impeachment or rebuttal regardless of whether a party identified that testimony in its designations, if the testimony is otherwise competent for such purpose.

196.    To reduce the number of duplicative exhibits, where a deposition excerpt refers to a document by exhibit number and that identical document was also marked as a different exhibit number, a party may substitute one exhibit for another.

197.     In order to facilitate the scheduling of witnesses and trial time, the parties will identify their final lists of witnesses expected to testify live or by deposition two (2) calendar days before the direct examination is expected to take place, and will include the order in which the party intends to call the identified witnesses, as well as whether it intends to have the witness testify live or by deposition.  The parties will make these disclosures in good faith but will not be bound by them.  Further, the parties will identify the witnesses they expect to call the following day by 6:30 p.m. Eastern Time the day before the witness is expected to be called.

198.     Except in the case of cross-examination or witnesses called adversely, the parties will identify exhibits, including demonstrative and native exhibits, to be used with each witness by 6:30 p.m. Eastern Time the day before the direct examination is expected to take place. Objections to any such exhibits shall be made by 9:30 p.m. Eastern Time that same day.  The parties will meet and confer on any objections and will present any unresolved issues to the Court the morning of the proposed use of the disputed exhibit.

199.     For each witness that will be called wholly or in part by deposition, the offering party will provide the other party with a list of final deposition designations from previously designated testimony by 6:00 p.m. Eastern Time two calendar days before any such deposition testimony is expected to be read or played in Court, and the previously identified objections, counter-designations, and objections to counter-designations will apply.  The parties will meet and confer by 8:00 p.m. Eastern Time one (1) day before the deposition testimony is expected to be read or played in Court to resolve any objections to such designations and counter-designations. Once the parties have met and conferred, they will submit any remaining disputed designations for the Court's consideration no later than 9:00 a.m. Eastern Time on the day that such deposition testimony is expected to be read or played in Court or at such other time as required by the Court,

including highlighted copies of the disputed materials and an itemized list of the remaining objections.

200.    When deposition designation excerpts are introduced, all admissible deposition counter-designation and counter-counter-designation excerpts, whether offered by videotape or by transcript, will be introduced simultaneously in the sequence in which the testimony was originally given.  Each party will be charged for the time taken to read or play its designations.

## VIII.    PLAINTIFFS' INTENDED PROOF OF AFFIRMATIVE CLAIMS AND RELIEF SOUGHT

201.    S&P submits this brief statement of its intended proof and relief sought.    This statement is not intended to be exhaustive of all issues to be tried.  In addition to the items identified below, S&P intends to prove the matters identified in its expert reports and depositions of expert witnesses.  S&P also intends to offer proof on the issues of fact and issues of law identified by the parties in this Pre-Trial Order.   S&P also intends to offer proof to rebut the items on which S&P Data offers proof, and S&P reserves the right to amend and supplement this statement in response to S&P Data's pretrial activities.

202.    S&P intends to establish through the evidence at trial that it owns valid trademarks in its family of S&P Marks, and that S&P Data's use of S&P DATA in connection with its services causes a likelihood of confusion between the parties, their products and their marks.

203.    S&P intends to establish through the evidence at trial that its S&P Marks are famous and were so prior to use of S&P DATA by Defendants and that Defendants' use of S&P DATA blurs the distinctive quality of S&P's S&P Marks.

204.    S&P will seek the following monetary relief at trial: Costs and attorney's fees pursuant to 6 Del. C. §2004, 6 Del. C. §2533(b), and 15 U.S.C. § 1117(a).

66

205.     S&P will seek a permanent injunction prohibiting S&P Data from infringing and diluting the S&P Marks, including by using, promoting, advertising, displaying or exploiting in any way the S&P DATA name or mark or any other name or trademark that confusingly similar to the S&P Marks, in connection with any goods or services.

## IX.     **DEFENDANTS' INTENDED PROOF OF DEFENSES**

206.     S&P Data submits this brief statement of its intended proof.   This statement is not intended to be exhaustive of all issues to be tried.  In addition to the items identified below, S&P Data intends to prove the matters identified in its expert reports and depositions of expert witnesses.  S&P Data also intends to offer proof on the issues of fact and issues of law identified by the parties in this Pre-Trial Order.   S&P Data also intends to offer proof to rebut the items on which S&P offers proof, and S&P Data reserves the right to amend and supplement this statement in response to S&P's pretrial activities.

207.     S&P Data intends establish through evidence at trial that S&P does not have a recognizable family of marks.

208.      S&P Data intends establish through evidence at trial that S&P cannot show that its marks satisfy the requirements for "fame" under the Lanham Act.

