1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3

4    S&P GLOBAL, INC. and STANDARD   )
     & POOR'S FINANCIAL SERVICES LLC,)
5                                    )
                     Plaintiffs,     )
6                                    ) C.A. No. 20-701-RGA
     v.                              )
7                                    ) Trial Volume I
     S&P DATA LLC, S&P DATA OHIO     )
8    LLC, S&P DATA MICHIGAN LLC and  )
     S&P DATA NEW MEXICO LLC,        )
9                                    )
                     Defendants.     )
10

11                                   J. Caleb Boggs Courthouse
                                     844 North King Street
12                                   Wilmington, Delaware

13                                   Monday, March 14, 2022
                                     8:59 a.m.
14                                   Bench Trial

15

     BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.
16

17   APPEARANCES:

18             SMITH KATZENSTEIN & JENKINS LLP
               BY:  JASON MILLER, ESQUIRE
19             BY:  NEAL C. BELGAM, ESQUIRE

20                      -and-

21             COWAN LIEBOWITZ & LATMAN
               BY:  RICHARD S. MANDEL, ESQUIRE
22             BY:  JOELLE MILOV, ESQUIRE

23                                   For the Plaintiffs

24

25

```
 1    APPEARANCES CONTINUED:

 2                    RICHARDS LAYTON & FINGER, P.A.
                      BY:  STEVEN J. FINEMAN, ESQUIRE
 3                    BY:  JASON J. RAWNSLEY, ESQUIRE
                      BY:  JENNIFER SIEW, ESQUIRE
 4
                                   For the Defendants
 5

 6                    ***   PROCEEDINGS   ***

 7

 8                    DEPUTY CLERK:  All rise.  Court is now in

 9    session.  The Honorable Richard G. Andrews presiding.

10                    THE COURT:  Please be seated.  Is the Plaintiff

11    ready?

12                    MR. MILLER:  Yes.  Good morning, Your Honor.

13    Jason Miller from Smith, Katzenstein, and Jenkins on behalf

14    of Plaintiffs S&P Global Inc. and Standard & Poor's

15    Financial Services LLC, and with me today from my office

16    Neal Belgam.

17                    MR. BELGAM:  Good morning, Your Honor.

18                    MR. MILLER:  Also, Richard Mandel --

19                    MR. MANDEL:  Good morning, Your Honor.

20                    MR. MILLER:  And Joelle Milov from Cowan

21    Liebowitz and Latman.

22                    MS. MILOV:  Good morning, Your Honor.

23                    MR. MILLER:  And we also have Anna Linne,

24    general counsel for Plaintiffs.

25                    THE COURT:  All right.  Thank you, Mr. Miller.
```

1          Defendant, you're ready?

2          MR. RAWNSLEY:  We are, Your Honor.  Good

3    morning.  Jason Rawnsley from Richards, Layton, and Finger

4    for the S&P Data defendants.  I'm joined today by my

5    colleague, Mr. Steven Fineman of Richards, Layton, and

6    Finger as well as by David Borts, who is the Chief

7    Technology Officer and Chief Operating Officer of S&P Data.

8          THE COURT:  All right.  So good.  Welcome

9    everyone.

10          Mr. Mandel, I assume you're going to open here?

11          MR. MANDEL:  Yes, Your Honor.

12          Good morning, Your Honor.  I'm Richard Mandel of

13    Cowan, Liebowitz & Latman and together with Joelle Milov, we

14    will be presenting evidence during this trial on behalf of

15    the plaintiffs, S&P Global Inc. and Standard & Poor's

16    Financial Services.

17          Now, the plaintiffs bring this case to protect

18    one of their most valuable assets, its S&P brand against

19    trademark infringement and dilution resulting from

20    Defendants' use of the name S&P Data.  The S&P brand has a

21    long and venerable history.  Plaintiffs' rights in the S&P

22    mark trace back more than eight decades to a 1941 merger

23    between two financial publishers, Poor's Publishing Company

24    and Standard Statistics, and the S&P mark has been

25    continuously used since the merger to identify Plaintiffs'

1    financial information services.

2          Now, those services include providing business

3    data, analytics, research and commentary, credit ratings,

4    and financial indices, including most notably the S&P 500,

5    which is oftentimes referred to simply as the S&P.

6          The S&P 500 was formed back in the 1950s to

7    reflect a representation of the state of the U.S. stock

8    market, and it's become one of the most widely followed

9    equity indices in the world.  The evidence will show that

10   it's familiar not just to financial professionals, but to

11   members of the general public, who see news reports about

12   the S&P every day and who also own investments in things

13   like mutual funds and ETFs that are branded under the S&P

14   trademark pursuant to licenses that Plaintiffs entered into.

15         The evidence will show that Plaintiffs own a

16   famous family of S&P marks, with the S&P house mark serving

17   as the common umbrella brand for all the services offered.

18   Now, that family has expanded over the years as Plaintiff

19   has introduced new marks, all of those marks beginning with

20   the S&P designation, which serves as the primary brand

21   identifier uniting the entire family.  And most of those

22   other marks include descriptive-type wording after that that

23   may reflect various countries, or certain segments of the

24   market.  Obviously, less important in terms of

25   identification from a branding point of view.

1          Now, the evidence will show that S&P owns many

2    registrations, federal registrations, for its S&P mark,

3    including the mark S&P itself, and that many of those

4    registrations, including the S&P mark alone, are

5    incontestable.  The evidence will also show that Plaintiffs

6    own strong common law rights in the S&P marks by virtue of

7    continuous usage going back to the 1940s.  So we submit

8    there will be no serious dispute as to priority in this

9    case.

10          The evidence will also leave no doubt as to the

11   strength of Plaintiffs' trademarks and that the S&P mark

12   will be found, we believe, by the evidence to come into the

13   strongest category of marks, famous marks that are entitled

14   to the broadest scope of protection under the trademark

15   laws.

16          You will hear testimony from Alice Cherry, a

17   marketing executive at S&P Global who will testify about the

18   extensive advertising and promotion of the S&P marks, the

19   billions of dollars in revenues that have been generated

20   from services sold under those marks, and the substantial

21   media coverage going back over a period of decades in

22   publications all across the country reflecting the

23   recognition of the S&P marks.  You will also hear evidence

24   that Brand Finance, one of the leading brand valuation firms

25   in the world, valued the S&P brand at $6 billion and ranked

1     it within the top ten strongest commercial service brands.

2             Now, as one would expect, given all these

3     typical hallmarks of fame, the evidence will show that the

4     S&P mark enjoys a high degree of recognition.  And that's

5     reflected both in S&P's own internal market research, which

6     it conducts for its own business purposes, as well as in the

7     survey that's conducted for purposes of this litigation by

8     Plaintiffs' expert Hal Poret, showing a 67 percent

9     recognition rate among members of the general consuming

10    public.

11            Now, the defendants are going to bring in their

12    own expert, Dr. Chiagouris, and he's going to quibble with

13    some of the design decisions that Mr. Poret made, but

14    notably he's not going to offer any survey of his own,

15    either on fame, recognition or on the likelihood of

16    confusion factors, which he then plans to, apparently, opine

17    on.

18            And that's important because I think, Your

19    Honor, as you listen to the evidence and consider these

20    criticisms, you can also look at all the other evidence in

21    this case that really serves to substantiate Mr. Poret's

22    findings:  the media coverage, S&P's own market research,

23    the sales revenues and advertising expenditures.  It all

24    points in the same direction as Mr. Poret's survey, and that

25    is to show that the mark is highly recognized and is a

1    famous mark.  And it's also supported by the internal

2    findings in the survey itself.  As Mr. Poret will testify,

3    despite all of Dr. Chiagouris' criticisms, the results for

4    the other marks tested all fall in line exactly with what

5    one would expect them to be, so that the made-up, fictitious

6    name that served as kind of a control only generated one

7    percent recognition, showing that people actually understood

8    the question and weren't saying they recognized something

9    that they didn't.  The very well-known names like Goldman

10   Sachs and NASDAQ achieved extremely high percentages, and

11   the less well-known actual financial names like FTSE got a

12   much, much lower level of recognition of about 15 percent.

13   That all tends to be very self authenticating, as Mr. Poret

14   will explain.

15          And as I turn to the likelihood of confusion

16   factors, which Dr. Chiagouris also will be opining on, I

17   want to highlight the actual evidence on those points and

18   how we believe it points overwhelmingly in favor of a

19   likelihood of confusion.

20          Now, as Your Honor knows, in the Third Circuit,

21   likelihood of confusion is governed by the Lapp Test, and

22   there are a number of factors to be balanced.  And what the

23   Third Circuit has identified as the most important factor, a

24   real starting point in any trademark infringement case, is

25   the similarity of the marks.  The evidence here will show

1    what is obviously, we think, simple common sense.  The marks

2    are highly similar and confusingly similar.  The S&P

3    portion, which is the dominant portion of both parties'

4    marks, is identical, and the evidence will show that

5    Defendants' use of the term "data" only serves to heighten

6    the similarity because that term is itself uniquely and

7    naturally associated with the plaintiffs.  Everything that

8    they do, their whole business, the services, whether you're

9    talking about the indices or the credit ratings or the

10    analytics, is all driven by data.  And we will offer

11    evidence showing that the term "S&P data" has actually

12    appeared in many news articles going back over a period of

13    decades with reference to the plaintiffs' business.  So the

14    evidence will support that the term "S&P Data" would fit

15    quite naturally into the portfolio of Plaintiffs' S&P marks

16    that the public already identifies with the plaintiffs.

17            Now, another important factor is the strength of

18    the plaintiffs' mark, and, on that, we've already talked

19    about a lot of the evidence that will show that.  Obviously,

20    the evidence that goes to the fame of those marks also

21    supports that they're strong marks.  And while we expect

22    that the defendant may try to argue that that strength is

23    diminished by third party use, we'll ask the Court to pay

24    careful attention to what the evidence actually is on that

25    point because while we've heard a lot of talk from the

1    defendants' executives about the supposed large number of

2    third parties, we've seen, really, almost nothing in terms

3    of the kind of admissible proof that Courts look for in

4    trying to gauge the effect of that third party use, whether

5    it really had a marketplace impact, whether it's really

6    served to develop a significant scope of usage such that

7    it's weakened the plaintiffs' rights.  And you will also

8    hear evidence from S&P's in-house counsel Anna Linne, who

9    will testify about the very significant enforcement efforts

10   that Plaintiffs have made and taken over the years to

11   protect their trademarks, including in some decisions in

12   Court cases that have actually referenced the fame of the

13   S&P marks.

14           Now, turning to the similarity of the parties'

15   services and the channels of trade, another factor under the

16   likelihood-of-confusion analysis, the evidence we'll here

17   will show that Defendants' call center and associated

18   business services are sufficiently related to Plaintiffs'

19   financial information services to create a likelihood of

20   confusion.  And it's important to keep in mind here that

21   Defendants themselves position and identify their services

22   as really being more than a typical call center.  They tried

23   to emphasize how they've become almost akin as a quasi sales

24   force for their clients and operate as part of the

25   infrastructure of that business, providing not only services

1    to support the business, but information and advice on how

2    to best position those -- their clients' services, how to

3    sell them more effectively, really using data and analytics

4    in a very similar fashion to the way Plaintiff does for its

5    customers.

6           The evidence will also show that the parties'

7    services are often offered to some of the same types of

8    customers in some of the same industries, including the

9    financial industry, and the evidence will show that there

10   have actually been several instances of actual confusion in

11   that industry among entities like Discover, SoFi, Wells

12   Fargo, and Key Bank, where individuals mistakenly believed

13   that S&P Data was part of Standard & Poor's.

14          The evidence will also show that both Plaintiffs

15   and Defendants operate their business in a B-to-B-to-C

16   structure.  And what that means is while their direct

17   customers may tend to be large businesses, the services are

18   offered in such a way that the public itself interacts with

19   the parties' marks and is exposed to those marks on a

20   regular basis.  In the case of Plaintiffs, that may be

21   individual investors who go to a financial website looking

22   for data that's licensed by the plaintiffs or who own

23   investments in ETF, or mutual funds that are licensed under

24   the S&P name.  In the case of Defendants, that may be

25   individuals who are actually called by the defendants' sales

1    agent who's selling to them, and in at least some states,

2    the defendants actually have to identify themselves on those

3    calls as being from S&P Data.  So there is another layer of

4    potential confusion in addition to the parties' direct

5    customers.

6            Now, turning to sophistication and the level of

7    care that the consumer is likely to exercise, we know that

8    defendants place a great deal of emphasis on this, and we

9    know we're going to hear a lot about that.  And they're

10   going to say this isn't an impulse purchase, and we don't

11   dispute that.  Nobody is claiming that somebody buys the

12   parties' services the way they buy a stick of gum or an item

13   at a checkout counter in line.  It's not an impulse

14   purchase.

15           But at the same time, as I've already noted,

16   there is evidence of actual confusion even among these

17   sophisticated individuals.  For example, you'll hear

18   evidence of the case of one person from SoFi who actually

19   went so far as to express interest in setting up an initial

20   immediate meeting with S&P Data about their services because

21   he thought they were part of Standard & Poor's.  If those

22   people with that level of sophistication can be confused, we

23   submit anyone can be confused.

24           Now, we know that the defendants will try to

25   downplay this evidence and will suggest it's a limited

1    number of instances and that people eventually realize their

2    mistakes before culminating a transaction, but there is a

3    reason why trademark law considers evidence of actual

4    confusion so important.  It's because it is notoriously

5    difficult to find, and it's why plaintiffs are not required

6    to prove actual confusion at all.  They're only required to

7    show a likelihood of confusion.  And we submit that for

8    every example of actual confusion that comes to light, there

9    are likely many more that never see the light of day and

10   that you never hear about.  So the fact that we will be able

11   to show these examples of confusion is persuasive proof and

12   important evidence that a likelihood of confusion exists in

13   this case.  And even if some of those individuals eventually

14   realize their mistake, even the initial interest they

15   express is relevant evidence of actionable confusion.

16          Now, the last factor I want to talk about in the

17   likelihood-of-confusion analysis is the defendants' intent.

18   And of course, it's not necessary that the defendant act in

19   bad faith for there to be an infringement.  When looking at

20   intent, Your Honor can consider whether they exercised

21   adequate care in choosing the mark.  And on that point, we

22   believe there is important evidence relating to an initial

23   dispute that took place in Canada with an earlier company

24   that Mr. Plashkes had formed that also used the name S&P

25   Data.  Now, I want to talk a little bit about that evidence.

1    I know it was the subject of in limine motions, and I think

2    it's important to put it in context and see where it fits in

3    this case.

4              The evidence is going to show that whatever

5    Mr. Plashkes and Mr. Borts may say about that dispute, the

6    paper record makes absolutely clear that that dispute got

7    resolved when the company to whom Mr. Plashkes sold his

8    business decided to drop that name and abandon the trademark

9    applications in Canada that had been the subject of McGraw

10   Hill, Plaintiff's predecessor, their initial complaint.

11   That happened years after Mr. Borts and Mr. Plashkes had

12   long left the business and moved on, and they candidly

13   acknowledged at their depositions that the decision on what

14   to do with the S&P Data mark from that first dispute was a

15   decision that belonged to that company that had acquired the

16   rights.  The only reason we're here today, that the

17   defendant is even in a position where it can have adopted

18   that mark, is because of that abandonment, because that

19   company to whom it sold the rights had moved on and away

20   from it for whatever reasons.

21             So if we're looking at that as an enforcement

22   matter, the evidence is going to make clear that it ended in

23   a successful resolution in McGraw Hill's favor, but what we

24   think is important about that evidence is it unquestionably

25   shows that Mr. Borts and Mr. Plashkes knew about the

1    plaintiffs' S&P mark, and any reasonable level of research

2    would have revealed that the dispute had existed after they

3    left and that the mark was eventually dropped by the

4    person -- the company to whom they sold the business after

5    continued complaints from McGraw Hill.

6           And while that dispute was about Canada, it

7    would not have taken much research or investigation to

8    recognize that McGraw Hill is hardly a Canadian company.

9    It's an American company, and its S&P marks are likely more

10   well known here in the United States.  In fact, we submit

11   it's hard to really believe that sophisticated

12   businesspeople like Mr. Borts and Mr. Plashkes weren't well

13   aware of the S&P 500 and the S&P marks already.  And we

14   believe a reasonable inference from the evidence is that

15   that is precisely the reason, when they eventually formed

16   the new business, the company that is actually in dispute

17   here and that's at issue in this case today, why for many

18   years they identified it as SP Data and not S&P Data.

19          Now, that evidence is important, and before I

20   explain why, so -- I just want to say, putting all of that

21   together, we think it will overwhelmingly support a

22   likelihood of confusion in this case.  And a lot of that

23   same evidence, I'm not going to repeat it, also goes to the

24   issue of likelihood of dilution as well, which, as Your

25   Honor knows, can be found even in the absence of a

1    likelihood of confusion.

2            So, the last point I want to point to, and if I

3    can ask to just set up the demonstrative we have, I want to

4    talk a little bit about the evidence that's going to be

5    relevant to the issue of our request for injunctive relief

6    and Defendants' laches defense.  And I raise those two

7    points together because they are interrelated.  The fact

8    that we're here dealing with a claim only for injunctive

9    relief, not for damages, affects the laches analysis, and

10   under the case law, the Third Circuit has said in these

11   circumstances, to bar relief, you really need an outrageous

12   delay amounting to a virtual abandonment of the plaintiff's

13   right for relief, and we submit that that is not the case,

14   and part of the reason, despite Defendants' effort to talk

15   about how long they've been using, the claimed delay that

16   they talk about really has to be understood in context.

17           As I indicated, when you start in 2004 with the

18   formation of these businesses, they're clearly identifying

19   it publicly as SP Data Response Management, not S&P Data.

20   And that will be shown from authenticated website printouts

21   from Wayback Machine, which collects old internet pages and

22   shows that's the only name that appeared on the website,

23   really, for about a decade.

24           And even when they opened call centers in the

25   United States physically for the first time in, I believe,

1  around 2010 in Cleveland, you will see evidence that when

2  Mr. Plashkes gave an interview on local TV, he's identified

3  as the CEO of SP data, not S&P Data, and that name also

4  appears across the bottom of screen on a banner, CEO, SP

5  Data.

6           And that's not by accident.  That's not just

7  that somebody made a mistake because there's lot of other

8  evidence that shows that the defendant was using that name

9  in their business, and Mr. Borts admitted that at his

10  deposition.  And you will see, for example, that even the

11  employee handbook that was in use as late as 2012 at the

12  Ohio center repeatedly refers to the defendant as SP Data.

13          So it's really not until around 2014 that you

14  really start to see an S&P Data starting to be used more in

15  public-facing materials like on the website, which is really

16  the primary public-facing material.  And you can see that on

17  our demonstrative in the first logo.  It's almost -- the

18  ampersand is almost partially obscured.  It kind of forms

19  part of the continuous loop with the S&P as part of it.

20  "Data" is in pretty big wording right next to it

21  immediately.  When they moved to the final logo you see,

22  which is the logo that was in place at the time this lawsuit

23  was commenced and, I believe, was introduced in late 2016,

24  now you'll see the ampersand very clearly delineated, the

25  "S&P" in much larger size than the term "data," clearly

1    emphasizing it.

2            And that, the evidence will show, is part of a

3    deliberate rebranding effort.  You will hear testimony,

4    deposition testimony, from Dean Harris, who is a branding

5    consultant who S&P Data actually hired to help them with the

6    website redesign and logo redesign that took place at this

7    time.  And he will explain how his mission was to increase

8    the brand awareness of the S&P Data name.  And one of the

9    very first things he did when he did an analysis of

10   strengths, weaknesses, opportunities, and threats, what's

11   called a SWOT analysis, is point out that the lack of brand

12   awareness in the United States was a real weakness for the

13   S&P Data brand, and he wanted to increase that.  He actually

14   even went so far as to suggest that they drop the name

15   entirely and change to a different name, which is important

16   evidence because at that late juncture, it shows that there

17   was still very limited awareness that had actually been

18   established here in the United States.

19           And he also, then, developed a branding strategy

20   built around the call center that sells.  For the first

21   time, they identified S&P as standing for sales and

22   performance.  It was never promoted that way before.  It was

23   never really promoted as standing for anything.  The

24   evidence will show that it was initially adopted to reflect

25   the initials of the founders, Mr. Plashkes and Mr. Shear,

 1    Mr. Shear was long gone from the business pretty soon after

 2    the first business was formed.  And it's not as if

 3    Defendants were promoting S&P as standing for anything.  And

 4    when they started promoting it as standing for sales and

 5    performance, that's an extremely broad promotion that ties

 6    into the idea that we're not just a call center.  We're

 7    offering you services that you can really use to help run

 8    your business and to identify better how to sell.

 9              So, that's all important evidence, and it's

10    important because when Your Honor takes into account

11    injunctive relief and laches, which are equitable, you know

12    laches is an equitable defense, injunctive relief,

13    obviously, tries to reach the equitable result, Your Honor

14    can take into account all of the evidence that bears on the

15    equities here, and that will include the fact that Defendant

16    was historically known for a long period of time as SP Data.

17    It will include the fact that they established very limited

18    brand awareness in the U.S., that they -- their own CEO

19    acknowledged making pretty negligible efforts at marketing,

20    and that they were long aware for the potential of a

21    dispute, for this very dispute that we're here for today.

22    And what will also be part of the equation will be the need

23    to protect the public against confusion and also the need to

24    protect S&P's enormous investment in its S&P brand.

25              And when you've heard all of that evidence, Your

1    Honor, we submit that it will show that an injunction

2    against the continued use of the S&P Data name is

3    appropriate and necessary, and we will ask the Court to

4    enter that relief.  Thank you.

5              THE COURT:  Okay.  Thank you, Mr. Mandel.

6              Mr. Rawnsley.

7              MR. RAWNSLEY:  Good morning, Your Honor.  We're

8    going to start by providing some background about S&P Data.

9              S&P Data is an onshore, outsourced contact

10   center.  Contact center is a business function that handles

11   interactions between a company and its customers, whether by

12   way of customer inquiries or by way of handling

13   transactions.  Now, this is a business function that many

14   companies choose to outsource, either wholly or partially or

15   even project-based, and that's where S&P Data comes in, and

16   those are the services that it provides.

17             S&P Data's clients are sophisticated companies.

18   They include ADP.  They include Comcast.  They include Wells

19   Fargo, and they include American Express.  And many of its

20   customers are long-term and loyal and have been with it for

21   a very long time, some going back to the original

22   incarnation of S&P Data formed in Canada in 1986.  Now,

23   while much of the contact center industry has been moved

24   offshore, S&P Data remains a North American company

25   primarily based throughout the United States and Canada.

1              S&P Data's clients know who they are dealing

2       with.   They know who S&P Data are, and they know what they

3       are getting, and this is because of the way S&P Data markets

4       itself.   S&P Data's sales presentations have traditionally

5       been performed by one of the three founders of the company.

6       They're often conducted in person.   S&P Data relies on its

7       reputation and it relies on its excellence and its long-term

8       track record of customers to gain clients.   You heard

9       Mr. Mandel state that Mr. Plashkes said we don't do much

10      marketing with the -- with the S&P Data name.   And that's

11      correct.   S&P Data has not done a lot of traditional

12      marketing because it does not do the kind of marketing that

13      Plaintiffs engage in.

14             Now, the evidence is going to show that the

15      costs of S&P Data's services range from tens of thousands to

16      millions or more per month.   They're going to show that the

17      negotiation of a contract to hire Defendants takes months as

18      well.   These are negotiations being conducted with the

19      clients the whole time.   They're constantly speaking with

20      S&P Data.   S&P Data, once it begins to provide its services,

21      it has to closely integrate with its customer's services.

22             Now, S&P Data is continuously in contact with

23      its clients throughout the work it provides for them.   That

24      is the very nature of its business.   Now, it's against this

25      backdrop that Plaintiffs have to prove likelihood of

1    confusion, likelihood of dilution.  And the Court is going

2    to hear that Plaintiffs' services are similarly very

3    expensive.  They range from the thousands up until the, into

4    the millions of dollars as well.  They also are created on a

5    contract basis where negotiations can take from weeks up to

6    months, and Plaintiffs are -- their clients are about as

7    sophisticated as it gets.  Their clients are sovereigns.

8    Their clients include educational institutions.  Their

9    clients include investment banks, and they are selling to

10   the asset managers and to the financial analysts within

11   those clients.

12          Now, the services Plaintiffs offer are financial

13   information services.  The Court is not going to hear any

14   evidence showing that that is in any way related or a

15   substitute for what S&P Data does.  They are simply not in

16   the same market.  They are not in the same business.

17          Now, Your Honor is going to hear from Mr. Dan

18   Plashkes, the CEO of S&P Data, and Mr. David Borts, who is

19   the Chief Operating Officer and Chief Technology Officer.

20   Mr. Plashkes is going to discuss how in 1986, he founded S&P

21   Data in Canada.  He's going to explain that the "S&P" came

22   from the names of the initial founders, Mr. Michael Shear

23   and Mr. Plashkes.  Similarly, Plaintiffs, who were

24   originally founded by Henry Varnum Poor, and they're also

25   deprecating the use of Standard and Poor's in favor of S&P.

```
 1              Now, Mr. Plashkes and Mr. Borts are both going

 2     to talk about the importance of data to S&P Data's

 3     recognition among the clients that it serves.  Data was

 4     important in 1986 when they chose the name because data is

 5     how S&P Data distinguishes itself from its competitors.  It

 6     has always been embracing technology.  It has always been

 7     trying to be ahead of its competitors, and it has always

 8     been continuously monitoring and tracking the information

 9     that it develops so that it can improve its own services.

10              Mr. Borts is going to explain how the company

11     used the phrase "SP Data" for a period of time alongside the

12     term "S&P Data."  Domain names, when they refounded the

13     company, cannot include ampersands, and so, based on

14     previous experience with a previous domain name that they

15     had in 1986 and on, they, for a while, chose to use SP Data

16     in certain forms, but the Court is also going to see that

17     the S&P Data name was being used with clients within this

18     period.  The Court is going to see evidence from newspapers

19     recognizing that S&P Data is also known as SP Data.

20              Now, Your Honor has just heard Plaintiffs also

21     allege number of instance of actual confusion, and there are

22     a few things to keep in mind as that evidence comes in.

23              First, the number of incidents has to be

24     considered against the number of interactions that S&P Data

25     engages in as it's providing services to its clients every
```

1    year.  They make millions of calls per year.  And the Court

2    is not going to hear any evidence of any actual confusion

3    arising from any one of those phone calls.

4            Second, the evidence is going to show that each

5    purported incident of actual confusion is ad hoc.  They are

6    not systematic.  Nothing connects one to the other.  And the

7    important -- confusion is readily dispelled because of the

8    simple fact because the parties cannot provide the same

9    services.  They do not, and they cannot.  And without any

10   effect on the marketplace, this -- this evidence of actual

11   confusion, alleged actual confusion, the Third Circuit has

12   told us, carries less weight when there's not an effect on

13   the marketplace.

14           Now, here's some other things the plaintiff is

15   not going to be able to show.  The plaintiffs have no expert

16   testimony on likelihood of confusion.  The plaintiffs have

17   no expert testimony that shows blurring of the parties'

18   respective marks.  The plaintiffs have no expert testimony

19   showing that the public recognizes any phrase as coming from

20   a single source as long as it's preceded by the name "S&P."

21           Now, Plaintiffs, we've heard, have conducted a

22   survey on recognition on the S&P name.  Now, fame is the

23   gating issue for Plaintiffs' dilution claim.  If there's no

24   fame, you don't get to the rest of the analysis.  It stops.

25   And the Court is going to have to determine whether

1    Plaintiffs carried the burden to show that the S&P name was

2    famous among the general members of the consuming public as

3    a designation of goods and services not today, not when the

4    survey was conducted, but when S&P Data first began

5    commercial use of its mark, and the evidence is going to

6    show that that occurred in 2004.

7              Now, we heard about, in 2014, how Defendants

8    began using the name S&P Data regularly, and that's correct.

9    S&P Data around 2013 and 2014 did make an effort to have a

10   single focus in its branding and go to the public more often

11   as S&P Data.  But in 2014, anyone looking at S&P Data's

12   website would know a few things.  They would know that the

13   name was S&P Data.  They would know that S&P Data had

14   clients who worked in the financial industry as well as

15   other industries.  They would know that S&P Data, at that

16   time, was touting its innovative social media presence.

17             Now, it is in this year, 2014, that S&P Data

18   came to the attention of the plaintiffs, that we know of.

19   Now, Plaintiffs had access to S&P Data's website at that

20   time.  It's not credible that they didn't look at it.  But

21   when it came to their attention in 2014, Plaintiffs referred

22   the matter to their general counsel.  The matter was

23   forwarded to Plaintiffs' outside trademark counsel at the

24   law firm of Proskauer Rose.  Under Plaintiffs' direction,

25   Proskauer Rose retained a trademark investigation firm who

1    investigated S&P Data.  And as a result of all this in 2014,

2    knowing that there was a company out there named S&P Data

3    that had clients in the financial service industry,

4    Plaintiffs did nothing as to S&P Data as a result of that in

5    2014.  They did nothing in 2015, nothing in 2016, nothing in

6    2017, and nothing in 2018.

7            Now, what was S&P Data doing during this time?

8    Starting in 2014, S&P Data was investing in itself.  S&P

9    Data opened two more facilities, one in New Mexico and one

10   in Michigan.  S&P Data, as you heard from Plaintiffs,

11   retained a consultant to promote the name further under the

12   S&P Data name.

13           In 2019, however, with no new incident of

14   confusion since 2014 -- and I should say alleged

15   confusion -- coming to the attention of Plaintiffs, nothing

16   in that period, on August 5th, 2019, Plaintiffs sent a cease

17   and desist letter to S&P Data that led to this litigation.

18   Now, in the month leading up to it, Plaintiffs were

19   considering rebranding one of their services, and they were

20   considering a host of names that used "S&P" and "data."  And

21   as far as we know, that's the only thing that changed

22   between 2014 and 2019 that led to the cease and desist

23   letter.

24           Now, Plaintiffs are going to attempt to rely

25   upon an incident with McGraw Hill in the late 1990s with the

1    original S&P Data Canada, and Plaintiffs place great weight

2    on what happens later towards the end of that incident,

3    around 1999 or 2000, but Plaintiffs don't dispute that

4    Mr. Plashkes and Mr. Borts were gone from the company by

5    1998.  They're not going to be able to show any knowledge of

6    what ultimately happened in the possession of Mr. Plashkes

7    and Mr. Borts.

8            But the Court is also going to hear how a key

9    witness to those events, Mr. Martin Teplitsky, died in 2016

10   after plaintiffs became aware in 2014 of S&P Data.  Now,

11   when the McGraw Hill incident arose in the late 1990s,

12   Mr. Dan Plashkes consulted Mr. Martin Teplitsky of the law

13   firm of Teplitsky Colson, and Mr. Plashkes is going to

14   testify to his recollection that the matter was resolved as

15   far as he knew.  We have no access to the testimony of

16   Mr. Teplitsky, and we don't have access to the documents of

17   Mr. Teplitsky to refresh anyone's recollection because the

18   law firm which remains today in existence, Teplitsky Colson,

19   they no longer have those records.  And then on Plaintiffs'

20   side, the evidentiary record is also suffering from the

21   absence.  Plaintiffs have produced only correspondence

22   directed to S&P Data and those operating on its behalf, yet

23   Plaintiffs have produced no correspondence, no communication

24   directed to Plaintiffs from or on behalf of S&P Data during

25   the time period in the late 1990s.

1          Now, this is prejudice that we've suffered, and

2     this is the laches defense which the plaintiffs have made

3     reference to, and the important thing about the laches

4     defense is that if Plaintiffs wait beyond the statute of

5     limitations period, a presumption is raised in favor of

6     undue prejudice and delay.  That occurred here, based on at

7     least 2014.  Between 2014, 2019, the earliest contact.

8     2020, the lawsuit is filed.  And we submit, Your Honor, the

9     plaintiffs are not going to be able to rebut that

10    presumption of undue prejudice.

11          So in short, Your Honor, these parties do very

12    different things.  They are not in the same markets.  They

13    may sell to the same companies, but, remember, they are not

14    talking to the same people at those companies.  A food

15    service vendor and an enterprise software vendor may both

16    sell to the same company, but that doesn't mean that they

17    are targeting that same company in any similar sense.

18          So for all of these reasons, Your Honor, we

19    don't believe the plaintiffs are going to be able to carry

20    their burden to prove likelihood of confusion and to prove

21    dilution.  Thank you.

22          THE COURT:  Mr. Rawnsley, I thought there was no

23    statute of limitations.  What is the length of the statute

24    of limitations that you think applies here?

25          MR. RAWNSLEY:  Yes, happy to explain it, Your

1    Honor.  So Your Honor's referring to our summary judgment

2    briefing in which we were addressing the straightforward

3    statute of limitations under Delaware State law as to

4    Delaware State common law claims.  For federal claims, for

5    Lanham Act claims, which we did not move on, what happens is

6    the Court is supposed to look analogously to the Delaware,

7    or the state in which the Court sits, here Delaware, statute

8    of limitations to determine what the analogous period would

9    be.  And a presumption in favor of laches is raised if the

10   delay took beyond what the statute of limitations would be

11   on the similar claims within the State of Delaware, and that

12   would be three years.  That's how laches operates at the

13   federal level, Your Honor.

14            THE COURT:  All right.  Thank you.

15            MR. MILLER:  Plaintiffs call Alice Cherry to the

16   stand.

17            MR. MILLER:  May we approach, Your Honor, to

18   give the binders?

19            THE COURT:  Yes.  Yes.

20            DEPUTY CLERK:  Please state and spell your full

21   name for the record.

22            THE WITNESS:  Alice Cherry.  Alice, A-L-I-C-E,

23   Cherry, C-H-E-R-R-Y.

24            DEPUTY CLERK:  Do you affirm that the testimony

25   you are about to give to the Court in the case now pending

Cherry - Direct

 1    will be the truth, the whole truth and nothing but the

 2    truth, you do so affirm?

 3                    THE WITNESS:  I do.

 4                    DEPUTY CLERK:  Thank you.  You can sit there.

 5                    THE WITNESS:  Thank you.

 6                    ALICE CHERRY, the witness herein, after having

 7    been duly sworn under oath, was examined and testified as

 8    follows:

 9                        DIRECT EXAMINATION

10    BY MR. MANDEL:

11    Q.    Good morning, Ms. Cherry.  Can you begin by briefly

12    describing your educational background.

13    A.    Sure.  I went to college at George Washington

14    University in and graduated in 1996.  I had a focus in

15    psychology and got my B.A.

16    Q.    And upon graduating from GW, did you begin your

17    professional career?

18    A.    I did.  I dove right in.  I started to work for a

19    bath and beauty products company.

20    Q.    And approximately how long were you in that position?

21    A.    The company was called Jungle Care.  I was there

22    around four years.

23    Q.    Was that a marketing position?

24    A.    It was a marketing position.

25    Q.    And did you move to a new position after that?

Cherry - Direct

1   A.      Yes, I started to work for another startup called

2   High Fusion.  That was eventually bought by Sylvan.

3   Q.      And how long, approximately, were you in that

4   position?

5   A.      You know, another four years or so.

6   Q.      Was that also a marketing position?

7   A.      It was a marketing position.

8   Q.      And what did you do next in your career?

9   A.      So, I worked for Sylvan, more of their -- the Sylvan

10  section that focused on providing free tutoring to students.

11  Q.      And how long were you doing that for?

12  A.      Another few years.

13  Q.      And what did you do at that point?

14  A.      At that point, I was recruited into a role at the

15  McGraw Hill companies.

16  Q.      And when you began at McGraw Hill, approximately what

17  year was that?

18  A.      2007.

19  Q.      What was your first position there?

20  A.      I was in charge of brand and digital.

21  Q.      And what side of McGraw Hill's business were you

22  working in?

23  A.      So McGraw Hill Company had a few businesses.  I was

24  in the higher education division.

25  Q.      How long did you stay at the education side of the

Cherry - Direct

1   business?

2   A.      So, at education, I stayed for around three years

3   before I moved to a corporate role.

4   Q.      And what was your corporate position?

5   A.      I was the director of marketing.

6   Q.      And did that position have any responsibilities with

7   respect to the Standard and Poor's portion of the McGraw

8   Hill business?

9   A.      Yes.  So once I moved to corporate marketing for the

10  McGraw Hill Companies -- I mean, it was -- McGraw Hill

11  Companies was a rather large business.  I worked for the VP

12  of marketing, who was responsible for the overall

13  positioning of all the businesses that fell underneath

14  McGraw Hill companies, which included Standard and Poor's.

15  Q.      And approximately how long were you in that position

16  for?

17  A.      I was in that role a little less than a year.

18  Q.      What did you do then?

19  A.      And then I moved to the Standard & Poor's business.

20  Q.      And what position did you take within Standard &

21  Poor's?

22  A.      I worked within the marketing, brand and

23  communications department and was in charge of digital

24  marketing there.

25  Q.      And how long did you hold that position for?

Cherry - Direct

1    A.      Almost two years.

2    Q.      What did you do next?

3    A.      And then I moved to Capital IQ or S&P Capital IQ, the

4    financial data analytics business, and was the director of

5    marketing there.

6    Q.      And can you describe, generally, what that business

7    involved at that time?

8    A.      Sure.  So Capital IQ focuses on providing financial

9    data analytics, software, feeds, to financial institutional

10   investors.  We also work with corporations, insurance

11   companies, as well as academia and universities.

12   Q.      And what were your responsibilities in that position?

13   A.      So, I worked really closely with the sales and

14   marketing department.  I was in charge of overall, you know,

15   marketing and representation of the brand and engagement

16   online and digital channels.

17   Q.      How long were you in that position with Capital IQ?

18   A.      About four years.

19   Q.      And what does that take us to, if you can remember in

20   the progression?

21   A.      Sure.  It's my life history here.  So I moved over to

22   take a larger role across S&P back in corporate marketing as

23   the head of corporate marketing for S&P Global.

