**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| S&P GLOBAL, INC. and STANDARD & POOR'S FINANCIAL SERVICES LLC, | ) )  ) |
| Plaintiffs, | ) ) |
| v. | ) )  C.A. No. 20-701-RGA ) |
| S&P DATA LLC, S&P DATA OHIO LLC, S&P DATA MICHIGAN LLC and S&P DATA NEW MEXICO LLC, | ) ) ) ) |
| Defendants. | ) ) ) |

**DEFENDANTS' ANSWERING POST-TRIAL BRIEF**

Frederick L. Cottrell, III (#2555)
Steven J. Fineman (#4025)
Jason J. Rawnsley (#5379)
Valerie A. Caras (#6608)
RICHARDS, LAYTON & FINGER, P.A.
920 N. King Street
Wilmington, DE 19801
(302) 651-7700
cottrell@rlf.com
fineman@rlf.com
rawnsley@rlf.com
caras@rlf.com

*Attorneys for Defendants S&P Data LLC,*
*S&P Data Ohio LLC, S&P Data Michigan*
*LLC, and S&P Data New Mexico LLC*

Dated: June 10, 2022

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ...................................................................................... iii

ARGUMENT ............................................................................................................... 1

I.    PLAINTIFFS HAVE FAILED TO PROVE THAT THE PUBLIC RECOGNIZES A FAMILY OF MARKS BASED ON THE "S&P" PREFIX ............................................................................................................ 1

II.    PLAINTIFFS HAVE FAILED TO PROVE A LIKELIHOOD OF CONFUSION UNDER THE LANHAM ACT ................................................ 3

    A.    The Lapp Analysis Favors Defendants ......................................... 4

        1.    The degree of similarity between the owner's mark and the alleged infringing mark ............................................... 4

        2.    The strength of the owner's mark ...................................... 6

        3.    The price of the services and other factors indicative of the care and attention expected of consumers when making a purchase ............................................................. 7

        4.    The length of time the defendant has used the mark without evidence of actual confusion arising ................... 8

        5.    The intent of the defendant in adopting the mark ............. 9

        6.    The evidence of actual confusion ..................................... 11

        7.    Whether the services, competing or not competing, are marketed through the same channels of trade and advertised through the same media ........................... 17

        8.    The extent to which the targets of the parties' sales efforts are the same ...................................................... 17

        9.    Relationship of the services in the minds of consumers, whether because of near-identity of the products, similarity of function, or other factors ........................... 18

        10.    Other facts suggesting that the consuming public might expect the prior owner to offer both services to expand into the defendant's market ........................... 20

    B.    Plaintiffs' Conspicuous Failure to Submit Survey Evidence Weighs Against a Likelihood of Confusion ............................. 20

    C.    Weighing the Factors Shows No Likelihood of Confusion ..................... 21

III.    PLAINTIFFS NEGLECTED THEIR STATE LAW INFRINGEMENT CLAIMS ................................................................. 21

IV.    PLAINTIFFS HAVE FAILED TO PROVE TRADEMARK
       DILUTION ...................................................................................22

       A.    Plaintiffs Failed to Prove Fame.................................................22

       B.    Fame Is Measured as of the Accused Mark's First Use
             in Commerce ............................................................................23

       C.    The Poret Survey Fails to Show Fame .......................................24

             1.    The Poret Survey Arrives Nearly Two Decades
                   Too Late .........................................................................24

             2.    The Poret Survey Failed to Measure Recognition
                   of Goods and Services ....................................................25

             3.    Even if Credited, the Poret Survey Fails to Show Fame................26

       D.    Plaintiffs Failed to Carry Their Burden on the Other Fame
             Elements...................................................................................26

             1.    In or Before 2004 ...........................................................27

             2.    After 2004 ......................................................................27

       E.    Plaintiffs Have Failed to Show Blurring....................................28

V.     PLAINTIFFS DID NOT EVEN TRY TO ESTABLISH DILUTION
       UNDER DELAWARE STATE LAW ....................................................30

VI.    LACHES BARS PLAINTIFFS' CLAIMS..............................................30

       A.    Plaintiffs Failed to Overcome the Presumption of Undue
             Delay .......................................................................................31

       B.    Plaintiffs' Delay Impaired Defendants' Ability to Defend
             Themselves ...............................................................................34

             1.    Plaintiffs Deprived Defendants of the Opportunity
                   to Conduct a Recognition Survey that Satisfied
                   the Statutory Requirements.............................................34

             2.    The Lack of Records Relating to the McGraw-Hill
                   Correspondence, and the Passage of Time, Have
                   Created Evidentiary Prejudice .......................................35

       C.    Plaintiffs' Delay Caused Economic Prejudice............................36

VII.   PLAINTIFFS HAVE NOT SHOWN ENTITLEMENT TO A
       PERMANENT INJUNCTION ..............................................................38

       A.    Plaintiffs' Failure to Rebut the Presumption of Laches
             Bars All Relief ..........................................................................39

       B.    Plaintiffs Are Not Entitled to an Injunction Under
             Delaware Law ...........................................................................40

CONCLUSION................................................................................................................40

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
   237 F.3d 198 (3d Cir. 2000) ................................................................... *passim*

*A.C. Aukerman Co. v. R.L. Chaides Construction Co.*,
   960 F.2d 1020 (Fed. Cir. 1992) ............................................................... 37

*Acxiom Corp. v. Axiom, Inc.*,
   27 F. Supp. 2d 478 (D. Del. 1998) ........................................................... 18

*Am. Beverage Corp. v. Diageo N. Am. Inc.*,
   936 F. Supp. 2d 555 (W.D. Pa. 2013) ............................................... 15, 33, 39

*AM Gen'l Corp. v. Daimler Chrysler Corp.*,
   311 F.3d 796 (7th Cir. 2002) .................................................................. 23

*American Mensa, Ltd. v. Inpharmatica, Ltd.*,
   No. WDQ-07-3283, 2008 WL 11363280 (D. Md. Nov. 6, 2008) .......................... 25

*Barnes Grp. Inc. v. Connell Ltd. P'ship*,
   793 F. Supp. 1277 (D. Del. 1992) ............................................................ 30

*Bd. of Regents of Univ. of Tx. Sys. v. KST Elec. Ltd.*,
   550 F. Supp. 2d 657 (W.D. Tex. 2008) ...................................................... 23

*Bridgestone/Firestone Res., Inc. v. Auto. Club De L'Ouest De La France*,
   245 F.3d 1359 (Fed. Cir. 2001) ............................................................... 38

*Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.*,
   921 F.2d 467 (3d Cir. 1990) ................................................................... 20

*Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*,
   269 F.3d 270 (3d Cir. 2001) ................................................................ *passim*

*Ciba-Geigy Corp. v. Bolar Pharm. Co.*,
   747 F.2d 844 (3d Cir. 1985) ................................................................... 40

*Coach Servs. Inc. v. Triumph Learning LLC*,
   668 F.3d 1356 (Fed. Cir. 2012) ............................................................... 24

*Dahl v. Swift Distrib., Inc.*,
   No. CV 10-00551 SJO, 2010 WL 1458957 (C.D. Cal. Apr. 1, 2010) .................... 29

*Dille Family Trust v. Nowlan Family Trust*,
   276 F. Supp. 3d 412 (E.D. Pa. 2017) ........................................................ 26

*Dionisi v. DeCampli*,
No. 9425, 1995 WL 398536 (Del. Ch. June 28, 1995) ............................................................40

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) ..............................................................................................................38

*Fancaster, Inc. v. Comcast Corp.*,
832 F. Supp. 2d 380 (D.N.J. 2011) .......................................................................................11

*Flat Rate Movers, Ltd. v. FlatRate Moving & Storage, Inc.*,
104 F. Supp. 3d 371 (S.D.N.Y. 2015) ..................................................................................10

*Ford Motor Co. v. Summit Motor Prods. Inc.*,
930 F.2d 277 (3d Cir. 1991) ...................................................................................................7

*Gavrieli Brands LLC v. Soto Massini (USA) Corp.*,
No. 18-462 (MN), 2020 WL 1443215 (D. Del. Mar. 24, 2020) ............................................11

*GOLO, LLC v. Goli Nutrition, Inc.*,
No. 20-667-RGA, 2020 WL 5203601 (D. Del. Sept. 1, 2020) ....................................... *passim*

*Grupo Gigante S.A. de C.V. v. Dallo & Co., Inc.*,
391 F.3d 1088 (9th Cir. 2004) .......................................................................................31, 36

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
579 U.S. 93 (2016) ...............................................................................................................31

*Harley's Hope Found. v. Harleys Dream*,
2022 WL 1154526 (D. Colo. Apr. 19, 2022) ........................................................................39

*Healthbox Glob. Partners, LLC v. Under Armour, Inc.*,
No. 16-146-SLR, 2016 WL 3919452 (D. Del. July 19, 2016) ..............................................29

*Hemstreet v. Computer Entry Systems Corp.*,
972 F.2d 1290 (Fed. Cir. 1992) .......................................................................................36, 37

*J&J Snack Foods Corp. v. McDonalds Corp.*,
932 F.2d 1460 (Fed. Cir. 1991) ..............................................................................................2

*Joint Stock Soc'y v. UDV N. Am., Inc.*,
53 F. Supp. 2d 692 (D. Del. 1999) ........................................................................................34

*Kos Pharm., Inc. v. Andrx Corp.*,
369 F.3d 700 (3d Cir. 2004) ............................................................................................10, 13

*Lincoln Fin. Advisors Corp. v. Sagepoint Fin. Inc.*,
No. 1:09-CV-15RM, 2009 WL 928993 (N.D. Ind. Apr. 2, 2009) ...........................................8

*McDonald's Corp. v. Druck & Gerner, DDS., P.C.*,
  814 F. Supp. 1127 (N.D.N.Y. 1993) ......................................................................38

*McGraw-Hill Cos. v. Vanguard Index Trust*,
  139 F. Supp. 2d 544 (S.D.N.Y. 2001) ....................................................................27

*McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*,
  511 F.3d 350 (3d Cir. 2007) ............................................................................11, 15

*Network Network v. CBS, Inc.*,
  No. CV 98-1349, 2000 WL 362016 (C.D. Cal. Jan. 18, 2000) ..............................29

*Nissan Motor Co. v. Nissan Comput. Corp.*,
  378 F.3d 1002 (9th Cir. 2004) ...............................................................................23

*Omicron Cap., LLC v. Omicron Cap., LLC*,
  433 F. Supp. 2d 382 (S.D.N.Y. 2006) ......................................................................7

*Playtex Prods., Inc. v. Ga.-Pac. Corp.*,
  390 F.3d 158 (2d Cir. 2004), *superseded on other grounds as stated in*
  *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97 (2d Cir. 2009) ......29

*Primepoint, L.L.C. v. Primepay, Inc.*,
  No. 06-1551 (RBM), 2009 WL 1884369 (D.N.J. June 30, 2009),
  *aff'd*, 401 F. App'x 663 (3d Cir. 2010) .................................................................5, 9

*Quia Corp. v. Mattel, Inc.*,
  No. C 10-1902 JF (HRL), 2011 WL 2749576 (N.D. Cal. July 14, 2011) ..............13

*Roederer v. J. Garcia Carrion, S.A.*,
  569 F.3d 855 (8th Cir. 2009) .................................................................................36

*Rust Envtl. & Infrastructure, Inc. v. Teunissen*,
  131 F.3d 1210 (7th Cir. 1997) ...............................................................................14

