IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

S&P GLOBAL INC. and STANDARD &
POOR'S FINANCIAL SERVICES LLC,

        Plaintiffs,

   v.

S&P DATA LLC, S&P DATA OHIO LLC,
S&P DATA MICHIGAN LLC and S&P
DATA NEW MEXICO LLC,

        Defendants.

Civil Action No. 20-701-RGA

## TRIAL OPINION

Neal C. Belgam, Kelly A. Green, Jason Z. Miller, SMITH KATZENSTEIN & JENKINS LLP,
Wilmington, DE; Richard S. Mandel, Joelle A. Milov, COWAN, LIEBOWITZ & LATMAN, P.C.,
New York, NY;

     Attorneys for Plaintiffs.

Frederick L. Cottrell, III, Steven J. Fineman, Jason J. Rawnsley, Valerie A. Caras, RICHARDS,
LAYTON & FINGER, P.A., Wilmington, DE;

     Attorneys for Defendants.

August 4, 2022



**ANDREWS, U.S. DISTRICT JUDGE:**

Plaintiffs S&P Global Inc. and Standard & Poor's Financial Services LLC ("Plaintiffs" or

"S&P") sued Defendants S&P Data LLC, S&P Data Ohio LLC, S&P Data Michigan LLC, and

S&P Data New Mexico LLC ("Defendants" or "S&P Data") under the Lanham Act and

Delaware law for trademark infringement, false designation of origin, unfair competition,

deceptive trade practices, and trademark dilution. (D.I. 14). I held a three-day bench trial on

March 14–17. (D.I. 132–34, hereinafter "Tr."). The parties have submitted post-trial briefing

and proposed findings of fact. (D.I. 136–140). For the following reasons, I find that Plaintiffs

have shown trademark infringement under 15 U.S.C. § 1114(1), false designation of origin under

15 U.S.C. § 1125(a), and trademark dilution under 6 Del. C. § 3313.

## I.      BACKGROUND

Plaintiffs are a financial data and analysis company. (Tr. 34:19–24).  Standard & Poor's

emerged in the 1940s and formed the S&P 500 index in the 1950s to track the general

performance of the U.S. stock market. (Tr. 34:1–36:10).  In the 1960s, Standard & Poor's was

acquired by McGraw Hill. (Tr. 34:15–18).  In addition to indices such as the S&P 500, Plaintiffs

provide debt ratings, benchmarking, intellectual property licensing, and research and quantitative

solutions. (Tr. 122:22–25).  Plaintiffs' licensees include Vanguard, Schwab, and Fidelity. (Tr.

113:14–21).

Defendants provide contact center services. (Tr. 395:17–19).  Contact centers handle

communications with a company's customers regarding that company's products or services.

(Tr. 395:20–396:1).  Dan Plashkes, Defendant's current CEO, and Michael Shear founded S&P

Data in Canada in 1986. (Tr. 397:6, 398:6–11).  In 1996, Plashkes sold S&P Data to a private

equity firm. (Tr. 402:7–403:1).  In 2004, Plashkes and David Borts formed a new company, also

called S&P Data, in the United States to provide contact center services. (Tr. 406:6–13; 480:18–19). Since 2004, S&P Data has opened multiple call centers in the United States and employs 2500 employees. (Tr. 449:16–17; DTX-40; DTX-51). Defendants' clients have included Mercedes-Benz, Unilever, American Express, and T-Mobile. (Tr. 396:9–14).

## II.     TRADEMARK INFRINGEMENT AND FALSE DESIGNATION OF ORIGIN

### A. Legal Standard

To prove trademark infringement under § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), "a plaintiff must show that: (1) the mark is valid and legally protectable; (2) the mark is owned by the plaintiff; and (3) the defendant's use of the mark to identify goods or services is likely to create confusion concerning the origin of the goods or services." *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 (3d Cir. 1994). "Likelihood of confusion is also the test for actions brought under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) for unfair competition to prevent false representations as to the source or origin of goods or services by a mark confusingly similar to one already in use." *Id.* at 473.

### B. Findings of Fact

1. Plaintiffs own valid federal marks for the asserted trademarks.

2. Plaintiffs have priority over Defendants.

3. Plaintiffs have a family of marks in S&P, S&P 100, S&P 1000, S&P 500, S&P 500 CATHOLIC VALUES INDEX, S&P 500 DYNAMIC VEQTOR INDEX, S&P LOW VOLATILITY INDEX, S&P VEQTOR, S&P AGGREGATE, S&P CAPITAL IQ, S&P CHINA 500, S&P COMPOSITE 1500, S&P GIVI, S&P GLOBAL, S&P GLOBAL MARKET INTELLIGENCE, S&P HIGH YIELD DIVIDEND ARISTOCRATS, S&P LTVC GLOBAL INDEX, S&P MIDCAP 400, S&P PRISM, S&P SMALLCAP 600,

3

S&P STRIDE, S&P STRIDE TIPS-LOCKBOX, S&P U.S. RETIREE SPENDING INDEX, and S&P WCI.

4. Plaintiffs' and Defendants' marks are similar.  The first *Lapp* factor favors Plaintiffs.

5. Plaintiffs' marks are commercially and conceptually strong.  The second *Lapp* factor favors Plaintiffs.

6. Plaintiffs and Defendants sell expensive goods and services to a sophisticated buyer class.  The third *Lapp* factor favors Defendants.

7. Defendants used the mark for approximately ten years without evidence of confusion. The fourth *Lapp* factor slightly favors Defendants.

8. Defendants knew about Plaintiffs' marks but had reasonable explanations for their choice of "S&P Data."  The fifth *Lapp* factor favors neither party.

9. There are at least three documented instances of initial interest confusion.  The sixth *Lapp* factor favors Plaintiffs.

10. The parties' channels of trade and advertisement do not have significant overlap.  The seventh *Lapp* factor favors Defendants.

11. Plaintiffs and Defendants both target firms in the financial industry.  The eighth *Lapp* factor favors Plaintiffs.

12. Plaintiffs' and Defendants' services and products are different and serve different functions for purchasers.  The ninth *Lapp* factor favors Defendants.

13. There is no evidence that Plaintiffs or Defendants will seek to expand into each other's markets.  The tenth *Lapp* factor favors Defendants.

14. Plaintiffs have shown a likelihood of confusion between Plaintiffs' S&P marks and Defendants' S&P Data mark.

### C. Discussion

As a preliminary matter, Defendants do not contest validity or priority. (*See* D.I. 139).
Plaintiffs own valid marks and Plaintiffs' use has priority over Defendants' use.

### 1. Plaintiff's "S&P" Marks Constitute a Family of Trademarks

Plaintiffs assert that their collection of S&P Marks constitutes a family of trademarks.
"A family of marks is a group of marks having a recognizable common characteristic, wherein
the marks are composed and used in such a way that the public associates not only the individual
marks, but the common characteristic of the family, with the trademark owner." *J & J Snack
Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 1462 (Fed. Cir. 1991). I must consider the
"use, advertisement, and distinctiveness of the marks, including assessment of the contribution of
the common feature to the recognition of the marks as of common origin." *Id.* at 1463.