209.     S&P Data intends to establish through evidence at trial that there is no likelihood of confusion between any of the asserted marks and the S&P DATA mark or the services provided in connection with it.

210.     S&P Data intends to establish through the evidence at trial that S&P Data's use of the S&P DATA mark does not blur the alleged distinctive quality of the asserted marks.

211.     S&P Data intends to establish through evidence at trial that it enjoys a presumption that S&P has unreasonably delayed bringing suit and caused S&P Data evidentiary and economic prejudice.

212.     S&P Data intends to establish that S&P cannot carry its burden to show entitlement to a permanent injunction.

## X.      **AMENDMENTS**

213.     S&P seeks to amend the Complaint to:

A.      Remove S&P INDICES (Reg. No. 3889706) from the list of pleaded S&P Marks (see ¶¶ 15-16 of the Amended Complaint, D.I. 14); and

B.      Delete its claim for monetary relief (damages or profits).

214.     S&P Data does not object to these amendments.

215.     S&P Data seeks to amend the Answer to remove the affirmative defenses of acquiescence and waiver.  S&P does not object to these amendments.

## XI.     **SETTLEMENT CERTIFICATION**

216.     The parties certify that they have engaged in a good faith effort to explore the resolution of the controversy by settlement but have not been able to resolve the case.

## XII.    **ADDITIONAL MATTERS -- CONFIDENTIALITY AT TRIAL**

217.     The parties agree to follow the provisions in the Protective Order (D.I. 27) entered in this case except as modified herein.   The Protective Order, insofar as it restricts the dissemination and use of "Protected Material," including documents marked "CONFIDENTIAL," "HIGHLY CONFIDENTIAL," or "CONFIDENTIAL-ATTORNEYS' EYES ONLY" shall not apply to the introduction of evidence at trial.

68

218.    Plaintiffs' position is that if a party believes that an exhibit or particular testimony requires special treatment because of its confidential nature, that party will raise the exhibit or testimony with the Court in advance and may request: (a) that the subject exhibit or testimony be sealed from the public; (b) that party representatives leave the courtroom during presentation of the exhibit or testimony in question; and/or (c) that the Court take such other protective measures as may be appropriate.

## XIII.   ANY OTHER MATTERS WHICH THE PARTIES DEEM APPROPRIATE

### A.    Motions *In Limine*

219.    S&P's motion *in limine* #1, S&P Data's opposition thereto, and S&P's reply are attached hereto as **Exhibit E**.

### B.    Type of Trial

220.    This trial is a bench trial.  See, e.g., Sanofi-Aventis, 453 F. Supp. 2d at 842 (bench trial held in case seeking permanent injunction and cancellation of defendant's mark).

### C.    Order of Proof

221.    Unless the Court specifies otherwise, the order of presentation of evidence will generally follow the burden of proof, as stated below:

A.    Opening Statements (S&P first, followed by S&P Data);

B.    S&P's presentation of evidence of its affirmative claims;

C.    S&P Data's presentation of evidence rebutting S&P's evidence of its affirmative claims, and presentation of evidence of affirmative defenses;

D.    S&P's presentation of evidence rebutting S&P Data's affirmative claims and evidence of affirmative defenses;

       **E.**     S&P Data's presentation of evidence rebutting S&P's evidence on S&P Data's affirmative defenses.

## XIV.   **ORDER TO CONTROL COURSE OF ACTION**

222.    This order shall control the subsequent course of the action, unless modified by the Court to prevent manifest injustice.

223.    The parties reserve the right to seek leave to supplement or amend this final pretrial order based on subsequent events or by agreement.

Dated:  February 14, 2021

SMITH, KATZENSTEIN & JENKINS LLP    RICHARDS, LAYTON & FINGER, P.A.

*/s/      Neal C. Belgam*                    */s/      Jason J. Rawnsley*
Neal C. Belgam (No. 2721)           Frederick L. Cottrell (No. 2555)
Jason Z. Miller (No. 6310)            Jason J. Rawnsley (No. 5379)
1000 West Street, Suite 1501        Valerie A. Caras (No. 6608)
Wilmington, DE  19801              920 North King Street
(302) 652-8400                       Wilmington, DE  19801
*nbelgam@skjlaw.com*              (302) 651-7700
*jmiller@skjlaw.com*                *cottrell@rlf.com*
                                       *rawnsley@rlf.com*
*Attorneys for Plaintiffs*           *caras@rlf.com*

*Of Counsel:*                      *Attorneys for Defendants*
Richard S. Mandel (Pro Hac Vice)
Joelle A. Milov (Pro Hac Vice)
114 West 47th Street
New York, NY 10036
*rsm@cll.com*
*jam@cll.com*