24   Q.      When did you become the head of corporate marketing

25   for S&P Global?

Cherry - Direct

1   A.      In 2016.

2   Q.      Now, as of 2016, did McGraw Hill still have an

3   educational component to its business?

4   A.      You know, 2016 is when everything changed.  You know,

5   McGraw Hill Companies has had a lot of changes sort of

6   leading up to 2016.

7   Q.      Can you describe generally what those changes were?

8   A.      Sure.  I mean, taking a few steps back, Standard &

9   Poor's is a company and division that has been around for a

10  very long time.  You know, our heritage really started in

11  the late 1800s.  It's a founder's culture where S&P was

12  founded by Henry Varnum Poor in an effort to create

13  transparency in the railroad markets, and that's where Henry

14  Varnum Poor was the creator.

15          Later on, there's been a series of acquisitions

16  through McGraw Hill Companies that led to McGraw Hill and

17  the creation of certain McGraw Hill Company.  In -- I think

18  it was in 2013, McGraw Hill Companies sold off its education

19  division because McGraw Hill's best known as a brand, it's

20  known for education.  And then McGraw Hill Financial was

21  created.  McGraw Hill Financial then rebranded and also

22  launched -- really, it was really focused, essentially, on

23  the financial portfolio, which was Standard & Poor's, and

24  other financial businesses, and that launched in 2016 under

25  S&P Global.

Cherry - Direct

1   Q.      Okay.  So let's back up and talk about some of that.

2   You mentioned the history going back to the 1800s.  When did

3   Standard & Poor's as a company first come into existence?

4   A.      Sure.  So Standard & Poor's came together in around

5   the 1940s when you have Henry Varnum Poor Publishing bought

6   Standard Statistics, and so Standard & Poor's really, you

7   know, S&P started together collectively in the 1940s.

8   Q.      And when -- or how far back does Standard & Poor's

9   use of the S&P trademark go?

10  A.      You know, it's before my lifetime, obviously.  You

11  know, starting in the 1940s.

12  Q.      And do you know that based on your knowledge of the

13  history of the company?

14  A.      Yes.

15  Q.      Now, when did Standard & Poor's become part of McGraw

16  Hill?

17  A.      So, McGraw Hill Companies purchased Standard & Poor's

18  in the 1960s.

19  Q.      Okay.  So, let's focus in a little more detail on

20  what the business of S&P is.  Can you describe generally

21  what Standard & Poor's business has been and is.

22  A.      Sure.  So, at S&P Global, we're a financial data and

23  analytics company focusing on critical data and insights

24  that are essential, you know, to institutional investors.

25  We have a few different parts of the business.  We have

Cherry - Direct

1     ratings.  We're best known for our ratings business.

2     Indices, I'm sure you've heard of the S&P 500.  We have a

3     market intelligence division as well as work we do with

4     benchmarks in pricing and commodities.

5     Q.    So let's break that up.  Let's start with the indices

6     business that you identified.  Can you just summarize what

7     that business consists of.

8     A.    Sure.  So at Indices, we offer a range of benchmarks.

9     I mentioned the S&P 500.  Probably most familiar with that.

10    We have thousands of indices, you know, ETFs.  We license

11    data, and we work really closely with institutional

12    investors or broker dealers.

13    Q.    And you mentioned ETFs.  Can you just explain how

14    that relationship works in terms of the making it available

15    ETFs.

16    A.    Sure, if it's an ETF or an index, that is something

17    that is available by -- for retail investors to invest in --

18    through their broker dealer, and it's something that we have

19    a variety of, you know, offerings, if it is an index or an

20    ETF, if it's focused on company -- you know S&P Commodities

21    or S&P HER or S&P BMI, those are all available through the

22    broker dealers.  And we work directly with the institutional

23    investor.

24    Q.    And you mentioned the S&P 500.  Is that the best

25    known of the various indices?

Cherry - Direct

1   A.      It is the best known.  It's one of our, sort of, gold

2   standards in benchmarks.

3   Q.      And when was that formed?

4   A.      In the 1950s.

5   Q.      And what was its purpose?

6   A.      Its purpose was really to give an indicator of

7   performance of the stock market.  It represents the

8   largest -- you know, 500 largest companies, largest 500

9   companies, and it's an indication or composite of the

10  performance.

11  Q.      And how has that index been used over the years?

12  A.      Wow.  It's been used a lot of different ways.  You

13  know, I think it depends how you want to view it.  It's used

14  sort of by everyday investors.  You look on the news, and

15  it's sort of streaming across the screens.  It's referenced

16  in articles, and it's an indicator of performance.  So if

17  I'm a teacher and I want to understand how my pension fund

18  is performing, I might have investments in the S&P 500 or I

19  might use this as an understanding of what is the overall

20  performance for my investments as an indicator.  It also is

21  used on the institutional side as the key part of, you know,

22  financial advisors who are, you know, you know, different

23  financial professionals used as a part of their day-to-day.

24  Q.      And focusing specifically on the index business, who

25  are S&P's customers for those services?

Cherry - Direct

1   A.      So, you know, when we look at customers, we really

2   look at it as a B-to-B-to-C model.  I think a lot of

3   businesses like ours really have to look at that whole

4   picture, you know, to say, okay, who is -- who is using the

5   product?  And then who is our sort of direct customer, too?

6               So our direct customers who we sell to every

7   day, if it's licensing data, you know, or working with them,

8   it is, you know, different broker dealers, could be a hedge

9   funds, too.  Lots of different a variety of institutional

10  customers.  And then there's the end customer, which is the

11  retail investor like you or me, you or me, that's making and

12  choosing to make investments.

13  Q.      Now, you also made reference to the ratings business.

14  Can you describe what that entails.

15  A.      Sure.  The ratings business is an issuer pay model.

16  It's focused on developing opinions based on

17  creditworthiness of, you know, of an entity.  We work with

18  corporations.

19  Q.      And is there any sense in which that follows a

20  B-to-B-to-C model?

21  A.      Yeah, absolutely.  I mean, if you are a retail

22  investor and you are interested in the bond market or making

23  different types of investments, you can go to our website.

24  Our information on ratings as well as sort of key data or

25  insights around, sort of, trends in that business is all

Cherry - Direct

1    available on line.

2    Q.    Now, you made reference a little bit to the Market

3    Intelligence Services when you were talking about Capital

4    IQ.  Can you just summarize very quickly how that service

5    operates today?

6    A.    Sure.  So the Market Intelligence business primarily

7    is a financial data and analytics and insights business, so

8    we work with institutional investors a few different ways.

9    One is through a subscription model, where they might

10   subscribe to, like, an online software.  You know, to log in

11   to get their sort of fundamental data and insights.  They --

12   we also work closely -- not every one works in subscription,

13   so, you know, we have some, you know, customers that we have

14   to customize different solutions for using APIs or working

15   within in their systems.

16   Q.    And I know you identified some of the direct

17   customers in your previous testimony for that service.  Is

18   there any B-to-B-to-C component to this aspect of the

19   business?

20   A.    So, with Market Intelligence, one of, you know, our

21   focus areas has been working with academia and universities.

22   So, if you are a business student, you have access to our

23   platform from the subscription model to use as a part of

24   your studies.  Additionally, we have, you know, a program

25   with universities where our information, our financial data

Cherry - Direct

1     and insights, are available for anyone at the public, public

2     library or the school.

3     Q.     Let me ask you if you can, at this time, turn to

4     Exhibit 126 in your binder, which unfortunately is toward

5     the back, but hopefully you can get there without too much

6     trouble.

7             Do you -- do you have it?

8     A.     Almost.  I can see it up here, but --

9             All right.

10    Q.     Can you identify what Plaintiffs' Exhibit 126 is?

11    A.     Sure.  This is a brochure from S&P Capital IQ that

12    details the programs that they offer for their -- the

13    business students there.

14    Q.     And how is this used?

15    A.     I mean, this is used as a part of the curriculum for

16    many classes and as a part of the students' work where they

17    log on and to gain access to the S&P Capital IQ platform as

18    a part of their curriculum.

19    Q.     Now, if you can flip a few exhibits back in your book

20    to 124, can you identify what we see there.

21    A.     Sure.  So, this is SSRN.  This is a platform that

22    features the academic research that is using and citing S&P

23    Global Market Intelligence data information.

24    Q.     Now, outside of academics, does the data from the

25    Market Intelligence business get licensed in any other way?

Cherry - Direct

1    A.     Sure.  We have -- we have partnerships and

2    relationship with redistributors.

3    Q.     And let me also ask you to turn to Exhibit 125 in

4    your binder.  Starting with the first several pages in that,

5    the Finbox part of this exhibit, can you explain what that

6    is.

7    A.     Yes, Finbox is an online service that's targeted to

8    the retail investor that provides, you know, basic stock,

9    company information, company data.

10   Q.     And how -- or strike that.

11          Is there any relationship between S&P and

12   Finbox?

13   A.     Yes, so this is for the retail investor, and you'll

14   see at the bottom, world-class partners.  We license data

15   directly from S&P Global Market Intelligence.

16   Q.     Are you focusing on Page 8547 at the bottom?

17   A.     Yes, 8547.

18   Q.     Also on that page, if you look higher up, it talks

19   about flexible pricing, getting a paid plan for as low as

20   $10 per month.  How does that pricing compare to the pricing

21   for direct customers who may have a relationship with the

22   Market Intelligence part of the business?

23   A.     Yes.  So, you know at $10 a month, you're really

24   getting some of the more basic fundamental data at a pretty

25   affordable price.  We do have more complicated pricing

Cherry - Direct

 1    structures for the institutional investment investor, I

 2    mean, because they have more, sort of, complicated needs.

 3    It's really needs-based, so it is a greater price point for

 4    -- for our client.

 5    Q.    And if I could ask you to just jump ahead in the

 6    exhibit a few pages to 8707, there's a heading, Simply Wall

 7    Street.  Can you explain what the remainder of this exhibit

 8    consists of.

 9    A.    So, this is very similar.  This Simply Wall Street is

10    another sort of online company targeting the retail investor

11    to make sure they have the critical tools and intelligence

12    they need to make decisions with their investments.

13    Q.    And how does the S&P Global Market Intelligence

14    business interact with Simply Wall Street?

15    A.    So Simply Wall Street works with a lot of different

16    brands, and here it says all of our data comes from S&P

17    Global Market Intelligence, the world's premiere provider of

18    financial data, and then it details some of that.

19    Q.    Now, in talking about S&P's services, you've

20    mentioned data several times.  Can you explain what the

21    significance of data is to S&P's various offerings?

22    A.    Sure.  You know, at the core, when I defined who we

23    are, really defined us as a financial data analytics and

24    insights company.  It goes back to our founders, you know,

25    Henry Varnum Poor, something I'm very proud of, that we were

Cherry - Direct

1    founded on the essence of data, but providing data for

2    transparency to -- to help individuals or companies.  And

3    it's sort of a part of our DNA.

4    Q.    And does the phrase "S&P data" have any meaning with

5    respect to S&P's business?

6    A.    I mean, S&P data is something that we've used in

7    conversations.  It's something we've referenced because we

8    have an enormous amount of data.

9    Q.    Is the phrase ever used in news reports referencing

10   the company?

11   A.    I have seen it used often in news reports.

12   Q.    And let me turn you, if I may, to Exhibit 123.

13              MR. BELGAM:  Your Honor, I'm assuming we can

14   just move a list of exhibits at the end of the exam.  Is

15   that acceptable?

16              THE COURT:  Fine by me.

17              MR. BELGAM:  Thank you.

18   BY MR. MANDEL:

19   Q.    Can you identify what's contained in Exhibit 123.

20   A.    So on 123, we have a series of news clippings that

21   start in the 1970s, and they have -- that use S&P Data, that

22   reference S&P data in the news clippings from the -- from

23   Wall Street Journal to industry publications like The

24   American Banker to the New York Times.

25   Q.    And we're obviously not going to look through all of

Cherry - Direct

1   this, but I do want to point you to just one example that

2   we've tabbed, hopefully, to save some time here.  They're in

3   chronological order also.

4           September 13th, 2000, bears the Bates Number

5   P5806.  Can you turn to that?

6   A.      Yeah.

7   Q.      And can you explain what this piece is about?

8   A.      So this piece here is about Schwab renewing the

9   worldwide license with Standard & Poor's.  It has a really

10  nice quote from their senior vice president at Schwab who

11  talks about S&P's market data being highly regarded by

12  customers and employees and helps to demystify the process

13  for customers, you know, using innovative information and

14  reporting."

15          MR. MANDEL:  And while I appreciate my colleague

16  Mr. Belgam's helpful suggestion, I will, since we've looked

17  at a grouping of these exhibits, at this time offer

18  Plaintiffs' Exhibits 123, 124, 125 and 126.

19          MR. RAWNSLEY:  No objection, Your Honor.

20          THE COURT:  All right.

21          THE WITNESS:  They're all admitted.

22          (PX Exhibit Nos. 123, 124, 125, and 126 were

23  admitted.)

24  BY MR. MANDEL:

25  Q.      Let's talk about S&P's advertising and promotion.

Cherry - Direct

1   How does S&P go about promoting itself under the S&P marks?

2   A.    So, you know, at S&P -- I'll give you the classic

3   sort of marketer's description, and there's three different

4   ways we promote.  One is through our earned media.  Earned

5   media is any type of public relations mentioned.  We have

6   paid media where we go out and create advertising and

7   engagement with marketplace and customers.  And then the

8   third is our owned media.  That's something that every

9   company has, which is our own sort of channels, your

10  website, your social media, anything that you own.

11  Q.    Okay.  We're going to look at a few of those

12  different ways of promotion.  Let me ask you to turn, if you

13  can, to Plaintiffs' 94.  Can you identify what generally is

14  contained in Exhibit 94 before we look at some of the

15  specifics.

16  A.    Sure.  In Exhibit 94, you have an overview of the

17  year and the -- some examples of the advertising that was

18  done in that year from 2011 to 2021.

19  Q.    And if you jump past the summary, the first grouping

20  of pages starting at Page 20090 and continuing

21  through 20105, can you talk about what's contained there as

22  a group?

23  A.    Yeah.  This is for S&P Global Market Intelligence and

24  S&P Capital IQ, and this identifies the different types of

25  advertising we've done, from a radio ad on NPR to updates

Cherry - Direct

1    on -- for news letters to digital ads that were sort of

2    issued in the marketplace to videos, commercials, that were

3    run online.  So, a selection.

4    Q.    And if you look at the next group of pages after that

5    starting with 10093 and running about 25 pages, it ends at

6    10251, are you able to explain what's contained there?

7    A.    Sure.  So this is a set of the different examples for

8    different years of advertising done for the indices

9    business.

10   Q.    And where did ads like this appear?

11   A.    So, these were ads that fall underneath our paid

12   programs, and they appeared in print publications like Wall

13   Street Journal, online, and advertisements -- you know,

14   you're walking and you're looking at something on your

15   phone, and you might see something in a newsletter or an ad

16   come up browsing on the web as well as sometimes outdoor,

17   which is called billboard.

18   Q.    And as we talk about this grouping of documents, I

19   want to direct your attention forward to Exhibit 105 in your

20   binder.  Can you explain what that is and how that relates

21   to what we've just looked at.

22   A.    Yes.  So this is the advertising budget for indices,

23   and it covers really by year along with the different

24   campaigns that were developed by year.

25   Q.    And does this reflect the actual dollars that had

Cherry - Direct

1   been expended on the various campaigns?

2   A.    Yes, this is the investment made for those campaigns.

3   Q.    What territory does -- did -- do these advertisements

4   cover?

5   A.    This is domestic.

6   Q.    And if you look underneath all the numbers, you see

7   some headings with names.  Can you explain what that is.

8   A.    Sure.  So, you have a heading called Let's Find Out,

9   you know, or Cartoon.  Those are the key names of the ads

10  and underneath are the variations because you create

11  different variations with them.

12  Q.    And we're not going to go through all of that,

13  obviously, but focusing you back to Exhibit 94 and the

14  collection of indices ads, are you able to match up any of

15  them to the advertising budget document?

16  A.    Sure, I'll give you a few examples.  So here, I'll do

17  the first two pages.  On the first one, you have Let's Find

18  Out.  It's focused on large cap funds, and it says -- and it

19  has horses, and if you scroll back here you have Let's Find

20  Out under 2012.

21  Q.    Look again, Exhibit 105.  Is that what you're looking

22  at?

23  A.    Yes.

24  Q.    And --

25  A.    And then you have maybe it's like ten down you have

Cherry - Direct

1    workhorse.

2    Q.    So that would be a reference to that iteration of the

3    Let's Find Out campaign?

4    A.    Correct.

5    Q.    And let's just turn to the next page in Exhibit 94,

6    Page 10148.  Can you identify what that is with reference to

7    the budget.

8    A.    Sure.  Well, you have a woman here holding an S&P

9    briefcase, and she's engaging with a youngster here.  And he

10   has building blocks in his hand, and this is sort of

11   focusing on creating a strong core using our family of

12   indices, the S&P 500, the S&P 400, S&P 600.

13   Q.    And what are the S&P 600 and S&P 400?

14   A.    So, those extend to a set of companies referencing

15   the number.

16   Q.    So those are different indices?

17   A.    Yes.  Correct.

18   Q.    And staying in Exhibit 94, after we get past the

19   indices ads, can you just tell us briefly what the remainder

20   of the exhibit running from 16621 to the end consists of?

21   A.    Sure.  These are examples from S&P Global of our

22   social media and some of our posts on social media.

23   Q.    What kind of social media platforms are reflected?

24   A.    Facebook.  Later here we have Twitter.  I think I saw

25   Instagram.

Cherry - Direct

1          MR. MANDEL:  Okay.  At this time, I'm going to

2    offer Exhibits 94 and 105 in evidence.

3          MR. RAWNSLEY:  No objection, Your Honor.

4          THE COURT:  Admitted without objection.

5          (PX Exhibit Nos. 94 and 105 were admitted into

6    evidence.)

7    BY MR. MANDEL:

8    Q.    Let me ask you to flip ahead in your binder to

9    Exhibit 106.  And can you identify what that is.

10   A.    So 106 is the enterprise marketing budget within

11   public affairs for S&P Global ranging from 2016 to 2021.

12   Q.    And can you explain what enterprise marketing is a

13   reference to?

14   A.    So enterprise marketing is in reference to corporate

15   marketing at S&P Global.

16   Q.    And what forms of corporate marketing does the

17   company engage in?

18   A.    Sure.  So that is some of the -- you know, series of

19   earned, paid, and owned, but this is sort of the creation of

20   company position and the promotion of it.  And we do that a

21   lot of different ways with the paid advertising you would

22   see under the brand marketing line.  Or event marketing is

23   really an essential part of how we connect through in-person

24   events, which are starting again, which are great, as well

25   as online events, you know, online webinars and whatnot.

Cherry - Direct

1    Q.    And what does the brand marketing line represent in

2    this exhibit?

3    A.    So that's the creation and -- as well as any of the

4    paid support for promotion of S&P Global at the corporate

5    level.

6    Q.    And what territories are covered by these

7    expenditures?

8    A.    This is a global number, but the majority of it is

9    domestically invested.

10   Q.    Okay.

11         MR. MANDEL:  I'm going to offer Exhibit 106 in

12   evidence.

13         MR. RAWNSLEY:  No objection.

14         THE COURT:  Admitted without objection.

15         (PX Exhibit No. 106 was admitted into evidence.)

16   BY MR. MANDEL:

17   Q.    Let me ask you to turn one more exhibit in your

18   binder to 107.  Can you identify what that is.

19   A.    So, this is the marketing budget and expenditures for

20   S&P Global Ratings.

21   Q.    And what kinds of marketing is reflected in that

22   budget?

23   A.    Sure.  It's at the top, but this includes promotional

24   items, events, sponsorship, advertisement, and it's really

25   supporting how we -- the different sectors in our business

Cherry - Direct

 1  which are sort of listed at the top.  Corporate ratings,

 2  risks, public finance, financial services, structured

 3  finance.

 4  Q.    And what territory does this cover?

 5  A.    This is a global budget as well.  You know, the

 6  majority of public finance, though, is -- is domestic.

 7  Q.    And when you say "the majority," can you put a

 8  percentage on that.

 9  A.    You know, 60 to 70 across the board, with public

10  finance being almost in its entirety.

11  Q.    So 60 to 70 for the other segments besides public

12  finance?

13  A.    Correct.

14          MR. MANDEL:  Okay.  I offer Exhibit 107 in

15  evidence.

16          MR. RAWNSLEY:  No objection.

17          THE COURT:  Admitted without objection.

18          (PX Exhibit No. 107 was admitting into

19  evidence.)

20  Q.    Turning to earned media, does the company track its

21  coverage in the media?

22  A.    We do regularly track our coverage in the media.

23  Q.    And let me ask you to turn ahead to Exhibit 116 in

24  your binder.  Are you able to identify what that document

25  is?

Cherry - Direct

1    A.      Yes, this is a monthly communications dashboard.

2    This has, sort of, the full year from 2020 and some of the

3    key metrics that we track as a communications team.

4    Q.     And if you turn to the fifth page of the exhibit,

5    7085, can you summarize what is recounted there.

6    A.      Yes.  So some of the -- you know, since this was a

7    full year, this is a comparison of, sort of, year over year

8    from 2019 to 2020 with our media mentions, for that year in

9    2020 being over, you know 13,000 and then -- I can see

10   better on this side.

11              We also have media outlets that we track, so

12   what are some of the top tier media outlets where we have,

13   sort of, mentions.  That includes Bloomberg, Wall Street

14   Journal, you know, the FT.

15              Social sharing.  I mean, in today's day and age,

16   I think there's been an explosion of the importance of

17   online.  Everything needs to go more online, as we were sort

18   of stuck at home for two years, so any type of engagement

19   such as social shares or any placement online has been

20   really critical.

21              And the last thing we look at is our share of

22   voice, which is on the right.

23              MR. MANDEL:  I offer Exhibit 116 into evidence.

24              MR. RAWNSLEY:  No objection.

25              THE COURT:  Admitted without objection.

Cherry - Direct

 1              (PX Exhibit No. 116 was admitted into evidence.)

 2    BY MR. MANDEL:

 3    Q.     For how long a period of time has S&P garnered

 4    coverage in the media?

 5    A.     You know, I -- S&P has been in the media, I think,

 6    going back to my other statement, well before my lifetime.

 7    It's -- we're a company that's over a century old.  They

 8    have -- we've been in the media for an extremely long time.

 9    It's referencing, you know, S&P, our products, our people,

10    and our thought leaders.

11    Q.     Let's move ahead to Exhibit 122 in your binder.  And

12    can you summarize what's contained in that exhibit.

13    A.     So this is a collection of media mentions that

14    mention S&P and different, sort of, noteworthy publications

15    starting in -- this is the 1970s.

16    Q.     And again, we're obviously not going to go through

17    all of this, but I do want to point you to one example of an

18    article.  Jumping ahead to December 27th, 1998, page P 13430

19    of the exhibit.

20              Can you briefly summarize what this article

21    consists of.

22    A.     So the article title is "Portfolios Et Cetera:  What

23    the S&P knew that the Dow didn't."  It's a New York Times

24    article and it's focused on the comparison of the S&P to the

25    Dow.

Cherry - Direct

1   Q.      And does the article repeatedly refer to it as the

2   S&P?

3   A.      Yes, that is correct.

4   Q.      What index is that actually talking about?

5   A.      The S&P 500.

6   Q.      Have you seen the S&P 500 referred to that way in

7   your experience, as the S&P?

8   A.      Yes.  It seems to be a shorthand, yes.

9              MR. MANDEL:  I'd offer Exhibit 122 into

10  evidence.

11             MR. RAWNSLEY:  No objection.

12             THE COURT:  Admitted without objection.

13             (PX Exhibit No. 122 was admitted into evidence.)

14  BY MR. MANDEL:

15  Q.      Does S&P -- well, strike that.  Is S&P a public

16  company?

17  A.      Yes.

18  Q.      Does it regularly report its earnings?

19  A.      Yes.

20  Q.      And do those earnings get reported in its annual

21  reports?

22  A.      Yes.

23  Q.      Let me focus you to Exhibit 104 and let me ask you if

24  you are able to identify what that consists of.

25  A.      So here, we have the summary from our annual report

Cherry - Direct

1     of our revenue as well as our advertising spending from 2000

2     to 2019.

3     Q.      And where does the information that's contained in

4     the summary come from?

5     A.      This comes from our annual report.

6     Q.      And if you look behind the summary, what do we have

7     in the rest of the exhibit?

8     A.      Excerpts of the annual report.

9     Q.      And --

10             THE COURT:  I'm sorry.  Before you go on, do you

11    know why 2003 is missing in that summary?

12             THE WITNESS:  It's a good catch.  I do not know.

13    I think 2000 -- I see 2007 is missing, too.

14             THE COURT:  Right.  I saw there was another one,

15    but I couldn't remember which one.

16             THE WITNESS:  Yeah.

17             MR. MANDEL:  Your Honor, I can clarify.  It was

18    in discovery when we produced it, I think we kind of missed

19    those years, and so they just aren't there.

20             THE COURT:  Okay.

21             MR. MANDEL:  But, obviously, this covers most of

22    the period from 2001 to 2019.

23    BY MR. MANDEL:

24    Q.      Now, is all of the revenue that's shown in

25    Exhibit 104 attributable to the United States?

Cherry - Direct

1  A.      No, it is not.

2  Q.      And can you explain, based on your knowledge of the

3  company and in your role at the company, what the

4  approximate breakdown is between international and domestic

5  revenues.

6  A.      Sure, at a high level, but you have to go back to the

7  structure of the business to sort of understand it because

8  when I started with McGraw Hill Companies, our revenue

9  split, which was in 2007, we were around 70 percent

10  international and 30 -- I'm sorry.  70 percent domestic,

11  30 percent international.

12  Q.      And has that fluctuated at all over the years?

13  A.      Yeah.  You know -- and then I think later on, once

14  McGraw Hill Financial was created, you know, and even until

15  today, the international business grew a little bit, so it

16  was more at 60 domestic, 40 international.

17  Q.      And focusing just on the domestic revenues, are all

18  of those revenues attributable to the use of the S&P mark?

19  A.      So, I guess working backwards from 2016 when we

20  became S&P Global, yes, it's a hundred percent attributable.

21  And then when you look at the period where we were McGraw

22  Hill Financial, it was probably closer to 80 percent.

23  Q.      And just let me stop you there just for a second.

24  Roughly what period are we talking about there?

25  A.      Like, three years.

Cherry - Direct

1   Q.      Between when?

2   A.      2013 to 2016.

3   Q.      Okay.  And how about prior to McGraw Hill Financial,

4   prior to 2013?

5   A.      So, I mean, we had a lot of businesses.  So I'm -- I

6   would probably estimate it domestically S&P to be around

7   30 percent of domestic revenue.

8   Q.      And that's because at that point you still have the

9   education business?

10  A.      We had education, construction, aviation being

11  Professional, McGraw Hill Professional.  It was it was --

12  McGraw Hill Companies was akin to on the other company.

13                  MR. MANDEL:  I offer Exhibit 104 in evidence.

14                  MR. RAWNSLEY:  No objection.

15                  THE COURT:  Admitted without objection.

16                  (PX Exhibit No. 104 was admitted into evidence.)

17  BY MR. MANDEL:

18  Q.      Has the company done any market research into the

19  brand recognition of S&P?

20  A.      You know, as a -- as an analytical company, it's

21  really essential that we do market research to understand

22  our brand and our reputation.

23  Q.      Let me ask you to turn to Exhibit 111 in your binder

24  and tell me if you can identify what that is.

25  A.      So this is a quantitative study conducted by Landor,

Cherry - Direct

1    third-party partner around the time we became S&P Global.

2    Q.    And who is Landor?

3    A.    Landor is a brand.  It's, you know, a well-known

4    branding firm.

5    Q.    And what were they studying here?

6    A.    So, we were making the transition to S&P Global and

7    wanted to understand more from financial professionals

8    around perceptions and understanding of the brand.

9    Q.    And who is actually tested in this study?

10   A.    I mean, you have finance managers, CFOs, risk

11   managers, traders.  And this was a global study that focused

12   on the U.S., Asia, you know, Europe.

13   Q.    Let me ask you to turn to Page 9907 in Exhibit 111

14   where the executive summary begins.  Can you summarize at a

15   high level what the basic findings were from the Landor

16   study.

17   A.    So, you know, it really was a reinforcement of the

18   strong equity and heritage that S&P Global has and that

19   we're a very strong brand in the financial data and

20   analytics space.

21   Q.    And if you jump ahead to 9914 of the document, are

22   there any findings there with respect to the level of

23   recognition found in the study?

24   A.    So, here on the left-hand side, it shows that we

25   have, you know, very strong familiarity in the U.S. at

1    86 percent.

2              MR. MANDEL:  I offer Exhibit 111 in evidence.

3              MR. RAWNSLEY:  No objection.

4              THE COURT:  All right.  Admitted without

5    objection.

6              (PX Exhibit No. 111 was admitted into evidence.)

7    BY MR. MANDEL:

8    Q.    Let's turn to Exhibit 112.  Can you identify what

9    that is.

10   A.    So this is another quantitative study called the

11   Brand Tracker, which tracks your branding reputation, and

12   this is the research summary from that.

13   Q.    Who did that research?

14   A.    So, this is done internally by the brand team at S&P

15   Global, and we work closely with a third party to conduct

16   this.

17   Q.    And who is the research conducted among?

18   A.    The similar audience, financial professionals.

19   Q.    Jumping ahead to Page 9694 of the document, which has

20   the heading "key findings," can you, again, at a high level,

21   summarize what the basic findings were from this research?

22   A.    Sure.  So, you know, you always want to test your

23   brand to understand what are the attributes that it's

24   associated with.  So, on the left-hand side here, you have

25   the S&P Global brand is very strong, and it's associated

Cherry - Direct

```
 1    with being trustworthy, dependable, reliable, a leading
 2    provider of essential intelligence, and vital.  And then on
 3    the right-hand side, these are just some of our key
 4    takeaways to understand and either act on, looking at having
 5    strong familiarity, capability gains, where do these
 6    increases come from, those came actually from North America.
 7    Looking at what are the drivers of consideration, when
 8    someone is considering to work with you and sort of take
 9    that next step, we have understanding on that of being
10    trustworthy, you know, offering insights and being easy to
11    work with.
12    Q.    And let me ask you to jump ahead to page -- I'm
13    sorry.  9701 of the document.  And, can you tell us what
14    finding was made in this study with respect to recognition?
15    A.    So, here it says S&P Global is the most recognized
16    company in the field.  And it has, you know, high
17    favorability.  So this on the left-hand side, you see the
18    growth from '07 to '19 for S&P Global as well as some of
19    other companies in the space their performance.
20    Q.    Now, has --
21              MR. MANDEL:  I'm sorry, let me offer Exhibit 112
22    in evidence.
23              MR. RAWNSLEY:  No objection.
24              THE COURT:  Admitted without objection.
25              (PX Exhibit No. 112 was admitted into evidence.)
```

Cherry - Direct

```
 1   BY MR. MANDEL:

 2   Q.      Has S&P ever commissioned any study of the value of

 3   the S&P brand?

 4   A.      Yes, we have.

 5   Q.      Can you jump ahead to Exhibit 117 in your binder and

 6   tell us what that is.

 7   A.      So this is a report out from a -- from a study we did

 8   with a company called Brand Finance that details the value

 9   of the S&P brand.

10   Q.      And if you turn to Page 9945 of the exhibit, what

11   does that reflect with respect to the valuation of that

12   Brand Finance found?

13   A.      Sure.  You know, Brand Finance is -- worked closely

14   with us.  They sort of evaluated everything, and they

15   determined that at S&P Global, we have a 6,000,000,000 in

16   2020, a $6 billion value on the brand.

17              MR. MANDEL:  I offer Exhibit 117 -- I'm sorry.

18   Yes, Exhibit 117 in evidence.

19              MR. RAWNSLEY:  No objection.

20              THE COURT:  Admitted without objection.

21              (PX Exhibit No. 117 was admitted into evidence.)

22   BY MR. MANDEL:

23   Q.      Now, does Brand Finance provide annual rankings on

24   its strength of brands?

25   A.      They do publish different rankings as a part of their
```

61

Cherry - Direct

1   course of work.  It's independent of, you know, of us.

2   Q.    And let me ask you to turn to Exhibit 118 in your

3   binder.  Can you tell us what that document is.

4   A.    So this is from June 2020.  It's from Brand Finance.

5   They issued the commercial services 50, the most valuable

6   and strongest commercial services brands in 2020.

7   Q.    And if you look at Page 6937 of the exhibit, can you

8   find S&P Global there.

9   A.    So out of the 50, S&P Global is listed as number ten,

10  and our brand value went up to 6.8 million.

11                  MR. MANDEL:  I offer Exhibit 118 into evidence.

12                  MR. RAWNSLEY:  No objection.

13                  THE COURT:  All right.  Admitted without

14  objection.

15                  (PX Exhibit No. 118 was admitted into evidence.)

16  BY MR. MANDEL:

17  Q.    Let me move ahead to Exhibit 119.  Can you explain

18  what that is.

19  A.    This is another Brand Finance annual report looking

20  at the U.S. 50, the most valuable and strongest American

21  brands.

22  Q.    And how does this report compare to Exhibit 118?

23  A.    So this report is a little bit different because you

24  have Disney, Coca-Cola, Amazon, Visa.  You have, sort of,

25  really, a range of any brand, not just being commercial.

1   Q.     Okay.  And let me turn your attention to page -- hard

2   to read but 6962, I believe, and if you look, since the

3   print is small, I'll direct you specifically -- do you see

4   S&P Global at Number 114 in the document?

5   A.     Yes, that is correct.

6   Q.     What does that reflect?

7   A.     That is our ranking with the top 500 American brands.

8   We're listed as 114.

9          MR. MANDEL:  I offer Exhibit 119 into evidence.

10         MR. RAWNSLEY:  No objection.

11         THE COURT:  Admitted without objection.

12         (PX Exhibit No. 119 was admitted into evidence.)

13  BY MR. MANDEL:

14  Q.     Has S&P won any industry awards?

15  A.     Yeah, we've -- we are recognized across the industry

16  for a variety of things from best places to work to

17  recognizing our products and our services.

18  Q.     And let me point you to Exhibit 120 in your binder.

19  Can you identify what that is and what it shows.

20  A.     This is a -- an award from Waters awarding S&P -- S&P

21  Global -- I'm sorry -- S&P Capital IQ as the best data

22  analytics provider.

23  Q.     And if you flip over the page to the next page of the

24  exhibit, 18056, what's reflected there?

25  A.     We were also recognized as the best overall data

Cherry - Direct

 1    provider.

 2              MR. MANDEL:  Let me offer Exhibit 120 in

 3    evidence.

 4              MR. RAWNSLEY:  No objection.

 5              THE COURT:  Admitted without objection.

 6              (PX Exhibit No. 120 was admitted into evidence.)

 7    BY MR. MANDEL:

 8    Q.    Moving ahead to the next exhibit in your binder, 121,

 9    can you explain what that is.

10    A.    These are a listing of other sort of various awards

11    across the business recognizing our ratings.

12              MR. MANDEL:  I offer Exhibit 121 into evidence.

13              MR. RAWNSLEY:  No objection.

14              THE COURT:  Admitted without objection.

15              (PX Exhibit No. 121 was admitted into evidence.)

16    BY MR. MANDEL:

17    Q.    Now, Ms. Cherry, you're aware that in this case,

18    Defendants are using the name S&P Data in connection with

19    their call center business; correct?

20    A.    Correct.

21    Q.    Can you explain, from a marketing perspective, what

22    you believe that usage does or any impact it has on the S&P

23    brand?

24    A.    Sure.

25              MR. RAWNSLEY:  Objection, Your Honor.  That's

Cherry - Direct

1    expert testimony.

2            THE COURT:  Well, I think if she's talking --

3    I'm going to overrule the objection.

4    BY MR. MANDEL:

5    Q.    You can answer.

6    A.    You know, so I think brand and reputation are core to

7    any business, and in S&P, we're known for transparency as

8    providing quality data and being trustworthy and a brand is

9    a huge asset for a business.  It's why people come to work

10   for you or it's -- for sales teams, it allows them to make

11   calls and people to pick up the phone because they know that

12   it's a trustworthy brand with S&P.  At the end of the day,

13   you want to really eliminate confusion, you know, about your

14   brand and ensure that you limit sort of any type of risk

15   that you have to it.

16           MR. MANDEL:  I have no further questions, Your

17   Honor.

18           THE COURT:  All right.  Mr. Rawnsley.

19           MR. RAWNSLEY:  Your Honor, may we approach with

20   binders?

21           THE COURT:  Yes.

22           MR. FINEMAN:  Your Honor, may I approach with

23   this?

24           THE COURT:  Yes.

25           THE WITNESS:  Do I need this one anymore?

Cherry - Cross

1          MR. FINEMAN:  I'm not sure.

2          THE COURT:  Okay.  Thank you.

3                  CROSS-EXAMINATION

4    BY MR. RAWNSLEY:

5    Q.    Good morning, Ms. Cherry.

6    A.    Good morning.

7    Q.    Welcome to Delaware.

8    A.    Thank you.

9    Q.    In 2007, you began to work for McGraw Hill companies;

10   correct?

11   A.    Correct.

12   Q.    And the McGraw Hill companies had an education

13   division; correct?

14   A.    Right.

15   Q.    And I heard you say they also had a construction

16   division; correct?

17          THE COURT:  I'm sorry, Ms. Cherry.  You need to

18   speak in terms of answer, not just nodding your head.  Make

19   sure you speak loud enough.

20          THE WITNESS:  Okay.  No problem.

21          Yes, it had a construction division.

22   BY MR. RAWNSLEY:

23   Q.    And I believe they had several publications as well;

24   correct?

25   A.    Yes.

Cherry - Cross

1    Q.      And the divestiture occurred in 2013 of the McGraw

2    Hill Education; is that correct?

3    A.      Correct.

4    Q.      And then McGraw Hill Financial was renamed after the

5    divestiture; correct?