*Sanofi-Aventis v. Advancis Pharm. Corp.*,
  453 F. Supp. 2d 834 (D. Del. 2006) .......................................................................10

*Scott Paper Co. v. Scott's Liquid Gold, Inc.*,
  589 F.2d 1225 (3d Cir. 1978), *superseded by statute on other grounds as stated in*
  *Parks LLC v. Tyson Foods, Inc.*, 863 F.3d 220 (3d Cir. 2017) .................................3

*Simon Prop. Grp., L.P. v. mySimon, Inc.*,
  No. IP 99-1195-C-H/S, 2000 WL 1206575 (S.D. Ind. Aug. 3, 2000) ..............22, 24

*Spark Therapeutics, Inc. v. Bluebird Bio, Inc.*,
  No. 21-00705-WCB, 2022 WL 605724 (D. Del. Jan. 25, 2022) ............................40

*Standard & Poor's Corp. v. Commodity Exchange, Inc.*,
   683 F.2d 704 (2d Cir. 1982)...........................................................................27

*Steak Umm Co. v. Steak'Em Up, Inc.*,
   No. 09-2857, 2011 WL 3679155 (E.D. Pa. Aug. 23, 2011) ....................................23

*Swfte Int'l Ltd. v. Selective Ins. Co. of Am.*,
   No. 94-44-SLR, 1994 WL 827812 (D. Del. Dec. 30, 1994)....................................12

*Therma-Scan, Inc. v. Thermoscan, Inc.*,
   295 F.3d 623 (6th Cir. 2002) ..............................................................................8

*Tri-Star Pictures, Inc. v. Unger*,
   14 F. Supp. 2d 339 (S.D.N.Y. 1998)....................................................................38

*Univ. of Pittsburgh v. Champion Prod. Inc.*,
   686 F.2d 1040 (3d Cir. 1982)..............................................................................39

*Univ. of Tex. at Austin v. KST Elec., Ltd.*,
   550 F. Supp. 2d 657, 679 (W.D. Tex. 2008).........................................................26

*VeriFone, Inc. v. Poynt Co.*,
   199 F. Supp. 3d 898 (D. Del. 2016)......................................................................15

*Versa Prods. Co. v. Bifold (Mfg.) Ltd.*,
   50 F.3d 189 (3d Cir. 1995).............................................................................3, 15

## STATUTES & RULES

15 U.S.C. § 1116(a) ...........................................................................................39

15 U.S.C. § 1125(c) ...........................................................................................22

15 U.S.C. § 1125(c)(1).......................................................................................23, 35

15 U.S.C. §1125(c)(2)(A)..................................................................................23, 25, 27

15 U.S.C. § 1125(c)(2)(B) .................................................................................28

15 U.S.C. § 1125(c)(4).......................................................................................3

15 U.S.C. § 1127................................................................................................24

## OTHER AUTHORITIES

J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 24:103 ..........23

J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 24:106 ....23, 26

J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 31:13............38

For years after S&P Global, Inc. and Standard & Poor's Financial Services LLC ("Plaintiffs") learned of S&P Data LLC, S&P Data Ohio LLC, S&P Data Michigan LLC and S&P Data New Mexico LLC ("Defendants" or "S&P Data") and the full extent of their services, Plaintiffs took no action. At the same time, Plaintiffs took swift enforcement action against others, and even against those offering goods and services that bore no relation to those of Plaintiffs.

In light of Plaintiffs' other enforcement activity, Plaintiffs must have necessarily concluded that Defendants' use of S&P Data was not a concern. Yet Plaintiffs now seek to deprive Defendants of the name that they have used commercially since 2004. Despite having had years to marshal support for their claims, Plaintiffs failed to demonstrate a likelihood of confusion or trademark dilution. Plaintiffs and Defendants do not compete in any manner, and their services bear no relation to each other. And Plaintiffs did not offer any expert testimony opining that Defendants' use of S&P Data was likely to cause confusion. Instead, Plaintiffs opted to rely on isolated and unpersuasive alleged incidents of actual confusion that range from the trivial to, at most, initial-interest confusion with no marketplace effect. The survey introduced to support Plaintiffs' dilution claim was conducted at the wrong time and therefore irrelevant—and even if it had been conducted properly, the results fail to show sufficient recognition (or even recognition of a trademark) to satisfy Plaintiffs' burden on dilution. Put simply, Plaintiffs have failed to carry their burden, and judgment should be entered in favor of Defendants on all claims.

## **ARGUMENT**

## I.    PLAINTIFFS HAVE FAILED TO PROVE THAT THE PUBLIC RECOGNIZES A FAMILY OF MARKS BASED ON THE "S&P" PREFIX

Plaintiffs made the strategic decision to assert infringement of a family of marks, and in reliance on that choice opted not to attempt to prove infringement of any single mark. To prevail on their claims, then, Plaintiffs must prove the existence of a family of marks. Because Plaintiffs

have no such family, the entirety of their case fails out of the gate.

The leading decision on the family-of-marks doctrine, *J&J Snack Foods Corp. v. McDonalds Corp.*, 932 F.2d 1460, 1462 (Fed. Cir. 1991), recognized that:

> A family of marks is a group of marks having a recognizable common characteristic, wherein the marks are composed and used in such a way that the public associates not only the individual marks, but the common characteristic of the family, with the trademark owner. Simply using a series of similar marks does not of itself establish the existence of a family.  There must be a recognition among the purchasing public that the common characteristic is indicative of a common origin of the goods.

While the *J&J* Court found that the asserted marks were part of a family that included "McDONUT for doughnuts, McPIZZA for a pizza product, and McMUFFIN, McCHICKEN and McRIB for sandwich-type products," *id.* at 1461, here, there is no evidence that "S&P" has similarly strong recognition such that the public recognizes Plaintiffs as the source of the combination of "S&P" and any other word.  For example, there is no record evidence that the public would associate S&P GIVI with S&P VEQTOR, S&P 500, or any other derivation of S&P, as the public would appreciate McDonald's is the likely source of the McMuffin and the McDonut.

In fact, the record shows the opposite: by adding "Global" to "S&P," Plaintiffs' own internal survey showed that recognition *decreased* among finance professionals and policy influencers from 2015 to 2016, DPFF ¶ 169—those most likely to recognize a family of S&P marks—yet Plaintiffs contend that placing *anything* behind "S&P" automatically yields recognition as a member of a family of marks.  Although Plaintiffs argue that they "established prior rights in a family of S&P Marks that all begin with the S&P house mark and are generally followed by non-distinctive components identifying geographic locations, market segments, and the like," no commonality justifies describing these unrelated categories as "the like."  Br. at 4.

The decrease in recognition is unsurprising.  Until 2016, Plaintiffs presented themselves to

the public as a conglomerate of unrelated divisions united only in ownership by McGraw-Hill:



PTX104 at P-005548
**Excerpt from Cover of McGraw-Hill 2012 Annual Report**

PTX104 at P-007353
**Excerpt from Cover of McGraw-Hill 2013 Annual Report**

The Platts commodity price service did not even use the S&P mark in its name or logo, and "Standard & Poor's" was the debt-rating service. McGraw-Hill also had education and aviation businesses and periodicals. DPFF ¶ 36. Recognition by the public of Plaintiffs' various businesses as part of a portfolio is exactly what a consultant told Plaintiffs in 2019: a "work in progress" of a "fractious group of brands and cultures." PTX117 at P-009958; Cherry at 84:16 to 85:2.

Because Plaintiffs have failed to show the required "recognition among the purchasing public that the common characteristic is indicative of a common origin of the goods," their infringement case, which is predicated on a recognized family of marks, must necessarily fail.

## II. PLAINTIFFS HAVE FAILED TO PROVE A LIKELIHOOD OF CONFUSION UNDER THE LANHAM ACT

Under the Lanham Act, Plaintiffs have the burden to prove by a preponderance of the evidence a likelihood of confusion among an appreciable number of ordinarily prudent consumers of the type of product at issue. *See* 15 U.S.C. § 1125(c)(4); *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210–11 (3d Cir. 2000); *Versa Prods. Co. v. Bifold (Mfg.) Ltd.*, 50 F.3d 189, 200 (3d Cir. 1995). Although Plaintiffs may own the registrations of the asserted marks, "[o]wnership of a trademark does not guarantee total absence of confusion in the marketplace." *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1231 (3d Cir. 1978), *superseded by*

statute on other grounds as stated in *Parks LLC v. Tyson Foods, Inc.*, 863 F.3d 220, 231 (3d Cir. 2017).  Plaintiffs have failed to meet their burden.

### A.    The *Lapp* Analysis Favors Defendants

The Third Circuit analyzes the "Lapp" factors to determine likelihood of confusion.  "The *Lapp* test is a qualitative inquiry."  *A&H*, 237 F.3d at 215.  No factor is "determinative in the likelihood of confusion analysis and each factor must be weighed and balanced one against the other."  *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 280 (3d Cir. 2001).  "[T]he relevant inquiry is not whether consumer confusion is a 'possibility,' but whether confusion is 'likely.'"  *Id.* at 280 n.7.

An analysis of all the *Lapp* factors shows that Plaintiffs have failed to carry their burden.

### 1.    *The degree of similarity between the owner's mark and the alleged infringing mark*

Both parties use the phrase "S&P" in their marks, but "mark similarity is not necessarily determinative of likely confusion, particularly when the products do not directly compete."  *Checkpoint*, 269 F.3d at 282.  The parties do not compete, directly or indirectly.  Tr. at 601:7–18.

Plaintiffs argue that, because "S&P" is the dominant portion of the mark (which Dean Harris, a marketing expert, disputed, DPFF ¶ 160) and because "Data" is generic, then sight and sound support a finding of likelihood of confusion.  Br. at 7–8.  But there is no "per se rule about the impact of generic terms within a nongeneric trademark . . . ."  *A&H*, 237 F.3d at 218 (affirming finding that MIRACLEWEAR and MIRACLE BRA were not confusingly similar).  "Where 'plaintiff and defendant deal in non-competing lines of goods or services,' as here, the Third Circuit has held that 'the court must look beyond the trademark to the nature of the products themselves, and to the context in which they are marketed and sold.'"  *GOLO, LLC v. Goli Nutrition, Inc.*, No. 20-667-RGA, 2020 WL 5203601, at *12 (D. Del. Sept. 1, 2020) (quoting *Lapp*, 721 F.3d at 462).

4

The context in which Defendants' services are marketed includes the word mark accompanied by the circle logo, of which the color scheme is an integral part.  DPFF ¶ 157; Borts at 476:9–19 ("They were specific colors that were chosen to represent S&P Data.").



PTX 27
**Website Circa 2020**



PTX 157
**Current Website**

By contrast, since their 2016 renaming, Plaintiffs have used the same red and black color scheme and bar logo on "everything"[1]:

PTX94 at P-014858
**Facebook Page**

PTX92 at P-000226
**Promotional Material**

The overall visual impression is distinct between the two marks.  *See A&H*, 237 F.3d at 217 (affirming finding of distinction in sight among marks when, *inter alia*, "Miraclesuit is often accompanied by the Look ten pounds lighter in ten seconds!' slogan"); *GOLO*, 2020 WL 5203601, at *4 ("Differences in the design, layout, and color scheme of the parties' websites and products are thus further likely to eliminate consumer confusion"); *Primepoint, L.L.C. v. Primepay, Inc.*, No. 06-1551 (RBM), 2009 WL 1884369, at *8 (D.N.J. June 30, 2009) (stating that "some consumers may be confused by the similar-sounding names" but that "the Court cannot with confidence conclude that such confusion, in the context of their different appearance, is likely or common"), *aff'd*, 401 F. App'x 663 (3d Cir. 2010).  As a result, this factor does not support a finding of likelihood of confusion.