All of Plaintiffs' asserted marks begin with "S&P" followed by a descriptor identifying
geographic locations, market segments, or other non-distinctive features of the good or service.
(Tr. 335:11–17). Plaintiffs have advertised their S&P marks together. (PTX-94 at P-10148, P-
10245; Tr. 47:5–17). Many of Plaintiffs' marks designate the investment focus of an index.
(D.I. 115 at 4–21). Others, such as S&P Global Market Intelligence, tend to designate a good or
service related to financial news, market research, and investment information. (*Id.* at 11).
Plaintiffs have used "S&P" to advertise their goods and services since the 1940s; the S&P 500
was first introduced in the 1950s. (Tr. 34:19–36:23). Plaintiffs obtained trademarks on S&P 500
and S&P 100 in 1987. (PTX-091 at P-1, P-167)

Defendants argue that Plaintiffs' own internal research showed that appending "Global"
to "S&P" decreased recognition among finance professionals and policy influencers from 2015
to 2016. (D.I. 139 at 2). Thus, according to Defendants, "S&P" is not a "common characteristic

[that] is indicative of a common origin of the goods." (*Id.* (citing *J&J Snack Foods*, 932 F.2d at 1462). The survey is based on "unaided awareness" questions, such as, "when you think of companies in the financial intelligence data and analytics industry, which ones come to mind?" (Tr. 69:5-70:6). In 2015, unaided awareness of S&P and Standard & Poor's had been 11%, while in 2017, unaided awareness of S&P Global was 6%. (DTX-86 at P-009734). Without more context, it is difficult to draw any conclusions from this market research. There is no information on how the survey was prepared and executed. I give this evidence little weight.

Plaintiffs have shown a long usage of their marks for similar goods and services. As discussed below, "S&P" itself is a strong mark. The marks have been advertised together in such a way that "S&P" is a recognizable common characteristic. Plaintiffs have shown that they hold a family of marks under the "S&P" house mark.

### 2. The *Lapp* Factors

To prove trademark infringement, Plaintiffs must show a likelihood of confusion. In the Third Circuit, likelihood of confusion is determined by the so-called *Lapp* factors:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

*Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983). No one factor is outcome determinative. "[E]ach factor must be weighed and balanced one against the other." *Checkpoint*

*Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 280 (3d Cir. 2001).  I will consider each factor in turn.

### a.  Degree of Similarity

Marks are confusingly similar "if ordinary consumers would likely conclude that [the two products] share a common source, affiliation, connection or sponsorship." *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 183 (3d Cir. 2010).

Here, the marks share "S&P."  Plaintiffs argue that "S&P" is the dominant feature of the marks, and accordingly favors a finding of similarity.  (D.I. 136 at 7).  I agree.  S&P is a "'prominent feature' as the first word in the mark."  *Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 1372 (Fed. Cir. 2005).  Furthermore, "S&P" is conceptually strong as an arbitrary mark, as discussed below.  "The presence of this strong distinctive term as the first word in both parties' marks renders the marks similar . . . ." *Id.*

As compared to Plaintiffs' "S&P" mark, Defendants' "S&P Data" merely appends a generic term to the more prominent "S&P."  "A subsequent user may not avoid likely confusion by appropriating another's entire mark and adding descriptive or non-descriptive matter to it." *Fisons*, 30 F.3d at 477 (cleaned up).

In the context of Plaintiffs' family of marks, Plaintiffs' marks and Defendants' mark both use non-distinctive words following "S&P."  "In comparing the senior user's family of marks with the junior user's mark, the question is not whether the junior user's mark is similar to the senior user's individual marks, but whether the junior user's mark would be likely to be viewed as a member of the senior user's family of marks."  4 McCarthy on Trademarks and Unfair Competition § 23:61 (5th ed. 2022) [hereinafter McCarthy] (cleaned up).

Plaintiffs argue that "data" is essential to Plaintiffs' business and is naturally associated with their services. (D.I. 136 at 8). Plaintiffs point to news articles discussing "data" in close proximity to the S&P mark, including as part of the phrase "S&P data." (Tr. 41:5–43:14; PTX-123). S&P Global Dow Jones Indices and S&P Global Market Intelligence provide financial data and analytics. (Tr. 38:2–7; Tr. 97:22–100:24). Thus, Defendants' marks are likely to be viewed as a member of Plaintiffs' family of marks.

Defendants respond that the logos create a distinct visual impression. A side-by-side comparison of the logos is not the proper method for analysis when the products are not usually sold in such a fashion. *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 216 (3d Cir. 2000). "Instead, an effort must be made to move into the mind of the roving consumer." *Id.* Courts determine similarity by evaluating the overall impression created by the sight, sound, and meaning of the marks. *Sabinsa*, 609 F.3d at 183. Here, while the logos have a different feel, Defendants' services are often pitched verbally through cold calls. (Tr. 453:6–21). "S&P Data" sounds similar to "S&P," especially where "Data" is a generic term and "S&P" is the first word. As discussed above, the word marks themselves are strikingly similar. Thus, while the logos are distinct, the sight, sound, and meaning of the marks are substantially similar.

The degree of similarity favors Plaintiffs.

### b. Strength of Plaintiffs' Marks

Stronger marks are more likely to cause confusion. *See Versa Prods. Co. v. Bifold Co. (Mfg.)*, 50 F.3d 189, 203 (3d Cir. 1995). A trademark's strength is based on the mark's conceptual distinctiveness and commercial strength. *Fisons*, 30 F.3d at 479.

Conceptual distinctiveness is measured along a spectrum ranging from generic (low distinctiveness) to arbitrary or fanciful (high distinctiveness). *Sabinsa*, 609 F.3d at 185.

8

"Arbitrary or fanciful marks use terms that neither describe nor suggest anything about the product." *Id.* The parties agree that Plaintiffs' marks are arbitrary. (D.I. 136 at 9–10; D.I. 139 at 6 n.2).

Commercial strength concerns the mark's marketplace recognition. Commercial strength may be measured by the extensiveness of advertising and sales. *Acxiom Corp. v. Axiom*, *Inc.*, 27 F. Supp. 2d 478, 496 (D. Del. 1998). Plaintiffs offer the following evidence of commercial strength:

- Annual spending of at least $33 million to advertise to the general public and target audiences through newsletters, holiday cards, radio placements, and digital and print advertisements. (Tr. 44:11–45:17; PTX-94; PTX-104).
- Marketing through public websites, social media pages, and earned media coverage throughout the country. (Tr. 120:15–17; 47:18–25; PTX-94; PTX-122; Tr. 42:19–24; 52:11–53:8).
- A period of use dating back to the 1940's. (Tr. 34:1–11).
- Survey evidence (the "Poret survey") showing a 67% rate of recognition among members of the general public. (Tr. 149:9–13, 151:10–15; PTX-161).
- Brand valuation of more than $6 billion by Brand Finance. (PTX-117 at P-9945; Tr. 60:2–16).

Defendants argue that Plaintiffs have failed to show that their marks are strong in Defendants' market. The Third Circuit has held "that courts must look at the strength of the mark in the industry in which infringement is alleged." *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 284 (3d Cir. 2001). In *Checkpoint*, the plaintiff's mark was suggestive or descriptive and had acquired a secondary meaning. *Id.* at 283. The mark was strong in the field of physical surveillance. *Id.* at 284. In the corporate security market, however, the mark was not conceptually strong because it had not acquired secondary meaning within that market. *Id.* Because the infringement "extend[ed] beyond the physical article security field into other, broader segments of the security industry," it was proper for the District Court to consider the mark's strength in the field of infringement. *Id.*

9

There is little direct evidence of the strength of S&P's marks in Defendants' industry, but I think this case is distinguishable from *Checkpoint*. Plaintiffs here have a conceptually stronger mark than did the *Checkpoint* plaintiff. "S&P" is at the highest level of conceptual distinctiveness, unlike the *Checkpoint* mark, which was merely suggestive or descriptive. Plaintiffs have presented extensive evidence of commercial strength, including evidence of commercial strength within the general public. The general public includes Defendants' industry. This is unlike *Checkpoint*, where there was "no evidence that Checkpoint Systems spent a substantial amount of resources in advertising in this market, nor is there any evidence that Checkpoint Systems has achieved mark recognition in this segment of the industry." 269 F.3d at 283–84. Finally, there is at least some evidence of actual confusion within Defendants' industry, as discussed below, which suggests that at least some people in Defendants' industry recognized Plaintiffs' marks.