6    A.      Correct.

7    Q.      And McGraw Hill Financial was renamed S&P Global in

8    2016; correct?

9    A.      Yes.

10   Q.      Now, in 2015, McGraw Hill Financial began discussing

11   strategy to launch what became S&P Global; correct?

12   A.      Yes.

13   Q.      And if you could please look in your binder to DTX

14   64.

15   A.      64?

16   Q.      64, please.

17   A.      Okay.

18   Q.      And you see the email at the bottom at the screen --

19   correct? -- from Mr. Douglas Peterson?

20   A.      Yes.

21   Q.      Who is Mr. Douglas Peterson?

22   A.      He is our president and CEO.

23   Q.      Okay.  And you are a recipient of that email;

24   correct, Ms. Cherry?

25   A.      Yes.

Cherry - Cross

1    Q.      Okay.  And if we can go to the next page, the next

2    page, please, so in that email, there's some names including

3    S&P Data Analytics and S&P DataLitiX with an X; correct?

4    A.      On the back page, yes.

5    Q.      And this was in connection with the strategy to

6    rename McGraw Hill Financial; correct?

7    A.      It is in relation to that, yes.

8    Q.      And if we could go up to the top email, please.

9            And you write back to Mr. Peterson; correct?

10   A.      Yes.

11   Q.      And in fact, you recommend several names to him;

12   correct?

13   A.      Correct.

14   Q.      And those names include S&P Data Analytics?

15   A.      Yes.

16   Q.      And S&P Data and Insights; correct?

17   A.      Yes.

18   Q.      And if we go down a little further, we can see S&P

19   Global Data and Analytics Services; correct?

20   A.      Yes.

21   Q.      And we can also see S&P -- well, strike that.

22           So after the name change to S&P Global,

23   Plaintiffs conducted some brand equity research; correct?

24   A.      Repeat that.

25   Q.      Plaintiffs conducted some brand equity research;

Cherry - Cross

1    isn't that correct?

2    A.    We did.

3    Q.    Okay.

4            MR. RAWNSLEY:  And before I move on, I'd like to

5    move DTX 64 into evidence.

6            MR. MANDEL:  No objection.

7            THE COURT:  Admitted without objection.

8            (DTX Exhibit No. 64 was admitted into evidence.)

9    BY MR. RAWNSLEY:

10   Q.    Okay.  Can you go to DTX 72, please?

11           And you were involved in the preparation of this

12   document; correct?

13   A.    I was.

14   Q.    Okay.  Can you go to Page 14, please.

15           So, at the time of this presentation, S&P had

16   56 percent recognition as a financial data and analytics

17   provider; correct?

18   A.    Yes.

19   Q.    Now, you continue to track the health of the S&P

20   Global brand; correct?

21   A.    Yes.

22   Q.    Okay.  Could you look at DTX 86, please, in your

23   binder.  And just let me know when you're ready.

24   A.    Okay.  86.  Okay.

25   Q.    Now, DTX 86 is a brand health assessment; correct?

Cherry - Cross

1    A.      Yes.

2    Q.      And I believe in your testimony a moment ago, we just

3    saw a version of this from 2020; correct?

4    A.      Correct.

5    Q.      Okay.  Now, the methodology of this was to conduct an

6    online survey; correct?

7    A.      Yes.

8    Q.      And that survey was among financial professionals;

9    correct?

10   A.      Yes.

11   Q.      And policy influencers; correct?

12   A.      Yes.

13   Q.      Okay.  Can you go to slide ten, please.

14           Now, this slide reports the results of a survey

15   for unaided awareness; correct?

16   A.      Yes, it does.

17   Q.      Okay.  And if we look at the question at the bottom,

18   it says, "Financial professionals were asked when you think

19   of companies in the financial intelligence data and

20   analytics industry, which ones come to mind"; correct?

21   A.      Yes, that's the question.

22   Q.      And we can see the result in the chart above,

23   correct?

24   A.      That is the result.

25   Q.      And recognition for S&P Global was six percent;

Cherry - Cross

1   correct?

2   A.      That is unaided.  Yes.

3   Q.      Correct.  Unaided awareness among financial

4   professionals of S&P Global was six percent; correct,

5   Ms. Cherry?

6   A.      Yes.

7   Q.      And in 2015, we see some data to the right; correct?

8   A.      Yes.

9   Q.      And S&P and Standard & Poor's had 11 percent

10  recognition in 2015; correct?

11  A.      Yes.

12              MR. RAWNSLEY:  I'd like to move DTX 86 into

13  evidence.

14              MR. MANDEL:  No objection.

15              THE COURT:  Admitted without objection.

16              (DTX Exhibit No. 86 was admitted into evidence.)

17  BY MR. RAWNSLEY:

18  Q.      Could you please go to DTX 90 in your binder,

19  Ms. Cherry.

20              Now, you see another brand health 2018 -- well,

21  strike that.  We see another research summary; correct?

22  A.      Yes.

23  Q.      To measure brand health; correct?

24              And this one is for 2018; correct?

25  A.      Correct.

Cherry - Cross

1    Q.    Okay.  And for this study, you were, again,

2    questioning financial professionals and policy influencers;

3    correct, Ms. Cherry?

4    A.    Yes.

5    Q.    Okay.  Could you please go to Slide 19 of this

6    document.

7    A.    Sorry.

8    Q.    Please take your time.

9    A.    Okay.

10   Q.    Okay.  And the slide says "conclusions and

11   recommendations" at the top; correct?

12   A.    Yes, it does.

13   Q.    And then there's some notes to the slide below it,

14   correct?

15   A.    There are.

16   Q.    And they follow under where it says "conclusions";

17   correct?

18   A.    Correct.

19   Q.    And it says, "Despite improvements, unaided awareness

20   is still low, particularly in North America, four percent";

21   correct?

22   A.    Yes.

23            MR. RAWNSLEY:  I move DTX 90 into evidence, Your

24   Honor.

25            MR. MANDEL:  No objection.

Cherry - Cross

1              THE COURT:  All right.  Admitted without

2      objection.

3              (DTX Exhibit No. 90 was admitted into evidence.)

4      BY MR. RAWNSLEY:

5      Q.     Now, S&P Global today has four segments, I believe

6      you spoke about; correct?

7      A.     Yes, I mean, we've merged with IHS Markit.  We have

8      additional segments.

9      Q.     Correct.  And that's a recent event; right?

10     A.     Yes, just two weeks ago.

11     Q.     And IHS Markit tracks sales of commodities; right?

12     A.     Yes, and data and yeah.

13     Q.     So, there's S&P Dow Jones indices segment; correct?

14     A.     Yes.

15     Q.     And there's S&P Global Ratings?

16     A.     Correct.

17     Q.     And S&P Global Market Intelligence?

18     A.     Yes.

19     Q.     Okay and S&P Global Platts; correct?

20     A.     Yes.

21     Q.     And you regard S&P Global's competitors as Refinitiv;

22     correct?

23     A.     Well, our competitors really differ, you know, the

24     set of companies we look at really differ by business to

25     business.  Refinitiv is one of them for the businesses, yes.

Cherry - Cross

1  Q.      Refinitiv is a competitor of S&P; correct,

2  Ms. Cherry?

3  A.      Specifically S&P Global Market Intelligence.

4  Q.      And Bloomberg is a competitor; correct?

5  A.      Yes.

6  Q.      And FactSet is a competitor?

7  A.      Yes.

8  Q.      And Moody's is a competitor; correct?

9  A.      Correct.

10  Q.      And Fitch is a competitor; correct?

11  A.      Correct.

12  Q.      Now, S&P Global has customers in academia, as I

13  believe we saw in your direct examination; correct?

14  A.      Yes.

15  Q.      And commercial banking?

16  A.      Mm-hmm.   Yes.

17  Q.      And government regulatory agencies --

18  A.      Yes.

19  Q.      -- correct?

20          Insurance?

21  A.      Yes.

22  Q.      Investment banking?

23  A.      Yes.

24  Q.      Investment managing?

25  A.      Yes.

Cherry - Cross

1    Q.      Private equity?

2    A.      Yes.

3    Q.      And industrials; correct?

4    A.      Yes.

5    Q.      Now, Plaintiffs obtained revenues in a variety of

6    ways, and one of those ways is from subscriptions; correct?

7    A.      Yes.

8    Q.      And those include subscriptions to the desktop

9    services; correct?

10   A.      Yes.

11   Q.      And desktop services are Market Intelligence and

12   Capital IQ; correct?

13   A.      Yes, we merged them into one since then, but yes.

14   Q.      Okay.

15   A.      Essentially.

16   Q.      When last we spoke, they were two; correct?

17   A.      They were two, and I noted we were merging them, so.

18   Q.      Okay.  And there's no list price for these desktop

19   services; correct?

20   A.      No, they are -- it's price to value, is the -- is the

21   model we use.

22   Q.      Can you explain price to value?

23   A.      So, price to value is really we work on a

24   customer-by-customer basis to understand their needs because

25   it's never as cut and dry as "I just need access to

Cherry - Cross

1    subscription."  We're working with highly, you know --

2    sometimes different types of requirements from customers or

3    requests, so depending on what that is, we will customize a

4    solution for them.

5    Q.    And so, the features the client has access to is

6    customized based on each customer's unique needs; correct?

7    A.    Yes.

8    Q.    And it takes time to find out what these needs are;

9    correct?

10   A.    Yes.

11   Q.    Now, before subscribing to one of the desktop

12   platforms, you have to speak with someone from S&P Global;

13   correct?

14   A.    Yes.

15   Q.    I can't just go online, put in my credit card, get

16   access to that account?

17   A.    As a retail investor, you could do that through a --

18   Simply Wall Street, you know, the Finbox programs.  Through

19   some of our distribution arms.

20   Q.    Ms. Cherry, I can't go in today and get access to S&P

21   Global's desktop platform by just putting in my credit card

22   number; correct?

23   A.    Well, you could get access to the data, but to --

24   there's different levels that you would have access to.  So

25   you would have access, as a retail investor, to some of our

Cherry - Cross

1   distribution platforms.  An institutional, like the ones you

2   just listed, is something that is a longer-lead-time

3   process.  Yes.

4   Q.    Ms. Cherry, I'm asking specifically about S&P

5   Global's desktop platforms; correct?

6   A.    Correct.

7   Q.    Do you understand that?

8   A.    Okay.  I thought you were -- I guess our desktop

9   platforms, I look at -- thank you for clarifying.  I wasn't

10  sure if you were talking about just the data and information

11  available on them.

12  Q.    I am not just speaking about the data and information

13  available on them, Ms. Cherry.  I'm asking specifically

14  about the service that S&P Global offers as a desktop

15  platform.  Do you understand that?

16  A.    Now, I do.

17  Q.    Okay.

18  A.    And so --

19  Q.    I can't go back to my office, put in my credit card

20  number, and gain access to that today, can I?

21  A.    You cannot.

22  Q.    Thank you.

23        Now, clients fall into three strategic pricing

24  tiers; correct?

25  A.    Yes, they do.

Cherry - Cross

1   Q.      Primary, core, and strategic?

2   A.      Yes.

3   Q.      Primary clients whose contracts are less than

4   $50,000; correct?

5   A.      That's right.

6   Q.      And core clients whose contracts run from 50,000 to a

7   million; correct?

8   A.      Correct.

9   Q.      And core is the biggest group; correct?

10  A.      Correct.

11  Q.      And strategic are clients whose contracts exceed a

12  million dollars; correct?

13  A.      Yes.

14  Q.      And it's not an instant process to get a contract for

15  the desktop platforms; correct?

16  A.      It is not.

17  Q.      The fastest it takes to get a contract is a few

18  months; correct?

19  A.      That's a good estimate.

20  Q.      And one of the major users of these desktop platforms

21  are investment bankers; correct?

22  A.      Yes.

23  Q.      Now, S&P Global also obtains transaction revenue from

24  its rating service; correct?

25  A.      Correct.

Cherry - Cross

1    Q.     Okay.  And the price of those services varies

2    depending on the client; correct?

3    A.     Correct.

4    Q.     And S&P Global also receives what it calls

5    non-subscription and transaction revenue; correct?

6    A.     Correct.

7    Q.     And that includes fees for credit ratings; correct?

8    A.     Yes.

9    Q.     And the clients for credit ratings are government

10   institutions, banks and corporations; correct?

11   A.     Mm-hmm.  Yes.

12   Q.     Individuals don't purchase those services, correct?

13   A.     Individuals do not purchase credit ratings.

14   Q.     And S&P Global provides those services under a

15   contract as well; correct, Ms. Cherry?

16   A.     Sorry.  You're talking little fast.  I can't hear

17   you.

18   Q.     My apologies.  I'll try to slow down.

19              S&P Global provides those services under their

20   contract as well, Ms. Cherry; correct?

21   A.     Yes.

22   Q.     And S&P Global draws revenue from what it calls

23   asset-linked fees; correct?

24   A.     Yes.

25   Q.     And those are fees charged to entities that want to

Cherry - Cross

1    offer an investment product based on one of S&P Global's

2    indices; correct?

3    A.     Yes.

4    Q.     And the revenues for that service depend on the

5    amount of assets under management; correct?

6    A.     Correct.

7    Q.     And the client paying S&P Global for that service is

8    the institution offering the product; right?

9    A.     Yes.

10   Q.     And entering into a contract to create an investment

11   product is not a quick purchase, either; right, Ms. Cherry?

12   A.     It is not.

13   Q.     Now, as to the received revenue for the sales

14   usage-based royalties --

15           THE REPORTER:  I'm sorry.  Could you repeat that

16   question?

17           MR. RAWNSLEY:  Sales-usage-based royalties.

18           THE WITNESS:  Correct.  Yes.

19   BY MR. RAWNSLEY:

20   Q.     And that's related to price reporting from Platts;

21   correct?

22   A.     Correct.

23   Q.     Okay.  And Platts reports on commodities; correct?

24   A.     Yes.

25   Q.     And the royalty is tied to trading volumes; correct?

Cherry - Cross

1    A.      Correct.

2    Q.      And institutions and corporate entities pay those

3    royalties; correct, Ms. Cherry?

4    A.      Yes.

5    Q.      Now, S&P Global promotes itself in a variety of ways

6    we've just heard you testify to; correct?

7    A.      Yes.

8    Q.      It hosts events and conferences; correct?

9    A.      Many, yes.

10   Q.      It publishes the work of its economists, analysts and

11   its writers; correct?

12   A.      Yes.

13   Q.      Its work appears in publications like The New York

14   Times, The Financial Times, the Wall Street Journal;

15   correct?

16   A.      Yes.

17   Q.      And if you could look at DTX 88 in your binder,

18   please, Ms. Cherry.  Now, you're the recipient of this

19   email; correct, Ms. Cherry?

20   A.      Yes.

21   Q.      Okay.  And I'd just like to look at the attachment

22   just for reference as we go through some of the events that

23   S&P Global engages in.

24           So, S&P Global engages in webinars?

25   A.      Yes, we do.

Cherry - Cross

1    Q.      It offers seminars and training courses?

2    A.      Yes.

3    Q.      And those training courses are in the areas of

4    expertise that S&P Global offers; correct?

5    A.      Yes.

6    Q.      And -- such as training for financial analysts;

7    correct?

8    A.      Yes, financial professionals.

9    Q.      And S&P Global sponsors events held by others;

10   correct?

11   A.      Sponsors events held by others, yes.

12   Q.      And S&P Global's direct marketing is

13   business-to-business; correct?

14   A.      Our direct marketing, yes; however, we work really

15   closely, like in the indices group, with providing broker

16   dealers with information about our index offering that goes

17   to FA's.  That then is shared with the retail industry.

18   Q.      But S&P Global's direct marketing is

19   business-to-business; correct?

20   A.      Sure.  Our primary, yes.

21   Q.      Can we go up to the second page of the email.

22           Do you see where it says Mr. Shawn Ryan there?

23   A.      Yes.

24   Q.      Okay.  And then if we go beneath that, there's a

25   stylized logo.  It says S&P Global; correct?

Cherry - Cross

1    A.    Yes.

2    Q.    And there's a bar on top?

3    A.    Yes.

4    Q.    S&P Global adopted that logo with the renaming of

5    McGraw Hill Financial; correct?

6    A.    Yes.

7    Q.    What color does that bar typically have?

8    A.    I mean, it depends.  It's either black or it could be

9    knocked out in white.

10   Q.    And do you have the S&P Global at the bottom of your

11   emails when you send emails, that style I just put up?

12   A.    I believe that logo is our main logo.  It's on

13   everything.

14   Q.    It's on everything; correct?

15   A.    Yes.

16              MR. RAWNSLEY:  Move to admit DTX 88.

17              MR. MANDEL:  No objection.

18              THE COURT:  Admitted without objection.

19              (DTX Exhibit No. 88 was admitted into evidence.)

20   BY MR. RAWNSLEY:

21   Q.    Okay.  Could we go to PTX 104?  I think it's probably

22   in the other binder.

23              Now, do you recall giving testimony about this

24   document?

25   A.    Yes.

Cherry - Cross

1    Q.    Now, the first line says the advertising spend in

2    2001 was 107 million; correct?

3    A.    Yes.

4    Q.    That was not advertising spend on the S&P Global

5    brand alone; correct?

6    A.    It was not.  This represented McGraw Hill Companies

7    across all of the portfolio.

8    Q.    Okay.  And that included, I believe we spoke earlier,

9    McGraw Hill Education; correct?

10   A.    It included Education, Construction, I believe,

11   Aviation.  You know, a list of companies.

12   Q.    Okay.  Thank you.

13           And can we go down three pages, please.  One

14   more, please.

15           So, we're on P-004273.  This is a Consolidated

16   Statement of Income.  Do you see that?

17   A.    Yes, I do.

18   Q.    Okay.  And then go down to the next page.  You see

19   the advertising spend there.  See where it says Advertising

20   Expense?

21   A.    Yes.

22   Q.    That figure is not broken out among any of the

23   businesses; correct?

24   A.    Correct.

25   Q.    And it's not broken up by region; correct?

Cherry - Cross

1    A.    It is not.

2    Q.    Okay.  Now, I heard you testify about Brand Finance

3    rankings; correct?

4    A.    Correct.

5    Q.    Okay.  Could we pull up PTX 117?  I believe it's in

6    evidence.

7          Okay.  Now, I believe I heard you say S&P Global

8    commissioned this; correct?

9    A.    Correct.

10   Q.    Do you know how much it cost?

11   A.    I do not.

12   Q.    If you go down to P-009958, and this is a slide with

13   Key Takeaways; correct?

14   A.    Yes, Key Takeaways from Management Interviews.

15   Q.    Thank you.

16         And one of the key takeaways was -- is "To date,

17   the S&P Global portfolio management is still a work in

18   progress"; correct?

19   A.    Correct.

20   Q.    And "portfolio" here refers to branding; correct?

21   A.    Correct.

22   Q.    And if we -- actually if we look below that, it says,

23   "The key to understanding whether brand strategy is working

24   or not will depend on whether the S&P Global brand

25   successfully transforms from a fractious group of brands and

Cherry - Cross

1    cultures"; correct?

2    A.    Yes.

3    Q.    Now, during your direct examination, you testified

4    about Brand Finance's U.S. 500; is that correct?

5    A.    Yes.

6    Q.    Okay.  And that was dated 2020; correct?

7    A.    Yes.

8    Q.    Okay.  S&P Global did not make Brand Finance's U.S.

9    500 in 2017; correct, Ms. Cherry?

10   A.    I do not believe so.

11   Q.    And S&P Global did not make Brand Finance's U.S. 500

12   in 2018; correct?

13   A.    I don't believe so.

14   Q.    And then in 2019, S&P Global commissioned Brand

15   Finance as a consultant to give advice about its brand;

16   correct?

17   A.    We did.

18   Q.    And then in 2020, S&P Global makes its debut

19   appearance in the U.S. 500; correct, Ms. Cherry?

20   A.    That is correct.

21   Q.    So you spoke a little bit about the Defendant S&P

22   Data; correct?

23   A.    Pardon?

24   Q.    You spoke a little bit on your direct examination

25   about the defendant in this case, S&P Data; correct?

Cherry - Cross

1    A.      Yes.

2    Q.      And you have been aware of S&P Data since 2014 at the

3    latest; correct?

4    A.      Correct.

5    Q.      Okay.  Could you please look at DTX 37.

6    A.      You said 37?

7    Q.      37, Ms. Cherry.

8    A.      Oh, it's in this one?  It's in a different binder?

9    Q.      It could be.  You'll be looking for the defendant's

10   binder.  Cross binder, it says.

11   A.      Oh, 37.  Got it.

12   Q.      Okay.  And you testified about this document in your

13   deposition; correct?

14   A.      I did.

15   Q.      Okay?

16   A.      Yes.

17   Q.      Now, you see an email from Outsell Headlines;

18   correct?

19   A.      Yes.

20   Q.      And Outsell Headlines is a service that provides news

21   headlines; correct?

22   A.      Yes.

23   Q.      And we can see one of the headlines here is that "S&P

24   Data hires cofounder of Center Partners David Geiger as

25   President of Emerging Markets."  Do you see that?

Cherry - Cross

1    A.      Yes.

2    Q.      Now, this email from Outsell Headlines went to a

3    Mr. Patrick Milano; correct?

4    A.      Yes.

5    Q.      Patrick Milano is an attorney; correct?

6    A.      Correct.

7    Q.      He's an attorney with S&P Global; correct?

8    A.      Was, yes.

9    Q.      And Mr. Milano forwards it to Scott Bennett; correct?

10   A.      Correct.

11   Q.      And Mr. Scott Bennett at that time was an attorney

12   for Plaintiffs as well; correct?

13   A.      Yes.

14   Q.      And Mr. Bennett, in turn, forwards to it to a

15   Ms. Susan Winter; correct?

16   A.      Correct.

17   Q.      And Ms. Winter was, at that time, an attorney for the

18   plaintiffs; correct?

19   A.      Correct.

20   Q.      And Ms. Winter was responsible for trademarks;

21   correct?

22   A.      Correct.

23   Q.      Okay.

24           MR. RAWNSLEY:  Move to admit DTX 37.

25           MR. MANDEL:  No objection.

Cherry - Cross

1          THE COURT:  Admitted without objection.

2          (DTX Exhibit No. 37 was admitted into evidence.)

3     BY MR. RAWNSLEY:

4     Q.    Can you please go to DTX 38, Ms. Cherry.

5          Now you, testified about this at your deposition

6     as well; correct?

7     A.    Correct.

8     Q.    Now, this is an email from a Mr. Chip Merritt;

9     correct?

10    A.    Correct.

11    Q.    And Mr. Merritt is Plaintiffs' head of investor

12    relations at the time of this email; correct?

13    A.    Correct.

14    Q.    And this email is April 7th, 2014; correct?

15    A.    Correct.

16    Q.    Mr. Merritt forwards the email to Kenneth Vittor;

17    correct?

18    A.    Correct.

19    Q.    And Kenneth Vittor, at that time, was the general

20    counsel of Plaintiffs; correct?

21    A.    Correct.

22    Q.    Now, you see some underlining in the article at the

23    bottom; correct?

24    A.    Yes.

25    Q.    And this is an article that also says S&P Data hires

Cherry - Cross

1    cofounder of Center Partners David Geiger as president of

2    emerging markets; correct?

3    A.    Correct.

4    Q.    And there's underlining because someone in this chain

5    of emails thought it was important to highlight certain

6    parts of this press release; correct?

7    A.    Correct.

8    Q.    Now, Mr. Vittor also forwards this email to

9    Ms. Winter; correct?

10   A.    Correct.

11   Q.    And Ms. Winter sends it to a JPaine@proskauer.com.

12   Do you see that, Ms. Cherry?

13   A.    Yes.

14   Q.    "Jpaine" is Jessica Paine; correct?

15   A.    I believe so.

16   Q.    And she was an attorney with the law firm of

17   Proskauer Rose; correct?

18   A.    Yes.

19   Q.    And at this time, Proskauer Rose handled trademark

20   matters as outside counsel for Plaintiffs; correct?

21   A.    Correct.

22   Q.    Now, in 2014, Plaintiffs conducted an investigation

23   into S&P Data; correct?

24   A.    Correct.

25   Q.    Proskauer hired a firm named Marksmen; correct?

Cherry - Cross

1    A.      Correct.

2    Q.      Marksmen is an investigative firm; correct?

3    A.      Yes.

4    Q.      And you assumed that the services offered by S&P Data

5    were one of the subjects of that investigation; correct?

6    A.      Correct.

7    Q.      You would expect that the website of S&P Data would

8    have been a first stop for Marksmen; correct?

9    A.      For anyone, sure, yes.

10   Q.      No one at Plaintiffs reached out to S&P Data as a

11   result of the press release we just saw; correct?

12   A.      To the best of my knowledge, right.

13              MR. RAWNSLEY:  Move to admit DTX 38, Your Honor.

14              MR. MANDEL:  No objection.

15              THE COURT:  All right.  Admitted without

16   objection.

17              (DTX Exhibit No. 38 was admitted into evidence.)

18   BY MR. RAWNSLEY:

19   Q.      Can you look at DTX 41, please.  And we're going to

20   start at the bottom.

21   A.      Start at the bottom?

22   Q.      Yes.

23   A.      Okay.

24              THE COURT:  So, Mr. Rawnsley, I think we ought

25   to take a morning break here.

Cherry - Cross

1            MR. RAWNSLEY:  Happy to.

2            THE COURT:  But even though, before we do, I do

3    just have one question.  In the earlier things where --

4    where you were being asked about the brand and the unaided

5    awareness recognition, what do you understand by "unaided

6    awareness" to mean.

7            THE WITNESS:  So when you look at your brand

8    health, you look at a combination of factors around it, in

9    addition to unaided awareness, that is not necessarily the

10   most important.  But "unaided awareness" would be if I said

11   to you, "Can you name a soda brand."  And you would say,

12   probably, Coca-Cola or something like that.  That is who

13   comes to mind without, sort of, prompting.  Are you familiar

14   with -- are you familiar with any of these soda brands, Coke

15   Pepsi, whatever?  Does that make sense?  So you have

16   unaided --

17           THE COURT:  So, when you say do I know any soda

18   brands, I can go Coke, Pepsi, Sprite, so on until I run out

19   of brands?

20           THE WITNESS:  Yes, and that is an unaided

21   question.  Now, when you look at -- at brand health, you

22   want to look at your --

23           THE COURT:  So actually, you've answered my

24   question.

25           THE WITNESS:  Okay.

Cherry - Cross

1                   THE COURT:  Okay.  Thank you.

2                   All right.  We'll take a 15-minute break.

3                   DEPUTY CLERK:  All rise.

4                   (Recess was taken.)

5                   THE COURT:  All right.  Come on back,

6       Ms. Cherry.

7                   All right.  Everyone be seated.

8                   Go ahead, Mr. Rawnsley.

9                   MR. RAWNSLEY:  Thank you, Your Honor.

10      BY MR. RAWNSLEY:

11      Q.     So I believe we left off at DTX 41.  Do you have

12      that, Ms. Cherry?

13      A.     I do.

14      Q.     Let's go to the bottom of this email, please.  Now,

15      at the bottom of this email, we see an email from Mr. Doug

16      DiLillo correct?

17      A.     Yes.

18      Q.     And Mr. DiLillo introduces himself as the Executive

19      Assistant to President Dan Bemis at S&P Data; correct?

20      A.     Correct.

21      Q.     Mr. DiLillo sends this message to an Ursula Cottone,

22      Key Bank; correct?

23      A.     Correct.

24      Q.     And Ms. Cottone, in turn, sends it to Ms. Kelly

25      McNamara, also at Key Bank; correct?

Cherry - Cross

1    A.      Correct.

2    Q.      Ms. McNamara sends it to Laura Albert at McGraw Hill

3    Financial; correct?

4    A.      Yes, Laura is at S&P Capital IQ.

5    Q.      And then if we go up further, the email reaches you;

6    correct?

7    A.      Correct.

8    Q.      And it reaches Ms. Pavani --

9    A.      Correct.

10   Q.      -- Thagirisa?  And Ms. Thagirisa is an attorney;

11   right, Ms. Cherry?

12   A.      She is.

13   Q.      Now, the subject is "SP Data" legal/brand issue added

14   to it from the original email from Mr. DiLillo; correct?

15   A.      Yes.

16   Q.      If you could please go -- well, before we leave this

17   document, what was the date of this email?

18   A.      6/17/2014.

19   Q.      Okay.

20           MR. RAWNSLEY:  Move to admit DTX 41 into

21   evidence, Your Honor.

22           MR. MANDEL:  No objection.

23           THE COURT:  Admitted without objection.

24           (DTX Exhibit No. 41 was admitted into evidence.)

25   BY MR. RAWNSLEY:

Cherry - Cross

1   Q.      Please go to DTX 47.  And we're going to start at the

2   bottom, once again.  Just let me know when you're ready.

3   A.      Okay.

4   Q.      And this is another email from Mr. DiLillo to

5   Ms. Cottone; correct?

6   A.      Correct.

7   Q.      And June 17th, 2014; correct?

8   A.      Correct.

9   Q.      And he identifies himself as an executive assistant

10  at S&P Data; correct?

11  A.      Correct.

12  Q.      He says that S&P Data is an outsourcing provider;

13  correct?

14  A.      Correct.

15  Q.      He states that S&P Data has an innovative social

16  media platform; correct?

17  A.      Correct.

18  Q.      And Mr. DiLillo sent this email again to Key Bank;

19  correct?

20  A.      Correct.

21  Q.      And if we go up again, this email once again found

22  its way to Plaintiffs; correct?

23  A.      Correct.

24  Q.      Including you?

25  A.      Correct.

Cherry - Cross

1   Q.      And if we can go to the top, we see an email address

2   at the very top, JPaine@proskauer.com; correct?

3   A.      Sorry.  There's a lot of names.

4   Q.      Please take your time.

5   A.      Oh, yes.  Thank you.

6   Q.      And we've seen that email address earlier; correct?

7   A.      Correct.

8   Q.      The news item about the hiring at S&P Data found its

9   way to Ms. Paine; correct?

10  A.      Correct.

11  Q.      And you do agree that the JPaine@proskauer.com is

12  still Ms. Jessica Paine at Proskauer Rose; correct?

13  A.      Correct.

14  Q.      Now, I believe I heard you say at the end of your

15  direct testimony that you want to eliminate confusion;

16  correct?

17  A.      Correct.

18  Q.      But you didn't want to do that in 2014, did you,

19  Ms. Cherry?

20  A.      I can't speak to that.

21              MR. RAWNSLEY:  No further questions.

22              THE COURT:  All right.

23              MR. MANDEL:  No redirect, Your Honor.

24              THE COURT:  No redirect, you just said?  Okay.

25              Thank you, Ms. Cherry, you may step down.

Cherry - Cross

1                 By the way, as we're changing things up, Mr.

2       Rawnsley, were you introducing DTX 47?

3                     MR. RAWNSLEY:  Yes, I move to admit.

4                     MR. MANDEL:  No objection.

5                     THE COURT:  Okay.

6                     (DTX Exhibit No. 47 was admitted into evidence.)

7                     THE WITNESS:  Am I finished?

8                     Thank you very much.

9                     THE COURT:  May she be excused or are you

10      planning to --

11                     MR. MANDEL:  She can be excused.

12                     MR. RAWNSLEY:  As long as she's not being

13      recalled, that's fine.

14                     THE COURT:  Okay.  So you're free to go.

15                     MR. MANDEL:  Your Honor, I'm going to hand the

16      podium over to my colleague, Ms. Milov, who is going to do

17      the questioning of our next witness, Kim Boyle, and I'm

18      going to go get her.

19                     THE COURT:  Okay.

20                     MR. MILLER:  May I approach to the witness, Your

21      Honor?

22                     THE COURT:  Yes.

23                     DEPUTY CLERK:  Please state and spell your full

24      name for the record.

25                     THE WITNESS:  It's Kimberly Boyle,

Boyle - Direct

1    K-I-M-B-E-R-L-Y B-O-Y-L-E.

2              DEPUTY CLERK:  Do you affirm that the testimony

3    you are about to give to the Court in the case now pending

4    will be the truth, the whole truth and nothing but the

5    truth, you do so affirm?

6              THE WITNESS:  Yes.

7              KIMBERLY BOYLE, the witness herein, after having

8    been duly sworn under oath, was examined and testified as

9    follows:

10             DEPUTY CLERK:  Make sure you speak into the

11   microphone.  Thank you.

12                       DIRECT EXAMINATION

13   BY MS. MILOV:

14   Q.    Good morning, Ms. Boyle.

15   A.    Good morning.

16   Q.    You currently work for S&P Dow Jones Indices;

17   correct?

18   A.    Yes.

19   Q.    What is the relationship between S&P Dow Jones

20   Indices and the plaintiff, S&P Global?

21   A.    S&P Dow Jones indices is a division of S&P Global.

22   Q.    And is S&P Dow Jones Indices sometimes referred to as

23   S&P DJI?

24   A.    Yes.

25   Q.    So if I use the two, S&P DJI and S&P Dow Jones

Boyle - Direct

1    Indices interchangeably, will you know I'm speaking about

2    the same entity?

3    A.    Yes.

4    Q.    And in general, what is the business of S&P Dow Jones

5    Indices?

6    A.    We calculate and distribute market indexes.

7    Q.    What is your current title at S&P DJI?

8    A.    I'm the global head of index data.

9    Q.    And what are your responsibilities as global head of

10   index data?

11   A.    I am -- so I'm responsible for the -- creating the

12   index data product that we distribute to our clients.  That

13   includes strategy, pricing, input on contracts, working with

14   our commercial teams, et cetera.

15   Q.    How long have you held your current position as

16   global head of index data?

17   A.    So I've been part of the index division for about ten

18   years now, and the last six years or so, I've been in this

19   particular role.

20   Q.    And what did you do at S&P DJI before your current

21   role.

22   A.    So prior to that, it was a role that was related to

23   this one.  It was really mostly focused on the product

24   management, less of the commercial, which is part of it now.

25   Q.    And what were your responsibilities in the product

Boyle - Direct

1    management role?

2    A.    Right.  So it was a little bit more focused on the

3    operations on the production side of the indices and just

4    organizing the product into a more sellable form than it had

5    been previously.

6    Q.    Have you held other roles at S&P?

7    A.    Yes.  I've been -- I've been at S&P for -- well, this

8    is my 25th year at S&P, so for the 15 years prior to that, I

9    worked in a different division.  The division that's most

10   like where I was before was the S&P Market Intelligence.

11   Mainly in commercial role, sales.

12   Q.    And very briefly, what did you do before you joined

13   S&P in terms of employment?

14   A.    I was at Reuters for ten years before I came to S&P,

15   and so Reuters is a financial data distribution platform.

16   Q.    And could you please turn to PTX 90 in your binder.

17   It would be the first -- first exhibit.

18         And what is this document?

19   A.    Right.  So this is about -- this is a media kit, an

20   S&P Global media kit.

21   Q.    Do you know how this document is used?

22   A.    Right.  So -- so this document is really an overview

23   of the S&P Global organization.  It talks about our breadth,

24   the different divisions, and the focus that each one of

25   those divisions covers.

Boyle - Direct

1    Q.      And I'd like to direct your attention to a page

2    that's a little bit more than halfway -- and for time, I

3    placed a tab on it.  It has the number in the corner P10364.

4             And what does this portion of the exhibit show?

5    A.      Right.  So this page gives a pretty concise overview

6    of the -- of the main products that we offer at S&P Dow

7    Jones Indices.

8    Q.      And do you know whether the information that is

9    contained in PTX 90 accurately reflects the goods and

10   services being offered by your division?

11   A.      Yes.

12   Q.      The left-most column is entitled Benchmarking.  What

13   is benchmarking?

14   A.      Right.  So many of our clients use indexes for what

15   they call benchmarking, which is just to say that it's a

16   measure of comparison of how, perhaps, their results as

17   portfolio manager or an investor will compare to the market,

18   with the indexes being the market.

19   Q.      And what service does S&P DJI provide related to

20   benchmarking?

21   A.      Primarily, our clients subscribe to our index data

22   services in order to -- in order to use our data for

23   benchmarking.  They'll use the historical data as well as

24   the current data.

25   Q.      How many indices does S&P DJI currently calculate

Boyle - Direct

1     each day?

2     A.     We calculate hundreds of thousands.  The number is

3     probably about 7- to 800,000 at this point.

4     Q.     So we're going to look at some other documents.

5                MS. MILOV:  But before I move on, Your Honor,

6     I'd like to offer PTX 90 into evidence.

7                MR. FINEMAN:  No objection.

8                THE COURT:  Admitted without objection.

9                (PTX Exhibit No. 90 was admitted into evidence.)

10    BY MS. MILOV:

11    Q.     If you could please turn to PTX 96 in your binder,

12    please.

13                What is this exhibit?

14    A.     So, so this is a group of -- we call them sort of

15    fact sheets which describe several of our indices.  This is

16    information that's available on our website and available in

17    PDFs for downloading.  This first one covers the S&P 100 and

18    goes on to cover the S&P 500, the S&P 500 Catholic Values,

19    S&P 500 Dynamic Vector, and other of our -- other of our --

20    of our indexes.  It describes the methodology and

21    construction and gives information that our users might be

22    interested in.

23    Q.     And do you know whether the information contained

24    within the fact sheets accurately contains data about these

25    indices as of February 26th, 2021, which appears to be the

Boyle - Direct

1   date on the bottom of the page?

2   A.    Yes.

3   Q.    And since we're going to be talking about it a few

4   times today, could you please explain in general terms what

5   the S&P 500 is.

6   A.    Right.  So the S&P 500 is probably our most popular

7   index.  It's an index meant to measure the large cap

8   companies in the United States.  So, it's -- it's about 500

9   companies, 505 securities.  And they're market cap weighted.

10          MS. MILOV:  Your Honor, I offer Plaintiffs'

11   Trial Exhibit 96 into evidence.

12          MR. FINEMAN:  No objection.

13          THE COURT:  All right.  Admitted without

14   objection.