---

[1] "Q.  And do you have the S&P Global at the bottom of your emails when you send emails, that style I just put up?  A.  I believe that logo is our main logo.  It's on everything.  Q.  It's on everything; correct?  A.  Yes."  Cherry at 82:10–15; DPFF ¶¶ 166–67.

## 2.    *The strength of the owner's mark*

To determine the strength of the owner's mark, courts evaluate the mark's conceptual[2] and commercial strength.  Plaintiffs argue that revenue and advertising budgets, use dating back to the 1940s, media coverage, and the Poret survey and Brand Finance valuation establish the commercial strength of Plaintiffs' marks.  Br. at 9–10.  Plaintiffs are wrong.

In *Checkpoint*, the Third Circuit recognized that the trial court "held, properly in our view, that courts must look at the strength of the mark in the industry in which infringement is alleged." *Checkpoint*, 269 F.3d at 284 (affirming ruling of no likelihood of conclusion where allegedly infringed mark was strong in one segment of the corporate security market but not in the segment in which the defendant offered services).  The plaintiff in *Checkpoint* (like Plaintiffs here) had presented evidence of thirty years of use in a "substantially exclusive manner" and millions of dollars of advertising expenditures, but this evidence did not amount to mark strength in the defendant's segment of the market.  *Id.* at 283.  Plaintiffs and Defendants here operate in entirely different industries, not just different industry segments, and the contact-center industry is a multi-billion-dollar market with many competitors.  *See* Borts at 500:10 to 501:10; DPFF ¶ 2.  Plaintiffs' revenues are derived from, and their advertising expenditures directed to, users of their services, i.e., financial indices, bond ratings, and commodity pricing.  DPFF ¶¶ 26–27.

Plaintiffs' reliance on the Poret survey and the Brand Finance valuation are unavailing. The respondents to Mr. Poret's survey were not drawn from those in the contact-center industry, nor were questions asked of them as to recognition in that industry.  DPFF ¶ 261.  And the Brand Finance valuation is, as its name implies, primarily a financial exercise based on net sales, with assumptions about discount rates, the weighted average cost of capital, sales forecasts, and

---

[2] Defendants do not dispute that the asserted marks are arbitrary, *i.e.*, that they "have no relation to the goods or services they designate."  Br. at 9.

comparable royalties, not a survey.  PTX 117 at P-010017.

In sum, the evidence introduced by Plaintiffs at trial does not measure strength in the contact-center industry and should be discounted accordingly.

### 3. *The price of the services and other factors indicative of the care and attention expected of consumers when making a purchase*

This factor favors Defendants.  "Where the relevant products are expensive, or the buyer class consists of sophisticated or professional purchasers, courts have generally not found Lanham Act violations."  *Checkpoint*, 269 F.3d at 284.  There can be no reasonable dispute that both Plaintiffs' and Defendants' services are expensive and that their clients take, at a minimum, weeks before engaging in a transaction.  DPFF ¶¶ 12–14, 40–43.

The degree of care and attention depends on the composition of the buyer class. "[P]rofessional buyers, or consumers of very expensive goods, will be held to a higher standard of care than others," but if "the buyer class consists of both professional buyers and consumers then the issue will center on the consumers, for confusion within the lowest stratum of reasonably prudent buyers may give rise to liability even if professional buyers in the market are not confused." *Ford Motor Co. v. Summit Motor Prods. Inc.*, 930 F.2d 277, 293 (3d Cir. 1991).

Contrary to Plaintiffs' argument, Br. at 11, Defendants do not have a single buyer class of both professionals and retail consumers.  Instead, there are two classes: companies that purchase the services of S&P Data and those who purchase the products or services of companies that retain S&P Data's services.  The retail consumer in the latter does not set the standard of care of the professional buyer in the former.  The level of care appropriate to those in the first class, the highly sophisticated, professional purchasers of Defendants' services, weighs against a likelihood of confusion.  DPFF ¶ 39; *see Omicron Cap., LLC v. Omicron Cap., LLC*, 433 F. Supp. 2d 382 (S.D.N.Y. 2006) (finding that the parties, a hedge fund manager and a commercial lending broker

with identical names, each targeted sophisticated clients unlikely to be confused).

The second class comprises those who (1) live in a state that requires S&P Data to identify itself along with the name of S&P Data's client, (2) receive an outgoing call from S&P Data, and (3) have had a previous relationship with S&P Data's client. DPFF ¶¶ 22, 25. The level of care is that of the reasonably prudent consumer. But Plaintiffs (1) offered no evidence that any member of this class confused the parties' services, DPFF ¶ 218, (2) did nothing to address what effect the use of S&P DATA together with the name of S&P Data's client may have when selling, *e.g.*, cable and cell phone plans, and (3) offered no expert testimony on the level of sophistication of these consumers. Any assertion of a likelihood of confusion among this class is speculation.

The buying class of Plaintiffs' services are sophisticated institutional entities spending at a minimum tens of thousands of dollars. DPFF ¶¶ 39–40. And even if Plaintiffs' "B2B2C" theory is credited—which is dubious, as Plaintiffs carefully avoid any suggestion that they target consumers, *see* DPFF ¶¶ 44–49—those deciding where to place funds for investment still exercise heightened care. *See Lincoln Fin. Advisors Corp. v. Sagepoint Fin. Inc.*, No. 1:09-CV-15RM, 2009 WL 928993, at *9 (N.D. Ind. Apr. 2, 2009) (stating that consumers "exercise more care in picking an investment service"). Accordingly, this factor favors Defendants.

### 4. *The length of time the defendant has used the mark without evidence of actual confusion arising*

Defendants have used the name S&P Data since 2004. DPFF ¶ 103. The earliest alleged incident of actual confusion occurred in 2014. DPFF ¶¶ 131–42. This factor (which Plaintiffs did not address) weighs in Defendants' favor.[3] *See Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 636 (6th Cir. 2002) (stating that "all of the instances which allegedly support a finding of

---

[3] Plaintiffs may discount this factor because of changes to S&P Data's website around 2014. But there is no evidence attributing any alleged incident of confusion to S&P Data's website.

actual confusion occurred between November 20, 1998, and July 26, 2000.  The absence of any evidence of confusion prior to this time period, despite the coexistence of the goods and services since 1990, supports a conclusion that consumers have not been confused"); *Primepoint*, 2009 WL 1884369, at *12 (finding that five-year period without actual confusion "provides further support for the Court's finding that the instances of confusion were isolated and sporadic").

### 5.    *The intent of the defendant in adopting the mark.*

Plaintiffs do not dispute that Michael Shear & Dan Plashkes had anything other than their initials and the visually efficient use of an ampersand in place of "and" in mind when they originally adopted "S&P" as part of their company's name in 1986.  Mr. Plashkes testified that "Data" referred to his prescient adoption of state-of-the-art technology as a way to best serve his company's clients and to differentiate S&P Data from competing contact centers (as recognized in contemporaneous media, *see* DPFF ¶¶ 65–67).  When reestablishing S&P Data in the United States, previous clients still knew them by the name S&P Data.  DPFF ¶¶ 107–09.

In the face of this explanation, Plaintiffs first argue that Defendants should have been deterred by the "objection" of McGraw-Hill.  But the "objection" upon which Plaintiffs rely was to registration, not use.  McGraw-Hill did not request that S&P Data cease using its name; to the contrary, McGraw-Hill expressly stated it had no concern with the use of S&P Data for contact-center services.  DPFF ¶¶ 87–88.  Plaintiffs posit that, even though McGraw-Hill did not object to the use of the name in the cited documents, Defendants should still have (erroneously) deduced that Plaintiffs did, in fact, object to Defendants' use of the name.

Plaintiffs next suggest that the incorporation of a company abroad as "SP Data" suggests knowledge of wrongdoing.  But Plaintiffs cannot explain why Defendants should have expected that the use of "SP" would avoid a dispute.  Plaintiffs did not suggest the use of "SP" as an alternative in the late 1990s (not that they have any legal right to dictate what name a company

*should* use).  Borts at 497:1–7 ("Q. And you knew that if you called it SP Data instead of S&P Data, that would largely eliminate that potential problem; right?  A. We had no reason to believe that SP Data would eliminate it at all.  We never had been asked to change our name in the past, and nor did we ever have information that would resolve it."); DPFF ¶¶ 87–88.

And Defendants testified that any dispute was in the past.  *See* Borts at 486:22–24 (explaining response upon receiving 2019 cease-and-desist letter that "it felt that, you know, this had been an issue that had gone away a long, long time ago"); Plashkes at 416:18–21 (realling that counsel "advised that our name is better known than your name and you should cease and desist anything and that you have no grounds for it, and that was what I assumed was where it was left"); DPFF ¶¶ 196, 199; *cf. GOLO*, 2020 WL 5203601, at *8 (finding continued use of mark not be bad faith, as it "just as equally supports an inference that Defendant disagrees with Plaintiff's infringement analysis." (citations omitted)).  And the assumption that there would not be a serious dispute was justified—Plaintiffs knew of S&P Data's existence and services by 2014 at the latest, and affirmatively chose not to take action.  DPFF ¶¶ 124–46.

In arguing that Defendants should have exercised greater circumspection, Plaintiffs cite decisions involving competitors, where it would not be unreasonable to expect heightened caution in the selection of a name.  *See Flat Rate Movers, Ltd. v. FlatRate Moving & Storage, Inc.*, 104 F. Supp. 3d 371, 380 (S.D.N.Y. 2015) (competing moving companies); *Sanofi-Aventis v. Advancis Pharm. Corp.*, 453 F. Supp. 2d 834, 844 (D. Del. 2006) (competing pharmaceutical companies); *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 725 (3d Cir. 2004) (competing pharmaceuticals).  But these decisions do not apply here, as the parties do not compete with one another in any sense.

Finally, Defendants do not try to trade off of Plaintiffs' marks.  Except when making outgoing calls—and even then, only where state law requires—Defendants' employees do not

identify themselves as calling on behalf of S&P Data.  DPFF ¶ 22.  If Defendants intended to trade on the goodwill of Plaintiffs' marks, one would expect Defendants' employees to introduce themselves as "S&P Data" on *all* calls.  DPFF ¶ 23.  This factor favors Defendants.