Defendants criticize Plaintiffs' reliance on the Brand Finance valuation because it is primarily a financial score. (D.I. 139 at 6–7). Discounting the brand valuation evidence does not change my analysis because there is plenty of other evidence of the commercial strength of the S&P marks. Accordingly, I find that Plaintiffs' marks are strong.

The strength of Plaintiffs' marks weighs in favor of Plaintiffs.

### c. Care and Attention of Consumers

"Where the relevant products are expensive, or the buyer class consists of sophisticated or professional purchasers, courts have generally not found Lanham Act violations." *Checkpoint*, 269 F.3d at 284.

Here, the buyer class is sophisticated. Both Plaintiffs' and Defendants' services are expensive. Plaintiffs' services are divided into three pricing tiers: primary clients with contracts

less than $50,000; core clients with contracts in the range of $50,000 to $1 million; strategic clients with contracts more than $1 million. (Tr. 76:23–77:13). Defendants' services are priced from several hundred thousand to over a million dollars each month. (Tr. 453:22–24).

Both Plaintiffs and Defendants enter into contracts with their clients. Plaintiffs negotiate contracts on a "customer-by-customer basis" and negotiations can take months. (Tr. 74:–75:7, 77:17–19; 135:19–21). Defendants typically enter into long-term contracts with their clients. (Tr. 457:1–13). It takes three to six months to negotiate such contracts. (Tr. 454:18–20).

Plaintiffs advance a theory that each party engages in a business-to-business-to-consumer ("B-to-B-to-C") model, and that I must consider the care and attention of the relevant end consumers. (D.I. 136 at 11–12). I disagree.

Some background is necessary to understand Plaintiffs' B-to-B-to-C theory. Plaintiffs license their intellectual property so that their clients can create investment vehicles that track a particular index (e.g., "S&P 500") and offer those vehicles to the public under the S&P brand. (Tr. 111:11–112:22; PTX-90 at P-10364). Plaintiffs' clients are the second "business" in the B-to-B-to-C model, while the second business's customers are the final "consumer."

Defendants provide call center services to large companies. Defendants handle communications with the large companies' customers. Under Plaintiffs' theory, Defendants' clients—the large companies—are the second "business," while the large companies' customers are the "consumers."

The "C" in Plaintiff's B-to-B-to-C model is not the "relevant consumer[]" in this case. *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 715 (3d Cir. 2004). While there might be some factual scenarios where an indirect purchaser is the relevant consumer, Plaintiffs' model is unpersuasive here. One gaping hole in Plaintiffs' theory is that the ultimate "consumers" in

Defendants' business model are not seeking to purchase "S&P Data" services. They are seeking to resolve an issue or purchase a product from Defendants' clients. Many times, they do not even know they are interacting with Defendants, as opposed to Defendants' client. (Tr. 459:25–460:9). Accordingly, I reject Plaintiffs' argument.

Plaintiffs also argue that there is a substantial likelihood of confusion among the parties' direct customers. (D.I. 136 at 11). They cite *Kos* in support of this proposition. *Kos*, however, concerned two cholesterol-altering drugs named ADVICOR and ALTOCOR. 369 F.3d at 703. The parties disputed whether physicians, a professional class, would nevertheless be susceptible to confusion. The Third Circuit held, "There is no reason to believe that medical expertise as to products will obviate confusion as to source or affiliation or other factors affecting goodwill." *Id.* at 717. The present case is different. The parties sell very different types of services. The transactions happen over a much longer period of time than it takes for a physician to write a prescription. Any initial confusion regarding the source would be quickly dissolved. Indeed, as discussed below, the evidence of actual confusion shows that potential clients realized fairly quickly that Defendants were not affiliated with Plaintiffs.

Plaintiffs also cite *Acxiom*, in which the Court rejected the argument that a lengthy sales process eliminated the potential for confusion. 27 F. Supp. 2d at 497. In the more recent *Checkpoint* case, the Third Circuit considered initial interest confusion in the context of the sixth *Lapp* factor, evidence of actual confusion. 269 F.3d at 292. I think the arguments about initial interest confusion evidence are best considered in the context of evidence of actual confusion. The third *Lapp* factor, "the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase," weighs in favor of Defendants.

### d.  Defendants' Use Without Confusion

Defendants named the company S&P Data in 2004. (Tr. 406:6–13). The earliest documented incident of confusion was in 2014. (DTX-41, Tr. 286:1-7). Defendants argue this period of use without confusion weighs in their favor. Plaintiffs argue that, before 2014, Defendants were promoting their company under the name "SP Data." (D.I. 140 at 5). For instance, the website was changed around 2014 from "SP Data" to "S&P Data." (PTX-88; DTX-185; Tr. 467:23–468:6). Defendants point to evidence that "SP Data" and "S&P Data" were used concurrently. (Tr. 489:14–23; DTX-23; DTX-179; PTX-55). I think the evidence shows that there was at least some use of "S&P Data" during that period, though the website—the most public-facing marketing—used "SP Data." Accordingly, this factor weighs slightly in favor of Defendants.

### e. Defendants' Intent

"[E]vidence of intentional, willful and admitted adoption of a mark closely similar to the existing mark[] weighs strongly in favor of finding [a] likelihood of confusion." *Checkpoint*, 269 F.3d at 286 (quotation omitted). I must consider the "adequacy and care with which a defendant investigates and evaluates its proposed mark, and its knowledge of similar marks." *Kos*, 369 F.3d at 721.

Some background is necessary to understand the parties' positions on this point. In 1986, Dan Plashkes and Michael Shear founded S&P Data Corp. in Canada as a contact center. (Tr. 397:6, 395:13–14; DTX-10). Plaintiffs' parent, McGraw Hill, opposed S&P Data Corp.'s applications to register for trademarks in Canada, although the ultimate resolution of the dispute is unclear. (PTX-12, PTX-13, PTX-14, PTX-15, PTX-76; Tr. 247:2–8, 248:8–250:23, 262:20–264:15). Mr. Plashkes, the co-founder of the present S&P Data, was aware of McGraw Hill's opposition, although he was not affiliated with the company at the time and did not participate in

the response. (Tr. 403:5–404:6, 415:10–14, 417:14–23). David Borts, another co-founder of the

present S&P Data, testified that McGraw Hill's objection was "in the back of our minds" when

Plashkes and Borts chose to incorporate as S&P Data in the United States. (Tr. 496:13).

Plaintiffs argue that (1) S&P's registration provides constructive notice of their rights in

the S&P marks, and (2) Defendants' principals Mr. Plashkes and Mr. Borts were "on notice of

S&P's potential objections by virtue of prior complaints raised by McGraw-Hill, S&P's

predecessor, to the registration and use of S&P Data in Canada by Mr. Plashkes' earlier

Canadian company." (D.I. 136 at 14–15).

Defendants argue that (1) S&P incorporates the surname initial of each co-founder of the

earlier Canadian company (*i.e.*, Shears and Plashkes), and (2) "[w]hen reestablishing S&P Data

in the United States, previous clients still knew them by the name S&P Data." (D.I. 139 at 9–

10). Defendants also argue, "McGraw-Hill did not request that S&P Data cease using its name;

to the contrary, McGraw-Hill expressly stated it had no concern with the use of S&P Data for

contact-center services." (*Id.* at 9). Plaintiffs respond, "[N]either Mr. Borts nor Mr. Plashkes

ever saw any of that correspondence and only became aware of the details of the negotiations

conducted with the new owner of S&P Data by virtue of the current litigation." (D.I. 140 at 7). I

agree with Plaintiffs. Mr. Plashkes testified that he never saw the letter, only that McGraw Hill

was told to "go away." (*See* Tr. 403:18–19, 403:25–404:3). Mr. Borts only learned of the

dispute through Mr. Plashkes. (Tr. 487:15–488:6).