15          (PTX Exhibit No. 96 was admitted into evidence.)

16   BY MS. MILOV:

17   Q.    Ms. Boyle what is end-of-day data?

18   A.    Right.  So we use the term end-of-day data to sort of

19   describe two different things.  One is that there's also a

20   realtime or intraday data, so to distinguish those two

21   services.  Our end-of-day service is updated once at the end

22   of the day versus the realtime or the intraday, which is

23   updated throughout the day.  And the other way that we

24   described it from a product standpoint is that our

25   end-of-day data includes the detailed, underlying

Boyle - Direct

1  information about the constituents and the weights of the

2  index.

3  Q.     How can an individual or entity receive end-of-day

4  data from your division?

5  A.     Right.  So there's several different several

6  different ways.  Usually, for an individual to receive that

7  type of information, they would access it, you know, through

8  our -- through our website, certainly, where you can pull a

9  lot of that data.  They would also get it through their

10  brokerage accounts, through online portals, through our

11  distribution partners, and we also have some direct

12  services.

13  Q.     So you mentioned a brokerage.  How might a brokerage

14  use the S&P data?

15  A.     Right.  So there would be companies like, maybe,

16  Fidelity or Vanguard or E-Trade who, you know, offer portals

17  for investing and they, you know, they make information

18  available about the market in general.  It's a common

19  measurement of the success of your investing, so individuals

20  would usually go to their brokerage account and be able to

21  see how the indexes perform.

22  Q.     Would you turn to PTX 100 in your binder, please.

23  What is this document?

24  A.     So this is a list of our end-of-day subscription

25  customers.

Boyle - Direct

1    Q.     And do you know where this document came from?

2    A.     Yes, this is -- this would be -- this is just a

3    standard list as part of our finance records.

4    Q.     And do you know whether the list in Plaintiffs'

5    Exhibit 100 accurately reflects the S&P DJI end-of-day

6    subscription customers approximately at the time when

7    documents were collected in this action?

8    A.     Yes.

9    Q.     Do you know if this is a list of all users who

10   received S&P DJI data?

11   A.     This is definitely not a complete list of everybody

12   who uses our data.  This would just be investment

13   professionals, financial companies who have entered into

14   licenses directly with us to access data.  You know, we also

15   make our data available through redistribution platforms, so

16   financial data platforms where we give the right to that

17   platform to share our data broadly with their client base,

18   and so quite a lot of our data is available for users

19   through those platforms, and those -- those platforms are

20   not required to report those users to us and they don't need

21   to have contracts with us.

22          And in addition, we work with other distributors

23   who -- who are not directed at financial professionals but

24   are more for online websites and other kinds of tools, and

25   they also have the right to display our data on their

Boyle - Direct

 1   platforms, and they're not required to report who those

 2   users are to us.

 3   Q.      So if we turn in this list in here, appears to be

 4   alphabetical.  I placed a Post-It for expediency on a page

 5   where I see the beginning of a number of Bank of America

 6   entities listed.

 7   A.      Right.

 8   Q.      How might this type of entity use the S&P data?

 9   A.      Right.  So variety of different ways.  They would be

10   using it for their own end investment purposes.  They would

11   be using it on their -- on their banking website, on their

12   client portal, on their public website.  You know, their own

13   tracking of their performance that they send out in

14   statements to their clients or for their 401Ks or retirement

15   plans that they manage.  They would definitely -- they would

16   definitely be fully using the end-of-day data to support all

17   of their client activity.

18             MS. MILOV:  Your Honor, I would offer

19   Plaintiffs' Trial Exhibit 100 into evidence at this time.

20             MR. FINEMAN:  No objection.

21             THE COURT:  All right.  Admitted without

22   objection.

23             (PTX Exhibit No. 100 was admitted into

24   evidence.)

25   BY MS. MILOV:

Boyle - Direct

1   Q.     Ms. Boyle, I'd like to turn to just one exhibit

2   further, to Plaintiffs' Trial Exhibit 101.  What is this

3   document?

4   A.     Right.  So these are end-of-day index subscription

5   customers who have direct relationships and contracts with

6   us.

7   Q.     Do you know where this document came from?

8   A.     Yes, this is based on a -- a finance report that we

9   regularly use.

10  Q.     And do you know whether the list in Plaintiffs'

11  Exhibit 101 accurately reflects the end-of-day subscription

12  customers with direct contracts when documents were

13  collected in this action?

14  A.     Yes.

15  Q.     So, this, again, appears to be a list in alphabetical

16  order, and I wanted to direct your attention to a page

17  containing an entry for NYS Teachers Retirement System.  Let

18  me know when you find it.

19         Why might an entity like that take a license?

20  A.     Right.  So we call NYS Teachers Retirement System an

21  asset owner.  They have a huge pension fund which is

22  intended for, you know, as part of the compensation plan for

23  New York State teachers.  So, the retirement system would

24  subscribe to our data to oversee the investments in their

25  retirement funds and to provide reporting, make financial

Boyle - Direct

1    investment decisions, and to share that information on the

2    results with the teachers or whoever the members of that

3    plan are.

4               MS. MILOV:  Your Honor, I would offer

5    Plaintiffs' Trial Exhibit 101 into evidence.

6               MR. FINEMAN:  No objection.

7               THE COURT:  All right.  Admitted without

8    objection.

9               (PTX Exhibit No. 101 was admitted into

10   evidence.)

11   BY MS. MILOV:

12   Q.    Ms. Boyle, at the beginning of your testimony, you

13   alluded to, I believe, realtime or intraday.  Could you

14   please let us know what that relates to, the end-of-day data

15   you were referencing?

16   A.    Right.  So the realtime data takes the underlying

17   securities within the index and creates an updated,

18   calculated, ticking version of the -- of the index, which in

19   essence calculates and makes available to the CME for

20   distribution to -- to vendors, to clients, to websites, to a

21   whole range of different portals and outlets.  So it's

22   updated daily, you know, second by second throughout the

23   day.

24   Q.    So could you please turn to Plaintiffs' Trial Exhibit

25   102 in your binder.  And what is this document?

Boyle - Direct

1    A.     Right.  So this is a list of our intraday clients.

2    Q.     Do you know where this document came from?

3    A.     Yes, there would be sort of a typical reporting that

4    we receive of the clients who have access to this, so that's

5    what this list is.

6    Q.     And do you know whether this list accurately reflects

7    the intraday customers that your division has when documents

8    were reflected in this action?

9    A.     Yes.

10   Q.     And I'd like to turn alphabetically.  I see a few

11   listings here CNBC, CNN, Fox News, New York Times.  Why

12   would media companies like these take a license?

13   A.     Right.  So the S&P 500 and S&P index updates are

14   newsworthy information that these portals and media outlets

15   want to share as part of the newsworthy information that

16   they're making available to their audience on a daily basis.

17   Q.     And moving a bit further, I also see Google and Yahoo

18   as licensees.  Why would companies like these take a

19   license?

20   A.     Right.  So similar to the media outlets, these are

21   online portals where people would, you know, frequently

22   check in throughout the day to see how the market is

23   performing, and so through the realtime license, they have

24   the right to show S&P 500 and other S&P indices on their

25   screens.  So -- so that people can check them at, you know,

Boyle - Direct

1    at their leisure.

2              MS. MILOV:  At this time, I would offer

3    Plaintiffs' Trial Exhibit 102 into evidence.

4              MR. FINEMAN:  No objection.

5              THE COURT:  Admitted without objection.

6              (PTX Exhibit No. 102 was admitted into

7    evidence.)

8    BY MS. MILOV:

9    Q.    Ms. Boyle, in what form does your division offer its

10   index data services?

11   A.    Right.  So you know, we have a few services where we

12   directly deliver the data out to our clients, and we also

13   have relationships where we distribute the data to our

14   redistribution partners who then make it available on their

15   screens and on their services for, you know, for their users

16   to have access to.

17   Q.    And does S&P DJI provide data on an index-by-index

18   basis?

19   A.    Right.  So typically, we don't make the data

20   available on an index-by-index basis from subscription

21   standpoint.  We offer packages of data.  So, you know,

22   oftentimes there's a relationship between the indices that

23   we offer together.  So, the S&P 500 for example, is offered

24   in our U.S. package, which contains the 400, the 500, the

25   600, the 1500 that they roll up into and, you know, a range

Boyle - Direct

1    of other S&P indices all in one grouping.  So, a

2    subscription would give you access to hundreds of indices.

3    Q.    Would you please turn to Plaintiffs' Trial

4    Exhibit 109 in your binder.  And what is this document?

5    A.    Right.  So this is revenue numbers from 2011 to 2020

6    for the S&P branded indices.

7    Q.    And do you know where this document came from?

8    A.    Yes.  This would -- this would be finance.  It would

9    come out of our finance department.

10   Q.    And do you know what territory these revenue numbers

11   relates to?

12   A.    Yes, this is U.S.

13   Q.    And do you know whether the exhibit accurately

14   reflects the revenue generated from data in the U.S. from

15   2011 to 2020?

16   A.    Yes.

17   Q.    And based on your review of this exhibit, what

18   conclusions, if any, can you draw about the sale of S&P's

19   data packages in the U.S. during this time?

20   A.    I mean, it's an incredible business.  It's growing.

21   It's grown tremendously between 2011 and 2020.  There's a

22   huge appetite within the U.S. market for S&P indices, and

23   these numbers demonstrate that.

24            MS. MILOV:  Your Honor, I would offer

25   Plaintiffs' Trial Exhibit 109 into evidence.

Boyle - Direct

 1              MR. FINEMAN:  No objection.

 2              THE COURT:  All right.  Admitted without

 3     objection.

 4              (PTX Exhibit No. 109 was admitted into

 5     evidence.)

 6     BY MS. MILOV:

 7     Q.     Ms. Boyle, I'd like you to turn, unfortunately, all

 8     the way back to Plaintiffs' Trial Exhibit 90, particularly

 9     to the tabbed page.  You just let me know once you're there.

10     A.     Yeah.

11     Q.     And I particularly would like to direct your

12     attention to the column second from the left entitled

13     Intellectual Property Licensing.  What does this relate to?

14     A.     Right.  So people see the S&P 500 on the news every

15     day, and they see the growth of that index and other indices

16     of ours, but, you know, the S&P 500 gets the most -- gets

17     the most fanfare, and they want to invest in it.  But it's

18     impractical for an individual to invest in 500 securities

19     and to kind of try, themselves, to keep up with the

20     weighting schemes and whatnot that they would have to in

21     order to track the performance themselves.

22              So, because you can't directly invest in an

23     index, there are products that we license to our clients

24     where we give them the right to track our index in a

25     financial product that can be bought by individuals or

Boyle - Direct

1    professionals.  So, ETFs, or mutual funds or annuities can

2    be created to mirror the results of the S&P 500 and other

3    indices, and this is a really important part of our --

4    really the primary part of our business activity, is to

5    enter into these -- call them IP licenses because the

6    financial institution is copying the design of our index in

7    the product that they are then selling to their client.

8    Q.    I want to speak a little bit more about those

9    products.  Can you please turn to Exhibit 97 in your binder.

10   And what is this exhibit?

11   A.    So this exhibit is produced by S&P, and it is showing

12   you all, not all, but long lists of the financial data

13   products that are available in the marketplace to track our,

14   you know, particular indices.  So, if you wanted to invest

15   in the S&P 500 directly, this is a list that we provide so

16   that you would know what products are authorized to offer,

17   you know, that sort of tracking.  And it goes through the

18   S&P 100, the S&P 500, the S&P 500 Catholic Values, the S&P

19   500 Dynamic Vector, the S&P 500 Low Volatility Index.  So

20   there are many indices listed here, and for each page, it

21   lists the financial products that are, you know -- people

22   can just go to to invest in them directly.

23              MS. MILOV:  Your Honor, I would move or I'd

24   offer Exhibit 97 into evidence.

25              MR. FINEMAN:  No objection.

Boyle - Direct

1          THE COURT:  Admitted without objection.

2          (PTX Exhibit No. 97 was admitted into evidence.)

3     BY MS. MILOV:

4     Q.    Ms. Boyle, could you please turn to Plaintiffs' Trial

5     Exhibit 99 in your binder.  And what is this document?

6     A.    So this is a list of our IP clients.

7     Q.    And do you know where this document came from?

8     A.    Yes, this comes from reporting and from our finance

9     records.

10    Q.    And do you know whether the exhibit accurately

11    reflects your IP licensees when documents were collected in

12    this action?

13    A.    Yes, it does.

14    Q.    And based on this exhibit, can you identify a few of

15    your IP licensees?

16    A.    Sure.  So, I mean some of our -- some of the, you

17    know, more well-known probably are, you know, Vanguard is --

18    is a huge S&P 500 mutual fund.  Schwab has an S&P 500 Fund.

19    State Street, Fidelity, Merrill Lynch, Morgan Stanley.

20    Yeah, there's -- I, mean all well-known financial

21    institutions have these IP relationships with us.

22          MS. MILOV:  Your Honor, I would offer

23    Plaintiffs' Trial Exhibit 99 into evidence.

24          MR. FINEMAN:  No objection.

25          THE COURT:  Admitted without objection.

Boyle - Direct

1          (PTX Exhibit No. 99 was admitted into evidence.)

2    BY MS. MILOV:

3    Q.     Ms. Boyle, could you please turn one back to

4    Plaintiffs' Trial Exhibit 98.  And what is this exhibit?

5    A.     Okay.  So this exhibit contains several fact sheets

6    that are -- these are -- these are not produced by S&P.

7    These would be coming off of the partner -- partner websites

8    or client websites.  And, so for example, this first one is

9    a description of the Schwab S&P 500 index funds.

10   Q.     In general, are you familiar with these products?

11   A.     Yes.

12   Q.     And since you mentioned the first page, the Schwab

13   S&P 500 index funds, does anything on this page show what

14   the share price was for this fund?

15   A.     Yes.  So what this is showing you is that to buy one

16   share of this fund, it would be $58.17 on the day that this

17   is described.

18   Q.     And what does the share price represent?

19   A.     Right.  So that's -- that's showing if, you know,

20   if -- really, if anybody just wanted to participate in the

21   S&P 500 investment with Schwab, they would be able to, you

22   know, get -- make an account and buy a share for $58.17.

23   Q.     So I wanted to turn your direction to about six pages

24   into the exhibit.  It has the number P14350 in the lower

25   right-hand corner.  And I'd particularly like to focus your

Boyle - Direct

1    attention on the subheading of highlights under the summary.

2    Let me know once you're there.

3    A.    Okay.

4    Q.    What do you understand these highlights to mean?

5    A.    Right.  So, I mean, this is really just the key

6    information for the investor.  It's a simple way to get

7    access to the 500 leading U.S. companies through buying a

8    single share in, you know, in this particular fund.  It

9    gives you the diverse 500 portfolio.  It's straightforward.

10   It's low cost, so it's -- it's just giving you that

11   overview.

12   Q.    And I wanted to march a few pages forward.  It's

13   about three pages forward, the number on the right-hand

14   corner is P14362.

15   A.    Yeah.

16   Q.    And what is this document?

17   A.    All right.  So this one describes a different S&P

18   500-based product.  This one is an ETF, so an ETF would be

19   an exchange traded fund, so this is something you can just

20   buy like you would buy a share of stock.  And it's an

21   iShares funds which is produced by Blackrock.  And yeah,

22   this is an overview of -- you know, it's a different

23   investment vehicle, but it's essentially capturing the same

24   investment profile of the S&P 500.

25   Q.    And does anything on this page show what the share

Boyle - Direct

1    price was for this ETF?

2    A.      Right.  So this one was $66.14.

3    Q.      And again, what does that share price represent here?

4    A.      So that's the price of one share of the ETF.

5              MS. MILOV:  Your Honor, I'd move or I'd offer

6    Plaintiffs' Trial Exhibit 98 into evidence.

7              MR. FINEMAN:  No objection.

8              THE COURT:  Admitted without objection.

9              (PTX Exhibit No. 98 was admitted into evidence.)

10   BY MS. MILOV:

11   Q.      Ms. Boyle, do you know how S&P DJI prices its IP

12   licenses?

13   A.      Yeah.  So the way that -- the way that we do that is

14   we -- we enter through -- into a contract which gives the

15   firm that we're working with the right to create this

16   investment vehicle, and we agree on a -- really, it's a very

17   small share of the assets that are invested in the funds.

18   So it's, you know, it's an assets under management, is the

19   term that they call it, so we would get a percentage of

20   what's invested in that fund.  And that gives the, you know

21   our partner, you know, iShares or whoever, the right to

22   track our index for the makeup of the product, and they

23   handle the regulatory piece of it.  They handle all the

24   marketing, all the client communications, you know, and all

25   of, you know, all of the material that gets distributed

Boyle - Direct

1   around about it, so that's kind of how it works.

2   Q.     Could you please turn to Plaintiffs' Trial

3   Exhibit 155 in your binder.  And what is this exhibit?

4   A.     Right.  So -- so this is -- this is a document in a

5   marketing material, I guess, that we've been making

6   available for many years now.  It's a survey that we send

7   out to the investment community to try and get an idea of

8   how, you know, how many assets are tracking the key S&P

9   indices in the marketplace.

10  Q.     Do you know where these documents came from?

11  A.     Yeah, this is available on our public website.  It's

12  marketing material.

13  Q.     And do these appear to be true and correct copies of

14  those annual surveys you were referencing?

15  A.     Yes.

16  Q.     So, I wanted to show you just a couple of entries on

17  this document.  If you look at the first page, the number on

18  the lower right-hand corner is P23063.  Can you state what

19  appears to be the total amount of assets under management

20  for S&P index-based financial products.

21  A.     Right.  So, for 2002, the total was 906,000,140.

22  Q.     And roughly what amount of the total assets under

23  management is attributable to the assets under management

24  for the S&P 500-based products?

25  A.     That was 840 billion.  It was almost 841 billion.

Boyle - Direct

1    Q.    So let's fast forward to the second to last page in

2    the exhibit.  It has the number P23124 in the lower

3    right-hand corner.  And what is the number of assets under

4    management here for just S&P 500-based products?

5    A.    So, that is 5.4 trillion.

6              MS. MILOV:  Your Honor, I would offer

7    Plaintiffs' Trial Exhibit 155 into evidence.

8              MR. FINEMAN:  No objection, Your Honor.

9              THE COURT:  Admitted without objection.

10             (PTX Exhibit No. 155 was admitted into

11   evidence.)

12   BY MS. MILOV:

13   Q.    Ms. Boyle, could you please turn one exhibit back to

14   Plaintiffs' Trial Exhibit 110.  And what is this document?

15   A.    So this is revenue from our IP licenses.

16   Q.    Do you know where this document came from?

17   A.    Yes, this is a finance document from our internal

18   documents from our company.

19   Q.    And do you know whether the exhibit accurately

20   reflects the revenue for IP licenses by S&P DJI?

21   A.    Yes.

22   Q.    What is the -- do you also know, what is the

23   territory covered by this revenue attributable here?

24   A.    This is U.S.

25   Q.    What is the line item under S&P at the top?

Boyle - Direct

1    A.      Right.  So S&P, that line, reflects the total of all

2    of the underlying licenses.

3    Q.      And at the bottom there's a row titled Other.  What

4    is that?

5    A.      So, in the listing above Other, you have many of our

6    specific S&P indices, but we have many, many others.  And so

7    the Other captures our other S&P indices as well as our

8    select sector indices.

9    Q.      So, the select sector indices, those would be

10   presented without use of S&P; correct?

11   A.      That's right.

12   Q.      And do you know approximately how much of that Other

13   category is related to the select sector indices?

14   A.      25 percent.

15   Q.      Reviewing Plaintiffs' Trial Exhibit 110, what

16   conclusions, if any, can you draw from the revenues

17   generated by S&P DJI for IP licenses?

18   A.      I mean, you know, there's been tremendous growth, and

19   a tremendous amount of the growth is related to the success

20   of the S&P 500-related IP products.

21            MS. MILOV:  Your Honor, I would offer

22   Plaintiffs' Trial Exhibit 110 into evidence.

23            MR. FINEMAN:  No objection, Your Honor.

24            THE COURT:  Admitted without objection.

25            (PTX Exhibit No. 110 was admitted into

Boyle - Direct

1    evidence.)

2    BY MS. MILOV:

3    Q.     Ms. Boyle, other than on data packages or financial

4    products, has the S&P name been promoted to various segments

5    of the public for S&P DJI services?

6    A.     Yes.  So it's broadly -- it's broadly available and

7    through many different means.  You know, your 401K, for

8    example, would have S&P 500 and other S&P indices reflected

9    in it.  All of your financial statements would reflect

10   growth versus an S&P index.  And in addition to that, we

11   have, you know several, you know, sort of specific

12   activities within our company that are intended to educate

13   and grow the knowledge of our indices, and impact on the,

14   you know, financial economy.

15              So, we have a very strong marketing department.

16   We put a lot of material on our public website.  We do a lot

17   of education through that.  We offer -- we offer webinars.

18   And then we have teams within our organization whose role it

19   is not to sell our services, but rather educate financial

20   advisors, the insurance community, corporations,

21   municipalities, other asset owners, and just generally make

22   them aware of benefits of using the S&P-branded indices as

23   part of your investment strategy.

24              MS. MILOV:  Pending cross-examination, I have no

25   further questions, Ms. Boyle.

Boyle - Cross

1          THE COURT:  All right.  Mr. Fineman.

2          MR. FINEMAN:  Thank you, Your Honor.

3          MR. RAWNSLEY:  May I approach, Your Honor?

4          THE COURT:  Yes.

5                    CROSS-EXAMINATION

6    BY MR. FINEMAN:

7    Q.    Ms. Boyle, while you're pouring yourself a cup of

8    water, I'll introduce myself to you.  You and I haven't had

9    the pleasure before.  My name is Steve Fineman.  I'm with

10   Richards, Layton, and Finger.  I'm going to be asking you

11   some questions this afternoon.

12   A.    It's nice to meet you.

13   Q.    It's nice to meet you as well.

14         I think I heard you say this on direct, but I

15   want to confirm.  You presently work for S&P Global;

16   correct?

17   A.    Well, the division that I work for is S&P Dow Jones

18   Indices, which is part of S&P Global.

19   Q.    And the S&P DJI stands for S&P Dow Jones Indices;

20   right?

21   A.    That's right.

22   Q.    And your division, the S&P DJI, was previously known

23   as the S&P Indices; correct?

24   A.    That's right.

25   Q.    Your clients and colleagues in the industry still

Boyle - Cross

1    refer to your division mainly as the S&P Indices division;

2    correct?

3    A.      That's pretty common, yes.

4    Q.      Those same clients and colleagues in the industry

5    actually refer to both your division and the product line

6    your division markets and sells as its S&P indices; correct?

7    A.      Yes.

8    Q.      And having the division known to the public by two

9    different names, doesn't create any issues, does it?

10   A.      I mean, I don't know, probably, what you mean by

11   "issues," but we do offer indices that are branded with S&P

12   and also with DJI, so it's reflective of a range of products

13   that we offer, but I don't think it's confusing.

14   Q.      Right.  Having the division known to the public by

15   two different names, does not create any issues; correct?

16   A.      I don't think so, no.

17   Q.      Okay.  The S&P Dow Jones Indices division offers four

18   categories of services; correct?

19   A.      Yes.

20   Q.      And you were talking about those a few minutes ago on

21   direct examination; correct?

22   A.      Yes.

23   Q.      Those four categories of services are benchmarking,

24   intellectual property licensing, custom indices, and

25   research and quantitative solutions; right?

Boyle - Cross

1    A.    Yes.

2    Q.    Other than those four categories of services, there

3    are no other categories of services offered by your

4    division; correct?

5    A.    Correct.

6    Q.    All right.  The first category of services you

7    identified is benchmarking; right?

8    A.    Yes.

9    Q.    And benchmarking describes when an index is used as a

10   comparison against another financial products or portfolios

11   to determine whether the financial product or portfolio is

12   outperforming or underperforming in comparison to the

13   market; right?

14   A.    That's right.

15   Q.    And the actual service performed is the provision of

16   information which is used by the end subscribers to compare

17   their performance against the index; right?

18   A.    That's right.

19   Q.    And I'm sorry.  You've got to speak up a little bit.

20   A.    Sorry.  Yes, that's right.

21   Q.    Thank you very much.

22         Such information is provided on a subscription

23   basis; correct?

24   A.    Yes.

25   Q.    And these subscription agreements are contracts with

Boyle - Cross

1    duration of periods of a year or two years; correct?

2    A.    Yes.

3    Q.    The subscription agreements provide for two manners

4    of redistribution of that information; right?

5    A.    I don't know.  No.  I don't know.

6    Q.    Well --

7    A.    I don't know what you mean by "two manners of

8    redistribution."

9    Q.    Well, sure.  The subscription agreements allow for

10   the information that's provided under them to be

11   redistributed, and there's two different ways in which that

12   can happen; right?

13   A.    Yes.

14   Q.    All right.  In the first scenario, S&P Global has a

15   specific agreement that provides a license under which a

16   customer can display the information provided by S&P Global

17   on their terminal or platform for use by the customer's end

18   client; right?

19   A.    Yes.

20   Q.    In the second scenario, where S&P Global licenses a

21   subscription to a client, like an asset manager or a bank,

22   there is a limited right to use the information provided by

23   S&P Global so the client can provide information to their

24   respective investors or would-be investors; right?

25   A.    Yes.

Boyle - Cross

1    Q.      In that second scenario that you just testified

2    about, the S&P client can include the information and

3    materials the client places on their own websites or in

4    materials they provide to their clients to show how they

5    perform versus the S&P Global index; correct?

6    A.      Yes.

7    Q.      All right.  Let's discuss for a moment how a party

8    enters into a subscription agreement with S&P Global.  Okay?

9    Okay.

10            There is a few ways in which a potential

11   customer obtains a subscription agreement; right?

12   A.      Yes.

13   Q.      The first way would be to click on the S&P Global

14   website and seek additional information; right?

15   A.      They would get information about the services if they

16   were to do that.  They wouldn't -- that wouldn't enter them

17   into a license.

18   Q.      Exactly.  They could go on the website and click, and

19   that would be the first step in gaining information on how

20   to enter into a subscription agreement; correct?

21   A.      Yes.

22   Q.      Another way would be to use functionality on the

23   systems or platform of one of S&P's existing subscribers

24   that redistributes; right?

25   A.      Yes.

Boyle - Cross

1   Q.      In that scenario, where a potential subscriber

2   reaches out through the platform of an existing subscriber

3   who redistributes, the existing client would let you know

4   that they have a client who is interested in S&P Global, and

5   then S&P Global would reach out to that potential new

6   client; right?

7   A.      That's partially -- that's partially right.  There --

8   you know, there's quite a lot of -- of our data that is

9   typically available on a redistribution platform, so there's

10  a certain layer of information that can be made available,

11  you know, without the need for a license.  And then a more

12  premium level of information that would, as you described,

13  require that they notify us and that we talk to them about

14  an additional license.

15  Q.      The last typical way in which potential subscriber

16  would contact S&P would be a marketing event or a conference

17  attended or hosted by S&P Global; right?

18  A.      Yes.

19  Q.      At those events or conferences, S&P Global collects

20  information from attendees and then reaches out to the

21  potential clients; correct?

22  A.      Very often, yes.

23  Q.      S&P Global provides its services to sophisticated

24  institutional companies; correct?

25  A.      Yes.

Boyle - Cross

1   Q.      And then those sophisticated institutional

2   subscribers would make the S&P Global information available

3   to their retail clients; right?

4   A.      Yes.

5   Q.      The purpose of providing information to clients that

6   S&P Global licenses is that those clients can use the

7   information to further their relationships with their own

8   clients; correct?

9   A.      That -- that's a primary reason.  That's not the only

10  reason.

11  Q.      Well, that's the end purpose; right?

12  A.      Right.  But if you looked at something like making

13  the data available to the media outlet or web portals,

14  something like that, it's really just so that they can

15  communicate with their audience, not necessarily as an

16  investment advisor.

17  Q.      Right.  But the end purpose is to facilitate your

18  clients to facilitate their relationships with their

19  clients; right?

20  A.      Yes.  Yes.

21  Q.      So, for example, a retail customer, the average

22  American consumer would not go to -- to the S&P Global

23  website and enter his or her credit card information and

24  subscribe to S&P Global services; correct?

25  A.      Correct.

Boyle - Cross

1    Q.      Entering into an agreement with S&P Global is not

2    like signing up for Netflix; correct?

3    A.      Correct.

4    Q.      Instead, an average consumer would use her or his

5    Fidelity account, E-Trade, Schwab, or other institutional

6    investor who's already an S&P subscriber to compare against

7    the S&P Global indices; right?

8    A.      Yes.

9    Q.      Average consumers are at least one level removed from

10   dealing directly with Plaintiffs; correct?

11   A.      For a subscription, yes.  There's quite a bit of free

12   data on our public website, so there is some level available

13   to individual consumers, but to enter into the subscription

14   agreement, then what you described is exactly right.

15   Q.      Across S&P Global, average consumers are at least one

16   level removed from dealing directly with Plaintiffs;

17   correct?

18   A.      Correct.

19   Q.      S&P Global does not directly license the retail user;

20   right?

21   A.      Correct.

22   Q.      In fact, S&P Global is not licensed to offer

23   investment vehicles; correct?

24   A.      Right.

25   Q.      S&P's business model is to offer -- offer the indices

Boyle - Cross

```
 1    and then to license the indices to the parties who do offer

 2    investment vehicles; right?

 3    A.     Yes.

 4    Q.     Let me direct your attention to DTX 124.  It should

 5    be in the binder that was provided to you immediately before

 6    I started to ask you questions.  And please let me know when

 7    you have that in front of you.

 8    A.     Yes.

 9    Q.     All right.  And you recognize DTX 124; correct?

10    A.     Yes.

11    Q.     DTX 124 is a description of the S&P 500 index; right?

12    A.     Yes.

13    Q.     The information found in DTX 124 is the type of

14    information provided to S&P Global's clients; right?

15    A.     Yes.

16    Q.     At the bottom of the page on DTX 124, there's a

17    disclaimer that reads in all capital letters, "FOR USE WITH

18    INSTITUTIONS ONLY, NOT FOR USE WITH RETAIL INVESTORS."

19               Isn't that right?

20    A.     Yes, it does say that.

21    Q.     And can we -- and I'm going to apologize.  I'm going

22    to ask you to toggle binders for one moment.  Can you please

23    look back at PTX 96, which I believe is a document that you

24    were discussing with your counsel on direct examination.

25    A.     Yes.
```

Boyle - Cross

1   Q.      Do you have DTX 96 -- excuse me.  I believe this is

2   PTX 96.

3   A.      Yes.

4   Q.      Do you have PTX 96 in front of you?

5   A.      Yes.

6   Q.      Do you recall discussing this document when you were

7   on direct examination?

8   A.      Yes.

9   Q.      And you'll note you were pointing out the date of

10  this document; correct?  It was February 26th, 2021?

11  A.      Yes.

12  Q.      All right.  Immediately below that date is a

13  disclaimer that says "FOR USE WITH INSTITUTIONS ONLY, NOT

14  FOR USE WITH RETAIL INVESTORS."

15              Correct?

16  A.      Correct.

17  Q.      And that's in all capital letters, isn't it?

18  A.      Yes.

19  Q.      All right.  And that disclaimer is consistent with

20  your earlier testimony that S&P Global is at least one step

21  removed from retail investors; right?

22  A.      Yes.

23  Q.      Let's talk about the second category of products S&P

24  Global offers, and that's intellectual property licensing.

25  S&P works with product sponsors globally so those product

Boyle - Cross

1    sponsors can offer to institutions or retail investors a

2    product -- a product that follows S&P Global indices; right?

3    A.     Yes.

4    Q.     So in terms of intellectual property licensing, S&P

5    Global's clients are those sophisticated institutions that

6    offer investment vehicles; correct?

7    A.     Correct.

8    Q.     And I think you might have mentioned this on direct

9    examination, and, for example, some of S&P Global's

10   institutional clients for these licensing products would

11   include Vanguard, State Street, and Blackrock; right?

12   A.     Yes.

13   Q.     And then those institutions, like Vanguard for

14   example, in turn handle the outreach to clients who want to

15   invest in the product being offered by that institution;

16   right?

17   A.     Yes.

18   Q.     The next category of product offered by S&P Global is

19   called custom indices; right?

20   A.     Yes.

21   Q.     And custom indices is constituted in three products;

22   right?

23   A.     Yes.

24   Q.     The figures type of custom index is when a customer

25   is interested in accessing one of S&P Global's indices but

Boyle - Cross

1     wants to make a change; right?

2     A.     Yes.

3     Q.     The second type of custom indices is when a customer

4     seeks to have its own brand on an index, and it wants S&P

5     Global to calculate it; right?

6     A.     Yes.

7     Q.     In those circumstances, S&P Global's merely acting as

8     a calculator and you distribute it back to the customer;

9     right?

10    A.     Yes.

11    Q.     And the third type of product of the custom indices

12    is a hybrid; right?

13    A.     Yes.

14    Q.     And under the hybrid approach, that's where an S&P

15    Global customer uses its intellectual property, but the

16    client wants to customize part of the index; right?

17    A.     Yes.

18    Q.     Let's talk about the fourth category.  The fourth

19    category of products is called research and quantitative

20    solutions; right?

21    A.     Yes.

22    Q.     But research and quantitative solutions is not a

23    commercial product that is offered by S&P Global; right?

24    A.     Correct.

25    Q.     It's not a -- it's not a commercial product by anyone

Boyle - Cross

1    affiliated with S&P Global; right?

2    A.    That's right.

3    Q.    Research and quantitative solutions is simply content

4    that S&P Global creates to remain relevant, educate the

5    industry, and increase demands for its services; right?

6    A.    Yes.

7    Q.    All right.  Let's return to the types of agreements

8    that S&P Global enters into with recipients of S&P Global's

9    products.  For any S&P Global client that licenses S&P

10   intellectual property, that client enters into an

11   intellectual property agreement with S&P Global; right?

12   A.    Yes.

13   Q.    Those clients would also enter into a separate data

14   license so they can receive the information necessary to

15   manage their product; right?

16   A.    Yes.

17   Q.    So they would have at least those two separate

18   agreements; right?

19   A.    Yes, usually.

20   Q.    There could be additional agreements that they would

21   enter into; right?

22   A.    Yes, sometimes.  Or there's instances where you would

23   just need the IP agreement and not the data.

24   Q.    Let me direct your attention to DTX 150, and that

25   should be in the binder with the other DTX exhibits.

Boyle - Cross

1    A.      Yeah.

2    Q.      And you recognize DTX 150; right?

3    A.      Yes.

4    Q.      This is a form template for ETF master agreement;

5    right?

6    A.      Yes.

7    Q.      Any client looking to acquire rights to S&P Global's

8    intellectual property would be required to enter an

9    agreement in the form of DTX 150; right?

10   A.      Yes.

11   Q.      Generally, S&P Global offers a master agreement that

12   has a broad set of terms that governs the overall

13   relationship; correct?

14   A.      Yes.

15   Q.      And that master agreement that an S&P Global client

16   enters into would have schedules that address the specific

17   ETF that's being offered by S&P Global; right?

18   A.      Yes.

19   Q.      Okay.  And since the license does not cover a

20   client's use of the S&P information separately, S&P Global

21   has the client enter into a master subscription agreement

22   and a pricing schedule; right?

23   A.      Yes.

24   Q.      At S&P Global, you have a team that is referred to as

25   the client coverage team; correct?

Boyle - Cross

1    A.      Yes.

2    Q.      That client coverage team is responsible for working

3    through the agreements we just talked about with the client

4    or potential client and provide the majority of the

5    information; right?

6    A.      Yes, they're the sales -- they're the sales team, so

7    they work with the clients, you know, through the process of

8    concluding that contract.

9    Q.      Right.  And it's a process; right?

10   A.      It can be.

11   Q.      Oftentimes, the clients negotiate the terms of the

12   contract; right?

13   A.      Yes.

14   Q.      And at some point in the process, where the client

15   coverage team is working with the client or potential

16   client, the S&P Global legal team would get involved as

17   well; right?

18   A.      Yes, sometimes.

19   Q.      Typically, this process of having a client enter into

20   a contract with S&P Global takes weeks to months; right?

21   A.      It can, yes.

22   Q.      Let me direct your attention to DTX 152.  You

23   recognize this agreement; correct?

24   A.      Yes.  Mm-hmm.

25   Q.      DTX 152 is an example of a master agreement for a

Boyle - Cross

1   client to receive the data of an index; right?

2   A.    Yes.

3   Q.    In addition to this master agreement that's been

4   marked as DTX 152, a client will also need to enter into an

5   index data services attachment and a pricing schedule;

6   right?

7   A.    Yes.

8   Q.    So for a client who's subscribing to full service,

9   that client would need to enter into at least three

10  agreements; right?

11  A.    Yes.

12  Q.    Alternatively, a client could access certain S&P

13  Global information from a platform that they would subscribe

14  to; right?

15  A.    Yes.

16  Q.    But the provider of that platform itself would have

17  had to have entered into a series of agreements, different

18  agreements, with S&P Global; right?

19  A.    Yes.

20  Q.    Such an agreement would constitute at least a master

21  distribution agreement with an order schedule which would

22  allow the distributor client to share certain S&P Global

23  information with its clients, but also specify what

24  information cannot be shared with its customers without

25  those customers separately entering into a master

Boyle - Cross

1   subscription agreement and pricing schedule license as you

2   just testified about; right?

3   A.     Yes.

4   Q.     Let's talk about pricing for a few minutes.  Let me

5   direct your attention to DTX 153, and before I publish 153,

6   I will say that I conferred with your counsel and inquired

7   to confirm that I can make this publicly available before I

8   did?

9              MR. FINEMAN:  And, Counsel, that is correct;

10  right?

11             MS. MILOV:  That's correct.

12  BY MR. FINEMAN:

13  Q.     And you recognize DTX 153; right?

14  A.     Yes.

15  Q.     This is a price list for someone entering into a

16  subscription agreement with Plaintiffs; right?