### 6.    *The evidence of actual confusion*

Plaintiffs failed to show that Defendants' use of "S&P Data" has resulted in confusion.  Instead, over the course of many years, following an investigation conducted by Plaintiffs' outside counsel and a trademark investigative firm in 2014, and with the benefit of full discovery in this litigation, Plaintiffs have alleged a *de minimis* number of instances of alleged confusion that defy organization in any pattern.  *See A&H*, 237 F.3d at 227 (affirming district court verdict that factor weighed in favor of alleged infringer when evidence of actual confusion was "isolated and idiosyncratic").  The alleged incidents mostly fall into the category of "initial-interest" confusion.  The Third Circuit recognizes initial-interest confusion as actionable, but "[w]here confusion has little or no meaningful effect in the marketplace, it is of little or no consequence in [the initial-interest] analysis."  *See Checkpoint*, 269 F.3d at 297.[4]

In *Checkpoint*, the Third Circuit affirmed a finding of no likelihood of confusion that, even though there was "some evidence in the record of temporary initial confusion between the companies, by experts, the media, investors and consumers," there was "no evidence of actual customer confusion in connection with the purchase of defendant's products."  *Checkpoint*, 269 F.3d at 291; *see also Fancaster, Inc. v. Comcast Corp.*, 832 F. Supp. 2d 380, 413 (D.N.J. 2011) (recognizing Third Circuit's holding that "the relatedness of the underlying products" is "of

---

[4] Notably, Plaintiffs cite initial-interest confusion decisions involving competitors, where one may find an effect on the marketplace from temporarily confused consumers.  *See Gavrieli Brands LLC v. Soto Massini (USA) Corp.*, No. 18-462 (MN), 2020 WL 1443215 (D. Del. Mar. 24, 2020) (ballet flats); *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350 (3d Cir. 2007) (artificial sweeteners).  Here, however, Plaintiffs did not show—or even allege—that there has been any effect on the marketplace.  Any such assertion would be wholly speculative.

particular importance in assessing initial interest confusion").[5]

Here, there is no evidence that any company retained S&P Data under the belief that it was receiving services from Plaintiffs.  DPFF ¶ 219.  And Plaintiffs failed to introduce any evidence of an effect on the marketplace; their decision to withdraw their damages claim after coexisting with Defendants for many years shows that Plaintiffs have suffered no tangible harm.  DPFF ¶ 203.

• ***KeyBank***: On June 17, 2014, an assistant to the president of S&P Data contacted KeyBank employee Ursula Cottone by LinkedIn and then by email.  DPFF ¶¶ 131, 137.  Ms. Cottone forwarded the LinkedIn message to a colleague, asking "Thoughts on how to respond to this request from S&P?"  DPFF ¶ 133.  Just ten minutes later, Ms. Cottone forwarded the second communication, writing, "More info, which doesn't sound like the S&P I know…"  DTX47.  The additional "info" was that:

> S&P Data is an onshore outsourcing provider that offers scalable contact center solutions that bridge outsourcing with consulting. We have a deep domain across a number of verticals and would like to provide you with a high level overview of our experience and capabilities.

DPFF ¶ 137.  In other words, it took just two sentences explaining Defendants' services to dispel any initial confusion that may have existed; Ms. Cottone appreciated that Plaintiffs do not provide contact-center services and related consulting.  And by then, Ms. Kelly McNamara of KeyBank was telling Plaintiffs, "Ooh, interesting!  She also received this one this morning.  Sleuth away!" DPFF ¶ 139.

These are not the words of someone experiencing confusion.  At most, this is an incident

---

[5] The *Fancaster* decision was vacated at the parties' request as a settlement condition (see attached order), but that does not affect its persuasive value.  *See Swfte Int'l Ltd. v. Selective Ins. Co. of Am.*, No. 94-44-SLR, 1994 WL 827812, at *4 n.2 (D. Del. Dec. 30, 1994) (stating that vacatur of a decision to facilitate settlement "does not, of course, prevent this court's adoption of that court's reasoning").

of initial-interest confusion with no effect on the marketplace.

- **SoFi**: This incident of initial-interest confusion ("[M]y initial impression was that you guys were from Standard & Poor's.") shows that a description of Defendants' services readily dispels any notion of a relationship with Plaintiffs, without even the need to ask; a "quick look at S&P Data's offerings" was all it took to eliminate any initial confusion there may have been. DPFF ¶¶ 225–26; PTX41.

- **Wells Fargo**: By definition, this is an incident of initial-interest confusion, since Defendants had (and have) no goods or services to offer to the Wells Fargo employee seeking a CDO Evaluator license. DPFF ¶¶ 227–28; PTX43.

- **Canadian Web Scraping**: First, this incident of alleged confusion, DPFF ¶¶ 236–37, occurred in Canada and should not be measured against U.S. trademark law or considered in this litigation. "Trademark standards do not traverse international borders. 'The concept of territoriality is basic to trademark law; trademark rights exist in each country solely according to that country's statutory scheme.'" *Kos*, 369 F.3d at 714 (quoting *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 599 (5th Cir. 1985)).

Second, and equally important, there neither was nor could be any confusion. Web-scraping software cannot be "confused" in anything other than the loosest metaphorical sense—and certainly not in a trademark sense. *Cf. Quia Corp. v. Mattel, Inc.*, No. C 10-1902 JF (HRL), 2011 WL 2749576, at *3 (N.D. Cal. July 14, 2011) ("[T]he mere fact that an internet search engine intermingles links to two products is not evidence of consumer confusion."). Plaintiffs try to sidestep this fact by arguing that "the website" "assumed" that the job offer was that of Plaintiffs, PPFF ¶ 142, but introduced no evidence that any person experienced confusion.

- **Reddit**: With the entirety of their internal resources available to try to locate instances of

confusion, Plaintiffs located a single comment made in a Reddit thread sometime in 2018 by an unknown person.  DPFF ¶¶ 238–44.  The comment was made somewhere within a three-year old, 6,700-comment thread in response to the question, "If all 50 states were to suddenly split into their own separate countries and go to war, who would ally with who and who would come out on top?"  PTX49.  Even if all of Plaintiffs' assertions as to this "incident" of confusion were correct, it would be probative of nothing more than that trademark law should not be used to "protect the most gullible fringe of the consuming public."  *Rust Envtl. & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1217 (7th Cir. 1997) (quotation marks omitted).  That someone, somewhere embraces conspiracy theories about control of the economy is not probative of likelihood of confusion.

• ***Discover***:  There is far less to this alleged incident of confusion than Plaintiffs advance.  Manuel Chagas, an executive at Discover, had scheduled a meeting with S&P Data.  DPFF ¶¶ 221–24.  His executive assistant—without copying Mr. Chagas—then sends an email, not to a particular person, but rather to "enterprisecontractsolutions@discover.com."  Someone at "Enterprise Contract Solutions" pulls an NDA for Standard & Poor's as the result of a "preliminary search," which NDA is then circulated internally before being sent to S&P Data.

But there is no indication that any Discover employee in that email thread attended or had any involvement in the meeting with Defendants, nor that the Discover executive had any mistaken impressions about S&P Data.  Mr. Borts testified that no one from Discover with whom he met suggested that Defendants were affiliated with Plaintiffs.  DPFF ¶ 224; Borts at 520:21 to 521:3.

• ***Indeed Jobs Board***: Plaintiffs rely on job reviews left by S&P Data's own employees on this website, DPFF ¶¶ 249–51, but there is no evidence that these employees experienced any confusion as to whether their employer was in any way related to Plaintiffs.  Plaintiffs have provided no evidence of (1) the clarity (or lack thereof) of the user interface that led to these

14

reviews being left under Plaintiffs' name on this third-party job-review website, or (2) any evidence that those leaving the reviews experienced any confusion as to the company for which they intended to leave a review. These reviews are most akin to misdirected communications, and the "[t]he probative value of a misdirected communication, . . . is decreased when the Court cannot tell whether the mistake resulted from the author's confusion of the parties' similar marks or from inadvertence." *GOLO*, 2020 WL 5203601, at *11; *see also Am. Beverage Corp. v. Diageo N. Am. Inc.*, 936 F. Supp. 2d 555, 608 (W.D. Pa. 2013) (recognizing that "Courts have rejected evidence of misdirected communications").

- ***Sanchez Lawsuit***: There is no indication that the attorney who forwarded this complaint to Plaintiffs even read past the case caption. DPFF ¶¶ 245–48. His email forwarding the complaint suggests haste. *See id*. at P-012409 ("Please let us know I we [*sic*] can assist you with the matter."); *cf. Versa*, 50 F.3d at 205 ("[I]nstances of actual confusion may not weigh in favor of a finding of likelihood of confusion unless the confused consumer was acting with the care expected of consumers purchasing the type of good at issue."). This alleged incident should receive no weight.

- ***Remaining Incidents***: Plaintiffs cite testimony of Defendants indicating that investment bank employees have asked on occasion whether Defendants have an affiliation with Plaintiffs. DPFF ¶¶ 252–54. But that is not confusion. *See VeriFone, Inc. v. Poynt Co.*, 199 F. Supp. 3d 898, 910 (D. Del. 2016) ("The above testimony does not demonstrate actual confusion. At most, it indicates that certain customers inquired as to whether the companies were related.").

\*\*\*

No common thread (such as, *e.g.*, repeated requests for a CDO license) connects the alleged incidents of actual confusion. *See A&H Sportswear*, 237 F.3d at 227 (affirming district court's finding that "isolated and idiosyncratic" incidents of actual confusion did not lead to likely confusion); *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 366 (3d Cir.

15

2007) ("[A] district court may weigh the sixth *Lapp* factor in favor of a defendant when it concludes that the evidence of actual confusion was isolated and idiosyncratic."). At most, Plaintiffs have shown that only handful of people have expressed initial-interest confusion over the entire duration of Defendants' existence.

And in light of how few incidents are alleged, Plaintiffs have a denominator problem. The opportunities for confusion must account for the duration of co-existence, the size and outreach exposure of Plaintiffs, and that the calls handled by Defendants each year number in the millions. DPFF ¶¶ 3, 14, 20, 40. For instance, Plaintiffs argue that "S&P was mentioned in the media over 13,000 times that year on a variety of outlets including Reuters, Bloomberg, and the Wall Street Journal, and mentions of S&P on social media were shared nearly 3 million times on Facebook and Twitter." PPFF ¶ 36. Yet Plaintiffs can marshal a numerator—counting generously—of just a handful of incidents of alleged confusion, whether characterized as initial or otherwise. *See Checkpoint*, 269 F.3d at 299 ("Given the size of these companies, and the large number of e-mails, customer inquiries, and other communications they receive on a daily basis, these isolated instances of initial interest confusion counsel against a finding of likely confusion."). In *Checkpoint*, the Third Circuit agreed with the trial court that the "limited initial interest confusion (i.e., the handful of e-mails and other anecdotal evidence of mistaken consumer inquiries) was de minimis when viewed in light of the length of time the parties operated together in the United States without significant evidence of confusion." *Checkpoint*, 269 F.3d at 298–99.

And "[a]lthough some cases hold that, given the difficulty of proving actual confusion, relatively little showing on the part of the plaintiffs is required, other cases warn against using isolated instances of confusion to buttress a claim. It is within the District Court's discretion to consider the facts, and weigh them." *A&H*, 237 F.3d at 227. General statements about the

16

difficulty of locating incidents of actual confusion are not rules requiring the Court to hypothesize the existence of incidents that Plaintiffs cannot locate.

Plaintiffs' failure to introduce evidence of actual confusion beyond the few purported instances above is strong evidence *against* a likelihood of confusion. This factor is at most neutral or favors Defendants.

> **7.    Whether the services, competing or not competing, are marketed through the same channels of trade and advertised through the same media.**

Other than their internet presence, Defendants' primary means of marketing are direct sales presentations and recommendations. DPFF ¶ 17. By contrast, Plaintiffs place research in financial publications, hold trainings for third-party financial analysts, sponsor events, and advertise online and in financial publications such as the Wall Street Journal. DPFF ¶ 55.

And Defendants' social media and website do not support Plaintiffs' position on this factor. "That the two parties advertise and sell on the Internet has become largely irrelevant to this factor." *GOLO*, 2020 WL 5203601, at *12 ("Today, it would be the rare commercial retailer that did not advertise online, and the shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion." (internal quotation marks and citation omitted)).