I find that Defendants had plausible reasons for adopting the name S&P Data. There is

no evidence that Defendants intended to trade on Plaintiffs' goodwill. Defendants did have full

knowledge of Plaintiffs' marks and Plaintiffs' potential objection to the use of "S&P" when they

adopted "S&P Data." In short, while Defendants did not act in bad faith, they are not entirely

"blameless" either. *Kos*, 369 F.3d at 721. In light of the evidence, I find this factor favors

neither party.

### f.   Evidence of Actual Confusion

Plaintiffs argue that there is significant evidence of actual confusion. (D.I. 136 at 12–14).

Plaintiffs point to the following incidents as evidence of actual confusion:

- In 2014, Defendants' executive assistant sent a LinkedIn message seeking to arrange an introduction call to KeyBank, a client of Plaintiffs. (PTX-78, Tr. 283:25–294:22). The message was eventually forwarded from KeyBank to one of Plaintiffs' employees.
- In 2016, Defendants had a meeting with Discover, a potential client. Defendants requested a non-disclosure agreement. (PTX-40; Tr. 444:21–445:1). Discover responded by producing an NDA between Discover and Plaintiffs. (*See* PTX-40).
- In 2017, Defendants' executive assistant sent emails to Steven Sikes from SoFi seeking to schedule a meeting between Mr. Sikes and Mr. Plashkes. (PTX-41). Mr. Sikes initially agreed to the meeting, but later declined the meeting, stating, "I apologize for the about face, but my initial impression was that you guys were from Standard & Poor's." (*Id.*).
- In 2017, Christy Boughman from Wells Fargo emailed sales@spdatallc.com and asked for pricing on "the S&P CDO Evaluator License." (PTX-43; Tr. 501:23–502:8). [The S&P CDO Evaluator is one of Plaintiffs' products.]. Defendants' executive assistant responded, "are you trying to reach standard and poors?" (*Id.*). Boughman replied, "I am trying to reach S&P Data LLC. Do you have the CDO Evaluator License?" (*Id.*).
- In 2018, a website that "scraped" a job listing from S&P Data included links to Standard & Poor's and had the S&P Global Logo. (PTX-44, 508:22–509:2).
- In 2018, a commenter on Reddit associated the "S&P data center" in Cleveland, Ohio, with the "primary assets that control the countr[y's] economy." (PTX-49).
- In 2020, an attorney contacted one of Plaintiffs' in-house counsels about a class action complaint against one of Defendants' entities. (PTX-48; Tr. 358:9–13).
- In 2020, two individuals appear to have left job reviews for Defendants on Plaintiffs' job board on Indeed. (Tr. 359:2–13).
- Defendants' witnesses testified to some instances where individuals have asked about whether Defendants are associated with Plaintiffs. (*E.g.*, Tr. 410:15–411:14).

Some of this evidence has little to no probative value. The web scraping, for instance,

likely reflects a computer software algorithm but does not show confusion by a person. *Cf. Quia*

*Corp. v. Mattel, Inc.*, 2011 WL 2749576, at *3 (N.D. Cal. July 14, 2011) ("[T]he mere fact that

an internet search engine intermingles links to two products is not evidence of consumer

confusion."). Inquiries about whether Defendants have a relation to Plaintiffs "do[] not

demonstrate actual confusion. At most, it indicates that certain customers inquired as to whether the companies were related." *VeriFone, Inc. v. Poynt Co.*, 199 F. Supp. 3d 898, 910 (D. Del. 2016).

The Reddit comment requires some assumptive leaps and is from an anonymous source. The employees leaving a review on the wrong company's Indeed portfolio and the attorney who contacted Plaintiffs regarding a lawsuit against Defendants might have some probative value, but it is hard to attribute this to actual confusion rather than inattentiveness or carelessness. *See Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 636 (6th Cir. 2002) (finding six emails sent to "thermascan" rather than "thermoscan" provided "only weak support for finding a likelihood of confusion" because it was possible that "the people who sent the e-mail messages . . . were inattentive or careless when attempting to find the e-mail address for Thermoscan, rather than confused about the source of the ear thermometers").

The Discover incident appears to be an idiosyncratic event, as it was not the department interfacing with Defendants that expressed confusion but rather the legal department. I give this some probative value.

The KeyBank, SoFi, and Wells Fargo incidents are the best evidence of confusion. Each shows initial interest confusion. Initial interest confusion is actionable in the Third Circuit. *Checkpoint*, 269 F.3d at 294. "The rarity of . . . evidence [of actual confusion] makes even a few incidents highly probative of the likelihood of confusion." *Kos*, 369 F.3d at 720 (citations omitted).

Defendants argue that the incidents of actual confusion did not and could not have any effect on the marketplace, and thus should be given no weight. The Third Circuit has held, "Where confusion has little or no meaningful effect in the marketplace, it is of little or no

consequence in our analysis. Nonetheless, we decline to issue a blanket rule limiting the

probative value of initial interest. Its significance will vary, and must be determined on a case-

by-case basis." *Checkpoint Sys.*, 269 F.3d at 297.

Considering the facts of this case, I think initial interest confusion has probative value.

Plaintiffs' marks enjoy both conceptual and commercial strength.  There is evidence of

recognition among the general public.  "Where strong and well-known marks are used by others,

the scope of protection may extend far to other product fields."  McCarthy § 24:49.

Accordingly, I think this factor favors Plaintiffs.

### g.  Channels of Trade and Advertisement

Under the seventh *Lapp* factor, I examine "whether the goods, competing or not

competing, are marketed through the same channels of trade and advertised through the same

media." *A & H Sportswear*, 237 F.3d at 215.

Defendants have an internet presence, but mostly market through sales presentations and

recommendations.  (Tr. 453:6–21).  Plaintiffs also have an internet presence and market their

business in a variety of other ways.  Plaintiffs publish academic research, advertise in print,

digital, and radio, and host training events, among other avenues.  (Tr. 44:2–47:25).

"Today, it would be the rare commercial retailer that did not advertise online, and the

shared use of a ubiquitous marketing channel does not shed much light on the likelihood of

consumer confusion." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d

1137, 1151 (9th Cir. 2011).  Other than the internet presence, Plaintiffs have not identified

overlapping channels of advertisement.  I find this factor favors Defendants.

### h.  Sales Targets

17

The eighth *Lapp* factor requires me to consider "the extent to which the targets of the parties' sales efforts are the same." *A & H Sportswear*, 237 F.3d at 215. Plaintiffs argue that there is overlap in the financial industry, fintech, and energy sectors. (D.I. 136 at 17). Defendants respond that the overlap in companies that purchase services from the parties must be understood in the context of how these companies operate. (D.I. 139 at 17–18). The department of a business purchasing call center services will be different from the department of the same business purchasing Plaintiffs' finance-related services. Defendants direct their sales efforts toward procurement, sales, marketing, and contact-center departments. (Tr. 456:16–19). There is no evidence that Plaintiffs direct their sales efforts to these departments. There is some evidence, as Plaintiffs argue, that "Defendants have directly targeted decision makers who seek Plaintiffs' services." (D.I. 140 at 8). As discussed in the context of evidence of actual confusion, a KeyBank employee forwarded Defendants' message to Plaintiffs' employee. The SoFi incident reflects a potential client who would have been willing to talk to Plaintiffs but who cancelled the scheduled meeting after learning it would be with Defendants.