17  A.     Yes.

18  Q.     And one of Plaintiffs' clients -- if one of

19  Plaintiffs' clients wants to create an investment vehicle

20  based on an index, that client pays basis points on the

21  access of that investment vehicle; right?

22  A.     Yes.

23  Q.     Those fees can range from anywhere between 10- to

24  50,000 on the low end to at least a hundred thousand; right?

25  A.     I'm sorry.  Was that -- that's for the IP license?

Boyle - Cross

1    Q.      Yes.

2    A.      Yes.  Yeah.

3    Q.      It can go well beyond $100,000; right?

4    A.      It can -- well, there's the basis point relationship,

5    so sort of depends on the investment in the product.

6    Q.      Right.  And based on those investment points, the

7    amount that the clients pay could be significant; right?

8    A.      Yeah.

9    Q.      And it can go well over $100,000?

10   A.      Yes.  It could.

11           THE COURT:  Ms. Boyle, remember to speak up

12   okay.

13           THE WITNESS:  Sorry.  Yes, it could.

14   BY MR. FINEMAN:

15   Q.      And in addition to the fees we've talked about,

16   there's additional fees that clients can incur in connection

17   with their subscription to Plaintiffs' services; right?

18   A.      Yes.

19   Q.      Plaintiffs -- let's -- we'll stop talking about

20   pricing.  Talk about competition.

21           Plaintiffs view companies who specifically index

22   providers and companies who offer indexes as sub-product

23   lines to their primary products to be their competitors;

24   right?

25   A.      Yes.

Boyle - Cross

1   Q.      Those are the entities that Plaintiffs consider to be

2   their market competitors, companies that offer index product

3   lines; right?

4   A.      Yes.

5   Q.      And with respect to those companies that only offer

6   indices as a sub-product line, Plaintiffs are not

7   competitors with those companies with respect to their other

8   product lines; right?

9   A.      Correct.

10  Q.      MSCI is an index provider that Plaintiffs view as a

11  competitor; right?

12  A.      Yes.

13  Q.      You're familiar with the name S&P Catholic Values

14  Index; right?

15  A.      S&P 500 Catholic Values Index.

16  Q.      Yes.  You're familiar with that; correct?

17  A.      Yes.  Mm-hmm.

18  Q.      The only service that Plaintiffs offer under the name

19  S&P 500 Catholic Values Index is the index itself; right?

20  A.      Yes.

21  Q.      Okay.  Customers or clients for that index do not

22  differ from those customer and client bases that you've just

23  testified about; right?

24  A.      I'm sorry.  I don't understand.

25  Q.      Of course.  Let me try this differently.  During your

Boyle - Cross

1    cross-examination today, when I was asking you questions,

2    you talked about who were the customers and clients of S&P;

3    right?

4    A.    Yes.

5    Q.    And you talked about who you viewed to be S&P's

6    competitors; right?  Do you recall that?

7    A.    Yes.

8    Q.    Okay.  So with respect to the particular names I'm

9    about to talk to you about, I'm asking you do the potential

10   and existing client customer base or the competitors you

11   described differ for these names that I'm reading to you now

12   than what we already discussed.

13            Do you understand what I'm asking now?

14   A.    Yes, I do.  No, they don't differ.

15   Q.    They're the same customers, potential customers, and

16   the same competitors; correct?

17   A.    Yes.

18   Q.    And it's the same marketplace for competitors;

19   correct?

20   A.    Yes.

21   Q.    And other than competitors that you testified to

22   earlier who also provide indices, there are no other

23   competitors for the S&P Catholic Values Index; right?

24   A.    No.

25   Q.    You're familiar with the name S&P Veqtor; right?

Boyle - Cross

1    A.    Yes.

2    Q.    And for the court reporter's benefit, that is

3    V-E-Q-T-O-R.

4          The only service that Plaintiffs offer under the

5    name S&P Veqtor is the index itself; right?

6    A.    Yes.

7    Q.    And again, customers or clients for that index do not

8    differ from those customer and client bases you testified to

9    earlier; correct?

10   A.    Correct.

11   Q.    And other than the competitors that you testified to

12   earlier who also provide indices, there are no other

13   competitors for the S&P Veqtor index; right?

14   A.    No.

15   Q.    Okay.  I'm going to list some other names, and I'm

16   going to read this list to you, and just let me read them

17   all, and if you don't hear one or you don't remember one,

18   I'll be happy to go back to it.  I'm going to try to do this

19   for efficiency purposes.

20   A.    Okay.

21   Q.    S&P 500 Veqtor.  S&P Dynamic Veqtor Index.  S&P China

22   500.  S&P Composite 1500.  S&P GIVI.  S&P High Yield

23   Dividend Aristocrats.  S&P Prism.  S&P Stride.  S&P Stride

24   Tips Lockbox.  S&P U.S. Retiree Spending Index.  S&P WCI.

25   S&P LTVC Global Index.  S&P 500 Low Volatility Index, S&P

Boyle - Cross

1    aggregate.  S&P 100, S&P 1,000.  S&P Mid Cap 400.  And S&P

2    Small Cap 600.

3            All right.  I know that was a long list, but did

4    you hear all the names I listed?

5    A.    Yes.

6    Q.    And if you need me to go back, I'm happy to go back

7    individually if you require that, but let me try to address

8    it in one question.

9            For each of the names I just identified, the

10   only service that Plaintiffs offer is the index itself that

11   corresponds to each respective name; right?

12   A.    That's right.

13   Q.    And the customers or clients of those indices that I

14   just read do not differ from those customer or client bases

15   you testified to earlier; right?

16   A.    Right.

17   Q.    Other than those competitors that you testified to

18   earlier who also provide indices, there are no other

19   competitors for the list of indices that I just read; isn't

20   that right?

21   A.    That's right.

22          MR. FINEMAN:  Ms. Boyle, I thank you very for

23   your time today.  I have no other questions.

24          THE COURT:  Thank you, Mr. Fineman.

25          Ms. Milov?

Boyle - Cross

1              MS. MILOV:  No further questions.

2              THE COURT:  Can this witness be excused?

3              MR. FINEMAN:  Unless she's being recalled, yes,

4     Your Honor.

5              THE COURT:  All right.  You're free to go.

6              MR. FINEMAN:  One housekeeping matter that does

7     not affect Ms. Boyle, but I'd like to move into evidence DTX

8     150, DTX 152, DTX 153, and to the extent I did not, DTX 124.

9              MS. MILOV:  No objections.

10             THE COURT:  All right.  They're all admitted

11    without objection.

12             (DTX Exhibit Nos. 150, 152, 153, and 124 were

13    admitted into evidence.)

14             THE COURT:  All right.

15             MR. MANDEL:  Your Honor, I don't know what time

16    you wanted to break for lunch.

17             THE WITNESS:  One o'clock.

18             MR. MANDEL:  One o'clock.  Okay.  So I'll go get

19    our next witness.

20             THE COURT:  Okay.

21             DEPUTY CLERK:  Please state and spell your full

22    name for the record.

23             THE WITNESS:  Hal, H-A-L, Poret, P-O-R-E-T.

24             DEPUTY CLERK:  Do you affirm that the testimony

25    you are about to give to the courts in the case now pending

Poret - Direct

 1   will be the truth, the whole truth and nothing but the

 2   truth, you do so affirm?

 3                  THE WITNESS:  Yes, I do.

 4                  DEPUTY CLERK:  Thank you.  You may sit down.

 5   Make sure you speak into the microphone.  This is the

 6   microphone.

 7                  HAL PORET, the witness herein, after having been

 8   duly sworn under oath, was examined and testified as

 9   follows:

10                  THE WITNESS:  Okay.  Thank you.

11                  MS. MILOV:  Your Honor, may I approach with the

12   binders both for yourself and for the witness?

13                  THE COURT:  Sure.  Yes.

14                        DIRECT EXAMINATION

15   BY MS. MILOV:

16   Q.    Good afternoon, Mr. Poret.  What is your occupation?

17   A.    I'm a market researcher.

18   Q.    And how long have you been a market researcher?

19   A.    About 18 years.

20   Q.    Before discussing your research in this case, I'd

21   like to talk to you briefly about your educational

22   background.  Could you please summarize it.

23   A.    Sure.  I have a B.S. in mathematics from Union

24   College which I got in 1993.  Then in 1995, I graduated SUNY

25   Albany with a master's in math, and in '98, I graduated

Poret - Direct

1    Harvard Law School with a JD.

2    Q.    Can you please describe your professional work

3    experience.

4    A.    Yes.  I practiced law for about four to five years in

5    a law firm in Boston after I graduated, and then I decided

6    to make a career change and go into survey research, so in

7    2004, I started at a company called ORC International which

8    was a market research and business research company, and I

9    was there from 2004 to 2015 as senior vice president doing

10   survey research.  Essentially, designing and conducting

11   surveys for a variety of purposes.  And then I left that and

12   started my own company just under my own name, Hal Poret,

13   LLC, in 2016, and I've been doing the same thing since on my

14   own.

15   Q.    Okay.  What kind of market research have you

16   conducted in your professional capacity?

17   A.    All kinds of consumer surveys, surveys, testing

18   companies, websites, and advertising and brands and a number

19   of different things for legal purposes as well.

20   Q.    And have these surveys included assessing consumer

21   perceptions of brand and advertising?

22   A.    Yes.

23   Q.    About how many surveys have you designed related to

24   consumer perception of brands?

25   A.    Certainly hundreds.

Poret - Direct

1    Q.     What kind of clients have you conducted market

2    research surveys for?

3    A.     It's a pretty big variety from, you know, small,

4    medium to large companies in all kinds of areas.  I don't

5    have any particular industry specialty.  You know, food and

6    beverage, consumer electronics, airlines, apparel, footwear,

7    financial.  All kinds of industries.

8    Q.     Can you identify any financial industry clients for

9    whom you have conducted market research?

10   A.     Yes, some of the ones that I know are public would be

11   Chase, American Express, Bank of California, and a number of

12   other banks and insurance companies and financial companies.

13   Q.     Is your market research always conducted in the

14   context of legal disputes?

15   A.     No.  It's about half doing what you'd call regular

16   corporate market research to help companies make their

17   decisions about their business in advertising and the other

18   half is committed to legal matters.

19   Q.     Have you previously submitted surveys related to

20   trademarks in federal district courts?

21   A.     Yes.

22   Q.     Could you estimate how many trademark surveys you

23   have designed for litigation?

24   A.     Probably several hundred.

25   Q.     What trademark issues have been addressed by surveys

Poret - Direct

1   you have designed?

2   A.      Likelihood of confusion, dilution, genericness,

3   secondary meaning.  And also recognition of marks such as

4   fame surveys or surveys going to the strength of a mark.

5   Q.      Have you ever been qualified as an expert in survey

6   research by a Federal Court?

7   A.      Yes.

8   Q.      Have you given testimony as a qualified survey expert

9   in any federal trademark litigations?

10  A.      Yes.

11  Q.      Have any courts or juries relied on surveys you have

12  conducted?

13  A.      Yes.

14  Q.      Do any of those include recognition surveys?

15  A.      Yes, several of those.

16  Q.      Could you please give us an example.

17  A.      I had a case where I did a survey testing recognition

18  of the John Deere green and yellow color mark for

19  agricultural equipment, and that was one survey that was

20  relied on by the court to find the fame of that color

21  scheme.

22  Q.      Have you published any articles on trademark surveys

23  during your career?

24  A.      Yes, I have three articles in The Trademark Reporter,

25  which is the journal of the International Trademark

Poret - Direct

1    Association, and I have a number of other papers and

2    articles that were mainly published in connection with

3    conferences.

4    Q.    Are you a member of any trade organizations related

5    to consumer research?

6    A.    I am a member of the American Way Association of

7    Public Opinion Research and the New York chapter of that,

8    and I'm also a member of the International Trademark

9    Association.

10   Q.    Have you spoken at any conferences on topics related

11   to trademark surveys?

12   A.    Yes.  I've been the speaker on trademark surveys at

13   the International Trademark Association's annual conference

14   a few times, and I've been asked to speak at conferences

15   from the American Intellectual Property Law Association and

16   some other IP and legal conferences.

17   Q.    Could you please open your binder to PTX 158.

18   A.    Okay.

19   Q.    Is your educational and professional background about

20   which you've just testified summarized in your CV in

21   Plaintiffs' Trial Exhibit 158?

22   A.    Yes.

23         MS. MILOV:  Your Honor, I offer Plaintiffs'

24   Trial Exhibit 158 into evidence, and I also move to qualify

25   Mr. Poret as an expert in consumer behavior and the design

Poret - Direct

1   and implementation of trademark surveys.

2                 MR. FINEMAN:  No objection to the introduction

3   of the exhibit, and no objection, Your Honor.

4                 THE COURT:  All right.  So you may proceed, and

5   the exhibit is admitted.

6                 (PTX Exhibit No. 158 was admitted into

7   evidence.)

8   BY MS. MILOV:

9   Q.    Mr. Poret, what assignment were you given in this

10  case?

11  A.    I was asked to design and conduct a study to test the

12  level of consumer recognition of the S&P mark among the

13  general consumer public.

14  Q.    You mentioned that you had conducted recognition

15  surveys.  About how many have you done previously?

16  A.    If you're counting both surveys just in regular

17  corporate market research as well as legal ones, probably a

18  hundred or more.

19  Q.    What do -- do you understand to -- to be the

20  relevance of consumer recognition to the claims in this

21  case?

22  A.    My understanding has been that for Lanham Act

23  dilution purposes, the standard is that a mark is widely

24  recognized among the general consuming public, so that's

25  been one reason why recognition has been studied, and it's

Poret - Direct

1    also my understanding that recognition can go to -- can be

2    relevant to the strength of a mark and a

3    likelihood-of-confusion analysis.

4    Q.     Did you design, supervise, and analyze a recognition

5    survey on Plaintiffs' behalf?

6    A.     Yes.

7    Q.     What mark did you assess in your survey?

8    A.     The S&P mark.

9    Q.     What methodology did you use to assess consumer

10   recognition of the S&P mark?

11   A.     I used a standard recognition series of questions in

12   which respondents were shown the S&P mark and -- as well as

13   some other marks included to assure the accuracy and

14   reliability of the survey, and they were basically asked

15   whether they had ever seen or heard of that mark as a name

16   of a financial institute.

17   Q.     Have you used this methodology before in recognition

18   surveys?

19   A.     Yes, many times.

20   Q.     Have others used this methodology in recognition

21   surveys?

22   A.     Yes, it's very common.

23   Q.     Is there any literature discussing appropriate

24   methodology for assessing the recognition or fame of a mark?

25   A.     This is discussed in a -- one of the leading

Poret - Direct

1   treatises.  It's called Trademark and Deceptive Advertising

2   Surveys.  That's published by the ABA, and it's edited by

3   Shari Diamond, who is also the author of the Reference Guide

4   on Survey Research, and Shari Diamond has a chapter in that

5   treatise that discusses dilution surveys and fame for

6   dilution surveys, and it endorses that methodology for

7   measuring recognition.  It notes that recognition -- that

8   it's standard to use an aided recognition question like

9   this.

10  Q.     Before getting into the details of the design of your

11  survey, can you briefly summarize the results of your

12  survey.

13  A.     Yes.  The central finding is that S&P was recognized

14  as a name in the financial industry by 67 percent of the

15  survey sample.

16  Q.     Let's turn to your actual survey design.  In order to

17  assess recognition of the S&P mark, what elements of

18  those -- the survey did you consider?

19  A.     Basically, what should be the relevant universe and

20  what methodology to use, what to use as the stimulus or

21  marks that were included, and the questions and the ultimate

22  analysis.

23  Q.     So let's take those one at a time, starting with

24  universe.  What is a survey's universe?

25  A.     It's the population whose state of mind or

Poret - Direct

1    perceptions are relevant to the issues that are being

2    tested.

3    Q.    And what is the proper universe for a recognition

4    survey?

5    A.    Well, in the context of fame like we talked about,

6    it's the general consuming public, since that's what is the

7    state standard for fame.

8    Q.    How did you go about ensuring your respondents fell

9    within this category of the general consuming public?

10   A.    I did an online survey, which is the most common type

11   of survey today, and used an online panel from a company

12   called Prodege, P-R-O-D-E-G-E, and had a random

13   representative sample selected from that panel.

14   Q.    Have you worked with Prodege before?

15   A.    Yes, I worked with them pretty regularly.

16   Q.    And why did you select that company?

17   A.    Because I've used them many times, and they -- their

18   procedures and their panels and their data quality has been

19   very good, and they are generally considered a leading panel

20   company.  Their panel has many millions of Americans, a

21   diverse pool.

22   Q.    Did you take any steps to ensure the survey sample

23   was representative of the population by age and gender?

24   A.    Yes, I used U.S. Census data and set quotas so that

25   the sample, essentially, matched the demographics of the

Poret - Direct

1    U.S. population.

2    Q.    Do you know what the allocation of respondents was

3    among various age groups?

4    A.    It was, essentially, something like 45 percent in the

5    youngest age bracket of 21 to 44, I think, and 20 percent in

6    the next group, that I think was 45 to 54.  And then it was

7    it was about a third in the oldest age group, 55 and over.

8    Q.    Do you know what the allocation of respondents was by

9    gender?

10   A.    It was close to even male and female with selecting

11   more female, as is the U.S. population.

12   Q.    How many respondents participated in the study?

13   A.    300.

14   Q.    Why did you use 300 as the number of respondents to

15   participate in the survey?

16   A.    It's a pretty common sample size for a survey like

17   this.  It's enough to reliably project the results to the

18   overall population that you're studying.

19   Q.    So, let's next get into the details of the

20   methodology you chose.  Why did you choose -- strike that.

21             What question did you ask respondents to gauge

22   their recognition of the S&P mark?

23   A.    Whether they have ever seen or heard of that as a

24   name in the financial industry.

25   Q.    Why did you choose this particular formulation of the

Poret - Direct

1    recognition question?

2    A.    Well, it's a pretty standard question to test

3    recognition because you're showing it and you're asking if

4    they've seen or heard of it before, so this type of question

5    has been used a lot of times.  And like I said before, since

6    recognition is the standard, it's been endorsed in the

7    literature that using an aided recognition question like

8    that is the standard way to measure this.

9    Q.    And why did you ask if respondents had seen or heard

10   of the term in the financial industry?

11   A.    Because terms have trademark significance in context,

12   not in the abstract, in other words, in connection with a

13   particular category of goods or services.  So I like to use

14   the example of -- of apple, since the term "apple" is

15   obviously a generic term in the context of fruit or it's a

16   nondistinctive, descriptive term if it's, for instance, a

17   flavor of candy.  And of course, it's a trademark or brand

18   for consumer electronics.  So the context matters in terms

19   of whether somebody recognize recognizes something as a

20   brand.  And like I also mentioned before, that same

21   treatise, that Sherry Diamond article, discusses that it's

22   appropriate to use a context to test recognition of a term

23   for a fame survey for that reason.

24   Q.    What term or terms did you present to respondents in

25   your survey?

Poret - Direct

1   A.      I used -- I presented that -- the S&P term as well as

2   seven other terms that were included in this type of

3   methodology as a way to assure the reliability of the

4   results.

5   Q.      Could you please turn to PTX 159 in your binder.

6   A.      Okay.

7   Q.      And what is this document?

8   A.      This is the questionnaire that is -- that I wrote

9   that was used to program the survey online.

10  Q.      And I'd like to focus your attention to the section

11  of the questionnaire surrounding Q 230, which is about four

12  pages in.  That's the beginning of it, and it runs on the

13  next page.  Do you see a listing of the eight marks in the

14  large bold type on the second page following?

15  A.      Yes.

16  Q.      Are these the marks you used in your survey?

17  A.      Yes.

18  Q.      So beyond the S&P marks, why did you choose these

19  particular additional names?

20  A.      I chose the first five additional ones to have a

21  range of other names that are used in the financial industry

22  that span more well-known ones such as Goldman Sachs and

23  NASDAQ to less well-known once such as FTSE.  And also, I

24  wanted to include several others besides S&P that were

25  acronyms or abbreviations.  And then the bottom two were

Poret - Direct

1    included as controls to, again, assure that there's no

2    problems in the survey or in the process that leads to

3    artificially inflated results.

4    Q.    So, let's take those in two parts.  You said you

5    wanted to provide a range.  Why did you want to provide that

6    range?

7    A.    Well, it's useful to have other benchmarks that you

8    can use to compare to the result for S&P and also, again, to

9    make sure the survey functions properly and is producing

10   reliable results.  For instance, you would expect a lot of

11   people to recognize Goldman Sachs, whereas you would expect

12   less people to recognize a term like FTSE.  So it's helpful

13   to see a range of results here for these other terms.

14   Q.    And you mentioned providing controls.  Can you first

15   explain what a control is.

16   A.    Yes, it's a procedure in a survey to measure what you

17   would think of as the noise or false positive level.  For

18   instance, in a survey, if you're asking people -- if you're

19   showing people a term and you're asking them whether they

20   recognize this, there could be any number of reasons why

21   somebody says yes, I recognize something even when that's

22   not true.  They could be guessing.  They could be

23   speculating.  They could just be assuming, or there could be

24   something wrong with the survey that just leads people to

25   say yes, I recognize something.

Poret - Direct

1       So a control is included in the survey to

2   account for that and make sure that there's not a problem

3   that's leading to artificially inflated recognition rates.

4   Q.      And what was the control in this survey?

5   A.      There were two.  There was E&K and there was Trouba,

6   T-R-O-U-B-A.

7   Q.      And why did you choose those two controls?

8   A.      I chose E&K in particular because it has the same

9   structure as S&P in terms of two initials separated by an

10  ampersand, and yet that's a fictional term.  It's not

11  actually used as a name in the financial industry.  So that

12  is really an ideal way to test whether the survey is simply

13  going to cause people to assume that two initials separated

14  by an ampersand is a real name in the financial industry and

15  to falsely report that they're aware of it even if they

16  couldn't be.

17      And then, it's not actually necessary to have

18  the second control, but I wanted to have as a second one

19  just to be safe, and so for that one, I just picked another

20  name that is, you know, plausible that can, it could be a

21  name of a financial company, but is really not used by one.

22  So that there were two ways to test what this false positive

23  or noise level is.

24  Q.      So were you finished with your answer?

25  A.      Yes, I was.  Thank you.

Poret - Direct

1    Q.     Could you please turn to PTX 160 in your binder.  And

2    what is this document?

3    A.     This is a compilation of the screen shots of what the

4    screens looked like to respondents while taking the survey,

5    although each of these would have been on a -- its own

6    separate screen.  This is just fitted onto a piece of paper

7    for convenience.

8    Q.     And I'd like to focus your attention on Page 4 of the

9    exhibit surrounding Q 200.  There's a header at the top that

10   says Main Survey.  Do you see that?

11   A.     Yes.

12   Q.     Can you please read Q 200 for us.

13   A.     Yes.  This is the introduction to the main survey,

14   and it said, "For this survey, you will be asked about some

15   names that you may or may not have seen or heard of before

16   in connection with the financial industry.  For any question

17   you are asked, if you have no opinion or do not know, please

18   indicate so.  Please do not guess."

19   Q.     And why specifically did you choose financial

20   industry here?

21   A.     I wanted to provide a term to provide context for the

22   reasons we discussed before, that that is -- has been

23   recognized as an appropriate thing to do, since marks are --

24   have significance in a particular context, but I didn't want

25   it to be an overly narrow specific term that would be more

1    suggestive.  So I picked "financial industry" because it's a

2    very broad term that encompasses many different segments,

3    and so I don't think the term "financial industry" being as

4    broad and general as it is would cue anybody into any

5    particular type of name like something like the S&P 500

6    Index as opposed to, I think, using a more specific thing,

7    like if it had said in connection with financial indices.

8    That, I think, would have been more suggestive to prompt

9    people to recognize a term like S&P.  So I think just being

10   broad with the term was more fair and less suggestive.

11   Q.    Does the order in which respondents consider the

12   terms you are testing influence their results?

13   A.    Yes, that always possible.

14   Q.    Did you take any steps to reduce that potential bias?

15   A.    I did.  I did a couple of things.  One of the things

16   I did was I had half of the sample see the term "S&P" first,

17   and that way I would have a large group of data where it was

18   impossible that the other term could influence their

19   perception of S&P because they were asked about S&P before

20   they even saw the other terms.  And the other thing that I

21   did is across all of the respondents, the order of all of

22   the other terms was randomized, which also accounts for

23   order bias.

24   Q.    Could respondents in your survey go back and change

25   their answers?

Poret - Direct

1    A.    No.

2    Q.    Could you please turn to PTX 161.  And what is this

3    exhibit?

4    A.    This is a -- these are tables of the key substantive

5    results from the survey.

6    Q.    And I'd also like you to turn in your binder to DTX

7    159.  I think we're going to put it up as a native, which

8    will be slightly easier to read.  And what is this document?

9    A.    This is the raw data file that contains all of

10   respondents' answers to all questions as well as it also has

11   a map that explains what each of these numbers means.

12   Q.    And I want to turn back now to PTX 161.  What was the

13   result in your survey for S&P?

14   A.    It was 67 percent answered that they have seen or

15   heard of S&P as a name in the financial industry, and that

16   also was, essentially, the same result if you looked only at

17   the respondents who saw S&P first so that the other terms

18   could not have influenced their answers about S&P.

19   Q.    Could you please walk us through the results for the

20   other noncontrolled terms you tested.

21   A.    Sure.  So as you can see, Goldman Sachs had

22   88 percent and NASDAQ had 87.3 percent, which were the

23   highest ones.  And then HSBC had 64.3 percent.  Moody's had

24   41 percent.  FTSE had 15 percent.

25   Q.    And what were the results for the controls in your

Poret - Direct

1    survey?

2    A.    Both of the controls had a one percent rate of

3    recognition.

4    Q.    So reviewing Plaintiffs' Trial Exhibit 161, what

5    conclusions, if any, can you draw from this table?

6    A.    The main conclusion is that these results are

7    reliable and accurate.  First of all, as you look at the

8    names of the other financial industry terms, the pattern is

9    logical and sensible.  You have Goldman Sachs and NASDAQ

10   with very high results, and you have other terms with lower

11   results, and most notably, FTSE only has 15 percent.  So

12   what this shows is that terms that are not well recognized

13   are not going to gets an artificially high result.

14        But probably most importantly the fact that E&K

15   and Trouba each only have one percent of respondents

16   answering that they recognize these is showing you that

17   there's no problem in the survey.  There's no

18   misunderstanding of the questions.  There's no leading or

19   biased effect of the survey that is just going to cause

20   people to claim to recognize a term that they actually

21   don't.  There's just this one percent noise level, which is

22   negligible.

23        And what all that does is it validates that the

24   67 percent result for S&P is accurate and reliable, that it

25   could only happen if the consumers in the survey generally

Poret - Direct

1   genuinely recognized that.

2   Q.     Did you implement any quality control measures to

3   make sure the results were reliable?

4   A.     Yes.  There's a number of measures.  For one, the

5   survey is double blind, so no one could have known that S&P

6   was the focus of the survey.  There were also a lot of

7   quality control measures within the survey.  It's -- in an

8   online survey, you want to make sure people are paying

9   attention, they're reading the instructions and the answer

10  choices, and they are not rushing through the survey too

11  quickly, so there are a number of procedures that address

12  that.  There's a CAPTCHA, C-A-P-T-C-H-A that ensures that

13  it's a live person taking the survey and not a computer

14  program.  Then there was a requirement of typing in their

15  birth year and gender accurately.  And then also entering

16  their age range in the subsequent question, all of those

17  validating that people are paying attention and typing the

18  information accurately and consistently.

19            And then there are two questions that were

20  included during the screening stage, which are things

21  referred to as speed bumps because they are designed to

22  catch people who are rushing through too quickly and not

23  paying attention.  One of those was a question that said,

24  "Which of the following social media services have you

25  used?"  And that contained a fictional choice in the list,

Poret - Direct

1    which was Hagelin, H-A-G-E-L-I-N, and that's one question

2    that gets people kicked out of the survey if they pick the

3    fictional choice Hagelin.

4              And then the other speed bump comes towards the

5    end of the screener.  It's a question where the answer

6    choices say -- they look like a scale.  It says strongly

7    agree, agree, and then at the other end, it says strongly

8    disagree.  So it looks like it's a question with a scale,

9    but the instruction actually says that we want them to type

10   in the word "other" -- sorry type in the word "survey" into

11   a box next to the word "other."  So, it's a really good --

12   what I, again, call a speed bump because if people are

13   rushing through, not paying attention and reading the

14   instructions carefully, they will just see the scale points,

15   and they'll pick one.  And then they'll get terminated from

16   the survey.  But if they are paying attention and reading

17   the instructions and they type the word "survey" in, then we

18   know they're paying careful attention and taking the survey

19   properly.

20             And then finally at the end of the screener,

21   there's a series of instructions that they're asked to read

22   and agree to.  And then there's also a quality control

23   measure that's part of the main survey, which is that every

24   time the respondents were shown and asked about a term on

25   that screen, they could not advance past the screen for at

Poret - Direct

1    least five seconds, so it would have been impossible to just

2    rush through that part of the survey and just quickly click

3    answer choices without looking at the mark or, you know, or

4    considering it.

5             So all of those were quality control measures,

6    in addition to the controls E&K and Trouba that I've already

7    described and the ability to look at the results as we just

8    did and see that there's no sign of any problems.

9    Q.    And in the survey context, what does "speeding" refer

10   to?

11   A.    It refers to rushing too quickly through a survey,

12   not paying enough attention, not reading carefully, just

13   going through and clicking indiscriminately.

14   Q.    And what does "exceeding" refer to in the survey

15   context?

16   A.    "Exceeding" refers to -- that isn't used very

17   frequently, but it refers to people who are taking too long

18   to do a survey.  In other words, they're exceeding the

19   amount of time you would expect somebody to take for the

20   survey.

21   Q.    And either in the implementation or analysis of the

22   results from this survey, did any data from speeders or

23   exceeders affect your results?

24   A.    No.  I mean, first of all, I think the primary way to

25   account for those things is all of the quality control

Poret - Direct

```
 1    measures that I talked about because those things are a

 2    better way of weeding out people who are rushing or not

 3    taking the survey properly than trying to judge the amount

 4    of time that they took.  But I did also end up looking at

 5    the recording of how much time each respondent took to take

 6    the survey, and I did look at the fact that if you were to

 7    kick out the people who took it in the least amount of time

 8    or the most, it wouldn't meaningfully change the result.

 9              MR. FINEMAN:  Your Honor, I'd like to lodge an

10    objection, if that data that Mr. Poret is talking about was

11    never produced.

12              MS. MILOV:  To my understanding, I'm not sure if

13    it was ever requested.

14              MR. FINEMAN:  Your Honor, I believe it was

15    requested in deposition, and we would have an objection if

16    the witness is testifying as to data that he reviewed and

17    did not produce.

18              THE COURT:  And which data is that that we're

19    talking about?

20              MR. FINEMAN:  He reviewed data relating,

21    allegedly, to speeding and exceeding, Your Honor, and, Your

22    Honor, I will tell you, I have no objection to reserving

23    this objection, Your Honor, so I am -- until I've completed

24    cross-examination, but I do want to lodge it so as to not

25    waive it, Your Honor.
```

Poret - Direct

```
 1              THE COURT:  Okay.  All right.  Are you nearly
 2   finished the direct?
 3              MS. MILOV:  Nearly, yes.
 4              THE COURT:  All right.  Well, why don't you
 5   finish up and then we'll take lunch.
 6              MS. MILOV:  Okay.
 7   BY MS. MILOV:
 8   Q.    Mr. Poret, are you familiar with the concepts of
 9   pretesting in surveys?
10   A.    Yes.
11   Q.    And what is pretesting?
12   A.    Pretesting is -- basically, means running a portion
13   of the survey and then going back and recontacting some of
14   the people who took it to ask them about their experience
15   with the survey, such as whether they understood the
16   questions or they felt there was any trouble with the
17   survey, and it's something that you could use to help you
18   refine your questions or the survey methodology.
19   Q.    And when is pretesting appropriate in the survey
20   context?
21   A.    Well, it's not so much a matter of when it's
22   appropriate, but pretesting is very rare for the simple
23   reason that companies are -- conduct thousands and thousands
24   of market research surveys, and there's countless litigation
25   surveys, and most of them use very well-established, heavily
```

Poret - Direct

1    tested methodologies and questions.  So in my 18 years of

2    seeing and doing thousands of surveys, I would say pretests

3    are things that happen, you know, less than one percent of

4    the time because most surveys are using well-tested

5    questions and methodologies that don't need to be reinvented

6    every time they are used again.

7              So pretests are more often used in academic

8    settings and more unusual settings where it's a novel

9    methodology or maybe there's something involved like

10   technology that consumers may have trouble understanding, or

11   maybe there's terminology that's particularly challenging.

12   But in a case like this, where you're asking the type of

13   question that is very simple and straightforward like have

14   you ever seen or heard this name, it's a standard question

15   that I wouldn't need to pretest.

16   Q.    Did you take any actions in conducting your survey to

17   ensure that respondents understood the questions as

18   presented?

19   A.    Yes.  I mean, I always do and did in this case what

20   is really the equivalent of a pretest, which is as I start

21   the survey and it's running and the data is coming in, I'm

22   looking at it, and I have the ability to see is there any

23   sign of any misunderstanding or any problems.  And as we

24   talked about it the data, you can see here, you know, this

25   is what I saw from the beginning, that there's no sign of

Poret - Direct

```
 1    any problems.  All of these results make sense and there is
 2    not a curiously high rate of people claiming to be aware of
 3    fictional terms, so the results are really self-validating
 4    in the sense that you can see from them that there's no
 5    problem with the survey or misunderstanding the questions.
 6    Q.     And what is "validation" in a survey context?
 7    A.     Well, the original concepts of validation came from
 8    something else when -- back when surveys were more commonly
 9    things like mall surveys and you would have 10 or 20
10    interviewers working around the country in different
11    locations stopping people in shopping malls and doing an
12    interview and then sending the results back to the survey
13    designer.  There was always the concern that these mall
14    interviewers could be fabricating interviews.  They could
15    just be filling out a form and sending it in.
16              So "validation" in that sense used to be or
17    still is when in-person surveys are done that you would call
18    on the phone a number of the people who supposedly took the
19    survey and actually asked them, you know, did you actually
20    take a survey the other day in this mall and did they ask
21    you these questions?  So you validated that the survey
22    actually occurred with a real person.  But in the context of
23    online surveys, which is more the norm today, the -- that
24    concern over validation doesn't exist because there's no
25    interviewer.  So it's not possible that an interviewer
```

Poret - Direct

1    fabricated an interview or falsified anything because every

2    interview is just self-administered online.

3              So, there's different concepts of validation

4    that take place to online surveys, and it's using data

5    within the survey to validate the identity and

6    characteristics of the person who took it.  So like I

7    described before, everybody at the beginning of the survey,

8    after they passed the CAPTCHA, they have to enter the year

9    of birth.  They have to enter their gender.  And the program

10   knows the year of birth and the gender of the panelists from

11   Prodege, who received the invitation.  And so the person who

12   has to type in the birth year and the gender of the panelist

13   to validate that that's who they are.  And that's what was

14   done here.  That's the standard validation technique for

15   online surveys.

16   Q.    And, Mr. Poret, I'd like to ask you one final

17   question, which is looking at Plaintiffs' Trial Exhibit 161,

18   how do you know the results of your survey were reliable?

19   A.    Largely because of the control results, but also

20   because of the overall pattern of results, again, that you

21   have what you would expect.  Goldman Sachs and NASDAQ have

22   very high results, and there were a number of other terms

23   that had lower results, and the controls only got one

24   percent.  And all of that proves that there is nothing about

25   this survey that is biased or flawed that will lead to a

Poret - Direct

 1   term getting a result like 67 percent unless that represents

 2   genuine recognition.

 3                MS. MILOV:  Your Honor, we would offer

 4   Plaintiffs' Trial Exhibits 159, 160, 161 and Defendants'

 5   Trial Exhibit 159 into evidence.

 6                MR. FINEMAN:  No objection, Your Honor.

 7                THE COURT:  So I'm not going to take Defense

 8   Exhibit 159 unless Defendant actually does something with it

 9   because why am I collecting the raw data?

10                If Mr. Fineman brings it up in cross and he

11   wants it in, then I'll put it in, but I don't see any reason

12   why it's necessary at this point, and so I'm against just

13   piling things into the record for no particular reason.  So,

14   the rest of them are admitted.

15                (PTX Exhibit Nos. 159, 160, and 161, were

16   admitted into evidence.)

17                MR. FINEMAN:  Your Honor, I'll wait to do

18   anything else until after the break.

19                THE COURT:  Okay.  All right.

20                So, let's have lunch.  We'll come back at 2:15.

21                DEPUTY CLERK:  All rise.

22                (Luncheon recess was taken.)

23                DEPUTY CLERK:  All rise.

24                THE COURT:  All right.  Let's continue.

25   Mr. Poret, where are you?  There you are.  Come on up.

1          MR. FINEMAN:  Your Honor, I think my friends

2     want to address the Court for a minute before I go.

3          THE COURT:  Okay.

4          MS. MILOV:  Yes, Your Honor.  Before Mr. Fineman

5     begins his cross, I did want to make one correction for the

6     record which relates to the request for data.  I was not at

7     the deposition, but it was requested, and I had forgotten in

8     reviewing, but to my knowledge, I don't believe any

9     follow-up letters arrived after or any motions, and

10    Mr. Poret's deposition occurred in October of 2021.

11         THE COURT:  Okay.  All right.  Thank.  You for

12    correcting the record.

13         And, Mr. Fineman, I take it you're going to

14    proceed and --

15         MR. FINEMAN:  We'll see if I can handle it on

16    cross-examination, Your Honor.

17         THE COURT:  Okay.

18                    CROSS-EXAMINATION

19    BY MR. FINEMAN:

20    Q.    Good afternoon, Mr. Poret.

21    A.    Good afternoon.

22    Q.    My name is Steve Fineman.  You and I haven't had the

23    pleasure before, have we?