Once the internet is properly removed from the analysis, Plaintiffs have failed to identify a single overlapping channel of trade among the parties. This factor favors Defendants.

> **8.    The extent to which the targets of the parties' sales efforts are the same.**

This factor favors Defendants. Plaintiffs direct their sales efforts to researchers, analysts, bankers, and issuers of debt. DPFF ¶ 39. The targets of Defendants' sales efforts are those looking to outsource contact centers, which is often an internal business function. DPFF ¶ 17.

Plaintiffs argue that there may be overlap among the *companies* that purchase the services of the parties. But running any company requires the purchase of a wide variety of dissimilar

goods and services (*e.g.*, food service, office supplies, IT, legal services, raw materials, insurance providers, furniture, banking, web hosting, auditors). By Plaintiffs' logic, any two entities that sell any two of these goods or services, however unrelated, would show that the parties had the same sales targets. This logic is flawed. Different persons at the same company may have responsibility for the purchasing decision for different products or services. *See Checkpoint*, 269 F.3d at 289 (stating that, even though the same companies may purchase the products sold by both parties, those responsible for purchasing each type of product were different). Even if Plaintiffs and Defendants work with the same company, the targets of the parties' sales efforts still differ.

According to Plaintiffs, "the Court in *Acxiom* rejected that precise argument." Br. at 17 (citation omitted). The Court in *Acxiom* did no such thing. In *Acxiom*, the Court found that the alleged infringer "attended industry trade shows that have targeted corporate officials responsible for marketing and customer care"—*i.e.*, the target audience for the trademark holder—and that "the decision makers" targeted by both parties included information technology managers and marketing personnel. *Acxiom Corp. v. Axiom, Inc.*, 27 F. Supp. 2d 478, 502–03 (D. Del. 1998). Here, Plaintiffs cite no evidence that the *targets* of S&P Data's sales efforts include those who, *e.g.*, need debt ratings or seek historical information on stock indices.

> **9.    Relationship of the services in the minds of consumers, whether because of near-identity of the products, similarity of function, or other factors.**

There is no near-identity of the parties' services. If there were, the parties would be competitors, and Plaintiffs concede that the parties do not compete. *See* Tr. at 601:7–18.

Nor is there a perceived similarity of function. Plaintiffs describe the services at such a high level of abstraction as to drain any useful meaning from their description. According to Plaintiffs, "Defendants' services involve a business analytics and consulting component that shares a functional similarity with Plaintiffs' financial information services in that both offer data-driven

18

solutions and infrastructure to help manage their customers' business operations more effectively and efficiently." Br. at 17. But Plaintiffs do not "help manage their customers' business operations," Br. at 15, or "help[] customers with sales and engagements," PPFF160. And as the SoFi and KeyBank incidents show, members of the public need little more than a "quick look," PTX41, or a two-sentence description of Defendants' services, DTX47, to conclusively recognize that, based on the nature of the services each provides, there is no similarity of function between the services offered by Plaintiffs and Defendants.[6]

Plaintiffs' purported evidence of similarity of function mainly draws on the testimony of Ms. Linne, whose combative testimony was that of an advocate, not a fact witness. Ms. Linne is in-house intellectual property counsel for Plaintiffs with responsibility for this litigation. DPFF ¶ 178. The Third Circuit cautions against giving much, if any, weight to such testimony. *See Checkpoint*, 269 F.3d at 298 (recognizing that "the District Court properly took into account the potential bias of Checkpoint Systems's employees who testified they had been approached by consumers interested in Check Point Software's firewall products"); *A&H*, 237 F.3d at 227 (same). Ms. Linne's alleged difficulty understanding from S&P Data's website what services Defendants offer is not credible evidence. DPFF ¶¶ 183–92. Plaintiffs did not offer testimony from any expert or fact witness that consumers recognize a near-identity between contact-center services, on the one hand, and stock indices, bond ratings, or commodity prices, on the other. This factor favors Defendants.

---

[6] There appears to be no limit to the types of services Plaintiffs believe to be related to, *e.g.*, stock indices, since Plaintiffs have threatened those who offer computer network installation, mortgages, advertising, and college football rankings. DPFF ¶¶ 209, 213–15.

10. ***Other facts suggesting that the consuming public might expect the prior owner to offer both services or to expand into the defendant's market.***

This factor, sometimes referred to as "converging markets," favors Defendants. Plaintiffs publish stock indices and commodity prices and issue bond ratings. Defendants provide contact-center services. DPFF ¶ 1. Nothing in the record suggests that the public would expect Plaintiffs to expand into telemarketing on behalf of third parties, or for S&P Data to track, *e.g.*, fluctuations in the price of gold. If recent M&A activity is any indication, Plaintiffs' merger with IHS Markit shows that Plaintiffs plan to go deeper, not wider, in the services they offer. DPFF ¶ 27. There is no record evidence that the markets for each side's services are growing closer to one another.

**B.    Plaintiffs' Conspicuous Failure to Submit Survey Evidence Weighs Against a Likelihood of Confusion**

Even though Plaintiffs had adequate time and ample resources to retain an expert to offer a likelihood-of-confusion opinion, Plaintiffs decided not to put forth such evidence— even though they retained an expert who routinely undertakes such surveys and offers opinions in litigation on that issue. Plaintiffs' failure to introduce such evidence is noteworthy.

In an effort to deflect attention from this omission, Plaintiffs argue that surveys are "neither mandatory nor essential," Br. at 18 n.2, citing *Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.*, 921 F.2d 467, 476 (3d Cir. 1990). *Jacquin* addressed whether the district court should have instructed the jury that surveys were required, and the Third Circuit answered in the negative.

Defendants do not dispute that proposition. The *absence* of surveys, however, can be weighed with the other evidence. As recognized in *Jacquin*, "plaintiff's failure to conduct such a survey where it has the financial resources to do so, could lead a jury to infer that the plaintiff believes the results of the survey will be unfavorable." *Id.* at 475. In that same decision, the Third Circuit observed that the plaintiff "presented no consumer surveys to show consumer expectations or actual confusion, so likewise neither the fourth nor sixth factor favors [the plaintiff]." *Id.*

Plaintiffs attempt to excuse the absence of a survey by asserting that it "would have been a particularly challenging undertaken [*sic*] given the need to question a universe of professional potential purchasers responsible for acquiring contact center services," Br. at 18, but Plaintiffs cite nothing to support this contention, and mere difficulty is no excuse.[7]  Plaintiffs' survey expert, who has conducted hundreds of likelihood-of-confusion surveys, did not testify why such a survey here would be particularly difficult.  As the party that bears the burden on this issue, Plaintiffs' failure to submit expert testimony speaks volumes.  The only reasonable conclusion is that Plaintiffs expected the results of a confusion survey would not show a likelihood of confusion.

### C.    Weighing the Factors Shows No Likelihood of Confusion

"[T]he *Lapp* factors are not to be mechanically tallied, . . . they are tools to guide a qualitative decision." *A&H*, 237 F.3d at 216.  The analysis reveals the absence of a likelihood of confusion here: factors one and two are neutral; factors three through five and seven through ten favor Defendants; and factor six is at most neutral or favors Defendants.  Where goods are not competing, the first two factors should not receive undue weight.  Failure to conduct a survey further tips the scale in Defendants' favor.  Weighing these considerations, Plaintiffs have failed to show a likelihood of confusion, and the Court should rule in favor of Defendants.

## III.    PLAINTIFFS NEGLECTED THEIR STATE LAW INFRINGEMENT CLAIMS

Plaintiffs cite no decision showing that Delaware recognizes the family-of-marks doctrine. It follows that Plaintiffs' state-law claims must be proven on a mark-by-mark basis.  As measured by the date of first use in Plaintiffs' own trademark registrations, Defendants' use of S&P DATA undisputedly precedes all but four of the asserted marks (S&P, S&P 100, S&P 500, and S&P 1000),

---

[7] Plaintiffs' claim that conducting a survey would have been too difficult, Br. at 18 n.2, casts doubt on Plaintiffs' "B2B2C" theory, as Plaintiffs do not explain what the difficulty would have been in surveying the purported "C" in that chain, *i.e.*, the customers of Defendants' clients.

DPFF ¶ 54, but Plaintiffs introduced no particularized evidence to establish common law rights or to show confusion between each of those marks and S&P DATA within the State of Delaware.[8]

Nor did Plaintiffs introduce any evidence of trademark rights or injuries in the State of Delaware.  The test for common-law trademark infringement, as well as violations of the Delaware Deceptive Trade Practices Act, is the same as the Lanham Act infringement test.  Given this failure of proof, the Court should enter judgment in favor of Defendants on Plaintiffs' state claims (which fail for the same reasons as discussed above regarding their Lanham Act claims regardless).

## IV.    PLAINTIFFS HAVE FAILED TO PROVE TRADEMARK DILUTION

Plaintiffs claim that Defendants' mark has likely diluted the strength of the asserted marks. To show trademark dilution under federal law, the plaintiff must prove that (1) it owns a mark that qualifies as famous; (2) the defendant is using the mark in interstate commerce; (3) the defendant's use began after plaintiff's mark became famous; and (4) the defendant's use causes dilution by lessening the capacity of the plaintiff's mark to identify and distinguish goods or services.  *See* 15 U.S.C. § 1125(c).  Plaintiffs have failed to carry their burden to prove trademark dilution.

### A.    Plaintiffs Failed to Prove Fame

Because dilution can bar the use of a trademark even when there is no confusion, "[t]he fame requirement is *the* critical limitation" that keeps dilution claims "from swallowing infringement law and from extending unwarranted protection even to quite prominent marks." *Simon Prop. Grp., L.P. v. mySimon, Inc.*, No. IP 99-1195-C-H/S, 2000 WL 1206575, at *5 (S.D. Ind. Aug. 3, 2000).

To determine whether a mark is famous, courts consider (1) the duration, extent, and geographic reach of advertising and publicity of the mark; (2) the amount, volumes, and

---

[8] Regardless, priority matters only if there is a likelihood of confusion—which there is not.

geographic extent of sales of goods or services offered under the mark; (3) the extent of actual recognition of the mark; and (4) whether the mark was registered. *See* 15 U.S.C. §1125(c)(2)(A).

The extent of actual recognition is "perhaps the most significant factor, as it directly shows how widely recognized the mark is." *Steak Umm Co. v. Steak'Em Up, Inc.*, No. 09-2857, 2011 WL 3679155, at *8 (E.D. Pa. Aug. 23, 2011) (citing MCCARTHY § 24:106 (4th ed.)[9]. The first two factors are "not necessarily as strong as factor three," since "they require the court to infer that advertising and sales have an impact on the 'general consuming public' and make the brand famous." *Id.* The fourth factor (registration) is at most minimally probative of fame. *See, e.g.*, *Bd. of Regents of Univ. of Tex. Sys. v. KST Elec. Ltd.*, 550 F. Supp. 2d 657, 675 (W.D. Tex. 2008) ("[A]s the leading commentator notes, '[o]ne cannot logically infer fame from the fact that a mark is one of the millions on the federal Register.'" (quoting MCCARTHY § 24:106 (4th ed.))).