Defendants point to *Checkpoint* in support of their position. In *Checkpoint*, the Third Circuit affirmed the district court's finding that, despite some overlap in the parties' customer base, this factor did not favor a finding of a likelihood of confusion. "Even though many companies often purchase both types of products, most rely on information specialists to make purchasing decisions about network security systems, . . . [b]ut information specialists are not essential to make purchasing decisions about physical article security systems." 269 F.3d at 289.

Plaintiffs point to *Acxiom Corp. v. Axiom, Inc.*, 27 F. Supp. 2d 478, 502–03 (D. Del. 1998) in support of their position. In *Acxiom*, the defendant argued that, despite overlap in the customer base, the sales targets were different because each party sold to different departments

in a corporation. *Id.* The *Acxiom* court found that there was some overlap—both parties targeted

information technology managers and senior management. *Id.*

Here, I think this factor favors Plaintiffs. The targeted industries have some overlap.

Defendants serve a variety of industries, one of which is the financial industry. Plaintiffs are

focused on the financial industry. There is evidence of confusion in the banking industry, which

is unsurprising given the strength of Plaintiffs' marks. I think Defendants are right to point out

that they service different departments within a corporation, which weighs somewhat in their

favor. Still, there is evidence of overlapping sales targets and, accordingly, I think this factor

favors Plaintiffs.

### i.   Relationship of the Goods in the Minds of Consumers

The ninth *Lapp* factor requires the court to consider "the relationship of the goods in the

minds of consumers, whether because of the near-identity of the products, the similarity of

function, or other factors." *A & H Sportswear*, 237 F.3d at 215. "The question is whether the

consumer might therefore reasonably conclude that one company would offer both of these

related products." *Fisons*, 30 F.3d at 481. Plaintiffs and Defendants do not sell the same

products or services. Plaintiffs argue that, nevertheless, "Defendants' services involve a business

analytics and consulting component that shares a functional similarity with Plaintiffs' financial

information services in that both offer data-driven solutions and infrastructure to help manage

their customers' business operations more effectively and efficiently." (D.I. 136 at 17). This is a

stretch. I do not think the parties' services are similar enough to seem related to consumers. An

emphasis on data and business analytics is so generic that it is a meaningless observation. No

matter how sophisticated Defendants' business is, at the end of the day, Defendants operate call

centers. Plaintiffs provide financial data and insights to institutional investors. (Tr. 34:19–24).

Plaintiffs argue that the similarity and fame of their mark increases the likelihood of confusion, despite the fact that Plaintiffs do not offer call center services. (D.I. 136 at 16–17). "The greater the similarity of the marks, the lesser is the similarity required in the goods or services of the parties to support a finding of likely confusion." McCarthy § 23:20.50 (citation omitted). Even so, the goods are dissimilar. I will consider how the overall strength of Plaintiffs' marks impacts the likelihood of confusion despite dissimilar goods and services in the weighing of the factors.

The ninth *Lapp* factor favors Defendants.

### j.  Converging Markets

The tenth *Lapp* factor considers "other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market." 721 F.2d at 463. Defendants argue, "Nothing in the record suggests that the public would expect Plaintiffs to expand into telemarketing on behalf of third parties." (D.I. 139 at 20). Further, "If recent M&A activity is any indication, Plaintiffs' merger with IHS Markit shows that Plaintiffs plan to go deeper, not wider, in the services they offer." (*Id.*). IHS Markit tracks sales of commodities, which is one of Plaintiffs' core offerings. (Tr. 72:5–12; 35:2–4). Defendants' argument is logical. Plaintiffs do not respond. (*See* D.I. 140).

I agree with Defendants. There is no record evidence that the consuming public might expect Plaintiffs to expand into the call center business. Accordingly, this factor favors Defendants.

### 3. Lack of Survey Evidence

Defendants urge me to consider Plaintiffs' failure to submit survey evidence as a factor that weighs against finding a likelihood of confusion. (D.I. 139 at 20). Both parties point to

*Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.*, 921 F.2d 467, 475–76 (3d Cir. 1990) in

support of their position.  In *Jacquin*, the Third Circuit considered whether "the district court

erred by refusing to instruct the jury on Jacquin's failure to conduct a consumer survey." *Id.*

The Court of Appeals held:

> [A] plaintiff's failure to conduct such a survey where it has the financial resources to do
> so, could lead a jury to infer that the plaintiff believes the results of the survey will be
> unfavorable.

> Nevertheless, we have not yet held that a consumer survey is mandatory to establish
> likelihood of confusion in a Lanham Act case and do not so hold in this case. While
> consumer surveys are useful, and indeed the most direct method of demonstrating
> secondary meaning and likelihood of confusion, they are not essential where, as here,
> other evidence exists.

*Id.* (citations omitted).

I decline to infer that a survey would have yielded unfavorable results based on Plaintiffs'

lack of survey evidence.  Plaintiffs presented other evidence regarding likelihood of confusion,

including actual instances of confusion.  Plaintiffs were not required to present survey evidence

in support of their case.

### 4. Weighing of the Factors

Plaintiffs have shown a likelihood of confusion.  Plaintiffs' and Defendants' marks are

strikingly similar, which is "[t]he single most important factor in determining likelihood of

confusion." *A & H Sportswear*, 237 F. 3d at 216.  Plaintiffs' marks enjoy commercial and

conceptual strength, and there is actual evidence of confusion in the industry where Plaintiffs'

and Defendants' sales targets overlap.  While Plaintiffs and Defendants offer different goods and

services, the test for noncompeting goods is likelihood of confusion as to sponsorship, affiliation

or connection.  McCarthy § 24:6; *A & H Sportswear*, 237 F. 3d at 216.  Plaintiffs have shown

this.  There is actual evidence of confusion as to affiliation, and the rarity of such evidence makes it especially probative.

Defendants rely heavily on *Checkpoint* in their likelihood of confusion analysis. *Checkpoint* is highly instructive as to the likelihood of confusion when plaintiffs and defendants do not compete.  The *Checkpoint* court recognized the highly fact-specific nature of the likelihood of confusion inquiry. 269 F.3d at 297.  Here, there is a key factual difference—Plaintiffs' marks are very strong, and accordingly enjoy a broad scope of protection.  "[T]he strength of the owner's mark directly affects the likelihood that consumers will be confused as to the sources of products bearing substantially similar marks." *Versa Prod.*, 50 F.3d at 203.  The evidence in this case bears this out.  Plaintiffs and Defendants do not compete, but there has been actual confusion regarding Defendants' affiliation with Plaintiffs.  Plaintiffs have shown a likelihood of confusion between Plaintiffs' and Defendants' marks.

## III.     STATE LAW CLAIMS

Plaintiffs state, "S&P's claims for infringement of registered marks under section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1) (Count I), false designation of origin under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count II), common law unfair competition under Delaware law (Count IV) and deceptive trade practices under 6 Del. C. § 2532(a)(2)-(3) (Count V) are all governed by the same standards." (D.I. 136 at 3 (citing cases)).  Defendants respond, in part, that Plaintiffs have failed to show that Delaware state law recognizes the family-of-marks doctrine, which is the basis of Plaintiffs' trademark infringement case. (D.I. 139 at 21). Plaintiffs offer a short reply that does not directly address this point. (*See* D.I. 140 at 9).

On this briefing, I cannot say that Delaware would recognize the family of marks doctrine.  Two of the three cases cited by Plaintiffs just say in a footnote that the same standards

apply to state law claims. *Sanofi-Aventis v. Advancis Pharm. Corp.*, 453 F. Supp. 2d 834, 847

n.2 (D. Del. 2006); *Chase Manhattan Bank, USA, N.A. v. Freedom Card, Inc.*, 333 F. Supp. 2d

239, 244 & n.13 (D. Del. 2004). The third case compares Delaware law to the Lanham Act in a

likelihood of confusion analysis. *Rockland Mortg. Corp. v. S'holders Funding*, Inc., 835 F.