24    A.    I don't think so.

25    Q.    Well, it's nice to meet you.

Poret - Cross

1    A.      You, too.

2    Q.      You've prepared hundreds of survey reports; correct?

3    A.      Yes.

4    Q.      You've testified in approximately 30 trials; right?

5    A.      Yes, I think more than that, but.

6    Q.      Approximately 30?

7    A.      Yeah, I think that's reasonably close.

8    Q.      All right.  As of July 2019, you had testified in

9    approximately 200 depositions; right?

10   A.      Yes, that's -- that seems right.

11   Q.      And by October of 2021, you had testified in

12   approximately 300 depositions; right?

13   A.      Yes, I think that's probably right.  I don't think

14   that's right, that I had a hundred in two years, but I think

15   it's correct that as of now, I've had 300 or so depositions.

16   Q.      Well, I'm going to defer to you on this because

17   you're the one with the degree in mathematics, but if I

18   understand correctly, that means over the last approximately

19   two years, you've testified in depositions a hundred times;

20   is that right?

21   A.      No, that's not even close to right.  I -- you're

22   right that I would estimate I've had about 300 probably now.

23   Q.      Well, if you had 200 in July of 2019 and 300 today --

24   or excuse me, 300 as of October 2021, that delta is a

25   hundred; right?

Poret - Cross

1    A.      Yes, but that's not the right math.  My CV that was

2    put into evidence before shows the number of times I had

3    testified in between 2019 and 2021, and I -- -- there's

4    about 15 to 20 per year, so -- and in a two-year period,

5    it's roughly 30 to 40.

6    Q.      So let me just ask you then:  When you -- when you

7    believed that you had testified in depositions 200 times by

8    July of 2019 and you testified that you've testified in

9    depositions approximately 300 times in 2021, in October of

10   2021, which one was wrong?

11   A.      I don't even know what testimony you're referring to.

12   I've been asked in all of my depositions how many times, and

13   I've generally estimated it's been a hundred or over a

14   hundred or over 200 or over 300.

15   Q.      Well, let's -- can you please -- actually, hold on.

16   Let me hand out some binders first.

17                MR. RAWNSLEY:  May I approach, Your Honor?

18                THE COURT:  Sure.

19                MR. FINEMAN:  One moment, Your Honor.  My

20   apologies.

21                THE COURT:  It's all right.

22   BY MR. FINEMAN:

23   Q.      Do you recall testifying before Judge Andrews in this

24   Court?

25   A.      Yes.

Poret - Cross

1    Q.    Let's pull up Page 512 numeric in the American Cruise

2    transcript.  And that testimony was on January 9th, 2019.

3    Do you recall that?

4    A.    I don't recall the date, but I recall the trial.

5    Q.    And I believe I might have misspoke.  I might have

6    said July instead of January, so I'll correct my earlier

7    statement to January of 2019.  And if you would please look

8    at Line 8, do you recognize this as your testimony,

9    Mr. Poret?

10   A.    I don't have any doubt that it is.  I obviously don't

11   remember this specific dialogue, but I'm sure it is if

12   you're pulling it up.

13   Q.    Okay.  And you testified that "I have ended up

14   testifying in depositions in about 200 cases."  Is that

15   right?

16   A.    Yes.

17   Q.    And you said today that you've now testified in about

18   300; correct?

19   A.    Yes, I think that was about correct.

20   Q.    And it appears that your math is off; right?

21   A.    No, I think now you're saying it was about 200 in

22   January of 2019 and that it's now March of 2022, so it was

23   about 200 then, and it's about 300 now.  I'm obviously --

24   obviously, it's not super easy to estimate off the top of my

25   head how many depositions there are, so maybe when I said

Poret - Cross

1     about 200, maybe it was over 200.  Maybe it was 220 or 230

2     at the time and now it's 300, but the only thing I can say

3     with definitive accuracy is that my CV lists every case that

4     I've given testimony in the past four or five years.  So if

5     you want to know how many it's been in the past however many

6     years, my CV that was put in before shows the instances of

7     testimony.

8     Q.     Right.  And to be clear, my question was October of

9     2019 because that's when you were deposed in this case;

10    right?

11    A.     I was, yes.  That sounds right.

12    Q.     So it was October of 2021 that you testified to

13    having given 300 depositions, not March of 2022; right?

14    A.     I don't remember.  You're asking was my testimony --

15    yes, in either case.  I'm estimating a large number over

16    18 years of experience.  And if you're asking was I -- could

17    I have been off by 10 or 20 or 30 in estimating at one time

18    or another, sure.

19    Q.     Is it fair to say that a large part of your business

20    is performing surveys directed at legal issues?

21    A.     Yes.

22    Q.     You've performed hundreds of surveys that address the

23    issue of likelihood of confusion in trademark cases;

24    correct?

25    A.     Yes.

Poret - Cross

1   Q.     You would agree with me that likelihood of confusion

2   is probably the most common legal issue that arises; right?

3   For you?

4   A.     Yeah, I would say that's the biggest category of

5   surveys that I'm asked to do in trademark cases.

6   Q.     And in fact, you have twice offered an opinion on

7   likelihood of confusion in this court to Judge Andrews;

8   isn't that correct?

9   A.     That's -- that certainly seems plausible.

10          THE COURT:  I would say only once.  Maybe the

11  other one was in front of a different judge.

12          MR. FINEMAN:  Your Honor, we'll take a look.

13          THE COURT:  Okay.  I've only had one trademark

14  trial, so -- and I'm confident in that number.

15  BY MR. FINEMAN:

16  Q.     Well, we can agree, sir, that you did testify in this

17  Court and give an opinion on likelihood of confusion at

18  least once; right?

19  A.     Yes.

20  Q.     And do you recall giving testimony in a case titled

21  GOLO versus Goli Nutrition?

22  A.     I certainly did an expert report in that case.  I

23  can't remember if I've given testimony, but, yes, I

24  definitely am familiar with that case, and I do believe

25  you're correct that --

Poret - Cross

```
 1                THE COURT:  And I'm sorry.  We didn't have a
 2   hearing in that case.
 3                MR. FINEMAN:  Your Honor, that's fair.
 4   BY MR. FINEMAN:
 5   Q.    You certainly offered an opinion in a case pending
 6   before this judge in the GOLO case; correct?
 7   A.    Yes.
 8   Q.    And it was on likelihood of confusion; right?
 9   A.    Yes.
10   Q.    And in connection here with your work on behalf of
11   the plaintiffs in this action, you reviewed the amended
12   complaint; right?
13   A.    Yes.
14   Q.    As a result, at the time you prepared your opening
15   expert report in this case, you were aware that Plaintiffs
16   were asserting likelihood of confusion and that likelihood
17   of confusion was an issue in this case; right?
18   A.    Yes.
19   Q.    All right.  Even though you reviewed the amended
20   complaint, you did not rely upon the amended complaint or
21   any other documents other than your survey results in
22   forming your opinion in this case; right?
23   A.    Yes, I would agree with that.
24   Q.    You also did not have any discussions with any Of
25   plaintiffs' employees; right?
```

Poret - Cross

1    A.      Right.

2    Q.      And counsel did not supply you with any facts or

3    information that you considered in forming your opinions;

4    right?

5    A.      I don't believe so.

6    Q.      Okay.  And notwithstanding that you knew likelihood

7    of confusion was an issue in this case, that you had

8    performed hundreds of likelihood-of-confusion surveys,

9    including in connection with litigation in this Court, and

10   you retained a vendor to enroll survey participants for a

11   survey, you have not offered and are not offering any

12   opinion in this case as to whether or not there was a

13   likelihood of confusion; right?

14   A.      Yes, correct.

15   Q.      All right.  I'd like to talk to you about a little

16   bit about the vendor you used to assist with the survey.

17   Okay?

18   A.      Sure.

19   Q.      You retained a vendor to perform some tasks in

20   connection with your survey; right?

21   A.      Yes.

22   Q.      And that vendor's name is Prodege.  Do I have that

23   right?

24   A.      Yes.

25   Q.      In connection with Prodege's retention in this

Poret - Cross

1   matter, Prodege provided programming and hosting services;
2   correct?
3   A.      Yes.
4   Q.      In other words, Prodege performed the computer
5   programming to administer your survey; right?
6   A.      Yes.
7   Q.      Prodege was also responsible for enrolling the survey
8   participants; right?
9   A.      Yes.  They -- they enrolled them in the first place
10   to have them on the panel, and they also would be handling
11   the sending invitations out, too, that are -- would allow
12   them to come to this particular survey.
13   Q.      All right.  You don't know how Prodege located the
14   survey participants; right?
15   A.      You mean in originally enrolling them --
16   Q.      Yes?
17   A.      -- on the panel?
18          It's correct that I can't speak exactly to all
19   of Prodege's measures for recruiting people to be on the
20   panel in the first place.
21   Q.      And you don't know how many times the participants
22   who provided responses in your survey participated in other
23   surveys; right?
24   A.      That's right.  And it could be -- obviously, vary
25   from participant to participant.

Poret - Cross

1    Q.     Now, Prodege conducted the survey from July 6th, 2021

2    through July 10th, 2021; right?

3    A.     I don't have the dates in my head, but if that's what

4    it says, I'm sure that's right.

5    Q.     All right.  Sitting here today, you don't know?

6    A.     Well, I don't have the exact dates in mind, but that

7    seems like generally the time period that it was done.

8    Q.     You have in front of you a binder, and that binder

9    should contain a copy of your opening expert report.  Would

10   that refresh your recollection?

11   A.     As to the specific dates, yes, it would list the

12   specific dates.

13   Q.     Could I direct your attention to Page 14 of your

14   July 2, 2021, expert report?

15   A.     Yes, I see it.  It says July 6th through July 10th.

16   Q.     At the bottom of the page under the heading

17   Interviewing Period, it says, "Interviewing was conducted

18   from July 6th, 2021 through July 10th, 2021"; correct?

19   A.     Yes.

20   Q.     All right.  And that does refresh your recollection

21   that the survey was conducted by Prodege between July 6th,

22   2021, and July 10th, 2021; correct?

23   A.     Yes.

24   Q.     All right.  So the respondents expressed their view

25   as to whether they recognized the names subject to the

Poret - Cross

1    survey, including S&P, during that July 6th, 2021, through

2    July 10th, 2021, time period; right?

3    A.    Yes.

4    Q.    All right.  While Prodege hosted the survey and

5    obtained the respondents and handled in the computer

6    programming, you designed the survey; right?

7    A.    Yes.

8    Q.    Let's talk a little bit about the survey itself.

9    Most surveys that are undertaken are conducted of adults;

10   right?

11   A.    Yes, I think that's accurate.

12   Q.    And that's because the general consuming public is

13   generally considered to be adults; right?

14   A.    It is for a lot of surveys.  There are surveys in

15   areas where children are more relevant, but I agree with

16   you.  The majority of surveys are among adult populations.

17   Q.    Right.  And that is because the general consuming

18   public is generally considered to be adults; right?

19   A.    It is for the majority of things.  Of course, kids

20   are consumers of certain types of goods and services, but I

21   would agree the majority are generally an adult consuming

22   population.

23   Q.    When we talk about doing surveys, and we talk about

24   the general consuming public, it's generally considered to

25   be adults; right?

Poret - Cross

1   A.     Again, most every survey is done for a specific

2   situation.  I agree with you.  Most often, the general

3   consuming public is considered adults, but there are, of

4   course, things where children or younger people are

5   consumers.

6   Q.    And have you ever previously considered the relevant

7   universe to be ages 18 and over?

8   A.     I've done lots of surveys where the relevant universe

9   was 18 and over.

10  Q.    Have you ever said before or testified or opined that

11  the relevant universe for the fame study consists of a

12  nationally representative sample of members of the general

13  consuming public age 18 and older?  Have you ever said that?

14  A.     I've had lots of surveys that were 18 and over, 21

15  and over, so I'm sure I've done so, I'm sure, many times.

16  I've done populations that were 18 and over or as low as 21

17  and over.

18  Q.    All right.  Do you ever recall having said that?

19  A.     I recall -- I've done so many reports and so many

20  surveys, and like I said, I've done many surveys that it was

21  18 and over, so I'm sure in those surveys that I said that

22  18 and over was the population that I surveyed.

23  Q.    Let me refresh your recollection.  Could you please

24  turn in your binder to the tab that's marked Deere and

25  Company report.  And while you're turning, I'm going to ask

Poret - Cross

1   you a question.  Do you recall earlier today actually

2   mentioning the Deere and Company survey that you --

3   A.     Yes.

4   Q.     And why don't you turn to Page 34 of that Deere and

5   Company survey.

6   A.     Okay.

7   Q.     Now I'm going to direct your attention to Roman II

8   fame survey.  You undertook a fame survey in the Deere and

9   Company matter; correct?

10  A.     Correct.

11  Q.     And did you write that "The relevant universe for the

12  fame survey consists of a nationally representative sample

13  of members of the general consuming public age 18 and

14  older"?

15  A.     Yes, and it was.

16  Q.     Did you continue and write "This is the proper

17  universe for a fame survey because the Trademark Dilution

18  Revision Act specifies that fame is to be measured among the

19  general consuming public"?

20  A.     Yes.

21  Q.     You didn't use a survey in this case of 18 and older,

22  did you?

23  A.     I did 21 and older in this case.

24  Q.     So you did not do a survey of 18 and older; correct?

25  A.     Correct.  Well, correct, 18-, 19-, 20-year-olds

Poret - Cross

1    are -- were not included in the survey.

2    Q.    Fair.  Your survey in this case started at age 21;

3    right?

4    A.    Yes.

5    Q.    Now, do you recall also having designed and performed

6    an online survey to determine whether the mark Vagisil was

7    famous?

8    A.    Yes.

9    Q.    And in that survey, you used 300 respondents, much

10   like you did in this case, but you used the age of 18;

11   right?

12   A.    I don't recall, but if that's what my report says,

13   then I'm sure it was.

14   Q.    Well, I don't want you to take my word for it,

15   Mr. Poret.  Let me refresh your recollection.  If you can

16   turn in your binder to the tab that's marked Vagisil Report,

17   and I'll ask it to be pulled up on the screen.  And we can

18   look at Page 6 of the Vagisil report.

19          And let me just ask, is this a report that you

20   authored, sir?

21   A.    Yes.

22   Q.    And at the top of the page under Study Design, does

23   it read "A total of 300 respondents participated in this

24   online survey among U.S. consumers age 18 and older to test

25   whether or not the mark Vagisil is famous in connection with

Poret - Cross

1   vaginal care products."  Is that what it says?

2   A.      Yes.

3   Q.      Does that refresh your recollection that when you did

4   a fame study with respect to the Vagisil product, you

5   started the survey at age 18; correct?

6   A.      Yes.

7   Q.      You also designed and performed an online survey on

8   behalf of WeWork where you were surveying whether a company

9   named Regis's HQ marks were famous within the state of Texas

10  or within certain areas of Texas; right?

11  A.      Yes.

12  Q.      All right.  In doing so, you utilized 800

13  participants among residents of Texas who were, again, 18

14  and older; isn't that right?

15  A.      I mean, again, the honest answer, I don't remember

16  the sample -- I don't remember the age in that particular

17  survey, but if the report says 18, then that's probably

18  right.  But I would also point out I think the reason there

19  were 800 was because I think there were a number of

20  different marks being tested in that, but, yes.

21  Q.      All right.

22  A.      If that may have been 18.

23  Q.      When you say a number of different marks, you're

24  actually referring to different styles of the same HQ mark;

25  right?

Poret - Cross

1    A.      I believe that's correct.

2    Q.      Right.  So it's not the case that you were studying,

3    for example, HQ, PBJ, or something else, it was three or

4    four, whatever it was, different styles of the same mark;

5    right?

6    A.      I believe that is accurate.

7    Q.      So putting aside the 800 participants for a moment,

8    again, if you don't recall, I'm happy to refresh your

9    recollection.  Do you recall whether the study you performed

10   in connection with the WeWork study of the HQ mark included

11   participants 18 and older and not 21 and older?

12   A.      What I can honestly say is like I said before.  I

13   recall that I've done lot of surveys that were 18 and older,

14   but do I remember that particular one?  I don't.  But if

15   that's what it says, there's certainly no -- nothing

16   controversial about that.

17   Q.      If you turn in your binder to the tab that's

18   marked -- it should be marked WeWork Report.  And if you

19   turn to Page 6.

20           And I will say that the first few pages are

21   actually a declaration that you submitted with it.  Your

22   report actually starts a few pages in.  It's behind

23   Exhibit 1.

24   A.      I do see it says 18 and older.

25   Q.      Well, on Page 6 of the WeWork report that you wrote,

Poret - Cross

1    it says, "A total of 800 respondents participated in this

2    online survey among residents of Texas age 18 and older to

3    test whether or not the Regis's alleged HQ marks are famous

4    within the state of Texas or within certain areas in Texas;

5    correct?

6    A.    Yes.

7    Q.    You would agree that most financial services are

8    primarily consumed by adults; correct?

9    A.    Yes.

10   Q.    If you had included 18-, 19, and 20-year-olds in your

11   study, those participants, as the youngest participants in

12   the survey, necessarily would have replaced older

13   participants in the study; right?

14   A.    I don't know if "replace" is the right word, but yes.

15   I mean, I think what you mean is if I had 300 participants

16   and I included 18-, 19-, and 20-year-olds then, you know

17   there probably would have been ten 18-, 19-, and

18   20-year-olds in the survey and ten older people not in the

19   survey.

20   Q.    I'm not sure I heard the last part right, but I think

21   we're saying the same thing.  Since the 18-, 19-, and

22   20-year-olds would be the youngest people, anyone they

23   replaced or anyone who they took the place of in the survey

24   would, by definition, be older than them; right?

25   A.    Older than them?  Yes.  Yes.

Poret - Cross

1    Q.      Would you agree that a three-year range in your study

2    from 18 to 20 years old would constitute approximately five

3    percent of the survey age range?

4    A.      That seems pretty close.

5    Q.      And do you believe that the individuals who were

6    closest in age to the 18-, 19-, and 20-year-olds -- well,

7    let me take a step back for a moment.  Are you able to read

8    the analytics off your dataset that you produced?

9    A.      Yes.  If you mean would I know what the numbers mean,

10   probably, yes for most things.

11   Q.      Okay.  Let's see if -- let's see if I could have

12   showing -- let's see 72.  We can pull up the dataset that

13   your counsel introduced, and let me just ask you a couple

14   questions about it.

15           I agree.  I don't think we need to introduce it

16   into the record, but I'm going to ask you a few questions

17   about it to see if you can help me.

18           And, Mr. Poret, I will tell you, if you have any

19   concerns about the way that we're manipulating the data

20   through Excel, I have it available on a laptop which is open

21   and ready, and if you need it to manipulate it yourself, I'm

22   happy to provide it to you.

23   A.      Okay.  Let's see.  This seems fine so far.

24   Q.      Does this look like your data for the survey

25   participants, but it's been sorted by age starting at the

Poret - Cross

1   youngest?  Does this look like yours?

2   A.    Yes.

3   Q.    And so to help the Court out, in the column that's

4   about four columns in at the top --

5              MR. FINEMAN:  And, Judge, I'm going to try to do

6   this very carefully because it's difficult to see all the

7   different data points.

8   BY MR. FINEMAN:

9   Q.    At the top where it says 2000 and there are two of

10  them in the columns, that represents the year that that

11  survey participant was born; correct?

12  A.    Yes.

13  Q.    So there's two survey participants at the top who

14  were born in the year 2000.  At the time you did this survey

15  in July 2, 6021, they would have been 21; right?

16  A.    Yes.

17  Q.    So the top two people would have been the youngest

18  two people in your survey; correct?

19  A.    Yes.

20  Q.    And 1999, they would have been 22?

21  A.    Yes.

22  Q.    And those participant would have been the second

23  youngest; right?

24  A.    Yes.

25  Q.    Can you tell me, based on this data, whether those

Poret - Cross

1   three participants answered yes or no to whether they

2   recognized various names?

3   A.     Yes.  If you scrolled further to the right in the

4   spreadsheet, I could.

5   Q.     Which column is it, sir?

6   A.     Yeah, you've gone far.  No.  No. that's fine.  I

7   mean --

8   Q.     You're giving me far too much credit.  I'm not doing

9   anything, Mr. Poret.  But my friend in the hot seat is doing

10  a great job.

11         Which column are you looking at?

12  A.     Well, at a minimum, I can see the column that starts

13  AL and it says Q 230_1.

14  Q.     Yes.

15  A.     That's showing that two of them said that they do not

16  recognize S&P, and one of them said that they do.

17  Q.     Okay.  So of the -- the three youngest people in the

18  survey -- and again, I'm going to defer to your mathematics

19  here and make sure I get it right.  So of the youngest group

20  in there, that are closest in age to that 18- and

21  19-year-old group, only 33 percent of them recognized or

22  answered affirmatively to your question about S&P; right?

23  A.     Yes, that's essentially correct.  One out of three.

24         THE COURT:  So let me get this straight.  You're

25  asking him three people.  One answered it as opposed to two

Poret - Cross

1    answered it?

2                   MR. FINEMAN:  As a starting point, Your Honor.

3                   THE COURT:  Okay.

4    BY MR. FINEMAN:

5    Q.    And if we go over -- back to the far left side where

6    the age bracket was, and then the next youngest would be

7    1998; correct?

8    A.    Yes.

9    Q.    And this is all we have to go from for people who

10   fall into the next closest three-year age bracket; right?

11   This is 21-, 22-, and 23-year-olds; right?

12   A.    You have sorted it by age, so you're pointing to the

13   21-, 22-, and 23-year-olds.

14   Q.    Right.  And I'm saying that those are the sole

15   participants who fall into that age range right?

16   Percentage?

17   A.    Yes, correct.

18   Q.    So if we go back to the column that we were looking

19   at before, can you tell us how the next four people answered

20   who were, again, in that same three-year age bracket, 21 to

21   23.

22   A.    Two said that they know S&P, and two said that they

23   don't.

24   Q.    Right.  So even so if we take the whole three-year

25   group -- thank you.  If we take the whole three-year group,

Poret - Cross

1   we're still below 50 percent as to those who recognized S&P;

2   right?

3   A.      Yes, it's three out of seven.

4   Q.      Right.  And that's about 42 percent; right?

5   A.      Yes.

6   Q.      And that's the next closest age demographic to the

7   three years age demographic that you omitted; right?

8   A.      Yes.

9   Q.      We don't have any statistics for participants in the

10  age range of 18 to 20; right?

11  A.      No, we don't, but you could assume that they -- that

12  zero of them recognize S&P, and it wouldn't meaningfully

13  change the overall result.  So, it's --

14  Q.      Well --

15  A.      -- it's a pretty negligible -- no matter what it

16  would have been, it couldn't be more than a negligible

17  difference.

18  Q.      Well, and perhaps people define "negligible"

19  differently, so let me ask you this:  I think we earlier

20  discussed that the 18- to 20-year-olds could form five

21  percent of the age bracket for your survey; right?

22  A.      I haven't done that math.  I said that sounds vaguely

23  reasonable.

24  Q.      Approximately five percent?

25  A.      Yes.  Again, I think that sounds fine.

Poret - Cross

1   Q.      And there were 300 participants in the survey?

2   A.      Yes.

3   Q.      So, that 18- to 21-year-old could have made up 15

4   participant right?

5   A.      Yes, it could have.

6   Q.      Who would have had or could have had, based on the

7   demographics for other people close in age to them, a much

8   lower percent of recognition than you reported of

9   67 percent; right?

10  A.      It's right that it's possible that a few more young

11  people could have had a lower result than the average, but

12  it's not possible that it could have dragged the overall

13  number down by a very meaningful amount.

14  Q.      Well, it could have moved it down by two percent;

15  correct?

16  A.      Yeah.  That's possible.

17  Q.      Okay.  So it could be as low as 65 percent if we

18  included 18- to 20-year-olds; right?

19  A.      It could be, and it could be a point or two higher,

20  but, yes, I agree with you if you changed -- if you swapped

21  in 10 or 15 respondents of one thing or another, the most it

22  could move it is a percent or two.

23  Q.      You're familiar with the term "speeders" in

24  connection with survey responses; right?

25  A.      Yes.

Poret - Cross

1   Q.      And your counsel asked you a little bit about

2   speeders; right?

3   A.      Yes.

4   Q.      Speeders are survey respondents that go through a

5   survey too quickly; right?

6   A.      Yes.  I mean, I think I explained it more than that

7   before, but roughly that's the idea.

8   Q.      Well, the problem with speeders is that they -- you

9   don't want respondents going through the survey so quickly

10  that they're not paying attention and providing meaningful

11  data; right?

12  A.      Agree.

13  Q.      For people not taking the survey properly, such as a

14  speeder, the results could be unreliable; right?

15  A.      Yeah, I agree with you.  If you deem somebody a

16  speeder, then that means that they're -- that that

17  particular person's result could be unreliable.

18  Q.      Right.  Let me try again because I think we're saying

19  the same thing, but I want to make sure.  For people not

20  taking the survey properly, such as a speeder, the results

21  could be unreliable; right?

22  A.      Well, for anybody who is a speeder, the results could

23  be unreliable.  Speeders would -- speeders would only --

24  speeders would only hurt that result for S&P, though,

25  because by definition if you're saying somebody's a speeder

Poret - Cross

1   and basically they're not paying attention, that then that

2   basically means that there's a one-third chance that they're

3   going to pick yes, I recognize this.

4            So I mean, I think I already explained all the

5   procedures that I had in place that weeded out speeders, but

6   also am not concerned about the concepts of speeding because

7   speeding creates noise in the surveys.  It doesn't lead to

8   one answer choice being picked out at a higher rate.  It

9   leads to noise.  So if you have a bunch of people randomly

10  speeding through a survey, you'd expect their answers to be

11  distributed randomly, not concentrated on the choice yes, I

12  recognize S&P.

13  Q.    You previously described speeding as a survey

14  offense; right?

15  A.    Yes.

16  Q.    Now, based on having reviewed Dr. Chiagouris's

17  criticism of your report, that you did not address speeders

18  or exceeders, who took too long, you requested data from

19  Prodege and eliminated the fastest five percent and the

20  slowest five percent from the survey results; right?

21  A.    Yes, I did, in response to that criticism.

22  Q.    And then you were in court today when you heard that

23  that data has not been produced to our side; correct?

24  A.    Yes, I heard that.

25  Q.    Right.  And you had to get that data from Prodege;

Poret - Cross

1    right?

2    A.    What I had to get is I had to get them to attach a

3    number of seconds for each respondent, so you could match

4    each respondent with how many seconds they took in the

5    survey.

6    Q.    Right.  So without that data, our side has no way of

7    determining how many people took an extraordinarily long

8    time or took, you know, milliseconds to complete the survey;

9    right?

10   A.    Yes, you would need that data to know that.

11   Q.    Right.  But you looked at that data, and after you

12   looked at that data, you eliminated the fastest five percent

13   and the slowest five percent from the dataset; right?

14   A.    I didn't actually eliminate them.  I didn't do that

15   because I think they shouldn't be eliminated.  I did it to

16   respond that if you were to eliminate those people, who I

17   don't think should be, that the result you would get would

18   be, I think, two percent lower than the overall result.

19   Q.    Right.  You performed the analysis that if you

20   eliminated the top five percent in speed and the slowest

21   five percent in speed, what would that do to the overall

22   percent of recognition under your survey; right?

23   A.    Yes.

24   Q.    And when you did that, it lowered the percentage;

25   correct?

Poret - Cross

1   A.      I think it lowered it from 67 to 65.

2   Q.      Okay.  You conducted a survey that included S&P

3   because you understood there to be an allegation that the

4   S&P mark is famous; right?

5   A.      Yes.

6   Q.      But you understand that there are a number of marks

7   asserted by Plaintiffs in this litigation; correct?

8   A.      Yes, I believe so.

9   Q.      You don't recall all the different marks; right?

10  A.      Right.

11  Q.      And you do not have a separate opinion regarding

12  awareness level of each of those marks; right?

13  A.      Right.

14  Q.      The survey you conducted included participants from

15  four geographic areas, Northeast, Midwest, South, and West,

16  right?

17  A.      Yes.

18  Q.      All right.  To the best of your knowledge, you did

19  not survey any views regarding the recognition of S&P in the

20  state of Delaware; right?

21  A.      There certainly wasn't any particular focus on

22  Delaware.  I think Delaware is -- I think Delaware is

23  included in the northeast.

24  Q.      You're speculating; right?

25  A.      I'm just not remembering off the top of my head what

Poret - Cross

1  Census region it's classified in, but it's in one of those

2  regions.

3  Q.     Sitting here today, you don't know of any respondents

4  who were in the State of Delaware; right?

5  A.     I don't -- I don't know.  I don't know by individual

6  state.

7  Q.     You also did not take into -- you also did not take

8  into consideration any aspect of the standards for a

9  dilution claim under Delaware law; right?

10  A.     I did not base anything on Delaware-specific state

11  law.

12  Q.     You don't even specifically know what the Delaware

13  dilution statute says; right?

14  A.     Right.  I don't know what it specifically says.

15  Q.     In the survey, you did not ask what company or

16  organization used S&P in the financial industry; right?

17  A.     Right.

18  Q.     You did not ask what goods or services are provided

19  by the company that uses S&P in the financial industry;

20  right?

21  A.     Right.

22  Q.     You did not ask the participants to identify where

23  the company who uses S&P in the financial industry is

24  located; right?

25  A.     Right.

Poret - Cross

1    Q.      You did not ask the respondents where they first

2    heard or saw any of the names in the survey used by any

3    company or organization in the financial industry; right?

4    A.      Right.

5    Q.      You did not ask the respondents when they first heard

6    or saw any of the names in the survey used by any company or

7    organization in the financial industry; right?

8    A.      Right.

9    Q.      In the survey you designed to test for the awareness

10   and recognition of the S&P mark, your survey, essentially,

11   consisted of one question; right?

12   A.      One question per mark, yes.

13   Q.      Right.  But it was one question; correct?

14   A.      Yes.  I -- I agree.  It's a one-question inquiry.

15   Q.      And the question you posed, and I want to make sure I

16   have this right, so let me quote:  "Have you ever seen or

17   heard of the following name used by any company or

18   organization in the financial industry?"  Was that the

19   question?

20   A.      Yes.

21   Q.      All right.  That's a closed question; right?

22   A.      Close-ended, yes.

23   Q.      That's a close-ended question; right?

24   A.      Yes.

25   Q.      You did not ask any open-ended questions in your

Poret - Cross

1  survey; right?

2  A.      Right.

3  Q.      Open-ended questions can be helpful because it gives

4  people a chance to type in an answer, and you might, for

5  example, find out a respondent is not paying attention;

6  right?

7  A.      Yeah.  I mean, I had plenty of other quality checks

8  for that, but that is one function that open-ended questions

9  can serve.  I mean, that's why you have the open-ended

10  question where people are told to type in the word "survey"

11  in the box to make sure they're paying attention and

12  complying with that instruction.

13  Q.      Some people who take surveys are just trying to rush

14  through it, and they'll type in "Google," "Facebook,"

15  "Instagram," things like that; right?

16  A.      Yes.

17  Q.      And in fact, there are a lot of benefits to asking

18  open-ended questions to make sure people are paying some

19  attention and they're responding to the survey meaningfully;

20  right?

21  A.      In some instances, yes, and I agree.  That's why I

22  had that other quality control question with an open end

23  that I mentioned.

24  Q.      Right.  Irrespective of whether questions were

25  closed-ended questions or open-ended questions, you did not

Poret - Cross

1    ask the respondents any other questions after they answered

2    the question as to whether they had ever heard or seen the

3    names identified in the survey used by any company or

4    organization in the financial industry; right?

5    A.    You're right.  That was the end of the main survey

6    test.

7    Q.    The survey format that you used in connection with

8    this litigation is called aided awareness; right?

9    A.    I -- I agree, yes.  It's aided awareness.

10   Q.    There's another type of testing and survey format

11   that is called unaided awareness; right?

12   A.    Yes.

13   Q.    And it's your position that it is common to measure

14   both unaided awareness and aided awareness in fame surveys

15   for dilution purposes; right?

16   A.    I don't know that I'd quite put it that way.  I would

17   say in the majority of instances, unaided awareness

18   questions are probably not used.  But unaided awareness

19   questions are incredibly common in a lot of contexts and in

20   a lot of surveys, so it is common -- it is common to use

21   unaided and aided awareness questions in a lot of surveys.

22   It really depends on -- unaided questions are useful when

23   you can ask about a narrow specific category so that people

24   can speak to it.  Like, if you said, you know, name a

25   breakfast cereal that's come to your mind, that's a narrow

Poret - Cross

1   category which people could answer.  But you wouldn't do it

2   if you -- you wouldn't ask people what food products come to

3   your mind and expect people to name breakfast cereals.  So

4   unaided questions can be useful, and they are common in a

5   lot of respects, but they measure recall, not recognition.

6   So sometimes they're useful, but they certainly always have

7   to be backed up by aided awareness.

8   Q.    Yeah, Mr. Poret, let me bring you back to my

9   question.  It is common to perform a fame survey using aided

10  and unaided awareness; right?

11  A.    I mean, I don't know how to quantify "common."  It's

12  the minority of cases, but I would say there are enough

13  situations where unaided questions will be useful that it's

14  certainly not uncommon.

15  Q.    All right.  And have you previously said that it was

16  common to use aided and unaided awareness studies when you'd

17  perform a fame study?

18  A.    I don't remember exactly what wording that I've used,

19  but I've done, like I said, plenty of surveys that have used

20  unaided and aided.  So, I think it's common enough to do

21  both approaches, whichever, you know, is appropriate and

22  works for the right situation.

23  Q.    Do you recall we were talking earlier about the

24  report you prepared in connection with the Vagisil product?

25  A.    Yes.

Poret - Cross

1         And I know I did have an unaided question in

2    that because that was asking about a very narrow category

3    like, well, what those products are used for.  So it's very

4    specific, and it was an area where people could name brands

5    that come to their mind in that product category as opposed

6    to here where, like I said, I didn't want to use something

7    so specific as tell me what financial indices come to your

8    mind.  I wanted to keep the category broad as financial

9    industry --

10   Q.    Right.

11   A.    -- so I didn't think an unaided question would be

12   sensible with trying to keep the category as broad as

13   financial industry because that encompasses so many

14   different things.

15   Q.    Right.  Thank you for that, Mr. Poret.  Do you recall

16   my question was, do you recall our discussion Vagisil

17   report?

18   A.    Yes, I do.

19   Q.    Can you please turn back to that report in your

20   binder.  It's un the tab Vagisil Report.  I believe it is

21   the last tab of the first volume.

22   A.    I have it.

23   Q.    And I'll have it put up on the screen for your

24   benefit as well and for the judge's benefit.

25             Can you please turn to page -- well, let me ask

Poret - Cross

1    you first.  This is an expert report that you prepared in

2    connection with litigation pending in the United States

3    District Court for the Eastern District of Virginia; right?

4    A.    Yes.

5    Q.    And if you turn to Page 5 of the Vagisil expert

6    report, is that your signature above the date?

7    A.    Yes.

8    Q.    And the date of this report is January 29th, 2019; is

9    that right?

10   A.    '18, yes.

11   Q.    I'm sorry.  Did I -- yes, 2018.  I am sorry.

12           So the date of this report was January 29, 2018;

13   correct?

14   A.    Yes.

15   Q.    Can you turn to Page 6.

16   A.    Yes, I'm there.

17   Q.    Okay.  You were designing a study to study fame;

18   right?

19   A.    Yes.

20   Q.    And the last sentence of the second paragraph says,

21   "It is common to measure both unaided and aided awareness,

22   as survey respondents cannot be expected to identify all

23   marks that they are aware of on an unaided basis"; right?

24   A.    That's explaining why when you have unaided you need

25   to pair it with an aided question, because you can't rely on

Poret - Cross

1    an unaided question on its own to measure recognition

2    because unaided questions mention recall, and you can't

3    expect everyone to identify every brand that is in their

4    consciousness.

5    Q.    Right.  And if you go to the top of that paragraph,

6    the second paragraph, same page, Page 6 of the Vagisil

7    report, you wrote "The survey followed a common methodology

8    in which both unaided and aided awareness of the Vagisil

9    mark within the relevant product category was measured";

10   right?

11   A.    Yes.

12   Q.    You didn't clarify that it was only common in certain

13   types of fame studies; right?

14   A.    I don't think -- I don't think I said that.  I said

15   it's a common methodology, and most reports I use is a

16   common methodology.

17   Q.    Well, you were certainly either expressly or

18   implicitly saying that it's a common methodology for a fame

19   study; right?

20   A.    Yes, I agree.  It's a common methodology for a fame

21   study, and what I did here is a common methodology for a

22   fame study, just like it's common to use Eveready surveys

23   for confusion and it's common to use Squirt surveys.

24   They're both standard approaches that you apply, you know,

25   what is feasible and sensible for the situation.  So, yes, I

Poret - Cross

1    agree what I did there was a common methodology and what I

2    did here is a common methodology.

3    Q.      And you were in the courtroom earlier today when

4    Judge Andrews was asking about unaided questions; right?

5    A.      You mean -- I wasn't here for all of the witnesses.

6    Q.      Perhaps you weren't in the courtroom.  Let me ask you

7    a question so that we can all clarify with the textual

8    example of an unaided question.  Can you please turn to the

9    page, next page of this report, Page 7 of the Vagisil

10   report?

11   A.      Yes.

12   Q.      All right.  On this page, we see an example of an

13   unaided question; right?

14   A.      Yes.

15   Q.      It says, "Please list all brands of vaginal care

16   products that you have ever seen or heard of.  Please be as

17   complete and specific as possible.  You may use as many or

18   few of the boxes as you need, or you may select none, the

19   none box, if none come to your mind"; right?

20   A.      Yes.  That is open-ended.

21   Q.      Right.  That's an unaided question; right?

22   A.      Yes.

23   Q.      But you didn't ask a similar question or any other

24   unaided question to, in connection to the S&P mark; right?