### B.    Fame Is Measured as of the Accused Mark's First Use in Commerce

Under the Lanham Act, "the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce." 15 U.S.C. § 1125(c)(1); *Nissan Motor Co. v. Nissan Comput. Corp.*, 378 F.3d 1002, 1012–13 (9th Cir. 2004) (holding that first use may be any use in commerce, not just the type of use at issue). Thus, plaintiffs must show that their marks were famous as of the first use of the challenged mark.[10] "This rule reflects the fair and equitable principle that one should not be liable for dilution by the use of a mark which was legal when first used." MCCARTHY § 24:103.

---

[9] Citations to "MCCARTHY" refer to J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION, and, unless noted otherwise, specifically to the fifth edition.

[10] The same requirement applies to alleged families of marks. *See AM Gen'l Corp. v. Daimler Chrysler Corp.*, 311 F.3d 796, 813 (7th Cir. 2002) ("DaimlerChrysler must show that its family of marks existed at the time of the first commercial use of the intended H2 grille."); *id.* at 818 ("[A] non-existent family cannot be famous.").

Defendants first used the S&P DATA mark in commerce in 2004.  DPFF ¶¶ 103, 107–09. Plaintiffs address this fact only in a footnote.  *See* Br. at 20 n.1 ("Although S&P Data LLC was formed in 2004, it did not begin using the S&P DATA name as a trademark in public facing materials until around 2014.").  "[P]ublic facing materials" is not the statutory test, however; "use in commerce" is.  *See* 15 U.S.C. § 1127 (stating that a mark is used in commerce if used or displayed in the sale or advertising of services and the services are rendered in commerce); DPFF ¶¶ 107–09.  Accordingly, Plaintiffs' evidence of fame must be dated 2004 or earlier.[11]

### C.    The Poret Survey Fails to Show Fame

Plaintiffs presented the testimony of Hal Poret, who conducted a survey that purportedly measured the recognition of the S&P mark (and no other).  Viewed against the express language of the Lanham Act, the survey was flawed from the outset, and even if had been designed correctly, the results fail to support a finding of fame.

### 1.    *The Poret Survey Arrives Nearly Two Decades Too Late*

Mr. Poret conducted his survey in the summer of 2021—16 years after Defendants first used the S&P DATA mark in commerce—and did not even ask the respondents when they formed the understanding on which their responses rested.  DPFF ¶¶ 257, 266.  His survey is thus not probative of fame.  *See Simon*, 2000 WL 1206575, at *6 (stating that "evidence of arguable fame" dating after the first use of the allegedly diluting mark is "irrelevant"); *cf. Coach Servs. Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1375 (Fed. Cir. 2012) (disregarding survey because, among other reasons, it was "conducted in 2007, several years after Triumph filed its applications").  For this reason alone, the Court should disregard the Poret survey in its entirety.

---

[11] Even if Plaintiffs were to make a statutorily erroneous assertion of a later date of Defendants' use in commerce (such as, *e.g.*, 2014), Mr. Poret's survey does not show fame in 2014 any more than it does in 2004 for the same reasons addressed below.

2.    *The Poret Survey Failed to Measure Recognition of Goods and Services*

The Lanham Act provides that a "a mark is famous if it is widely *recognized* by the general consuming public of the United States *as a designation of source of the goods or services of the mark's owner*." 15 U.S.C. § 1125(c)(2)(A) (emphasis added). Mr. Poret failed to survey his respondents on this very point. As recognized in *American Mensa, Ltd. v. Inpharmatica, Ltd.*, No. WDQ-07-3283, 2008 WL 11363280, at *13 (D. Md. Nov. 6, 2008) (citation omitted):

> Mensa's expert's study revealed that 59 percent of respondents had heard the term "mensa" before. That 59 percent of respondents had heard of Mensa does not answer the inquiry. The TDRA states that a mark is famous if it is recognized by the public "as a designation of source of the goods or services of the mark's owner." § 1125(c)(2)(A). Thus, the relevant question is how many respondents identified the Mensa Mark as representing the goods and services that Mensa actually provides.

Plaintiffs' survey respondents here, not having been asked, did not describe what services they understood to be offered under the mark. DPFF ¶ 263. By contrast, Mr. Poret has elsewhere asked additional questions to determine whether the respondents actually recognized the mark as connected to a company's goods or services, DPFF ¶¶ 263–64; Mr. Poret evidently knows how to conduct a survey that satisfies the statute. This failure has empirical significance: in another study conducted by Mr. Poret, asking those survey participants who had recognized the mark what they actually understood it to refer to decreased recognition by about 10%. DPFF ¶ 64.

Mr. Poret conceded that his survey does not show that the respondents could identify Plaintiffs' services. DPFF ¶ 263. His use of open-ended questions in other surveys belies his *post hoc* attempt to excuse this failing here on the basis that "the controls do a better job of scientifically accounting for that than to try to interpret open-ended answers." Poret at 221:16 to 222:7.

If, as Mr. Poret surmises, the respondents could not identify or describe the services of Plaintiffs, then the term "S&P" is not even functioning as a trademark, *i.e.*, "as a designation of source of the goods or services of the mark's owner." *See* 15 U.S.C. § 1125(c)(2)(A) (defining

"famous" for purposes of dilution).  Mr. Poret's failure to ask questions that would elicit information directed to the statutory requirements for fame renders the results of his survey unreliable for purposes of proving dilution.

### 3.    *Even if Credited, the Poret Survey Fails to Show Fame*

The leading trademark treatise recommends that, to show fame, "a minimum threshold survey response should be in the range of 75% of the general consuming public of the United States."  MCCARTHY § 24:106.  The Poret survey reached just 67%—dropping to 65% in a late effort to control for speeders and exceeders.  *See* Poret at 194:22–23 ("Well, for anybody who is a speeder, the results could be unreliable.").  In *Dille Family Trust v. Nowlan Family Trust*, 276 F. Supp. 3d 412, 436 (E.D. Pa. 2017), the court ruled as a matter of law that such a showing failed to prove the level of recognition needed for fame:

> Plaintiff's survey found—at best—2% unaided recognition, and 63% aided recognition of the science fiction character Buck Rogers. It is not necessary to accept Professor McCarthy's threshold of 75% recognition to observe that Plaintiff's results fall far short of the recognition of other marks held to be famous after the T[rademark ]D[ilution ]R[evision ]A[ct].

Plaintiffs' own survey expert testified likewise.  *See* Poret at 236:4–6 ("[I]n all those other cases, the numbers were either clearly well above anything that I had seen to be agreed upon to establish fame . . . ."); *see also Univ. of Tex. at Austin v. KST Elec., Ltd.*, 550 F. Supp. 2d 657, 679 (W.D. Tex. 2008) (stating that the Trademark Dilution Revision Act "is simply not intended to protect trademarks whose fame is at all in doubt" (internal quotation marks removed)).  Because the 67% result necessarily sets the ceiling for *actual* recognition of the S&P mark, *see supra* Part IV.C.2, the survey does not show fame of the "S&P" mark.

### D.    Plaintiffs Failed to Carry Their Burden on the Other Fame Elements

Like the Poret survey, Plaintiffs' evidence on the remaining fame factors must still satisfy the requirement that fame be among the general consuming public and that it be measured on or

before the first use in commerce of the accused mark. These requirements eliminate from consideration much of what Plaintiffs presented as evidence of fame.

### 1.    *In or Before 2004*

For evidence of fame before 2004, Plaintiffs cite two federal decisions. Despite conceding in response to questioning from the Court that these decisions were merely "evidence of successful enforcement in cases that were brought," Tr. at 602:15–16, Plaintiffs now cite dicta from these decisions as purported substantive factual evidence of fame in this case. Even if this were proper— it is not, as the decisions are hearsay, and Plaintiffs neither asserted nor could assert any preclusion doctrine resting on these decisions—these opinions still do not support a finding of fame.

*Standard & Poor's Corp. v. Commodity Exchange, Inc.*, 683 F.2d 704, 708 (2d Cir. 1982) (emphasis added), has no bearing on Lanham Act fame, since it states that the marks there at issue were "strong and connote a favorable image in the minds *of investors and members of the financial community*." This dictum is irrelevant to a cause of action requiring fame among "the general consuming public of the United States." 15 U.S.C. § 1125(c)(2)(A). And dicta from *McGraw-Hill Cos. v. Vanguard Index Trust*, 139 F. Supp. 2d 544, 545 (S.D.N.Y. 2001), is similarly irrelevant, as it was a breach of contract case, not a dilution or even a likelihood-of-confusion case.

Plaintiffs' remaining purported evidence of fame on or before 2004 consists of aggregate figures of advertising expenditures and revenue for the entire McGraw-Hill business from 2001, 2002, and 2004, and certain newspaper articles. DPFF ¶¶ 56–59. But it does not follow that expenditures and revenue necessarily amount to recognition among the general consuming public.

### 2.    *After 2004*

Fame must be among the general consuming public. Plaintiffs' advertising and promotional expenditures are targeted to Plaintiffs' customers, not the general consuming public. The "industry awards" that Plaintiffs cite, PPFF ¶ 46, are just that—niche awards within the

27

financial industry (*e.g.*, best ESG ratings provider and best Islamic finance provider).  The Landor survey was of "finance professionals around the globe."  PTX-111.  The Brand Finance rankings are primarily a financial exercise.  PTX 118, 119.  Again, it does not follow that a revenue-generating company, however successful, is famous among the general consuming public.

The evidence reflects this fact, since Plaintiffs have struggled with recognition even among their targeted customers, let alone among the general consuming public.  In 2015, only 53% of those in the United States surveyed as part of "Financial Professional Research" recognized "S&P" as a financial, data and analytics provider.  *See* DTX72 at P-009674.  In 2017, only 6% of financial professionals and policy influencers identified S&P Global in response to the question, "when you think of companies in the financial intelligence data and analytics industry, which ones come to mind?"  DTX86 at P-009734.  In 2018, Plaintiffs recognized in the comments to a slide titled "Conclusions and Recommendations" that "[d]espite improvements unaided awareness is still low particularly in the North America [*sic*] 4%."  DTX90 at P-009890.  Plaintiffs achieved these low levels of recognition among their core customers *despite* their advertising expenditures and promotional activity.  Such evidence undermines Plaintiffs' contention that "S&P" is famous. Without firm evidence of recognition, the dilution inquiry should end here.

### E.    Plaintiffs Have Failed to Show Blurring

Even if Plaintiffs had proven fame, they still failed to prove blurring, *i.e.*, "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark."  15 U.S.C. § 1125(c)(2)(B).  The test is: (1) the degree of similarity between the mark or trade name and the famous mark; (2) the degree of inherent or acquired distinctiveness of the famous mark; (3) the extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark; (4) the degree of recognition of the famous mark; (5) whether the user of the mark or trade name intended to create an association with the

famous mark; and (6) any actual association between the mark or trade name and the famous mark.

Factors one, two, four, and five are addressed above. As to factor three, the parties have coexisted for nearly two decades. *See Network Network v. CBS, Inc.*, No. CV 98-1349 NM(ANX), 2000 WL 362016, at \*4 (C.D. Cal. Jan. 18, 2000) ("The length of time of concurrent usage of 'tnn' before Nashville complained indicates that Network's activity did not seriously dilute the value of Nashville's trademark."). Thus, factor three does not support a finding of blurring.

As to the sixth factor, Plaintiffs did not conduct a survey to try to establish evidence of an actual association between the marks, despite their expert's having previously conducted such surveys, noting that "an association between the respective marks [is] a prerequisite for dilution to occur." Poret at 214:10 to 215:7, 237:6–8.