Supp. 182, 196-97 (D. Del. 1993). It is possible that the "same standards" refer to the elements

of the claim, not to doctrines such as the family of marks doctrine relied upon by Plaintiffs.

Plaintiffs did not respond to Defendants' argument. Absent a more compelling analysis,

including at least some reference to Delaware caselaw, as opposed to broad statements in federal

cases in different contexts, to argue for the correctness of Plaintiffs' position on Delaware law, I

find Plaintiffs have not provided a sufficient basis to find in their favor on their state law claims.

## IV.      LANHAM ACT DILUTION

### A. Legal Standard

Under the Lanham Act, "Subject to the principles of equity, the owner of a famous mark

that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an

injunction against another person who, at any time after the owner's mark has become famous,

commences use of a mark or trade name in commerce that is likely to cause dilution by blurring

or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or

likely confusion, of competition, or of actual economic injury." 15 U.S.C. § 1125(c).

Fame is a threshold requirement for dilution. A mark is famous "if it is widely

recognized by the general consuming public of the United States as a designation of source of the

goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). A court may consider (1)

"[t]he duration, extent, and geographic reach of advertising and publicity of the mark"; (2) "[t]he

23

amount, volume, and geographic extent of sales of goods or services offered under the mark"; (3)

"[t]he extent of actual recognition of the mark"; and (4) "[w]hether the mark was registered." *Id.*

### B. Findings of Fact

1. Defendants first used "S&P Data" in commerce in 2004.

2. Plaintiffs have used "S&P" in commerce since the 1940s. Plaintiffs' marks were the subject of publicity in national sources from at least 1979.

3. The amount, volume, and geographic extent of sales under Plaintiffs' marks prior to 2004 cannot be determined.

4. The extent of actual recognition of Plaintiffs' marks prior to 2004 cannot be determined.

5. Some of Plaintiffs' marks were federally registered before 2004.

6. Plaintiffs have failed to show that their marks were famous prior to Defendants' use of its mark in commerce.

### A. Discussion

For injunctive relief under the dilution statute, a plaintiff must prove that its mark was famous before the defendant started using its mark in commerce. *See* 15 U.S.C. 1125(c). Plaintiffs suggest, in a footnote, that fame should be measured as of 2014, when Defendants first used "S&P" on their website. (*See* D.I. 136 at 20 n.4). Defendants respond that Defendants first used the mark in commerce, as defined by the Lanham Act, from 2004. (D.I. 139 at 23). I agree with Defendants. 15 U.S.C. § 1127 provides, "For the purposes of this chapter, a mark shall be deemed to be in use in commerce . . . on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce . . . ." Defendants have presented evidence that a sales presentation in use from 2004 to 2006 and the "standard consulting agreement" in 2004 used the "S&P Data" name. (Tr. 484:6–8, 489:20–23; DTX23;

DTX-179; DTX-16).  Accordingly, I find that Defendants used the mark in commerce from 2004.

Plaintiffs' evidence of fame includes advertising spend, media coverage, revenue, federal trademark registrations, and the Poret survey.  (D.I. 136 at 20–23).  Much of Plaintiffs' evidence, however, comes from after 2004.  For the following reasons, I think the pre-2004 evidence fails to meet the "rigorous standard" required to prove fame under the dilution statute.  *See Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1374–76 (Fed. Cir. 2012) (affirming the Trademark Trial and Appeal Board's finding that Coach failed to provide sufficient evidence showing fame prior to the defendant's trademark registration filing).

For the first two factors, Plaintiffs have some evidence of advertising and revenues from before 2004.  In 2001 and 2002, Plaintiffs (meaning McGraw-Hill) spent $107 million and $92 million on advertising and reported $4.6 billion and $4.8 billion in revenue, respectively.  (PTX-104).  Defendants point out that these are aggregate figures not broken down by business, region, country, or mark.  (Tr. 83:18–84:1).  Prior to 2013, McGraw Hill had education, construction, and aviation businesses as well as the S&P business.  (Tr. 56:10–12).  Accordingly, I do not think these figures are probative of the extent to which advertising and revenues prior to 2004 are attributable to the asserted marks.

There is other evidence that supports the first factor.  Plaintiffs used S&P in commerce from the 1940s.  (Tr. 34:1–11).  Plaintiffs gained attention in national news sources such as the Wall Street Journal, the New York Times, and USA Today from 1979.  (PTX-122).  Plaintiffs have submitted over a dozen articles from before 2004.  (*See id.*).

The first two factors are "not necessarily as strong as factor three," since "they require the court to infer that advertising and sales have an impact on the 'general consuming public' and

make the brand famous." *Steak Umm Co. v. Steak'Em Up, Inc.*, 2011 WL 3679155, at *8 (E.D. Pa. Aug. 23, 2011).

For the third factor, actual recognition, Plaintiffs rely heavily upon a survey conducted by Hal Poret. The survey showed that 67% of the general consuming public was aware of the S&P mark in the financial industry. (Tr. 149:9–13, 151:10–15; PTX-161). The survey asked a single, "aided recognition" question: whether the participants had seen or heard of a series of eight names used by any company or organization in the financial industry. (Tr. 153:21–24; PTX-159).

Defendants argue that the Poret survey is not probative of fame because it was conducted in 2021, seventeen years after Defendants started using S&P Data in the United States. (D.I. 139 at 24; Tr. 180:13–23). Fame surveys conducted for litigation can be probative of fame from an earlier date. *See Empress Cubana Del Tabaco v. Culbro Corp.*, 70 U.S.P.Q.2d 1650, 1680 (S.D.N.Y. 2004) ("The absence of any consumer studies from the relevant period necessitates making inferences from surveys conducted both beforehand and afterward."), *aff'd in part and reversed in part on other grounds*, 399 F.3d 462 (2d Cir. 2005). When a great deal of time has elapsed between the relevant time period and the survey, however, the probative value of the survey decreases. In this case, I think the probative value is low. Many things can and did change in seventeen years. The 67% recognition rate is already below what the leading commentator recommends ought to be the threshold for a finding of fame. McCarthy § 24:106 ("[A] minimum threshold survey response should be in the range of 75% of the general consuming public of the United States."). Based on the evidence, there is little reason to think that brand recognition seventeen years ago was as good or better than the already-marginal 67% recognition rate.

Plaintiffs also cite internal market research and third-party brand valuation reports as evidence of fame. This evidence comes from 2016 or later, however, and thus also has low probative value for showing fame before 2004. (*E.g.*, PTX-111).

The fourth factor, registration, does not seem to help Plaintiffs in this case. This factor "is only persuasive on its own if used to show that a mark is *not* famous." *Steak Umm Co.*, 2011 WL 3679155, at *8. As McCarthy explains, "one could logically infer lack of fame from a lack of registration, reasoning that if the owner of an allegedly 'famous' mark did not even bother to take the commercially ordinary and minimal step of federally registering the mark, this is an admission against interest that the mark is not 'famous.'" § 24:106. As of 2004, only S&P 100, S&P 500, and S&P 1000 were registered. "S&P" itself was not registered until 2009. (PTX-091 at P-1076). Given Plaintiffs' longstanding use of S&P, however, and the three federal registrations on the books as of 2004, I decline to draw the negative inference against Plaintiffs. Suffice it to say, however, that this factor does not provide much support for Plaintiffs' position.