25   A.      Right.

Poret - Cross

1   Q.      And if you turn to Page 23 of this report, you -- on

2   Page 23 of this report, you reported the percent response of

3   the unaided question; correct?

4   A.      Yes.

5   Q.      And I believe that was 38.7 percent; is that right?

6   A.      Yes.

7   Q.      Can you please turn the page to Page 24.  At the

8   bottom of the page, did you write that "The 38.7 percent

9   unaided result for Vagisil is very high and provides an

10  initial indication that Vagisil is a strong and well-known

11  mark, as it was top of mind for many respondents and the

12  most mentioned mark on an unaided basis"?

13  A.      Yes.

14  Q.      So, that provided you with a data point for forming

15  your opinion in the Vagisil case; right?

16  A.      Yes, that was one of the data points.

17  Q.      And before you asked the unaided question of the

18  respondents in the Vagisil engagement, you defined the

19  phrase vaginal care products; right?

20  A.      Yes.

21  Q.      And I believe that that can be found on Page 7 of the

22  Vagisil report; correct?

23  A.      Yes.

24  Q.      Okay.  So you said to the respondents in your survey,

25  "For this survey, we'd like you to think about vaginal care

Poret - Cross

1    products" -- or excuse me vaginal care products, whether or

2    not you have ever personally purchased those products;

3    right?

4    A.    Yes.

5    Q.    And then you wrote "When we say vaginal care

6    products, we mean products that are used to address vaginal

7    itching, discomfort, dryness, odor, or other vaginal health

8    care or hygiene issues, including products such as vaginal

9    creams, wipes, sprays, powders, washes, moisturizer, or

10   other items"; right?

11   A.    Yes.  This goes to what I was explaining before,

12   which is that if you're going have an unaided question, you

13   need to have a specific, narrow context for what the product

14   category is so that you can expect people to name what

15   brands come to mind in that specific category.

16   Q.    Okay.  In connection with the survey that you

17   performed in this case, you testified about here today, you

18   didn't define for the respondents what you meant by

19   "financial industry"; right?

20   A.    Right.  Intentionally because the decision that I

21   made in this case to try to be fair and conservative, was to

22   not cue people to say they recognize S&P because they've

23   heard of the S&P 500.  So I made an intentional decision to

24   avoid using the narrow category of financial index because I

25   thought that would be more cuing them to recognize S&P and

Poret - Cross

1   by being broad.  By using the broad category of financial

2   industry, that would not be cuing people to recognize what

3   S&P is most known for, and that's exactly why I didn't use

4   that approach and used an open-ended question, because I

5   thought in this instance, the more conservative thing to do

6   was to stay away from defining the category narrowly such as

7   saying name the financial indices that come to you.

8   Q.    My question was you didn't define "financial

9   industry" in your survey; right?

10  A.    That is correct.

11  Q.    And you could have defined "financial industry" in

12  your survey in any way you wanted; right?

13  A.    I mean, I could do anything I want, but I couldn't do

14  it any way I want without potentially having something that

15  is going to be accused of a bias.  So, again, yes, I could

16  have said I will define "financial industry" as, you know, I

17  mean indices or measures of, you know stocks, or

18  commodities, but I was intentionally staying away from doing

19  that.

20  Q.    You also could have said "financial industry"

21  includes anything in the universe that touches money, that

22  involves banks, insurance companies, brokerage houses, ATM

23  tellers, the people who go and cash checks.  It could have

24  been anything you wanted, no matter how narrow or how broad;

25  right?

Poret - Cross

1    A.    Well, it's right that I have the freedom to write it

2    however I want it, but it's not right that that would have

3    been a good way to do it.

4    Q.    So you let the respondents each individually try to

5    figure out what was meant by "financial industry"; right?

6    A.    No, they didn't have to -- they didn't have to figure

7    anything out.  They just had to honestly answer whether they

8    recognized the term "S&P."  And by keeping it broad, I was

9    doing less to cue them to recognize S&P or what it's known

10   as as opposed to if I had said, again, you know, do you

11   recognize this as a financial index or said something about

12   measures of tracking the performance of markets.  Something

13   like that would have been more likely to cue people to say,

14   "Oh, yeah, uh-huh, I recognize that's what S&P is."  So I

15   did it intentionally broadly because that's clearly less

16   suggestive.

17   Q.    But you don't know whether the respondents

18   interpreted broadly or narrowly because you don't know how

19   they interpreted it; right?

20   A.    I don't know exactly how they interpreted "financial

21   industry," but I know they accurately answered the question

22   of whether they recognized S&P because they -- when they

23   were shown equivalent terms that are fictional and not used

24   in the financial industry, almost everybody said, "No, I

25   don't recognize that."  So I know the answer is reliable

Poret - Cross

1    that they recognized S&P as a mark in the financial

2    industry.  I just don't know how each individual interprets

3    the words "financial industry."

4    Q.    You just said that there were two fictional names

5    included in the survey; right?

6    A.    Yes.

7    Q.    All right.  And I believe, I don't want to put words

8    in your mouth, so tell me if I have this wrong, did you say

9    that you picked Trouba because it could seem like a name in

10   the financial industry?

11   A.    Yes, that's one of the reasons, that it could come

12   off as a name.  So it could be the name of any investment

13   firm or anything.

14   Q.    Well, it's not actually fictional; right?

15   A.    Well, it's a real person's last name in the real

16   world, which is why it's plausible as a name.

17   Q.    Right.  You picked a professional hockey player who

18   plays for the New York Rangers as the name you included for

19   what could be a professional financial institution; right?

20   A.    That is the -- where the name came to my mind from.

21   Q.    Right.  And you included the name of a professional

22   hockey player who plays for the New York Rangers as the name

23   that could be a financial institution; right?

24   A.    That is where I got the idea of that name, but the

25   survey results bear out my correct assumption that the

Poret - Cross

```
 1   typical consumer does not know who Jacob Trouba is, and they
 2   are not going to see the word "Trouba" in a survey and
 3   somehow say, yes, that's the name of a company in a
 4   financial industry because I've heard of that New York
 5   Ranger player.  So the results of the survey that one
 6   percent said yes, I recognize that as a name in the
 7   financial industry confirms that people do not recognize
 8   that as a name that they think is a financial industry name.
 9   Q.    Right.  You don't -- you didn't actually pick that
10   name because it would sound like a financial institution
11   because you've used that name in other surveys; right?
12   A.    Yes.  Because it is a real last name and, therefore,
13   it is plausible.  It's not some ridiculous, made-up term
14   that nobody could possibly think is a name.
15   Q.    I mean, you previously used it to substitute as a
16   potential television channel; right?
17   A.    I've used it in the quality control question as well
18   because it's -- it's a term that, since it actually exists,
19   I don't think it can be accused of just being an absurd term
20   that people would automatically dismiss as not real.
21   Q.    I'm sorry.  My question was you've used it as a
22   substitute for a television channel.  Yes or no?
23   A.    Yes, for the same reason because it's -- it's a
24   plausible name.
25   Q.    Now, Mr. Poret, some of these questions I'm asking
```

Poret - Cross

1    you are yes-or-no questions.  I've given you a lot of leeway

2    to expound upon them, but for now on I'm going to ask you if

3    I ask you a yes-or-no question and it can be answered yes or

4    no, I'm going to ask you to answer it yes or no.  And your

5    counsel is free to follow up with you as much as they want

6    it if they want to ask you some questions.

7              I'd like you to turn in your binder to the REELZ

8    expert report.

9    A.    Okay.

10   Q.    Do you recognize that report?

11   A.    Yes.

12   Q.    Is that a report that you prepared?

13   A.    Yes.

14   Q.    That's an expert report you prepared in connection

15   with litigation that was pending in the United States

16   District Court for the District of Minnesota; right?

17   A.    Yes.

18   Q.    Can you please turn to Page 124 of that report.

19   A.    Yes.

20   Q.    Is that your signature?

21   A.    Yes.

22   Q.    Is that dated November 20th, 2020?

23   A.    Yes.

24   Q.    Can you please turn to Page 5 of this report.

25   A.    Okay.

Poret - Cross

1   Q.     You see there's -- in the middle of the page, there's

2   five number headings?

3   A.     Yes.

4   Q.     All right.  The first heading says that you

5   performed -- you designed and conducted a survey to

6   determine whether Plaintiff's REELZ mark is famous; right?

7   A.     Yes.

8   Q.     And you defined that as the fame survey?

9   A.     Yes.

10  Q.     All right.  Also, on Page 5 under the heading three,

11  you wrote that you performed a survey to determine whether

12  consumers who encounter the use of REELZ in connection with

13  Instagram's REELZ app feature form an association with REELZ

14  and its mark, such an association between the respective

15  marks being a prerequisite for dilution to occur.

16          Do you see that?

17  A.     Yes.

18  Q.     You didn't perform that survey in this case; correct?

19  A.     Correct.

20  Q.     And number five, it says a survey to determine

21  whether consumers who encounter the REELZ mark in connection

22  with Plaintiff's products and services form an association

23  with Instagram's REELZ feature, such an association between

24  the respective marks being a prerequisite for dilution to

25  occur; right?

Poret - Cross

1    A.    Right.

2    Q.    You didn't perform that survey in this case, either,

3    did you?

4    A.    Correct.

5    Q.    And those are known as forward association surveys

6    and reverse association surveys respectively; right?

7    A.    Yes.

8    Q.    All right.  Can you please turn to Page 9 of this

9    REELZ report.

10   A.    Okay.

11   Q.    Can you please look at the second -- or excuse me.  I

12   guess it's the third paragraph on Page 9.  It starts with

13   "the survey followed."  Do you see that?

14   A.    Yes.

15   Q.    In this report, you wrote again, much like the

16   Vagisil report, the survey followed a common methodology in

17   which both unaided and aided awareness of the plaintiff's

18   mark within the relevant product category, television

19   channels/networks, was measured; right?

20   A.    Yes.

21   Q.    And at the end of that paragraph, same paragraph, you

22   concluded with it is common to measure both unaided and

23   aided awareness, as survey respondents cannot be expected to

24   identify all marks that they are aware of on an unaided

25   basis; right?

Poret - Cross

1   A.    Yes.

2   Q.    Can you please turn to Page 30 of this REELZ report.

3         This is another example where you asked an

4   unaided question while performing a fame survey; right?

5   A.    Yes.

6   Q.    You asked the respondents to please list the

7   television channels/networks that came to your mind.  You

8   may use as many or few of the boxes below as you need;

9   right?

10  A.    Yes.

11  Q.    Then afterwards, you asked the close-ended question

12  which was an aided question that said, "Have you ever seen

13  or heard of a television channel/network with the following

14  name?"  Correct?

15  A.    Yes.

16  Q.    And then if you turn to Page 32, you asked the

17  question "Have you personally ever watched the REELZ

18  channel?"

19  A.    Yes.

20  Q.    And you also asked on that same page, "What shows or

21  series, if any, can you name that are currently or

22  previously been on the REELZ channel"; right?

23  A.    Yes.

24  Q.    You did not ask any questions similar to those

25  questions in the S&P survey; right?

Poret - Cross

1    A.    I'm not sure what would have been a similar question,

2    so it doesn't seem applicable, but you're correct.  There

3    wasn't any follow-up question like that.

4    Q.    But you were trying to disprove fame in the REELZ

5    study; right?

6    A.    I wasn't trying to do anything.  I was trying to

7    measure whether it's famous.

8    Q.    You were retained by a party who was trying to show

9    that there was no fame; correct?

10   A.    Yeah.  That's correct, that the party retaining me

11   wanted to argue no fame.

12   Q.    Now, I'm going to ask you to turn to the Deere

13   report, and this is the one that you testified to on your

14   direct examination; right?

15   A.    Yes.

16   Q.    And we also looked at this for a moment earlier;

17   correct?

18   A.    Yes.

19   Q.    And this is an expert report that you prepared in

20   connection with litigation pending in the United States

21   District Court for the Western District of Kentucky; right?

22   A.    Yes.

23   Q.    And can you please turn to pages 21 to 22 of this

24   report.

25   A.    Okay.

Poret - Cross

1   Q.      At the bottom of Page 21, it says fame survey;

2   correct?

3   A.      Yes.

4   Q.      So one of the things you were doing in connection

5   with the Deere report was you were undertaking a fame survey

6   again; right?

7   A.      Yes.

8   Q.      And you asked the respondents "For each product, we'd

9   like to know if you recognize the product as coming from a

10  specific company or brand based solely on the colors of the

11  product.  Any company or brand names/logos have been

12  intentionally removed from the products."  Right?

13  A.      Yes.

14  Q.      This is an open-ended question; right?

15  A.      No.

16  Q.      I'm sorry.  This is an unaided question; correct?

17  A.      No.

18  Q.      You think this is an aided question?

19  A.      It's not.

20  Q.      Is it aided or unaided?

21  A.      It's not a question at all.  This survey did not have

22  an unaided question.

23  Q.      Okay.  You asked the participants if they could

24  identify if the product came from a specific company or was

25  related to a brand name based solely on the colors; right?

Poret - Cross

1    A.     What you're showing is an initial instruction.  Then

2    the next question was a closed-ended question.

3    Q.     All right.  Fair.  Can you please turn to page --

4    let's look at Page 22.  Excuse me.   23.

5           You asked "Please select one of the following

6    options for the product."  Beneath the instruction,

7    respondents were shown the image of a tractor, and then they

8    were asked, based solely on the colors, I do recognize it as

9    coming from a company and I can name it; based on the

10   colors, I do recognize the farming company, but I cannot

11   name it; or I don't recognize it; right?

12   A.     Yes.

13   Q.     Is that an aided question or unaided question?

14   A.     It's aided.  This is, by definition, an aided survey

15   because the image of the mark is shown above the question.

16   That is, by definition, aided.  In other words, no one is

17   being tested whether the mark comes to their mind on its

18   own.  The mark is shown in the survey and then they're being

19   asked if they recognize it.  So it's, by definition, an

20   aided survey, which has to be the case for something like

21   color because you can't ask somebody to articulate something

22   visual.  You have to show them something visual.

23   Q.     Right.  And on the next page, on Page 24, you ask a

24   question:  Based solely on the colors, what company or

25   brands do you think this product is from; right?

Poret - Cross

1    A.    Yes, but that was to see if they named John Deere.

2    John Deere wasn't the mark that was being tested whether it

3    was famous.  It was the color scheme which was shown to

4    them.

5    Q.    Right.

6    A.    So there was no unaided question in this measuring

7    unaided awareness of the green/yellow color scheme, which

8    was the mark.

9    Q.    Right.  And in this case, you could have asked a

10   follow-up question and said:  When you said if you ever

11   heard of or had heard or seen of S&P in connection -- used

12   by any company, you said what company; right?

13   A.    You're asking could I have said what is the name of

14   the company that --

15   Q.    You heard or saw it used in connection with, yeah.

16   A.    Well, I suppose that's possible, but that didn't

17   strike me as a useful question because presumably a lot of

18   people would have said "S&P" and not been able to articulate

19   whatever the official name of the company is.  So it seemed

20   very rational to have, when people are looking at a green

21   tractor, to see if they were identifying it as Deere.  But

22   if people are being shown the mark S&P to say what company

23   uses that, they're probably going to say S&P.  It doesn't

24   seem very useful.

25   Q.    You also could have asked what products or services

Poret - Cross

1  does the company you're thinking of offer; right?

2  A.     You could ask any question that you think was useful.

3  That seemed like those are very difficult questions for

4  people to articulate answers to, but, yes, you could ask

5  anything that you would like to.

6  Q.     All right.  I'm not asking about anything I'd like

7  to.  I'm asking a very specific question.  You could have

8  very easily have asked the respondents to identify any

9  products or services that they're aware of that are

10  associated with the company they were thinking about when

11  they responded; right?

12  A.     You could ask that question.  I didn't think that

13  that would be able to produce clear answers that would be

14  able to be relied on to try to then discern exactly what the

15  respondent is thinking when they give those answers.

16  Q.     Well, if the respondent said they make hockey pucks,

17  you'd know that that person probably doesn't recognize S&P,

18  wouldn't it?

19  A.     I would agree that would be a strange answer that I

20  would be suspicious of.

21  Q.     And if that person said, "Oh, I know S&P.  They gave

22  me tax advice last year," that would tell you they're not

23  thinking of S&P the plaintiffs in this case; right?

24  A.     Some of those things might be true, but I think the

25  controls do a better job of scientifically accounting for

Poret - Cross

1   that than to try to interpret open-ended answers because

2   inevitably what you would really get if you ask questions

3   like that is you would get a lot of vague answers that

4   relate to financial things that would be hard to interpret.

5   And having the controls is a much better way to assure that

6   people are not just arbitrarily guessing or making false

7   assumptions or speculations.

8            MR. FINEMAN:  Your Honor, I also -- I want to

9   say I'm happy to stop at any point when Your Honor wants to

10  take the afternoon break.  I've still got a fair number

11  more.

12           THE COURT:  I guess you're familiar with the law

13  of diminishing returns.

14           MR. FINEMAN:  I am.

15           THE COURT:  All right.  Well, keep going.  We'll

16  take a break at about quarter of four.

17           MR. FINEMAN:  That's fine, Your Honor.

18  BY MR. FINEMAN:

19  Q.     Can you please turn to the expert report that's King

20  of Pop?

21  A.     Yes.

22  Q.     And this is an expert report you prepared; right?

23  A.     Yes.

24  Q.     And this one, this report, King of Pop is more

25  similar to the survey you did in this case; correct?

Poret - Cross

1    A.      That seems right, off the top of my head.

2    Q.      In the King of Pop survey, if you look at Page 7, you

3    asked the following question:  Have you ever heard or seen

4    the following words or phrases used to identify any person

5    or organization; right?

6    A.      Yes.

7    Q.      And then on Page 8, you can see that you showed the

8    respondents six names, including a particular fictitious

9    name, at least one; right?

10   A.      Yes.

11   Q.      But then you asked another question; right?

12   A.      You can show it to me.  I don't remember.

13   Q.      Sure.  Can you turn to Page 10, please.

14   A.      Oh, yes.  I asked people "Who does the phrase 'King

15   of Pop' identify" to see if they would say Michael Jackson.

16   Q.      Right.  Because that would tell you that the people

17   who identified King of Pop know that King of Pop responds to

18   Michael Jackson; correct?

19   A.      Yes, that is correct.  That's why I asked.

20   Q.      And when you did that, the percentage dropped a fair

21   amount; correct?

22   A.      Again, I'll have to look at the numbers.  It looks

23   like 85.8 percent said that they have heard or seen of King

24   of Pop, and then 73 percent were able to identify Michael

25   Jackson.  But I wouldn't necessarily call that the

Poret - Cross

1    percentage dropping because it is legitimate to recognize a

2    phrase or a source but not actually know who it comes from.

3    So people who said yes, I recognize King of Pop, but can't

4    remember who the artist is, that doesn't -- that doesn't in

5    and of itself delegitimize their answer.  It's just a

6    different level of recognition.

7    Q.    Right.  So the people who identified S&P as something

8    that they had heard or seen used by a company or name,

9    doesn't mean that they know that S&P is the source of

10   whatever service and products they provide; right?

11   A.    But it doesn't -- somebody recognizing S&P doesn't

12   mean they know the official corporate name or identity of

13   the company or that they can name what specific services

14   they provide.  People probably have a lot of different

15   levels of knowledge, but recognition of a mark does not

16   necessarily mean you know the name of the company or exactly

17   everything that they do.

18   Q.    And if you can now turn --

19           MR. FINEMAN:  And, Your Honor, this will be my

20   last report.

21   BY MR. FINEMAN:

22   Q.    If you can please turn to the one marked WeWork.

23   This is also an expert report you prepared; correct,

24   Mr. Poret?

25   A.    Yes.

Poret - Cross

1    Q.      All right.  And you prepared this in connection with

2    litigation that was in the United States District Court,

3    Northern District of Texas, Dallas Division; right?

4    A.      Yes.

5    Q.      And in the WeWork matter, you were retained to design

6    and conduct a survey to measure the extent to which, if at

7    all, Regis's claimed HQ marks are famous within the state of

8    Texas generally or within particular areas of Texas; right?

9    A.      Yes.

10   Q.      All right.  The party who retained you was attempting

11   to show that the mark HQ was not famous; right?

12   A.      Yes, that is a right.

13   Q.      And just so we're clear, the Texas antidilution

14   statute, that mark is considered to be famous if the mark is

15   widely recognized, is the same as the Lanham Act except it

16   narrows the geographic scope to Texas; right?

17   A.      I'm not sure, but that sounds close enough to my

18   memory.  I don't want to speak to my knowledge of the Texas

19   state law, but that sounds close enough to what I would have

20   thought.

21   Q.      Can you turn to Page 6 of this report just to refresh

22   your recollection.

23           On Page 6 of this WeWork report, you wrote what

24   you understood the Texas antidilution statute to be, and as

25   you look at it now, my question to you is:  That was

```
 1    correct; right?  The Texas antidilution that you were doing
 2    a fame survey for was effectively the same or close to the
 3    Lanham Act except it's geographically different?
 4    A.     It looks very similar to what it says.
 5    Q.     So you were undertaking a fame survey, the same as
 6    you would for a claim under the Federal Lanham Dilution Act;
 7    right?
 8    A.     Well, there were some differences relating to the
 9    states and localities, but I generally agree the concept of
10    the survey is similar.
11    Q.     Right.  Other than you were trying to get, for
12    example, four corners of Texas geographically like you were
13    getting four areas of the United States, everything else was
14    the same; correct?
15    A.     I don't know about everything, but I agree with you
16    that the concepts of measuring fame is a similar concept.
17    Q.     All right.  And in the WeWork survey, you showed the
18    respondents the HQ mark, so again, it was a two-letter mark;
19    right?
20    A.     Yes.
21    Q.     And you showed that mark along with two other names,
22    IBM and a fictitious name; right?
23    A.     Again, I can't say I remember every detail of surveys
24    from that long ago, but that's what it says in here, I'm
25    sure.
```

Poret - Cross

1    Q.     If you turn to Page 10, I think that it can probably

2    refresh your recollection.  Here you have the IBM mark and

3    the ZJ mark; right?

4    A.     Yes.

5    Q.     Okay.  So you agree you were showing the respondents

6    the HQ mark, which was the mark in question, then IBM, which

7    we all know is the real mark, and a fictitious mark; right?

8    A.     Yes.

9    Q.     And on Page 8, you gave an instructions with respect

10   to the names.  You said for each one, we'd like to know

11   whether you have ever seen or heard of it used as a brand or

12   company name in connection with any services or products;

13   right?

14   A.     Yes.

15   Q.     You then posed to the participants the following

16   question:  With respect to the names, have you ever seen or

17   heard of the following used as a brand or company name in

18   connection with any services or products; right?

19   A.     Yes.

20   Q.     Now, that's a little bit different than the question

21   you asked here; right?

22   A.     Yes.

23   Q.     Because here, it says used as a brand or company

24   name, and here you said used by a company; right?

25   A.     Yes.

Poret - Cross

1   Q.     But otherwise, it's a very similar question; right?

2   A.     It's -- yes, it's similar.

3   Q.     And you believe that question provided a reliable

4   initial measurement of the extent to which the participants

5   believed they recognized HQ in connection with any services

6   or products; right?

7   A.     Yes.

8   Q.     The participants who did not answer affirmatively

9   with, "yes, I have," when asked whether they are have seen

10  or heard of the HQ mark do not recognize it; right?

11            Let me re-ask it.

12  A.     Do not recognize it?

13  Q.     Let me ask that differently.  The participants had

14  the ability to say they recognized it or they didn't; right?

15  A.     Yes.

16  Q.     All right.  All the participants who answered that

17  they had seen or heard of HQ as a brand or company name were

18  asked an additional series of questions to determine whether

19  they were thinking of Regis' HQ, another company's use of

20  HQ, or merely guessing or racing; right?

21  A.     Yes.

22  Q.     And this is precisely what I was asking you earlier,

23  isn't it, that you could have asked a question just like

24  that to determine whether the people who answer

25  affirmatively in recognition in this survey?  Isn't that

Poret - Cross

1    exactly what I was asking you earlier?

2    A.    Yes, and I answered you earlier as to why I didn't

3    think that made sense in this instance.

4    Q.    Right.  So for this two-letter mark in this case when

5    you were retained to disprove fame, you didn't -- you asked

6    several follow-up questions.  And in this case, where you

7    were trying to show that it was widely known, you didn't ask

8    any follow-up questions that might have lowered the rate of

9    percent people who recognized it and associated it with

10   Plaintiffs; right?

11   A.    I don't agree with all of that.  I agree you've -- I

12   agree that there's some -- you've pointed to a number of

13   different surveys that have been both for the plaintiff or

14   for the defendant, and they've involved different products

15   and service categories, and I've done what I did that fit

16   each specific situation, which is what I do in hundreds of

17   surveys.  So if you had 300 of my reports here, you'd have

18   300 slightly different surveys, but I disagree with the

19   suggestion that it has anything to do with who's for the

20   plaintiff or who's for the defendant.  The reason that I

21   didn't think the follow-up question would be useful here is

22   because I don't think people who are asked what company do

23   you think uses S&P or can you describe their services would

24   be able to give answers that are articulate enough to then

25   classify them as whether or not they're correctly

Poret - Cross

1    identifying the plaintiffs' name or category of services.

2    Q.    Right.  Can you go to Page 12, please, of this

3    report.  You also asked -- and you'll see it at the top of

4    the page.  You wrote "What company uses the following as a

5    brand or company name, if you know?"  Right?

6    A.    Right.  Because in that case, HQ is not the name of

7    the company.  The name of the company was Regis.  So if

8    somebody did know the service as Regis's HQ service, they

9    would easily be able to say that the company is called

10   Regis.  Whereas here, the mark is S&P, so to ask somebody

11   what company uses S&P and have them then answer S&P is a

12   useless answer.

13   Q.    Okay.  The next question says:  "What services or

14   products are offered in connection with the following name

15   or logo, if you know?"  Right?

16   A.    Right.  Again, because that was a case where the type

17   of service that they offered would be easy to identify

18   because they offer one core service, whereas the plaintiff

19   here offers a number of different services, and they are --

20   there are financial things that are not easy to articulate.

21   So my expectation is people would have said S&P offers, you

22   know, things in the market or finance or things like that.

23   So I just didn't think that that, in this instance, was

24   going to be a way to get open-ended answers that are clear

25   and able to be classified as opposed to some of these other

Poret - Cross

1    things.

2    Q.    Right.  Last, the participants were asked what else,

3    if anything, do you know about the company that uses the

4    following as a brand or company name?  Right?

5    A.    Yes.

6    Q.    And again, that's not a question you asked here;

7    right?

8    A.    Right.

9    Q.    And that last question, according to you, gave the

10   participants a final opportunity to give any answer that

11   could indicate that they were specifically thinking of

12   Regis's HQ; right?

13   A.    Yes.

14   Q.    You believe that the participants were actually

15   thinking of Regis when answering that they recognize HQ,

16   they would be able to indicate so by giving a response that

17   identifies Regis or its type of services, these questions;

18   right?

19   A.    It's correct in that case I thought that if somebody

20   was thinking of the Regis HQ service that was at issue and

21   they said I recognize HQ that they would either be able to

22   say that is a service from Regis or that that is a office

23   rental service or a co-working-space service.  I thought

24   yes, somebody should be able to articulate that specificity

25   in that case.

Poret - Cross

1   Q.    Right.  Now, on Page 26, you actually wrote, even if

2   all of these respondents -- excuse me.  You reported on

3   Page 26 that the overall rate of respondents that hadn't

4   seen or heard of HQ's brand or company in connection with

5   any services or products was 12.6 percent; right?

6   A.    Yes.

7   Q.    But based on the answers to your follow-up questions,

8   not the original question, which was similar to the one you

9   asked here, but based on the follow-up questions, you were

10  able to exclude all of those 12.6 percent because they

11  didn't really know what they were -- that they weren't

12  correct when they were identifying HQ; right?

13  A.    No, that's not correct they were excluded.  It's

14  correct that I recorded the rate that said they recognize

15  it, and then I reported the rate of those who gave follow-up

16  answers that confirmed that what they were thinking of was

17  Regis's co-working service.  So I reported both of those

18  percentages, and what I said here is that even if you looked

19  at the larger percentage, it would be a low number.

20  Q.    Right.  You got your rate from your original

21  question; right?  But then, at the bottom of the page on

22  Page 26, you wrote "Regardless, it necessary to consult the

23  subsequent answers to determine the extent to which, if at

24  all, respondents who reported awareness of HQ were actually

25  thinking of Regis's HQ."  You wrote that; correct?

Poret - Cross

1    A.    Yes.

2    Q.    It was necessary to consult those questions that you

3    didn't ask in this case; right?

4    A.    Yes.

5    Q.    And when you considered the answers to those

6    follow-up questions, the ones you asked in HQ -- in the HQ

7    matter but you didn't ask here, you were able to determine

8    that all 12.6 percent were not actually thinking of the HQ

9    mark even though they had indicated that they affirmatively

10   recognized it; right?

11   A.    I believe that is correct, which is not too

12   surprising because 12 percent is a very low number that

13   could be in the range of survey noise.  So, that isn't

14   shocking, that a number in the roughly ten percent range

15   would be mostly noise.

16   Q.    Mr. Poret, when writing expert reports for

17   litigation, you understand it's important to express all of

18   your opinions in your report; right?

19   A.    Yes.

20   Q.    And at the time you wrote your opening report, all of

21   the opinions you intended to offer in this matter were

22   contained in your opening report?

23   A.    Yes.

24   Q.    And in this case, you wrote every word in your expert

25   report; right?

Poret - Cross

1    A.      Yes.

2    Q.      And I'm not going to go back to these reports unless

3    you feel you need to, but let me just ask you:  When we were

4    looking at the Vagisil report, your purpose in conducting a

5    survey in that case was to measure the extent to which the

6    Vagisil mark is famous, if at all, in connection with

7    vaginal care products; right?

8    A.      Yes.

9    Q.      And in the Vagisil matter, you were retained by the

10   party who was ultimately seeking to prove that the Vagisil

11   mark was, indeed, famous; right?

12   A.      Yes.

13   Q.      In the REELZ report, you were retained to design and

14   conduct a survey to determine whether the REELZ mark was

15   famous; correct?

16   A.      Yes.

17   Q.      And you were retained by the party who was attempting

18   to prove that the REELZ mark was not famous; right?

19   A.      Yes.

20   Q.      And you ultimately offered an opinion that said based

21   on the survey results, it is my opinion that Plaintiff's

22   REELZ mark is not famous; correct?

23   A.      Yes.

24   Q.      In the Regis report we were just look at, the WeWork

25   report, you were asked to measure the extent to which at all

Poret - Cross

1   Regis's claimed HQ marks are famous within the states of

2   Texas generally or within particular areas of Texas; right?

3   A.     Yes.

4   Q.     And you were retained by the party who was seeking to

5   prove that the HQ mark was not famous; correct?

6   A.     Yep.  Yes, correct.

7   Q.     You ultimately concluded that Regis's claimed HQ

8   marks are not famous or well known; right?

9   A.     Yes.

10  Q.     And in the Deere and Company matter that we looked

11  at, you were -- when you were asked about the color scheme,

12  right, you were retained by the party who was seeking to

13  prove that the color scheme was famous as an identifier of

14  Deere; right?

15  A.     Yes.

16  Q.     You ultimately concluded that the color scheme is

17  famous as an identifier for Deere; right?

18  A.     Yes.

19  Q.     So, in those cases we all looked at, you offered an

20  opinion as to whether the marks were famous or not famous;

21  right?

22  A.     Yes.

23  Q.     In this case, however, you have not and are not

24  offering any opinion that the S&P mark is famous; isn't that

25  right?

Poret - Cross

1   A.     Yes, that's correct.  I'm providing the data, and my

2   opinion is that it was collected reliably, and that number

3   is -- I'm not issuing an ultimate determination on that

4   because I have not seen -- in all those other cases, the

5   numbers were either clearly well above anything that I had

6   seen to be agreed upon to establish fame or well below

7   anything that I had seen to establish fame.  And this number

8   is in a range that I have not seen any concrete agreement

9   that says I can definitively classify this.  So I'm

10  presenting the result for what it is, and my opinion is that

11  it's a reliable number, but it's for the Court to determine

12  -- to weigh it along with the other evidence.

13  Q.     Right.  Because in the other cases, the percentages

14  in those cases where you determined that it was famous were

15  high enough that you were able to make the decision and

16  opine that those marks were famous; right?

17  A.     It's that they were high enough that I think they

18  were above anything that I've ever seen any court or

19  commentator agree is clearly within the ballpark of fame.

20  Yes.

21  Q.     And the percentage in this case does not meet that

22  threshold; correct?

23  A.     Well, it's more that I'm not aware of there being a

24  bright-line threshold that lets me classify this number.  So

25  I think what's correct is this number is in a range that I

Poret - Cross

1      need to, as a researcher, say, I can't be the one to
2      definitively classify this in the ultimate legal
3      determination.  And I -- my opinion is the 67 percent number
4      was collected by a reliable method, and I leave it to the
5      Court to consider and weigh it.
6      Q.     And you have not offered and you are not offering any
7      opinion that dilution has occurred in this case; correct?
8      A.     That is correct.
9                  MR. FINEMAN:  All right.  Thank you very much
10     for your time today, Mr. Poret.  I have no further
11     questions.
12                 THE COURT:  All right.  Any redirect?
13                 MS. MILOV:  No, Your Honor.
14                 THE COURT:  All right.  May Mr. Poret be
15     excused?
16                 MS. MILOV:  Yes, Your Honor.
17                 THE COURT:  Mr. Fineman?
18                 MR. FINEMAN:  Yes.
19                 THE COURT:  Okay.  Mr. Poret, thank you.  Watch
20     your step.  You're excused.
21                 THE WITNESS:  Thank you, Your Honor.
22                 THE COURT:  All right.  So, let's take a break.
23     We'll come back at four o'clock.
24                 MR. FINEMAN:  Thank you, Your Honor.
25                 DEPUTY CLERK:  All rise.

```
 1                      (Recess was taken.)

 2                THE CLERK:  All rise.

 3                THE COURT:  All right.  Shall we move onto the

 4      next?

 5                MS. MILOV:  Your Honor, the Plaintiff intends to

 6      play excerpts from the deposition of Katherine Roome taken

 7      on June 25th, 2021.  Ms. Roome was a former in-house counsel

 8      at Plaintiff and its successor companies.  May I approach

 9      with binders of the exhibits --

10                THE COURT:  Sure.  Yeah.

11                MS. MILOV:  -- and excerpts?

12                And before we move on, the rough estimate that

13      we have regarding the run time, the total is 52 minutes, and

14      Plaintiff's designations and replies are about 32 minutes

15      and Defendants' counter-designations are about 20 minutes.

16                THE COURT:  Okay.

17                (Start of video.)

18      Q.    Good afternoon, Ms. Roome.  My name is Jason

19      Rawnsley.  I represent the defendants in this litigation, as

20      you just heard.  Could you please state your name for the

21      record.

22      A.    Katherine Roome.

23      Q.    Where are you located this afternoon?

24      A.    Cambridge, New York.

25      Q.    And do you understand that the testimony you are
```

1   going to provide today is under oath, same as though you

2   were in court?

3   A.    Yes.

4   Q.    Switching topics, Ms. Roome.  Could you take me

5   briefly through your educational history, starting with any

6   undergraduate degree you may have received?

7   A.    I got my bachelor's from Williams College, and I got

8   juris doctor from Cornell University.

9   Q.    What did you study at Williams?

10   A.    American Civilization.

11   Q.    When did you receive your bachelor's degree?

12   A.    1974.

13   Q.    And when did you receive your JD from Cornell?

14   A.    1977.

15   Q.    After you received your JD from Cornell, did you

16   enter the workforce?

17   A.    Yes.

18   Q.    What did you do?

19   A.    I worked for Chadbourne & Parke, New York City.

20   Q.    What's Chadbourne & Parke?

21   A.    A law firm.

22   Q.    Were you an attorney with Chadbourne & Parke?

23   A.    Yes.

24   Q.    Did you have a particular practice area?

25   A.    Litigation.

1   Q.      Is Chadbourne & Parke still in existence, to your

2   knowledge?

3   A.      I think so.

4   Q.      And how long were you with Chadbourne & Parke?

5   A.      Two-and-a-half years.

6   Q.      What did you do after you ceased employment with

7   Chadbourne & Parke?

8   A.      I went to work for McGraw Hill in-house.

9   Q.      When you first joined McGraw Hill, what was your

10  title?

11  A.      Assistant general counsel.

12  Q.      And just to orient ourselves chronologically, are we

13  at some point in the late 1970s when you joined McGraw Hill?

14  A.      1980.

15  Q.      1980.  Thank you.

16          As assistant general counsel with McGraw Hill,

17  what were your responsibilities?

18  A.      Many and varied.  A lot of intellectual property

19  initially.  Everything from a little bit of corporate and

20  real estate, but focused eventually on intellectual property

21  and privacy and some compliance work.

22  Q.      During your employment with McGraw Hill, did you ever

23  receive a promotion or a different title?

24  A.      Yes.

25  Q.      So after you were assistant general counsel, what was

1    your next role with McGraw Hill?

2    A.    Vice president associate general counsel.

3    Q.    Do you recall when that was roughly?

4    A.    1992 or something, around then.

5    Q.    Did your duties change when you became vice president

6    assistant general counsel?

7    A.    Well, I had supervision of other lawyers.

8    Q.    Did your responsibilities still include intellectual

9    property matters?

10   A.    Yes.

11   Q.    And how long did you hold that position?

12   A.    Until I retired in 20 -- I think January of 2013.

13   Q.    During your time with McGraw Hill, did McGraw Hill

14   employ other attorneys who had responsibilities for

15   intellectual property?

16   A.    Yes.

17   Q.    And did those attorneys report to you?

18   A.    A couple of them.

19   Q.    During your employment at McGraw Hill, did McGraw

20   Hill have any system in place to monitor the use of other

21   names or phrases for trademark infringement?