Nor are the Google Analytics results that Plaintiffs cite competent evidence of association for purposes of a blurring analysis. PTX51. Plaintiffs put on no expert or other evidence of what the purported results actually measure. DPFF ¶ 233. Even if Plaintiffs had introduced evidence to explain these results, courts routinely disregard search engine results as probative of confusion; the use of Google Analytics to show "association" for purposes of the Lanham Act should be no different in this regard. *See Playtex Prods., Inc. v. Ga.-Pac. Corp.*, 390 F.3d 158, 166 (2d Cir. 2004) (agreeing with district court that "the fact that the computer associates 'moist ones' with 'Wet ones' reflects little, if anything, about whether consumers are actually confused" (internal quotation marks omitted)), *superseded on other grounds as stated in Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 108 (2d Cir. 2009); *Healthbox Glob. Partners, LLC v. Under Armour, Inc.*, No. 16-146-SLR, 2016 WL 3919452, at \*7 (D. Del. July 19, 2016) (stating that website traffic reports "are not compelling evidence that consumers thought healthbox.com was affiliated with defendant"); *Dahl v. Swift Distrib., Inc.*, No. CV 10-00551 SJO (RZx), 2010 WL

1458957, at *9 (C.D. Cal. Apr. 1, 2010) (declining "to accept Plaintiff's contention that any alleged confusion of the Google search engine indicates that consumers are actually confused").

Given Plaintiffs' failure to carry their burden on fame and blurring, the Court should enter judgment in favor of Defendants on this claim.

## V.    PLAINTIFFS DID NOT EVEN TRY TO ESTABLISH DILUTION UNDER DELAWARE STATE LAW

To show dilution under Delaware law, "some mental association between the marks is necessary for a dilution claim.  It is this association that may blur the distinctiveness of plaintiff's marks." *Barnes Grp. Inc. v. Connell Ltd. P'ship*, 793 F. Supp. 1277, 1304 (D. Del. 1992).  Plaintiffs failed to address any requirement for association under state law, and purported evidence of association among the general consuming public nationally fails to serve as evidence of association among the general consuming public of the State of Delaware.  Even if it did not, Plaintiffs have still failed to show association for the same reasons stated above.  The Court should thus rule in favor of Defendants on Plaintiffs' state law dilution claim.

## VI.    LACHES BARS PLAINTIFFS' CLAIMS

By 2014 at the latest, Plaintiffs' general counsel, in-house attorneys, brand employees, outside counsel, and a private investigation firm all were aware of Defendants' use of "S&P," Defendants' online presence, and Defendants' services.  Yet with this full knowledge, Plaintiffs took no action.  Matters changed only when Plaintiffs began to see potential value in the use of the word "data" as a brand or trademark, and not because of any act of Defendants.  Plaintiffs do not have a trademark for S&P DATA or any variation, nor have they argued that they own such a mark at common law.  Yet Plaintiffs have repeatedly displayed an interest in recent years in using such a name, apparently to capitalize on a trend in use of the word "data."  DPFF ¶¶ 163–64, 173–81.

Defendants stood in the way of that use; hence, this litigation.  Plaintiffs cannot credibly explain any other reason for their sudden decision to send a cease-and-desist letter in August of 2019.

Although the laches defense itself does not have a fixed period of time, the presumption of laches arises if Plaintiffs delayed bringing suit beyond the statute of limitations for analogous claims in the state in which the district court sits (here, three years).  Plaintiffs admit that they must overcome the presumption of laches because of their delay in bringing suit, measured from 2014 (Plaintiffs almost certainly had notice of S&P Data much earlier, *see* DPFF ¶¶ 116–19).  Br. at 29.  And even overcoming the presumption does not, in itself, defeat laches; with or without the presumption, Defendants have proven laches by a preponderance of the evidence.

### A.    Plaintiffs Failed to Overcome the Presumption of Undue Delay

Not only do Plaintiffs have no explanation for their decision not to take action between 2014 and August of 2019, they cannot provide one because they have withheld relevant documents as privileged.  In their brief, Plaintiffs craft a "progressive encroachment" defense to laches to justify why Plaintiffs had no obligation to take action.  But there has been no testimony or evidence that that was *why* Plaintiffs did not take action—or why they *did* take action when they chose to in 2019.  *Cf. Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93 (2016) (criticizing *Seagate* for "making dispositive the ability of the infringer to muster a reasonable (even though unsuccessful) defense at the infringement trial," even if the infringer "did not act on the basis of the defense or was even aware of it"); *see also Grupo Gigante S.A. de C.V. v. Dallo & Co., Inc.*, 391 F.3d 1088, 1103 (9th Cir. 2004) ("[I]t is unclear from the record whether Groupo Gigante learned that the Dallos' first Gigante Market was operating in the red until discovery commenced in this case.").  And Plaintiffs cannot, at this stage, endorse that theory as their own, as doing so would require a privilege waiver to test its veracity—and it is far too late for that.  *See* Tr. at 604:8–17.  Plaintiffs have thus put themselves in a situation where they cannot rebut the presumption of undue delay.

Even if that were not the case, the doctrine of progressive encroachment is inapplicable:

• Plaintiffs argue that they had no need to take action because Defendants promoted themselves publicly as "SP Data for the first decade of their operations." Br. at 32. But Plaintiffs admit that "[t]here is no evidence that Plaintiffs were aware of these early uses," *id.*, nor is there evidence that Plaintiffs were aware of any such use at any time before this lawsuit.

• Plaintiffs cite no evidence that they ever recognized Defendants as SP Data before this litigation. And Laura Albert's email would not support this assertion. Ms. Albert wrote that Defendants were "trying to represent S&P and are in fact SP Data." But when asked, "When you wrote 'SP Data,' were you intentionally omitting the ampersand?" she responded, "I don't recall." 291:14–19. And Ms. Albert repeatedly stated that she spoke with no one, did not recall what she did, and was speculating and making assumptions as to what she might have done. DPFF ¶ 135. Regardless, the emails she received repeatedly identified Defendants as "S&P Data." DPFF ¶¶ 132, 137.

• And if Plaintiffs' interpretation of Ms. Albert's email were correct, then Plaintiffs' opposition to laches would be even weaker: it would mean that in 2014 Plaintiffs became aware of a company they believed was actually SP Data but was "trying to represent" itself as S&P—and chose to do nothing about it.

• Plaintiffs argue that S&P Data's logo changed after 2014 and exaggerate the effect of the difference in the size and placement of the ampersand. Br. at 33. But even assuming that the previous logo did not spur Plaintiffs to act because the width and placement of the ampersand differed by a few pixels from its new logo, it would follow that Plaintiffs had no issue with the use of the mark S&P DATA apart from the logo or stylization. Again, Plaintiffs introduced no evidence showing that a *change* in the logo motivated Plaintiffs to take action.

• Plaintiffs point to new website copy from around 2017 to imply that Defendants expanded the nature of their business (they have not, *see* DPFF ¶ 5) because the website stated that Defendants offered a "business consulting platform." Br. at 33. First, progressive encroachment "does not apply to situations involving normal business growth." *Am. Bev.*, 936 F. Supp. at 611 (stating that the doctrine applies only to changes such as expansion into different territories or lines of business). Second, Plaintiffs knew in 2014 that S&P Data was "an onshore outsourcing provider that offers scalable contact center solutions that bridge outsourcing with consulting." DTX47; DPFF ¶ 137. S&P Data's website as of February 23, 2014, stated that "[a]s brand, and subject matter experts, we consider ourselves transactional consultants." DTX185.

• Plaintiffs argue that "[p]romoting 'S&P' for the first time as standing for 'Sales & Performance'" reflects "the same kind of metrics that *might* be found in Plaintiffs' data analytics." Br. at 33 (emphasis added). But there is a complete failure of evidence that "sales and performance," as either a phrase or a concept, is uniquely identified with Plaintiffs, rather than ubiquitous as to any money-making enterprise, from a convenience store to a multinational conglomerate. And ultimately this is a sideshow, since the record is devoid of any evidence that the use of that phrase ever caused any concern for or had any significance whatsoever to Plaintiffs.

• Finally, any recent social media efforts initiated by Defendants since the lawsuit began logically cannot excuse Plaintiffs' prejudicial delay in *bringing* suit.

Plaintiffs' failure so much as to contact S&P Data in 2014 is particularly inexplicable in light of their efforts to squash any third-party use of "S&P" they come across, regardless of logo, industry, or even a tenuous relation to Plaintiffs' services.[12] DPFF ¶¶ 207–16; *see also supra* p.

---

[12] As Plaintiffs told themselves in an internal document, "only we own S&P," DTX72 at P-009672—a legally erroneous statement, since the trademark laws protect only against likelihood of confusion among an appreciable number of reasonable consumers, and do not grant rights in

19 n.6.   The record leaves one conclusion: Plaintiffs' executives, in-house counsel, outside counsel, and trademark investigation firm investigated Defendants in 2014 and recognized there was no trademark infringement.  DPFF ¶¶ 143–46.  Only when Plaintiffs considered using a name like "S&P Data" in their own business did they choose to take action.  DPFF ¶¶ 173–93.  Because of this outrageous, inexcusable abuse of the trademark laws, Plaintiffs cannot rebut, and Defendants have shown, undue delay.

### B.    Plaintiffs' Delay Impaired Defendants' Ability to Defend Themselves

"Evidentiary prejudice arises when a defendant cannot present a full and fair defense on the merits due to the loss of records, the death of witnesses, or the unreliability of memories of long past events."  *Joint Stock Soc'y v. UDV N. Am., Inc.*, 53 F. Supp. 2d 692, 717 (D. Del. 1999) (internal quotation marks omitted).  Here, the lost opportunity to obtain evidence from the relevant time period, Defendants' failure to preserve evidence, and the fading of memories due to the passage of time have hindered Defendants' ability to defend themselves in several respects.

### 1.    *Plaintiffs Deprived Defendants of the Opportunity to Conduct a Recognition Survey that Satisfied the Statutory Requirements*

Fame must be measured as of the date of first use in commerce, *see supra* Part IV.B, which occurred in 2004, *see* DPFF ¶¶ 107–09.  But whenever measured, Plaintiffs' delay prejudicially deprived Defendants of the opportunity to challenge Plaintiffs' assertion of fame before Plaintiffs engaged in a campaign to increase awareness upon the adoption of the "S&P Global" name in 2016.  DPFF ¶ 165.  No survey can recapture the state of recognition among the general consuming public prior to the break with Plaintiffs' past that began in 2016; after all, "2016 is when everything changed."  Cherry at 33:4; DPFF ¶ 165.  Any survey conducted since then has no value under the

---

gross barring any use by others of a phrase used as a trademark.  As a statement of Plaintiffs' IP policy, however, it is apt.

statute. *See* 15 U.S.C. § 1125(c)(1) (dilution applies to anyone "who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce"). This evidentiary prejudice bars, at a minimum, Plaintiffs' dilution claim.

Plaintiffs contend that Defendants' lost opportunity to conduct a survey is "far too speculative," Br. at 36 n.9, but that makes no sense: it is a simple fact that that opportunity is now lost. Plaintiffs' citation to the results of Mr. Poret's statutorily deficient recognition survey as a reason why no earlier survey was necessary, *see* Br. at 36 n.9, does nothing to rebut the prejudice.