The Trademark Dilution Revision Act ("TDRA") amended the dilution statute in 2006. "One of the major purposes of the TDRA was to restrict dilution causes of action to those few truly famous marks like Budweiser beer, Camel cigarettes, Barbie Dolls, and the like." *Bd. of Regents, Univ. of Tex. Sys. v. KST Elec., Ltd.*, 550 F. Supp. 2d 657, 679 (W.D. Tex. 2008) (cleaned up). "As one academic commentator put it, the 'TDRA is simply not intended to protect trademarks whose fame is at all in doubt.'" *Id.* (citing Barton Beebe, *A Defense of the New Federal Trademark Antidilution Law*, 16 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 1143, 1158 (2006)). In this case, Plaintiffs' evidence of fame around 2004 or earlier is lacking.

## V.     DELAWARE ANTIDILUTION STATUTE

### A. Legal Standard

6 Del. C. § 3313 provides, "Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this chapter, or a mark valid at common law or a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties, or the absence of confusion as to the source of goods or services." A plaintiff's mark need not be famous to obtain relief under the Delaware statute; rather, proof of distinctiveness suffices. *See Barnes Grp. Inc. v. Connell Ltd. P'ship*, 793 F. Supp. 1277, 1304 (D. Del. 1992). A plaintiff must also show some mental association between the marks. *See id.*

### B. Findings of Fact

1. Plaintiffs' marks are inherently distinctive.

2. Plaintiffs' and Defendants' marks are similar.

3. Plaintiffs are engaging in substantially exclusive use of their marks.

4. Plaintiffs' "S&P" mark has a high degree of recognition among the general public.

5. Defendants did not adopt their mark with the intent to create an association with Plaintiffs' marks.

6. There are several instances of actual association between the marks.

7. There is mental association between Plaintiffs' and Defendants' marks.

8. Plaintiffs have shown a likelihood of dilution under the Delaware Antidilution statute.

### C. Discussion

Plaintiffs' marks are inherently distinctive, and thus qualify for protection under the Delaware Antidilution Statute.

Plaintiffs have also shown mental association between the marks. Few courts have

applied the Delaware Antidilution Statute, and the test for mental association is not entirely clear.

*See Spark Therapeutics, Inc. v. bluebird bio, Inc.*, 2022 WL 605724, at *13 (D. Del. Jan. 25,

2022). The *Spark* court considered the federal dilution factors, which are "similar to factors

adopted by courts in analyzing state anti-dilution statutes." *Id.* at *17. The federal dilution

factors are:

> (i) The degree of similarity between the mark or trade name and the famous mark.
> (ii) The degree of inherent or acquired distinctiveness of the famous mark.
> (iii) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.
> (iv) The degree of recognition of the famous mark.
> (v) Whether the user of the mark or trade name intended to create an association with the famous mark.
> (vi) Any actual association between the mark or trade name and the famous mark.

15 U.S.C. 1125(c)(2)(B). I think the federal dilution factors are helpful in assessing whether

there is some mental association between the marks, and therefore will consider the evidence

Plaintiffs presented for their Lanham Act claim of dilution by blurring.

As I found with regard to likelihood of confusion, the first and second factors favor

Plaintiffs.

The third factor, the extent to which the owner of the famous mark is engaging in

substantially exclusive use of the mark, favors Plaintiffs. Plaintiffs' marks are federally

registered. (Tr. 335:11–13). Plaintiffs have enforced their trademark rights over many years

through litigation, demand letters, and trademark oppositions at the Trademark Trial and Appeal

Board. (Tr. 339:2–352:9).

The fourth factor, the degree of recognition of Plaintiffs' mark, favors Plaintiffs. Here, I

think the Poret survey has a much stronger probative value. The Delaware antidilution statute

does not have the same temporal requirement as the federal antidilution statute. The Poret

survey is 2021 evidence offered to show the degree of recognition in 2021. Accordingly, the survey's finding of a 67% level of recognition suggests a high degree of recognition of Plaintiffs' mark.

The fifth factor, whether Defendants used Plaintiffs' mark with the intent to create an association with Plaintiffs' mark, favors Defendants. As discussed above, while Defendants knew about Plaintiffs' mark, there is no evidence that Defendants chose S&P to freeride on Plaintiffs' name recognition.

The sixth factor, actual association between the marks, favors Plaintiffs. As discussed in the context of likelihood of confusion, there is evidence of actual confusion. Some of Plaintiffs' examples of confusion have more force in the dilution context because they show association between the marks even if they do not show confusion. The website scraping, for instance, associated Plaintiffs' and Defendants' marks. Accordingly, I find this factor favors Plaintiffs.

Five out of six dilution factors favor Plaintiffs. Weighing the evidence, it seems likely that there is mental association between Plaintiffs' and Defendants' marks. This association is most powerfully shown through evidence of actual confusion, but the marks' distinctiveness, similarity, exclusivity, and degree of recognition all favor finding a likelihood of dilution by blurring. Accordingly, I find that Plaintiffs have shown dilution by blurring under the Delaware Antidilution Statute.

## VI.       LACHES

### A.  Legal Standard

Laches is an affirmative defense with two elements: (1) inexcusable delay in initiating suit and (2) prejudice to the defendant from the delay. *See Univ. of Pittsburgh v. Champion Prods. Inc.*, 686 F.2d 1040, 1044 (3d Cir. 1982). Delay is assessed based on the most analogous

statute of limitations. *Kars 4 Kids Inc. v. Am. Can!*, 8 F. 4th 209, 220 (3d Cir. 2021). If the

limitations period has expired, there is a presumption of laches. *Id.* at 221. A plaintiff can rebut

this presumption by showing that the delay was excusable and did not prejudice the defendant.

*Id.*

In Delaware, the statute of limitations on analogous state claims is three years. *Sanofi-*

*Aventis*, 453 F. Supp. 2d at 855–56. Here, Plaintiffs admit that, because Plaintiffs first learned of

Defendants' use in 2014, they bear the burden of rebutting the presumption of laches. (D.I. 136

at 29).

### B. Findings of Fact

1. Plaintiffs' delay in initiating suit is excusable due to the changing nature of Defendants'
   use of Defendants' mark.

2. Defendants have not suffered evidentiary prejudice due to the delay.

3. Defendants have not suffered economic prejudice due to the delay.

4. Plaintiffs have rebutted the presumption of laches.

### C. Discussion

Plaintiffs seek only injunctive relief. "[T]he doctrine [of laches] is sparingly applied

where . . . a plaintiff seeks only equitable relief." *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d

455, 461 (4th Cir. 1996). "Only 'outrageous, unreasonable, and inexcusable delay' bars all

claims for relief; less egregious delay bars claims for past infringement, not for prospective

injunctive relief." *Sanofi-Aventis*, 453 F. Supp. 2d at 856 (quoting *Univ. of Pittsburgh*, 686 F.2d

at 1044).

I find that the equities in this case favor granting an injunction. Plaintiffs' delay was not

so outrageous and unreasonable as to bar their claim for injunctive relief. The relevant period of

delay is 2014 to 2019, when the parties began settlement negotiations. (Tr. 363:18–23). "Time spent in attempting to resolve a dispute is not counted towards laches because [s]ettlement of legal disputes is a highly favored course of conduct for which a party should be rewarded, not penalized." McCarthy § 31:15 (citation and internal quotation marks omitted). Thus, Plaintiffs delayed only two years beyond the statutory period.