22   A.    Did McGraw Hill have what?

23   Q.    Any system in place to monitor the use of names or

24   phrases by others for potential trademark infringement.

25   A.    Did we have a system for it?  We had a watch service,

1    yes.

2    Q.    Could you tell me what you recall about that watch

3    service.

4    A.    It was handled by our outside trademark counsel.

5    Q.    And when you refer to "outside trademark counsel,"

6    are you talking about one firm or a number of firms over the

7    years?

8    A.    There were -- during my tenure, I think there were --

9    well -- were -- there was more than one trademark counsel,

10   so.

11   Q.    Do you recall the names of any of those attorneys?

12   A.    Yes, Darby & Darby.

13   Q.    Any others that you can recall?

14   A.    Well, Proskauer.

15   Q.    And other than Darby & Darby and Proskauer, can you

16   recall any other firms that McGraw Hill may have retained

17   for monitoring for trademark infringement?

18   A.    I can't recall.  There were one or two others.  I --

19   I don't recall.  Those firms retained counsel in other

20   places sometimes.

21   Q.    I have introduced as Exhibit Roome 1 a document

22   bearing the Bates Number P-021504 on the first page.

23   Ms. Roome, please take a moment to look through it, and as a

24   general matter, please look through as much of any of the

25   documents I introduce today as you need to give truthful and

1    accurate responses to my questions.

2                But are you able to tell me what this document

3    is?

4    A.    It's correspondence from Darby & Darby addressed to

5    me, and the second page is correspondence addressed to an

6    Andy Baum from another law firm.

7    Q.    And was Andrew Baum one of the attorneys that McGraw

8    Hill retained to handle intellectual property matters while

9    you were employed by McGraw Hill?

10   A.    Yes.

11   Q.    Now, the first page, under the "re" line, it says

12   "S&P Investors Enterprises, Inc."  Correct?

13   A.    Yes.

14   Q.    Okay.  And if you will please go down to the second

15   page of the document.  It's from a law firm named Ladas &

16   Parry.  Do you see that?

17   A.    Yes.

18   Q.    Do you recall who Ladas & Parry were?

19   A.    No.

20   Q.    And do you see where Ladas & Parry writes to Mr. Baum

21   and states that "the following company has been incorporated

22   in the above jurisdiction"?

23   A.    Yes.

24   Q.    And they list the corporate name of the S&P

25   inventors -- strike that.  They list the corporate name of

1   the S&P Investors Enterprises, Inc., that we saw on the

2   first page of Exhibit 1; correct?

3   A.    Yes.

4   Q.    And they note that it's been incorporated in Kentucky

5   in the "re" line; correct?

6   A.    It says "McGraw Hill, Inc., trademark S&P in

7   Kentucky."  It doesn't say that -- anything about

8   incorporation.  Did you --

9   Q.    Sure.  Well, let me ask you this, Ms. Roome.  Does

10  that indicate to you that the corporate entity S&P Investors

11  Enterprises, Inc., was incorporated in Kentucky?

12  A.    Oh, I'm sorry.  Below there it says so.  Yes.

13  Q.    Okay.  And to the best of your knowledge, was

14  monitoring states for newly incorporated entities a service

15  that Ladas & Parry was performing for McGraw Hill, directly

16  or indirectly, at this time?

17  A.    I don't remember the specific name Ladas & Parry, but

18  I know that Darby & Darby used services to monitor

19  trademarks.

20  Q.    Okay.  And as part of their monitoring of trademarks,

21  they monitored the names of newly incorporated companies;

22  correct?

23  A.    Yes.

24  Q.    And they monitored every state for newly incorporated

25  companies for potentially infringing trademarks; correct?

1    A.      I don't know.

2    Q.      Well, they wouldn't have just been monitoring

3    Kentucky; correct?

4    A.      I don't -- I wouldn't think so.

5    Q.      You would expect them to be monitoring nationwide;

6    correct?

7    A.      I would expect so.

8    Q.      And during your employment with McGraw Hill, to the

9    best of your recollection, did McGraw Hill continue to

10   retain the services of firms to monitor the names of newly

11   incorporated companies?

12   A.      Yes.

13   Q.      And you left McGraw Hill in 2013?

14   A.      I think the beginning of 2013.

15   Q.      Do you have any recollection of a dispute between

16   McGraw Hill and an entity or entities over the use of the

17   name S&P Data?

18   A.      S&P Data specifically?

19   Q.      Of the use of the name S&P Data or involving a

20   company named S&P Data?

21   A.      Not beyond the documents which I saw during

22   preparation for this.

23   Q.      Okay.  So other than the documents you saw, you don't

24   have any recollection of a dispute McGraw Hill may have had

25   regarding the use of the name S&P Data; correct?

1    A.    No.

2    Q.    And is that because of the passage of time between

3    when you would have been addressing it and the current date?

4    A.    Yes.

5    Q.    Okay.  Val, could you please introduce Tab 2.

6              So, Ms. Roome, I'm going to be introducing

7    another document which should show up as Exhibit 2 shortly

8    in your folder.  Just please let me know when you have it.

9    A.    I have it.

10   Q.    Okay.  So I have introduced as Exhibit Roome 2 a

11   document bearing the Bates Number P-019755 in the lower

12   right-hand corner of the first page.

13             Ms. Roome, do you recognize this document?

14   A.    I don't remember it.

15   Q.    Do you recognize it as a document that you would have

16   either sent or received in the course of your

17   responsibilities at McGraw Hill?

18   A.    It appears to be so.

19   Q.    Okay.  That you know.

20             And you see at the top where it says "legal" and

21   then there's an ID number with what appears to be a phone

22   number?

23   A.    ID number.  I see a fax number.  I'm sorry.  Where

24   are you?

25   Q.    Sure.

1   A.      Oh, at the top.  I'm sorry.  Yes, correct.  Yes.

2   Q.      Okay.  And this is -- well, the first page is a

3   letter from the law firm Smart & Biggar directed to Amanda

4   Laura Nye of Darby & Darby.  Do you know who Smart & Biggar

5   were, Ms. Roome?

6   A.      I saw this letterhead in preparing for this

7   deposition, and I believe it was a firm retained by Darby &

8   Darby.

9   Q.      Okay.  And other than seeing the letterhead on this

10  document, do you have any independent recollection of the

11  retention of Smart & Biggar by McGraw Hill?

12  A.      The name is vaguely familiar.

13  Q.      So, if you could please scroll down to the third page

14  of this document, the P number is 15474.

15  A.      Yes.

16  Q.      Okay.  And this is a letter from Smart & Biggar to

17  McMillan Binch.  Do you know what McMillan Binch was,

18  Ms. Roome?

19  A.      No.

20  Q.      And it says, "Attention:  Ms. Alice Ann Morlock."  Is

21  that name familiar to you, Ms. Roome?

22  A.      No.

23  Q.      Under the "re" line, it references possible

24  oppositions against Canadian trademark applications.  Do you

25  see that?

1    A.     Yes.

2    Q.     And do you see that there are three serial numbers

3    listed?

4    A.     Yes.

5    Q.     And do you understand those to be serial numbers that

6    correspond to Canadian trademark applications?

7    A.     Yes.

8    Q.     So introducing as Exhibit 6 a document bearing the

9    Bates SANDPDATA0026118, Ms. Roome, I'll represent to you

10   that this is a document from the website of the Canadian

11   Trademark Office.

12            And my first question is:  Do you see the

13   application number there, 0811099?

14   A.     Yes.

15   Q.     Could you go back to Exhibit 5 for a moment, please.

16   A.     Yes.

17   Q.     And that's the same number as the serial number in

18   the "re" line of this letter to Ms. Nye on the first page,

19   811099; correct?"

20   A.     Yes.

21   Q.     Thank you.  And, again, if we go down to the third

22   page from Smart & Biggar to Ms. Morlock, we, again, see the

23   serial Number 811099; correct?

24   A.     Yes.

25   Q.     Do you understand that this -- going back to

1    Exhibit 6 -- do you understand that this refers to

2    information regarding the trademark applications listed in

3    Exhibit 5?

4    A.    I assume so.

5    Q.    Okay.  That should suffice.  So let's go back to

6    Exhibit 5 for a moment.  Please let me know when you are

7    there.

8    A.    I am there.

9    Q.    But if you're -- oh, okay.  Sorry about that.  So we

10   just looked at serial number 811099.  On the first page in

11   the "re" line and on the third page of Exhibit 5, do you see

12   a serial number 811100?

13   A.    Yes, I do.

14   Q.    Okay.  Could we introduce Exhibit 7, please.

15   A.    Okay.  I have it.

16   Q.    Okay.  So Exhibit 7, Exhibit Roome 7 is Bates Number

17   SANDPDATA0026120.  Ms. Roome, I will represent to you again

18   that this is a document pulled from the website of the

19   Canadian Trademark Office.

20         And do you see that the application number bears

21   the same 811100 that we just looked at as the serial number

22   81111 in Exhibit 5?

23   A.    Yes.

24   Q.    And then if you could look close to the top, I think

25   about a third of the way down, there is a description of

1    "services" again.

2    A.     Yes.

3    Q.     Okay.  And to the best of your recollection, do -- do

4    you understand that description of services to be the same

5    as that we looked at in Exhibit 3 and in Exhibit 6?

6    A.     Yes, it appears to be the same.

7    Q.     Okay.  And do you understand this -- you know,

8    granted that it's not a document that was produced by you --

9    to contain information about the trademark application

10   811100?

11   A.     Yes.

12   Q.     Could you introduce Exhibit 8, please, Val.

13          Okay.  And you see an application number at the

14   top of this document, 811101?

15   A.     Yes, I do.

16   Q.     Okay.  And you understand that to be an application

17   number for a trademark application?

18   A.     I assume so.  Yes, it says so on the left.  Yes.

19   Q.     Is -- and just to wrap up this line of questioning,

20   the 811101 number we just saw has a corresponding serial

21   Number 811101 in the "re" line of the first and third pages

22   of Exhibit 5; correct?

23   A.     Yes.

24   Q.     Okay.  Exhibit Roome 9 has a Bates number of

25   P-007434.  It appears to be a letter from Ms. Amanda Laura

1    Nye directed to Ms. Alice Ann Morlock.  Ms. Roome, do you

2    recognize this letter?

3    A.    I haven't -- I don't remember it, no.

4    Q.    Okay.  I believe you testified earlier that Ms. Nye

5    was an attorney with the law firm of Darby & Darby?

6    A.    Yes.

7    Q.    Now, this letter isn't signed; correct?

8    A.    Not on what I'm looking at.

9    Q.    Okay.  And there's no stamp on it indicating that it

10   was received in any particular location; correct?

11   A.    I don't see a stamp.

12   Q.    Okay.  There's no printing indicating that this was a

13   fax transmission anywhere on it; correct?

14   A.    No.

15   Q.    And there's not a header for Darby & Darby with the

16   logo like we saw in one of the earlier exhibits; correct?

17   A.    No.

18   Q.    Ms. Roome, do you know one way or another whether

19   this letter was ever sent?

20   A.    I assume it was.

21   Q.    Why do you assume that?

22   A.    I don't see -- it says -- we are on 9; right?  It

23   just disappeared.

24   Q.    We are still on Exhibit 9.

25   A.    Yeah.  Well, I don't know whether there was a cover

1    sheet on this or not.

2    Q.     Right.  So there's nothing like a cover sheet to

3    indicate that this was sent; correct?

4    A.     Right.

5    Q.     Okay.  Am --

6    A.     Sometimes --

7    Q.     Now, I'm sorry.  Please go ahead.  My apologies.

8    A.     Letters aren't always signed when they go into the

9    file, even if they've been sent.

10   Q.     Okay.  And this lacks the logo of Darby & Darby;

11   correct?

12   A.     That is correct.  Well, it says Amanda Nye.

13   Q.     It contains her information, but it doesn't contain

14   the logo that we saw in previous letters from Darby & Darby;

15   correct?

16   A.     It doesn't say Darby & Darby, except in the website

17   address.

18   Q.     Darbylaw.com; correct?

19   A.     Yeah.

20   Q.     So, let me ask again.  Is there anything on this

21   document in particular that indicates to you that this was

22   actually sent to Ms. Morlock?

23   A.     No, I can't say.

24   Q.     Okay.  Thank you.

25          Now, the substance of this letter refers to a

1    draft proposed settlement agreement.  Could you take a

2    moment to read the text and let me know if you see that?

3    A.     Yes.  Yes.

4    Q.     Okay.  Do you recall ever seeing a draft settlement

5    agreement proposed by S&P Data?

6    A.     I don't recall.

7    Q.     Okay.  We are done with that.

8               So I've introduced Exhibit Roome 10.  It bears

9    the Bates P-006928.  Ms. Roome, do you recognize this

10   document?

11   A.     I may have seen this.  I may have seen this during

12   preparation for this deposition.

13   Q.     Okay.  And at the bottom of this document, do you see

14   where you are indicated as a copy recipient?

15   A.     Yes.

16   Q.     And there's no header or logo for the Darby & Darby

17   firm on this; correct?

18   A.     Well, it says Amanda Nye, attorney at law.  It has

19   her phone number and its web -- the website.

20   Q.     Does the full name of the firm appear anywhere in

21   this?

22   A.     No, I don't see the name Darby & Darby.

23   Q.     Does a logo for Darby & Darby appear anywhere on this

24   exhibit?

25   A.     No, but when things were sent by telecopier in 2000,

1    that may have been the way it was done.

2    Q.    Do you know that one way or another, Ms. Roome, are

3    or you speculating?

4    A.    I don't know for certain.

5    Q.    Okay.  So Exhibit 11 bears the Bates P-006929.

6    Ms. Roome, do you see, once again, that you are indicated as

7    a copy recipient via telecopier?

8    A.    Yes.

9    Q.    And we don't see any printing on the top or the

10   bottom of these pages indicating transmission by fax

11   machine; correct?

12   A.    We don't -- we don't see the separate confirmation

13   page.

14   Q.    Okay.  And we don't see any printing at the top

15   indicating a phone number or any other identifying

16   information such as we saw in an earlier exhibit; correct?

17   A.    No, this could be a file copy.

18   Q.    Okay.  And Ms. Nye doesn't sign this letter, does

19   she?

20   A.    No.

21   Q.    And this, again, does not contain any info about the

22   Darby & Darby law firm other than Ms. Nye's name, phone

23   number, and email address in the top right-hand corner of

24   the first page; correct?

25   A.    Yeah, that's -- yeah, that's the letterhead.

1    Q.    Okay.  Ms. Nye, can you say one day -- my apologies,

2    strike that.  Ms. Roome, can you say one way or another

3    whether this document was ever sent to Ms. Morlock?

4    A.    I can't say for certain, but it could have been a

5    file copy.

6    Q.    Okay.  But you are speculating it could have been a

7    file copy; correct?

8    A.    I don't know for certain.

9    Q.    Okay.  You don't have a specific recollection that

10   this was a file copy; correct?

11   A.    No.

12   Q.    Okay.  Now, the second full paragraph it states "We

13   are less than pleased, however, that your client is now

14   unwilling to reach a written agreement whereby your client

15   would agree not to use or register S&P Data or any

16   confusingly similar mark for services related to those our

17   client offers under S&P."

18   A.    I see that.

19   Q.    Okay.  It doesn't say that S&P Data has to stop using

20   the name S&P Data; correct?

21   A.    Ask that again?  What?

22   Q.    Sure.

23   A.    We will -- are less than pleased your client is

24   unwilling to reach a written agreement.  So your question

25   is?

1   Q.     It's not referencing an agreement not to use S&P

2   Data; correct?

3   A.     No, because there isn't -- it says "now unwilling to

4   reach a written agreement."

5   Q.     Okay.  And the term of that written agreement isn't

6   an agreement not to use S&P Data.  It's an agreement not to

7   use S&P Data for services related to those that our client

8   offers under S&P; correct?

9   A.     Services related to those our -- it says that they --

10  there's not going to be a written agreement whereby this

11  company agrees not to use a confusingly similar mark for

12  services related to those offered by S&P, my former

13  employer.

14  Q.     Correct.  So is it your understanding that the author

15  of this letter was asking S&P Data to enter into an

16  agreement that it would not use S&P Data or any confusingly

17  similar mark for services related to those that your former

18  employer offered under S&P; correct?

19  A.     Yes.

20  Q.     So the term would be that S&P Data could still use

21  the name provided that they did not do so for services

22  related to those that your former employer offered under

23  S&P; correct?

24  A.     Yes, but there's no indication here of what services

25  my former employer offers under that name.

1    Q.    That is correct.  There's not, is there?

2    A.    Not -- not enumerated in this letter.

3    Q.    Okay.  And we saw earlier the proposal for the

4    settlement agreement was that S&P Data could use the name

5    provided it stayed within the services described in its

6    trademark applications; correct?

7    A.    I'm sorry.  I don't -- you are referring to where?

8    Q.    Do you recall earlier when we looked at the

9    identification of services in the trademark applications?

10   A.    I remember when we looked at identification of

11   services, yes.

12   Q.    Okay.  And do you remember we looked at an earlier

13   settlement proposal made on behalf of your client that S&P

14   Data could use the name provided it stayed within those

15   services identified in its trademark application?

16   A.    Let me go back and look at that.

17   Q.    Okay.  Are you having difficulty remembering that?

18   A.    Yeah.

19   Q.    Okay.

20   A.    If I had all the documents in front of me, it would

21   be easier.

22   Q.    No, I understand.  Okay.  So I will read to you from

23   Exhibit 5.

24   A.    Okay.  I will go back to 5.

25   Q.    Okay.  Go back to 5.

1  A.      This was the Smart & Biggar.

2  Q.      Sure.  Go to the very bottom page.

3  A.      Yeah.  Oh, I see.  Additionally, beyond the services

4  three existing (reading to self under her breath).  I'm

5  sorry, but not having all the documents in front of me with

6  the chronology, this is hard for me to piece together --

7  Q.      I appreciate that.

8  A.      -- which letter came before which document.

9  Q.      I appreciate that.

10 A.      Yeah, this is -- I mean, I'm not taking any notes,

11 but this is July 1997.  And then Exhibit 10, I don't know

12 what the date of that was, so.

13 Q.      Right.  And it's hard to remember these details

14 because they were decades ago; correct?

15 A.      They were decades ago.

16 Q.      So just briefly on Exhibit 5, I just wanted to remind

17 you of the settlement terms initially proposed by your

18 client on the last page of Exhibit 5.  Do you remember when

19 we looked at Item 2?

20 A.      You said this is initially.  I don't know if this was

21 initially or subsequently or when.

22 Q.      Okay.  And that's because you can't recall the

23 details of what happened all that long ago; correct?

24 A.      Yeah.

25 Q.      If you had additional documents in this

1    correspondence, could that potentially help you to

2    understand the context of these agreements?

3    A.      Possibly.

4    Q.      Do you have any reason to think there were more

5    documents relating to this matter?

6    A.      I have no recollection.

7    Q.      So, Ms. Roome, after June 12, 2000, do you have any

8    recollection of any steps taken by McGraw Hill to monitor

9    S&P Data or any of its affiliates or subsidiaries or

10   successive companies for the use of the name S&P Data?

11   A.      I have no direct recollection.

12   Q.      Okay.  And do you ever recall having seen an executed

13   settlement agreement between your employer, McGraw Hill, or

14   any of its affiliates and anyone on behalf of S&P Data?

15   A.      The client you're representing.  I have no

16   recollection.

17   Q.      Well, any client that goes under the name -- any

18   company that goes under the name S&P Data.

19   A.      I have no recollection.

20   Q.      Okay.  Did you ever speak directly with anyone at S&P

21   Data on behalf of your employer regarding the matters we've

22   looked at today?

23   A.      I have no recollection.

24   Q.      Do you know whether anyone on your behalf spoke

25   directly with anyone at S&P Data regarding the matters we've

1     discussed today?

2     A.     I have no recollection.

3     Q.     Okay.  What about -- well, do you know whether anyone

4     at McGraw Hill ever spoke directly with anyone at a company

5     named International Data Response regarding the subject

6     matter of the documents we've looked at today?

7     A.     I have no recollection.

8     Q.     Do you know whether anyone at McGraw Hill ever spoke

9     directly with anyone at a company named Telespectrum

10    regarding the subject matter of the documents we've looked

11    at today?

12    A.     I have no recollection.

13    Q.     Is it fair to say you don't know who at S&P Data may

14    have been aware of the subject matter of the documents we've

15    seen today?

16    A.     No, I don't know.

17    Q.     And you don't know who at Telespectrum may have been

18    aware of the subject matter of the documents we've seen

19    today?

20    A.     Not based -- no, I don't.

21    Q.     Okay.  And you don't know who at a company named

22    International Data Response may have been aware of the

23    subject matter of the documents we have seen today?

24    A.     No, I don't know.

25    Q.     Have you ever spoken with a man named Dan Plashkes?

1    A.     Not to my recollection.

2    Q.     Do you know whether anyone at McGraw Hill ever spoke

3    with a man named Dan Plashkes regarding these trademark

4    matters we have discussed today?

5    A.     I don't know.

6    Q.     Do you know whether anyone on behalf of McGraw Hill

7    ever spoke with a man named Dan Plashkes regarding the

8    subject matter of the documents we've seen today?

9    A.     I don't know.

10   Q.     Did you ever speak with a man named David Borts

11   regarding the subject matter of the exhibits we've seen

12   today?

13   A.     I don't know.

14   Q.     Do you know whether anyone at McGraw Hill ever spoke

15   with anyone named David Borts regarding the subject matter

16   of the exhibits we've seen today?

17   A.     I don't know.

18   Q.     Do you know whether anyone acting on behalf of McGraw

19   Hill ever spoke with a man named David Borts regarding the

20   subject matter of the exhibits we've seen today?

21   A.     I don't know.

22   Q.     Okay.  And just looking quickly at Exhibit 11.  It's

23   directed to a Ms. Alice Anne Morlock of McMillan Binch.  Do

24   you see that?

25   A.     Yes.

1    Q.    Do you know who Ms. Morlock may have been speaking

2    with at her client regarding these trademark oppositions?

3    A.    No, I don't know.

4    Q.    After 2000 up until the time you left McGraw Hill, do

5    you recall any other matters involving an entity named S&P

6    Data or the use of the name S&P Data?

7    A.    No, I don't.

8    Q.    Okay.  When you left McGraw Hill, who among its

9    in-house counsel was responsible for intellectual property

10    matters?

11    A.    When I left, I think it was Susan Winter.

12    Q.    Okay.  And when you left, did you transfer your files

13    to Ms. Winter regarding intellectual property matters?

14    A.    I think I did well before that.

15    Q.    Okay.  Do you know whether you provided Ms. Winter

16    with documents regarding the Canadian trademark opposition

17    that we've looked at today?

18    A.    Well, they would have been in the file room.  So they

19    were available to the attorneys in the department.

20    Q.    Ms. Roome, I'm going to ask you to -- put in front of

21    you Exhibit 5, if you can just click on that.

22    A.    I got it.

23    Q.    And let me just direct you to the last page of the

24    document, P-15475.  Do you have that?

25    A.    Yes, I do.

1    Q.      And if you look down about midway down the page, it

2    says, "Our client would be willing to settle these

3    opposition disputes along the broad parameters as follows."

4    Is it correct that what's being set forth there is a

5    settlement proposal?

6    A.      Well, it's along the broad parameters.

7    Q.      Correct.  It's the broad parameters for potential

8    settlement; correct?

9    A.      That's how I understand it.

10   Q.      And in order to complete that settlement, you would

11   need to come to an agreement; correct?

12   A.      Correct.

13   Q.      Are you aware of any agreement ever being reached to

14   settle the matter?

15   A.      I don't recall.

16   Q.      And we haven't seen any documents that reflected any

17   final settlement agreement; correct?

18   A.      I haven't seen anything in preparing for this.

19   Q.      And you weren't shown anything by Mr. Rawnsley today

20   that reflected any settlement agreement; correct?

21   A.      Correct.

22   Q.      Now, if you look at the sentence, it says, "Our

23   client would be willing to settle these opposition

24   disputes."  These opposition disputes that we're talking

25   about are in Canada; correct?

1    A.     That's my understanding.

2    Q.     With respect to Canadian trademark applications;

3    correct?

4    A.     That's my understanding.

5    Q.     Do you have any understanding, one way or another, as

6    to whether this settlement proposal would have extended to

7    the United States?

8    A.     It seems to appear to these opposition disputes

9    involving the applications referenced at the top of the

10   letter.

11   Q.     All of which are Canadian applications.  Correct?

12   A.     That's what it says.

13   Q.     Now, let's look at Exhibit 9.

14   A.     Exhibit 9.

15   Q.     If you can just pull it up, it's a March 8th, 2000,

16   letter.  Do you have that?

17   A.     Yes.

18   Q.     And in this document, Ms. Nye writes in the end of

19   the second paragraph, "In the mean time, please give your

20   consent to further three-month extension of the currently

21   outstanding deadlines of March 19th, March 26th, and

22   April 12, 2000."  Do you understand that to be a request for

23   a consent of the time to oppose?

24          What's your understanding of what's being

25   referenced there?

1    A.      Possible Canadian Opposition is the heading.

2    Q.      And based on that, how would you understand a request

3    to -- for consent to further extensions?

4    A.      I would understand the extensions to be referring to

5    the Canadian opposition.

6    Q.      Let's pull up Exhibit 6, if we can.  Now, if you

7    look, this is a document that Mr. Rawnsley showed you that

8    he represented came from the Canadian Trademark Office.  Do

9    you recall that?

10   A.      Yes.

11   Q.      And if you look at the second page of Exhibit 6, do

12   you see down underneath "statement of opposition" there's

13   various references to extensions of the time being granted?

14   A.      Opposition -- opposition history?  Yes.

15   Q.      Yeah, can you see there's a number of extensions of

16   the time being granted to the opponent?

17   A.      Yes.

18   Q.      And for the last six of them, do you also see there's

19   a reference that says "with consent"?

20   A.      Yes.

21   Q.      And would that, to your understanding, indicate that

22   the extensions of time had been consented to by the

23   applicant?

24   A.      Yes.

25   Q.      Now, if you look at the next to last one of those

1   extensions, it's dated March 10, 2000.  Correct?

2   A.     Yes.

3   Q.     And it says "with consent extension time granted to

4   opponent" and then has the action date as March 10, 2000;

5   correct?

6   A.     Yes.

7   Q.     And if you look back at Exhibit 9, that letter was

8   dated March 8, 2000.  That's two days before the entry that

9   we just looked at; correct?

10  A.     Yes.

11  Q.     And in that letter, Ms. Nye is requesting consents

12  for an extension; correct?

13  A.     Yes.

14  Q.     And then if we look at Exhibit 6, according to the

15  Canadian Trademark Office records, it appears that consent

16  was granted two days later on March 10th; correct?

17  A.     Well, I'm looking.  With consent extension of time

18  granted March 10th, yes.

19  Q.     Let me rephrase.  We've looked at a request on

20  March 8, 2000, in Exhibit 9 for an extension.  And we have

21  seen in the Canadian Trademark Office records on Exhibit 6,

22  two days later, it's indicated extension of time granted

23  with consent.  Based on that, can you draw any conclusion on

24  whether or not it's likely that Exhibit 9 was actually

25  essential?

1    A.      It appears to be, yes.

2    Q.      Now, let's look at Exhibit 7.  Exhibit 7 is a

3    Canadian Trademark Office record with respect to another of

4    the S&P Data applications; correct?

5    A.      Yes.

6    Q.      And if you look at the second page of that exhibit,

7    that also contains a number of extensions of time over a

8    period of years from 1997 out to 2000; is that right?

9    A.      Yes.

10   Q.      And would that indicate to you anything about how

11   long the matter continued to be in discussion between the

12   parties?

13   A.      It looks like in 2000 there's an extension of time

14   granted to opponent.

15   Q.      That's the last time you see one; right?

16   A.      That's last time.  It says deadline to file -- yeah,

17   I don't know what that means.  Deadline to file.

18   Q.      Well --

19   A.      But it looks like a consent to extend the time to the

20   opponent was last done on this document in 2000.

21   Q.      The last deadline that is shown to file is May 19,

22   2000; correct?

23   A.      May 19, yes.

24   Q.      And if you look further up in the exhibit on the

25   first page under "action history," do you see the last entry

1  says "withdrawn by owner" May 29, 2000?

2  A.    With "withdrawn by owner" May 29, 2000.  I see that.

3  Q.    And what would you understand that to be a reference

4  to?

5  A.    That the owner of the application had withdrawn the

6  application.

7  Q.    And if you look up higher in the document under "C

8  IPO status," do you see that on the left-hand side?  It also

9  says under there "withdrawn by owner."  Correct?

10 A.    Correct.  It says "withdrawn by owner."

11 Q.    And underneath that it says

12 "dead/application/withdrawn/abandoned"; correct?

13 A.    Yes, I see that.

14 Q.    So based on all of that, what conclusions can you

15 draw about what happened with respect to these S&P Data

16 applications?

17 A.    It appears that the applications were withdrawn or

18 abandoned.

19 Q.    And let's look at Exhibit 10 for a moment.  That's a

20 May 17, 2000, letter that was marked previously; correct?

21 A.    Yes.

22 Q.    And in the first paragraph it says "Further to our

23 telephone conversation this morning and my voicemail message

24 shortly thereafter, I'm enclosing a draft settlement

25 agreement."  Do you have any reason to understand why

1    Ms. Nye would be referring to a telephone conversation if

2    she hadn't spoken to Ms. Morlock?"

3    A.    No.

4    Q.    And if you read on in the exhibit, it says, "The

5    agreement now reflects that the various S&P Data

6    applications have been abandoned, as you advised me this

7    morning that you expected to file notices of abandonment

8    today."

9              Do you know of any reason why Ms. Nye would

10   prepare a letter indicating that the applicant was planning

11   to abandon the applications if she hadn't been advised of

12   that?

13   A.    No.

14   Q.    And in fact, from the trademark records that we've

15   looked at, we see that 12 days later, applications to --

16   abandonments were actually filed with respect to those

17   applications; correct?

18   A.    Yes.

19   Q.    Now, let's look at Exhibit 11.  This is a June 12,

20   2000, letter, again from Ms. Nye.  And in the first sentence

21   it says, "Our Canadian attorney received his copies of

22   abandonments of the various S&P Data applications filed by

23   your client, formerly known as S&P Data Corp."  Are you

24   aware of any reason why Ms. Nye would prepare a letter

25   indicating that she had received copies of abandonments if

1    she hadn't received them?

2            You can answer.

3    A.    No.

4    Q.    And as of June 12, 2000, the Canadian trademark

5    records that we've seen indicate that abandonments had been

6    filed; correct?

7    A.    Yes.

8    Q.    Do you recall that Mr. Rawnsley asked you questions

9    about whether the agreement that's been referenced would

10   have prevented S&P Data from using its mark?

11   A.    Yes.

12   Q.    He didn't read you the next sentence, which says,

13   "Accordingly, we take this opportunity to confirm that you

14   have represented to us that your client is not currently

15   using S&P Data or any of the other S&P variations which were

16   the subject of these requests for extension of time."  Do

17   you have any reason to know why Ms. Nye would indicate that

18   such a representation had been made if it hadn't been made?

19   A.    No.

20   Q.    And the last sentence when Ms. Nye asks about -- or

21   indicates that there's been a representation that the client

22   is not currently using S&P Data, that's not limited to any

23   particular services, is it?

24   A.    No.

25   Q.    In Exhibit 11, it says, "As for future use, you have

1    told us that your client has no intention to use S&P or S&P

2    Data in the future, given the merger of the parent company

3    into Telespectrum, with the surviving company name being

4    Telespectrum."  Do you have any knowledge as to why Ms. Nye

5    would make that statement if that hadn't been represented to

6    her?

7    A.    No.

8    Q.    First of all, Ms. Roome, you haven't been shown today

9    any correspondence directed to McGraw Hill or its counsel

10   from anyone on behalf of S&P Data; correct?

11   A.    I don't recollect any today.

12   Q.    Do you recall at any point having seen a

13   communication directed to McGraw Hill or its counsel from

14   someone on behalf of S&P Data at any time?

15   A.    No, I don't recollect.

16   Q.    If there had been such communications to McGraw Hill

17   or its counsel in the course of your duties, do you expect

18   that those communications would have come to your attention?

19   A.    If they pertained to this trademark matter?

20   Q.    Correct.

21   A.    Yes.

22   Q.    And they would have gone into the file; correct?

23   A.    That would be typical.

24   Q.    Are you aware of the practices of Darby & Darby with

25   regard to its preparation of drafts?

1    A.    Not specifically.

2    Q.    Are you aware generally?

3    A.    Usually, it would say "draft" if it were a draft.

4    Q.    Did you ever work for Darby & Darby?

5    A.    No.

6    Q.    Do you know whether they had any policies for

7    requiring things to be labeled "draft" if they were drafts?

8    A.    No, I wouldn't know.  But I have seen drafts -- I

9    have -- I don't recall specifically, but usually, if an

10   outside attorney sent me a draft letter, it would be marked

11   "draft."

12   Q.    Okay.  And you don't recall that with regards to the

13   practices of Darby & Darby; correct?

14   A.    Not specifically.

15   Q.    Correct.  That was one of my questions.  And I will

16   go back again.  Do you see anything on this document in

17   particular that indicates that this document, regardless of

18   what the subject matter of it may say, but that this

19   document in particular was actually sent to Ms. Morlock?

20   A.    It appears to have been.

21   Q.    What indicates that to you?

22   A.    It has the letterhead on it.  It has the "via

23   telecopier."  It doesn't say "draft" anywhere.

24   Q.    Okay.  And it doesn't have a fax transmission;

25   correct?

1  A.     No, it does not have that little header thing at the

2  top.

3  Q.     And we saw that earlier on other fax transmissions;

4  correct?

5  A.     We did on some of the documents you showed me.

6  Q.     And this says it was intended to be via telecopier;

7  correct?

8  A.     This says "via telecopier."

9  Q.     And that's a fax machine; correct, Ms. Roome?

10  A.     Yes.

11  Q.     Okay.  And, Ms. Roome, other than the fact that this

12  is set up in a letter format, is there anything about

13  Exhibit 10 that indicates to you that this document in

14  particular was sent to Ms. Morlock by Ms. Nye?

15  A.     I assume it was.  I don't know why it would have been

16  prepared.  It doesn't carry a draft notice.  It says that it

17  was cc'd and sent to me.  I don't know why it would be in

18  her file unless it was sent.

19  Q.     And we haven't seen a copy indicating a fax

20  transmission with information at the top; correct?

21  A.     No, we -- I haven't.

22  Q.     You have not, correct.  And you haven't seen a copy

23  with a fax cover letter; correct?

24  A.     I haven't.

25  Q.     Okay.  And if you had received a copy with that

1    information, would that have been maintained in McGraw

2    Hill's files?

3    A.    Typically.

4    Q.    Okay.  Let's go to Exhibit 11, Ms. Roome.  Now, this

5    one you are indicated as a copy recipient via telecopier;

6    correct?

7    A.    Yes.

8    Q.    And we don't see anything printed at the top or the

9    bottom of these pages indicating a fax transmission.

10   Correct?

11   A.    We don't see it on this.

12   Q.    Okay.  And you haven't been shown any fax cover

13   letter for this; correct?

14   A.    I don't believe so.

15   Q.    And you have no recollection of ever having seen one;

16   correct?

17   A.    I don't believe so.

18   Q.    Do you have any recollection whatsoever of having

19   seen this letter before it may have been shown to you by

20   your counsel or by myself today?

21   A.    No.

22   Q.    And Mr. Mandel directed you to some subsequent

23   paragraphs here, and it says, "You have told us that your

24   client has no intention to use S&P or S&P Data in the future

25   given the merger of parent company into Telespectrum."

1    Correct?

2    A.    Yes, that's what it says.

3    Q.    And it could be that they did not want to use the

4    Telespectrum -- strike that.  It's a possibility that

5    Telespectrum had no intention to use S&P Data going forward

6    because of the merger; correct?

7    A.    I -- that -- Amanda seems to be assuming that.  But

8    she is assuming, given the merger that -- you have told us

9    your client has no intention, given the merger, to use the

10   name.

11   Q.    Correct.  Because it's being merged away into a

12   company named Telespectrum; correct?

13   A.    Yes.

14            (Conclusion of video.)

15            MS. MILOV:  Your Honor, as a housekeeping

16   matter, after that, I wanted to offer into evidence

17   Plaintiffs' Exhibits 53, 76, 13, 14, 15, 77, 16 and 17,

18   which were presented during that video deposition excerpt.

19            MR. RAWNSLEY:  No objection, Your Honor.

20            THE COURT:  All right.  Admitted without

21   objection.

22            (PTX Exhibit Nos. 53, 76, 13, 14, 15, 77, 16,

23   and 17 were admitted into evidence.)

24            MS. MILOV:  And, Your Honor, I am mindful of the

25   time.  We're about six minutes before 5:00 p.m.  The next

1    deposition excerpt video we have is about 21 minutes, so I

2    wasn't sure if you wanted to pick up in the morning.

3                    THE COURT:  All right.  Well, why don't we pick

4    up in the morning.  We'll start at five minutes of 9:00 so

5    that we can get this thing done.

6                    Okay.  Anything else before we break for the

7    day?

8                    MR. FINEMAN:  Nothing from our side, Your Honor.

9                    MS. MILOV:  Nothing from Plaintiffs.

10                   THE COURT:  All right.  Well, have a good

11   evening.  I'll see you all tomorrow.

12                   MS. MILOV:  Thank you.

13                   MR. FINEMAN:  Thank you, Your Honor.

14                   DEPUTY CLERK:  All rise.

15                   (Court was recessed at 4:55 p.m.)

16                   I hereby certify the foregoing is a true and

17   accurate transcript from my stenographic notes in the

18   proceeding.

19                        /s/ Heather M. Triozzi
                          Certified Merit and Real-Time Reporter
20                        U.S. District Court

21

22

23

24

25