## 2. *The Lack of Records Relating to the McGraw-Hill Correspondence, and the Passage of Time, Have Created Evidentiary Prejudice*

Plaintiffs rely on McGraw-Hill's opposition to registration of a trademark in the late 1990s for two purposes: first, to argue that Defendants selected their name in bad faith (under the *Lapp* analysis), and second, to try to save themselves from laches on that same basis. Br. at 14–16, 37. But the passage of time and the absence of documents once in Plaintiffs' possession have worked in favor of Plaintiffs to deny Defendants evidence needed to rebut Plaintiffs' allegations.

Plaintiffs' argument on the intent *Lapp* factor rests entirely on the alleged awareness of Dan Plashkes and David Borts as to what occurred with McGraw-Hill. Plaintiffs cite the testimony of Mr. Plashkes and Mr. Borts *now* to show that lost evidence is unnecessary. But Plaintiffs deprived Defendants of documents that could have been used to defend themselves. And Martin Teplitsky, S&P Data's outside counsel, died in 2016, well after Plaintiffs' claim accrued. DPFF ¶ 100. Had Plaintiffs not delayed suit, Defendants would have had access to a key witness as to an incident that Plaintiffs have made a centerpiece of their case.

Ms. Roome testified to the understandable difficulty of recalling with precision the specific details of incidents that occurred more than 20 years ago. DPFF ¶ 102 n.4. Curiously, Plaintiffs somehow managed to save those documents that were generated by their side of that incident yet

not a single document from those retained by the original S&P Data, a problem for which they

have no explanation.[13]    Laches precludes Plaintiffs from resting on their rights, allowing

evidentiary prejudice to accrue, and only then pursuing their claims.  Here, Plaintiffs rely on the

evidence they kept that purportedly supports their claims, while Defendants have been denied the

opportunity rely on similar evidence because certain records and a witness are no longer available

due to Plaintiffs' delay.

### C.    Plaintiffs' Delay Caused Economic Prejudice

In 2014, Defendants began to increase their spending on advertising and promotion in

connection with the S&P Data mark by 50%, and spending continued to climb in the following

years.  DPFF ¶ 151.  Defendant also opened two new facilities under the S&P Data name.  DPFF

¶ 149.  "[A] a defendant can make the required showing of prejudice by proving that it has

continued to build a valuable business around its trademark during the time that the plaintiff

delayed the exercise of its legal rights."  *See Grupo*, 391 F.3d at 1105 ("By opening a second

Gigante Market after Grupo Gigante learned of the Dallos' alleged infringement, and by operating

both stores for an additional four years after that use was discovered, the Dallos were prejudiced

by Grupo Gigante's delay.").

Plaintiffs quote a gloss on the economic prejudice element introduced in the Federal

Circuit's patent decision in *Hemstreet v. Computer Entry Systems Corp.*, 972 F.2d 1290, 1294 (Fed.

Cir. 1992): that the change in position "must be because of and as a result of the delay, not simply

a business decision to capitalize on a market opportunity."  In *Hemstreet*, the sole cited basis for

---

[13] Plaintiffs argue that a defendant should expect a lawsuit following a challenge to the
registration of a trademark, citing *Roederer v. J. Garcia Carrion, S.A.*, 569 F.3d 855 (8th Cir. 2009).
Unlike *Roederer*, however, McGraw-Hill expressly did not object to the original S&P Data's
continued use of its name.  DPFF ¶¶ 87–88.

this gloss was the *en banc* decision in *A.C. Aukerman Co. v. R.L. Chaides Construction Co.*, 960 F.2d 1020, 1033 (Fed. Cir. 1992). The *Aukerman* Court stated only as follows regarding economic prejudice at the cited location, however (with citations omitted):

> Economic prejudice may arise where a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit. Such damages or monetary losses are not merely those attributable to a finding of liability for infringement. Economic prejudice would then arise in every suit. The courts must look for a *change* in the economic position of the alleged infringer during the period of delay. On the other hand, this does not mean that a patentee may intentionally lie silently in wait watching damages escalate, particularly where an infringer, if he had had notice, could have switched to a noninfringing product. Indeed, economic prejudice is not a simple concept but rather is likely to be a slippery issue to resolve.

In sum, (1) the economic prejudice must be of the kind that could have been avoided by an earlier suit, (2) damages generally are not automatically tantamount to economic prejudice, and (3) the change in position must occur during the period of the delay. Nowhere is reliance mentioned.

Some decisions rely on *Hemstreet* to inject a reliance element into laches. *See, e.g.*, Br. at 36 (citing *Genzyme Corp. v. Atrium Med. Corp.*, No. 00-958-MPT, 2003 U.S. Dist. LEXIS 12784, at *10–11 (D. Del. July 22, 2003 ("[T]o prove economic prejudice necessarily requires Atrium to produce facts that, for example, show *expenditures made in reliance upon* Genzyme's inaction." (emphasis added))). But that is equitable estoppel or acquiescence, not laches.[14] And *Hemstreet* goes even further in imposing a standard that no company could satisfy: that the company chose to make expenditures, plans, or investments solely for non-business reasons.

And as McCarthy notes, "defendant's knowing 'reliance' on plaintiff's objection and claim of infringement is not required. For example, a laches defense is viable if the defendant is prejudiced by its investment into and expansion of the goods or services identified by the mark

---

[14] As stated in *Aukerman*, "[t]he second element [of equitable estoppel], reliance, is not a requirement of laches but is essential to equitable estoppel." 960 F.2d at 1042.

because of the plaintiff's delay, even though defendant was not threatened by plaintiff and perhaps knew nothing of the senior user's mark." *See* MCCARTHY § 31:13 (citing, *inter alia*, *Procter & Gamble Co. v. J.L. Prescott Co.*, 102 F.2d 773 (3d Cir. 1939)); *see also Bridgestone/Firestone Res., Inc. v. Auto. Club De L'Ouest De La France*, 245 F.3d 1359, 1363 (Fed. Cir. 2001) (recognizing in trademark case that "economic prejudice to the defendant may ensue whether or not the plaintiff overtly lulled the defendant into believing that the plaintiff would not act, or whether or not the defendant believed that the plaintiff would have grounds for action").

Finally, Plaintiffs claim that no prejudice exists because it would "cost little" to remedy the infringement, yet cite a decision regarding a single dental office in Plattsburgh, New York, *see McDonald's Corp. v. Druck & Gerner, DDS., P.C.*, 814 F. Supp. 1127, 1138 (N.D.N.Y. 1993), and a decision in which the defendant did not make expenditures tied to the challenged mark (a movie title) until after the lawsuit began, *see Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 361 (S.D.N.Y. 1998). S&P Data has used its name since 2004, operates across the United States and Canada, has spent hundreds of thousands of dollars in advertising and promotion, and has clients such as Comcast, T-Mobile, Bell Canada, and Costco. DPFF ¶¶ 11, 103–10, 151.

## VII. PLAINTIFFS HAVE NOT SHOWN ENTITLEMENT TO A PERMANENT INJUNCTION

Plaintiffs failed to carry their burden to justify a permanent injunction, which requires proof that (1) the plaintiff suffered an irreparable injury; (2) remedies available at law are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

In 2020, the Lanham Act was amended to include a presumption of irreparable harm upon a finding of dilution or infringement of a federally registered mark. 15 U.S.C. § 1116(a) ("A

plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction"). Delay rebuts this presumption. *Harley's Hope Found. v. Harleys Dream*, No. 22-cv-0136-WJM-STV, 2022 WL 1154526, at *3 (D. Colo. Apr. 19, 2022) (finding presumption rebutted when plaintiff waited over two years to send cease-and-desist letter and another six months before filing suit); *Am. Beverage Corp. v. Diageo N. Am. Inc.*, 936 F. Supp. 2d 555, 612 (W.D. Pa. 2013) (finding delay inexcusable when "[p]laintiffs had concerns after seeing the Diageo products and failed expeditiously to protect their rights"). Because Plaintiffs unduly delayed bringing suit, Defendants have rebutted the presumption.

The only merits argument that Plaintiffs make to show irreparable harm beyond the presumption is to cite the conclusory, fact-free speculation of their in-house counsel. Br. at 39. But Plaintiffs have not and will not be harmed, reparably or irreparably, tangibly or intangibly. *See, e.g.*, DPFF ¶ 203. Plaintiffs have not explained how continued coexistence would result in a cent of revenue diverted from Plaintiffs or wrongfully obtained by Defendants or cause Plaintiffs to lose control of their marks. Plaintiffs' failure on this element merits denial of the requested relief.

Plaintiffs address the balance of hardships and the public interest in a similarly cursory manner. For these reasons, an injunction should not issue.

### A. Plaintiffs' Failure to Rebut the Presumption of Laches Bars All Relief

For laches to bar prospective relief, the delay must be inexcusable. *See Univ. of Pittsburgh v. Champion Prod. Inc.*, 686 F.2d 1040, 1045 (3d Cir. 1982). But "where the plaintiff sleeps on his rights for a period of time greater than the applicable statute of limitations, the burden of proof shifts to the plaintiff to prove the absence of such prejudice to the defendant as would bar all relief." *Id.* Plaintiffs have not rebutted the presumption raised by their delay in bringing suit.

Even without the presumption, however, Plaintiffs' delay is inexcusable so as to bar prospective relief as a matter of laches. DPFF ¶¶ 116–46, 161–97.

## B.    Plaintiffs Are Not Entitled to an Injunction Under Delaware Law

Defendants do not argue for injunctive relief under Delaware law and instead merely cite the state statute. Br. at 40. In *Spark Therapeutics, Inc. v. Bluebird Bio, Inc.*, No. 21-00705-WCB, 2022 WL 605724, at *21 (D. Del. Jan. 25, 2022), the Court declined to issue an injunction under Delaware law when the plaintiff's "showing of irreparable harm essentially amounts to speculation regarding the potential 'loss of control over reputation' and the fact that such harm, if it occurred, would be 'impossible to quantify'"—almost exactly Plaintiffs' argument here. *Id.* Because "there is no statutory presumption of irreparable harm under Delaware law," this failure dooms Plaintiffs' request for injunctive relief. *Id.* Any injunction would be limited regardless. *Cf. Ciba-Geigy Corp. v. Bolar Pharm. Co.*, 747 F.2d 844, 850 (3d Cir. 1985) (stating that, unlike Lanham Act claim, injunction based on state law claim "can only prevent [the plaintiff's] activity as it relates to New Jersey").

In any event, even if Plaintiffs had argued for the issuance of an injunction under state law, laches bars Plaintiffs' request for injunctive relief on their state law claims. *See, e.g.*, *Dionisi v. DeCampli*, No. 9425, 1995 WL 398536, at *13–14 (Del. Ch. June 28, 1995) (denying request for injunction under Delaware Deceptive Trade Practices Act because of delay in seeking relief).

## <u>CONCLUSION</u>

For these reasons, the Court should enter judgment in favor of Defendants on all counts.

_/s/ Jason J. Rawnsley_
Frederick L. Cottrell, III (#2555)
Steven J. Fineman (#4025)
Jason J. Rawnsley (#5379)
Valerie A. Caras (#6608)
RICHARDS, LAYTON & FINGER, P.A.
920 N. King Street
Wilmington, DE 19801
(302) 651-7700
cottrell@rlf.com
fineman@rlf.com
rawnsley@rlf.com
caras@rlf.com
_Attorneys for Defendants S&P Data LLC,_
_S&P Data Ohio LLC, S&P Data Michigan_
_LLC, and S&P Data New Mexico LLC_

Dated: June 10, 2022