Plaintiffs argue that the delay is excused under the progressive encroachment doctrine. (D.I. 136 at 30). While the Third Circuit has not explicitly recognized the doctrine, in *University of Pittsburgh*, the Court found that a substantial change in the "character and scope" of infringement supported a finding that there was not unreasonable delay. 686 F. 2d at 1046. In that case, the defendant's activities expanded from "from a modest program of [merchandise] sales to students and local adherents of the university to a program of national sales aimed at servicing and capitalizing upon Pitt's emergence as a national college football power." *Id.* Here, Defendants' encroachment is not as stark. There is, however, evidence that Defendants made a concerted effort to unify their advertising and marketing around "S&P Data" rather than "SP Data" between 2014 and 2019. I think that this, combined with the relatively short period of delay, makes Plaintiffs' delay excusable.

In this case, the earliest evidence of confusion—the 2014 KeyBank incident—supports the inference that Defendants were still using "SP Data" fairly prominently when Defendants' use of the mark first came to Plaintiffs' attention. After Defendants' executive assistant reached out to KeyBank, the message was forwarded to one of Plaintiffs' employees, Laura Albert. (PTX-78; Tr. 284:25–285:14, 287:13–22). Ms. Albert forwarded the message to her manager with the note, "Can you please take a look at the below? They are trying to represent S&P and are in fact SP Data." (*Id.*). Ms. Albert testified that she did not remember why she said that

Defendants "are in fact SP Data" at the time but speculated that she did some research upon

sensing that her client—KeyBank—was confused. (Tr. 291:6–13, 293:24–294:9). I credit Ms.

Albert's testimony on the steps she likely took upon receiving the KeyBank message. In light of

Defendants' mixed use of "SP Data" and "S&P Data" during the relevant time period, it seems

likely that Ms. Albert encountered materials referring to Defendants as "SP Data." (*See* PTX-88;

Tr. 489:1–16).

 After Plaintiffs first became aware of Defendants' use of "S&P," Defendants became

more intentional about branding. Around 2014, Defendants made the effort to identify solely as

"S&P Data." (Tr. 467:20–22). In 2015, Defendants hired a consultant who identified branding

as a weakness for the company. (Tr. 297:21–298:25; 300:11–17). That same year, they

developed a new logo that increased the prominence of the ampersand and "S&P:"





Old logo. (PTX-66; Tr. 312:8–313:22)    New logo.  (PTX-68; Tr. 313:23–314:1)

The new logo features "S&P" more prominently.  The evidence suggests that Defendants' use of

"SP Data" has tapered off in recent years.  In this light, it seems reasonable that Plaintiffs did not

immediately file suit or take other action in 2014.

 I also think that there was no prejudice to Defendants.  Defendants assert both

evidentiary prejudice and economic prejudice.  For evidentiary prejudice, Defendants argue that

the delay deprived Defendants of the opportunity to conduct a recognition survey to show

Plaintiffs' lack of fame as of 2004.  While a fame survey closer in time to relevant period would

have more probative value, it is difficult to say that a survey conducted in, say, 2016, would have

much more probative value than one conducted in 2021. At any rate, Plaintiffs have not met their burden of showing fame and Defendants have not been prejudiced in that regard.

Defendants also point to McGraw-Hill's late-1990s opposition to the Canadian company's "S&P Data" registration. (D.I. 139 at 35). Defendants assert that additional documents might have been found, and the testimony of S&P Data's outside counsel, who died in 2016, could have been taken. The Canadian registration dispute is relevant to Defendants' knowledge of Plaintiffs' mark. Plaintiffs have used it to argue bad faith based on Defendants' selection of "S&P" despite knowing about McGraw Hill's previous opposition to it. Given that Mr. Plashkes was not personally involved in the matter, however, it is difficult to see how more details regarding the incident would help Defendants.

Accordingly, there is no substantial evidentiary prejudice.

Regarding economic prejudice, Plaintiffs argue, "The mere fact that Defendants expanded their business after 2014 does not constitute economic prejudice." (D.I. 136 at 36). I agree. Defendants point to increased spending on advertising and opening new facilities under the S&P Data name. (D.I. 139 at 36). "If . . . prejudice could consist merely of expenditures in promoting the infringed name, then relief would have to be denied in practically every case of delay." *Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 615 (7th Cir. 1965). Rather, economic prejudice occurs when the defendant has "buil[t] up innocently an important reliance on the publicity of his mark[] so that its loss would cost dearly." *Chandon Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531, 535 (2d Cir. 1964); *see also Univ. of Pittsburgh*, 686 F.2d at 1045 (noting that laches gives "rise to affirmative rights in the defendant as a result of detrimental reliance").

34

Here, the evidence does not reflect Defendants' reliance upon the publicity of "S&P Data." As discussed with regard to likelihood of confusion, Defendants' sales process is long and personalized. Sales are primarily "founder-led[, ] developed through relationships . . . with former clients." (Tr. 453:8–12). As Mr. Borts, Defendants' principal, testified, "I mean, listen. People don't wake up in the morning and think, oh, I'm going to call S&P Data for call center services." (Tr. 516:14–16).

The opening of additional call centers under the "S&P Data" banner similarly does not show prejudice to Defendants. The call centers are not retail stores that attract the general public. Call center employees only disclose Defendants' name when required to by state law. Where required by state law, they state that they are calling from S&P Data on behalf of Defendants' clients. (Tr. 459:25–460:9 ("Hi. This is David Borts from S&P Data calling on behalf of T-Mobile.")).

Plaintiffs have rebutted a presumption of laches. Plaintiffs' delay was reasonable and Defendants did not encounter material prejudice.

## VII.    RELIEF

Plaintiffs seek a permanent injunction. "According to well-established principles of equity, a plaintiff seeking a permanent injunction must . . . demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

"The law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion." *Citizens Fin. Grp., Inc. v. Citizens*

*Nat. Bank of Evans City*, 383 F.3d 110, 131 (3d Cir. 2004) (citing *Lapp*, 721 F. 2d at 462). "A permanent injunction is the usual and normal remedy once trademark infringement has been found in a final judgment." McCarthy § 30.1.

Under 15 U.S.C. § 1116(a), a "plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction." Since I have found a violation of the Lanham Act, the presumption applies. Defendants argue that this presumption is rebutted because of Plaintiffs' delay. (D.I. 139 at 39 (citing *Harley's Hope Found. v. Harleys Dream*, 2022 WL 1154526, at *3 (D. Colo. Apr. 19, 2022)). I do not think the delay in this case rebuts the presumption because, as I have found, Plaintiffs' delay was excusable.

The other *eBay* factors also favor Plaintiffs. Remedies available at law would not be able to compensate Plaintiffs for their loss of control over their reputation. (Tr. 364:9–25); *see AAMCO Transmissions, Inc. v. Dunlap*, 646 F. App'x 182, 183 (3d Cir. 2016). Defendants' hardships are not so great where, as discussed above, there is little evidence of economic harm and Defendants used the name "SP Data" interchangeably for many years.[1] Finally, the public interest would be served by a permanent injunction by preventing consumer confusion.

Accordingly, I will grant Plaintiffs' requested relief of a permanent injunction.[2]

## VIII.    CONCLUSION

For the foregoing reasons, I find that Plaintiffs have proven Counts I, II, and VI by showing trademark infringement under 15 U.S.C. § 1114(1), false designation of origin under 15

---

[1] Plaintiffs do not take issue with "SP Data." (D.I. 135 at 7:11–16; D.I. 136 at 39 (describing "Defendants' original SP Data name" as available)).

[2] I do not need separately to consider injunctive relief pursuant to the Delaware statute, 6 Del. C. § 3313.

U.S.C. § 1125(a), and trademark dilution under 6 Del. C. § 3313.  I will grant Plaintiffs'
requested relief of a permanent injunction.

 The parties are instructed to meet and confer about how to proceed from this point.  The
parties are asked to submit a joint status report within one week, preferably with a jointly
proposed final judgment and permanent injunction.